## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---

In re:                                          :        Chapter 11
                                                :
EMIVEST AEROSPACE CORPORATION,                  :        Case No. 10-13391 (MFW)
                                                :
Debtor.[1]                                      :
                                                :
                                                :
                                                :

---

## DECLARATION OF ANTHONY POWER IN SUPPORT OF THE
## DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Anthony Power, under penalty of perjury, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.        I am the chief executive officer of Emivest Aerospace Corporation ("Emivest" or the "Company"), the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case").

2.        On October 20, 2010 (the "Petition Date"), Emivest filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

3.        In my capacity as chief executive officer of Emivest, I am generally familiar with the day-to-day operations, business and financial affairs, and books and records of the Debtor. I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of the Chapter 11 Case, and in support of (i) the Debtor's voluntary petition for relief under chapter 11 of the Bankruptcy Code,

---

[1] The last four digits of the Debtor's federal tax identification number are 8827. The Debtor's mailing address and corporate headquarters is 1770 Skyplace Blvd., San Antonio, TX 78216.

and (ii) relief, in the form of motions and applications, that the Debtor has requested of the Court on the Petition Date (the "First Day Motions").

4.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. Unless otherwise indicated, the financial information contained herein is unaudited.

5.     This Declaration is intended to provide a summary overview of the Debtor and this Chapter 11 Case. Part I of this Declaration provides an overview of the Debtor's business and corporate history. Part II provides a description of the Debtor's organizational and capital structures. Part III provides a discussion of the events leading to the commencement of this Chapter 11 Case. Part IV sets forth relevant facts in support of the Debtor's First Day Motions.

6.     If I were called to testify, I would testify competently to the facts set forth in this Declaration and I am authorized to submit this Declaration on behalf of the Debtor.

## PART I

### The Debtor's Business and Corporate History

7.     Emivest (formerly known as Sino Swearingen Aircraft) is a U.S. based aircraft manufacturing company that produces business jets, including the SJ30, the world's fastest, highest flying and longest range, light business jet.[2] Emivest has its origins stemming from Swearingen Aircraft, which was founded by aircraft designer Ed Swearingen in 1958. Early work by Swearingen's company included the development of prototype aircraft for other

---

[2]     Emivest holds all rights and design IP to the SJ30 business jet.

manufacturers. Subsequently, in 1995, Swearingen founded Sino Swearingen Aircraft Corporation ("SSAC"), which was committed to developing a new small jet for the general aviation market. The project was primarily funded by entities affiliated with the government of Taiwan. SSAC spent over 12 years, and in excess of $700 million in total investment, in the development of the SJ30 aircraft.

8. The SJ30 is the first new concept business jet to come onto the market since 1963. The SJ30 significantly outperforms its competitors in terms of performance efficiency, including speed, distance and cost. In late 2008, the SJ30 set a world speed record, for an aircraft under 20,000 pounds, flying from London to Dubai in seven hours and seven minutes (including a 41-minute stop to refuel in Istanbul). In addition to its performance capabilities, the SJ30 fills a void in the business jet marketplace by providing its customers with luxury features and comfort. For example, the SJ30 significantly improves passenger comfort and customer experience by maintaining sea level pressurization at altitudes up to 41,000 feet, substantially reducing fatigue and dehydration, improving safety and increasing passenger productivity.

9. In 2005, the SJ30-2 gained its FAA certification and customer deliveries commenced in 2006 and 2007. Around this time, the Taiwanese government chose to pursue an alternative industrial strategy and sought a new majority investor for SSAC. In 2008, Emivest Aviation (US) LLC ("Emivest Aviation") acquired a controlling interest in SSAC by way of a merger of SSAC with Emivest Acquisition Corporation, a wholly-owned subsidiary of Emivest Aviation (US) LLC. Subsequent to the merger, SSAC changed its name to Emivest Aerospace Corporation.

10.     The Company's headquarters, development center and assembly facilities are located in San Antonio, Texas.[3] The facility is comprised of 130,000 square feet of built-up space with direct access to the San Antonio International Airport's main runway. This location holds many strategic advantages for an aircraft manufacturer as it is the home to many U.S. government Air Force bases. The Company leases a second facility, totaling 12,800 square feet, also at the San Antonio International Airport, which is used as a test facility and FAA repair station. Production for the Company takes place in an company-owned assembly facility located in Martinsburg, West Virginia.[4]

11.     The Company retails aircraft directly to individuals through a combination of its own sales force and its three distributors, located in the US, UK and Germany. Over the course of its operations, the Company has built up an extensive customer order book and currently has a five-year order backlog (over 200 aircraft on order, backed by non-refundable deposits). The average aircraft price is $7.2 million. The most recent order was delivered in November 2009.

12.     At the present time, the Company has three aircraft at various stages of production which it intends to deliver to the purchasers. If the Company obtains the necessary financing to fund the working capital investment to complete these aircraft, each in-progress SJ30 could be completed over the next 24 months to yield a net positive cash flow of approximately $2.5 million upon completion.

---

[3]     The Company leases the land on which this facility is built.

[4]     The Company leases the land on which this facility is built.

# PART II

## The Debtor's Organizational Structure

13.     The Company is a Delaware corporation, incorporated on November 5, 1999.  In June 2008, subject to the terms and conditions of an Agreement and Plan of Merger (the "Merger Agreement"), Emivest Aviation acquired an 80% controlling interest in the Company.[5]  As part of the Merger Agreement, the Company, which at the time was named Sino Swaringen Aircraft Corporation, changed its name to Emivest Aerospace Corporation.  An entity controlled by the Taiwanese government and several smaller investors hold the balance of the shares, including the SJ30's principal designer, Ed Swearingen, and one of the original founders of the Company, Doug Jaffe.  The current board of directors is composed of nine directors, seven of which are from Emivest (US) LLC and two of which have been appointed from the Taiwanese entity.

## The Debtor's Capital Structure

### A.     Prepetition Credit Facility

14.     During 2009, the Company entered into a revolving credit agreement in the aggregate principal amount of up to $97.5 million (the "Prepetition Revolving Credit Agreement") with Emivest Aviation (the "Prepetition Secured Party").  The note matures on March 31, 2011, and bears interest at 7% per annum, calculated on the outstanding daily balance.  As of October 18, 2010, an aggregate principal amount of $35,841,439.91, together with accrued interest in the amount of $2,857,059.59, was outstanding under the Prepetition Revolving Credit Agreement.

---

[5]     Emivest Aviation (US) LLC, a Delaware limited liability company, is directly controlled by Emirates Investment & Development Company PSC.

15.     The Company's obligations under the Prepetition Revolving Credit Agreement are secured by substantially all of the Company's assets.

**B.      Yao-Hwa Glass Co., LTD Promissory Note**

16.     The Company also owes approximately $15 million on account of its obligations under a certain promissory note by the Company to Yao-Hwa Glass Co., LTD, dated as of June 6, 2008 (the "Yao-Hwa Promissory Note").  Under the terms of the Yao-Hwa Promissory Note, the note is to be repaid in three equal installments of $5 million in June of each of 2014, 2019, and 2024.  The Yao-Hwa Promissory Note is an unsecured obligation.

**C.      Security Air Park Promissory Note**

17.     In addition to the Prepetition Revolving Credit Agreement and Yao-Hwa Promissory Note, the Debtor owes approximately $250,000 on account of its obligations under that certain promissory note by the Company to Security Air Park, Inc., dated as of April 15, 2008 (the "Air Park Promissory Note"), plus accrued and unpaid interest thereon.  The Air Park Promissory Note is an unsecured obligation of the Debtor and is due and payable in 120 equal monthly installments of $3,561.05 beginning on May 15, 2008 and ending on April 15, 2018.

**D.      Other Unsecured Debt**

18.     In addition to the foregoing, as of September 2010, the Debtor had approximately $4.75 million in unpaid ordinary course trade debt, consisting of approximately $4.5 million in trade accounts payable and $250,000 in connection with purchases for which invoices had not yet been received.

# PART III

## Events Leading to the Chapter 11 Case

### A.    Arbitration Proceedings

19.    In recent years, the Company has been involved in a number of arbitration proceedings.  On November 12, 2009, an arbitration award was entered against the Company in connection with an agreement entered into with Wells Fargo Securities, LLC (f/k/a Wachovia Capital Markets, LLC) ("Wells Fargo") to assist the Company in raising capital equity.  The agreement stipulated that the bank would serve as the exclusive placement agent related to any issuance of preferred stock, common stock, or other equity offerings during a period of time.  As discussed above, in June 2008, the Company entered into an agreement with Emivest Aviation to raise $50,000,000 of equity in connection with the Merger Agreement.  Wells Fargo claimed that under the terms of its agreement with the Company, it was owed a transaction fee, even though it was not directly involved in the equity transaction.  The Commercial Arbitration Tribunal of the American Arbitration Association ruled in favor of Wells Fargo and awarded Wells Fargo $4,219,139 (the "Award").

20.    On June 7, 2010, the Company entered into a Forbearance and Security Agreement (the "Forbearance Agreement") with Wells Fargo.  The material terms of the Forbearance Agreement are as follows.  Wells Fargo agreed to forbear from exercising its rights and remedies to collect on the Award against the Company, in exchange for the Company paying Wells Fargo a total of $700,000 in monthly installments beginning on June 30, 2010 and continuing through December 31, 2010.  Pursuant to the Forbearance Agreement, the Company pledged, assigned, and granted Wells Fargo a security interest in all claims, demands, causes of

action, and rights of recovery against any person or entity that my be liable to the Company in connection with the Award.  As of the Petition Date, a total of $225,000 has been paid by the Company to Wells Fargo.

21.    In connection with the Award, Emivest Aviation and the Company have initiated an arbitration to enforce their rights of indemnity from certain of the Company's minority shareholders.    The arbitration proceeding with the Judicial Arbitration and Mediation Services/Endispute was initiated on March 4, 2010 against these shareholders (the "Indemnity Arbitration I").  The Indemnity Arbitration I is currently pending.

22.    In a separate arbitration action against the Company's minority shareholders, Emivest Aviation and the Company are requesting that the former shareholders of SSAC indemnify the Company for Sino Swearingen's failure to disclose technical and/or design issues that have materially impaired the production and/or sale of the SJ30 and for which the Company has incurred significant costs.  The action was commenced on May 25, 2010 and is currently pending before the Judicial Arbitration and Mediation Services/Endipsute.

**B.    Lack of Working Capital**

23.    Since commencing commercial production in late 2005, the Company has suffered from a lack of sufficient working capital resources to fund materials necessary in the production process.  Moreover, the Company has incurred significant work in process write-downs for product cost in excess of anticipated sales price as a result of the inherent production inefficiencies and low initial production volumes typically associated with transitioning a complex product from development to commercial production.

## C. Global Economic Crisis and Restructuring Efforts

24.     Shortly after the rebirth of SSAC as Emivest Aerospace in 2008, the global economic downturn severely hit the business aviation industry, along with every other industrial sector.   The global financial crisis has drastically reduced the demand for business jets, especially in the category of small and medium sized jets, worth $4 million to $24 million.   The macroeconomic difficulties have led the business jet customer base to reduce their travel budgets for business and private flights and has resulted in the cancellation or delay of many orders. Demand for business jets was also damaged by public indignation over lavish corporate expenditures at a time when tens of thousands of workers are losing their jobs.   As a result of the difficult business and retail environment, as well as the bad publicity, the Debtor has faced decreases in its cash flow and future orders.

25.     Despite the circumstances that contributed to the Debtor's current liquidity challenges, the Company remains an industry leader and its products offer a unique new entrant into the market of high speed luxury business jets.   This case has been initiated to enable the Company to obtain debtor-in-possession financing and to stabilize its business while it seeks a long-term strategic solution or to otherwise maximize the value of its assets through a sale or reorganization.   In furtherance of these objectives, the Company has implemented cost savings measures, including renegotiating more favorable terms for service contracts, reducing frequency of waste removal pickups, returning vending machines, and suspending the Company's voluntary 401(k) matching.   Since June 2009, the Company has also laid off approximately 150 full-time employees.

26.     Notwithstanding the above-referenced cost-saving measures, the Company remains over-leveraged and is facing significant liquidity constraints.   Given this current position, the Company simply cannot continue to operate outside of chapter 11.

27.     In July 2010, the Company retained Morgan Joseph & Co. Inc. ("Morgan Joseph") as its investment banker and financial advisor.  Prior to filing this Chapter 11 Case, the Debtor, with the assistance of Morgan Joseph, pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of certain or all of the Debtor's assets or businesses.

## PART IV

## Summary of First Day Motions and Applications[6]

28.     To enable the Debtor to operate effectively and to avoid the adverse effects of the chapter 11 filing, the Debtor has filed, or will file upon scheduling of a further hearing by this Court, the motions (the "First Day Motions") described below.

29.     In connection with the preparation for this bankruptcy case, I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance or the input and assistance of employees working under my supervision and bankruptcy counsel.  I believe the information contained in the First Day Motions is accurate and correct.  As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtor's reorganization efforts.

---

[6] Capitalized terms used but not defined in this section have the meanings given them in the applicable First Day Motion.

**A.    Motion of Debtor for Entry of an Order Pursuant to Bankruptcy Rule 1007(c) and Local Rule 1007-1(b) Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs**

30.    The Debtor seeks entry of an order extending the time within which it must file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and a statement of financial affairs (collectively, the "Schedules and Statement") through the date that is the sixtieth (60th) day after the Petition Date.

31.    Given the size and complexity of its business and the fact that certain prepetition invoices have not yet been received or entered into the Debtor's financial accounting systems, the Debtor has not had the opportunity to gather the necessary information to prepare and file the Schedules and Statement.

32.    In addition, due to the voluminous books and records and a complex system of accounting, collection of the information necessary to complete the Schedules and Statement will require substantial time and effort on the part of the Debtor and its employees.  As a result, the Debtor will not be able to satisfactorily prepare accurate Schedules and Statement within thirty days of the Petition Date as outlined in Bankruptcy Rule 1007(c) and Local Rule 1007-1(b).

33.    At this juncture, I believe that an extension through the date that is the sixtieth (60th) day after the Petition Date will provide sufficient time to prepare and file the Schedules and Statement.

**B.    Debtor's Application for Entry of An Order Authorizing Employment and Retention of DLA Piper LLP (US) as Special Counsel for the Debtor *Nunc Pro Tunc* to the Petition Date**

34.    The Debtor seeks authorization to retain and employ DLA Piper LLP (US) ("DLA Piper") as special counsel *nunc pro tunc* to the Petition Date.  DLA Piper has represented the

Company in general corporate matters for a number of years and in the course of this representation has become familiar with the Debtor's assets, business operations, financial affairs, corporate and capital structures, and therefore is in the best position to advise the Debtor in connection with the sale of its assets in this bankruptcy case.

35.     I believe that the professional compensation to be charged by DLA Piper is reasonable and that DLA Piper does not represent or hold any interest adverse to the Debtor or to the estate with respect to the matter on which DLA Piper is to be employed. The engagement and retention of DLA Piper on the terms and conditions set forth in the Application is necessary and in the best interests of the Debtor, its estate, and its creditors.

**C.      Debtor's Motion for Entry of An Order Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) and Local Bankruptcy Rule 2002-1(f) Authorizing the Retention of Donlin, Recano & Company, Inc. as Claims, Noticing, and Balloting Agent to the Debtor and Debtor in Possession**

36.     The Debtor seeks authorization to retain Donlin, Recano & Company, Inc. ("Donlin Recano") as its claims, noticing and balloting agent ("Agent"). Upon information and belief, Donlin Recano is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe Donlin Recano is well qualified to serve as Agent in this case. The employment of Donlin Recano will also provide with efficient management of the claims, noticing and balloting processes in this case, thereby leaving the Debtor's management and advisors to focus on the Debtor's reorganization efforts.

**D.      Debtor's Application for Entry of An Order Authorizing Employment and Retention of Morgan Joseph & Co. Inc. as Financial Advisors *Nunc Pro Tunc* to the Petition Date**

37.     The Debtor seeks authorization to retain and employ Morgan Joseph & Co. Inc. ("Morgan Joseph") as its Financial Advisors *nunc pro tunc* to the Petition Date. Morgan Joseph

has become uniquely situated to provide financial advisory services to the Debtor in pursuit of a restructuring transaction, financing transaction and/or sale transaction(s). The Debtor has chosen Morgan Joseph to act as its Financial Advisor post-petition because Morgan Joseph has substantial expertise in financial restructurings, financing transactions and distressed mergers and acquisitions, and is well qualified to perform these services and represent the Debtor's interest in this Chapter 11 Case.

38.     I believe that the professional compensation to be charged by Morgan Joseph is reasonable and that Morgan Joseph is a "disinterested person" within the meaning of Bankruptcy Code section 101(14). The engagement and retention of Morgan Joseph on the terms and conditions set forth in the Application is necessary and in the best interests of the Debtor, its estate, and its creditors.

**E.     Motion for Entry of an Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Rule 2016-2 of the Local Rules Establishing Procedures for the Interim Compensation and Reimbursement of Expenses of Professionals**

39.     By this Motion, the Debtor requests, pursuant to sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, and Local Rule 2016-2, entry of an order establishing procedures for the monthly allowance and payment of compensation and reimbursement of expenses for professionals whose retentions are approved by this Court pursuant to sections 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) (collectively, the "Professionals"). In addition, the Debtor seeks approval of procedures for reimbursement of reasonable out-of-pocket expenses

incurred by members of any committee appointed in this case pursuant to section 1102 of the Bankruptcy Code.

40.     The Debtor submits, and I believe, that such an order will streamline the professional compensation process and enable the Court, the United States Trustee for the District of Delaware (the "U.S. Trustee"), and all other parties in interest to closely monitor the costs of administration, forecast cash flows, and implement efficient cash management procedures.  Moreover, these procedures will also allow the Court and the key parties in interest, including the U.S. Trustee, to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

**F.     Motion for Entry of Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rule 4001, and Local Rule 4001-2 (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection; and (IV) Scheduling a Final Hearing.**

41.     As set forth above, the Debtor is currently facing severe liquidity restraints. Without immediate access to working capital, the Debtor will be unable to fund its day-to-day business operations during the pendency of this Chapter 11 Case, which would adversely affect the value of the Debtor's business as a going concern.  The Debtor requires a postpetition financing commitment to preserve the value of the estate.

42.     Accordingly, the Debtor is seeking authorization to obtain postpetition financing in an aggregate amount not to exceed $4,000,000 (the "DIP Facility").  The Debtor is seeking to access $1,000,000 of the DIP Facility on an interim basis.

43.     In connection with the Debtor's restructuring efforts, Morgan Joseph, on behalf of the Debtor, contacted approximately forty-five (45) financial institutions to determine whether

they were interested in providing postpetition financing to the Debtor. Substantially all of those financial institutions contacted spoke with the Debtor and/or its advisors regarding various diligence items and were provided with diligence information concerning the Debtor.

44.     Of the forty-five financial institutions that were contacted, three (3) submitted term sheets to the Debtor and its advisors regarding postpetition financing, including the DIP Agent. The Debtor and its advisors reviewed these term sheets and engaged in extensive negotiations with these parties in an effort to obtain postpetition financing on the best possible terms.

45.     The Debtor ultimately decided that the proposal for debtor in possession financing advanced by the DIP Lenders was the best available under the circumstances and adequately addressed the Debtor's reasonably foreseeable working capital needs, while maintaining the going concern value of the Debtor's business. The Prepetition Secured Party, the Texas Comptroller, and Wells Fargo have consented to having their liens primed in exchange for certain adequate protections as set forth in the DIP Motion which include, with respect to the Prepetition Secured Party, the granting of replacement liens and superpriority claims in respect of any diminution in value and, with respect to Wells Fargo and the Texas Comptroller, the granting of superpriority claims, replacement liens, and payments out of the proceeds of the DIP Facility in partial satisfaction of Wells Fargo's and the Texas Comptroller's claims against the Debtor.

46.     The DIP Documents were negotiated in good faith and at arm's length among the parties, culminating in a carefully-crafted agreement designed to maintain the Debtor's business as a going concern pending a sale and preserve value for all parties in interest. Given the urgent

needs of the Debtor to obtain financial and operational stability for the benefit of all parties in interest, the terms of the proposed DIP Documents are the best available. The DIP Documents reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by fair consideration.

47.    The consulting and market services to be provided by the DIP Agent with respect to the Leased Properties and the Tangible and Other Assets upon the occurrence of an Event of Default, as set forth in Article VII of the DIP Credit Agreement, are fair and reasonable and are in the best interest of the Debtor's estate. The DIP Agent has considerable expertise in providing these services and its provision of these services as set forth in the DIP Facility will maximize value for the estate.

48.    The funds provided by the DIP Facility are essential to enable the Debtor to maintain the value of its assets and business through the pendency of this Chapter 11 Case. If the Debtor is unable to access the DIP Facility, the going-concern value of its business will be irreparably harmed which, in turn, will adversely affect the value ultimately received by stakeholders.

**G.    Motion for Entry of an Order Pursuant to Sections 105(a), 363 and 345 of the Bankruptcy Code and Local Rule 2015-2 Authorizing the Debtor to (I) Maintain and Use Its Existing Bank Accounts and Business Forms and (II) Maintain and Use Its Existing Cash Management System**

49.    The Debtor seeks an order authorizing the Debtor to (i) maintain and use its existing bank accounts and business forms and (ii) maintain and use its existing cash management system. In connection with this relief, the Debtor respectfully requests a waiver of certain of the Guidelines established by the U.S. Trustee in this District that require the Debtor to

close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationary.

50.     As described in detail in the motion, the Debtor maintains a cash management and disbursement system in the ordinary course of its operations (the "Cash Management System"). The Cash Management System allows the Debtor to effectively collect cash receipts and make disbursements to satisfy obligations to the Debtor's creditors.  To lessen the disruption caused by the bankruptcy filing and maximize the value of its estate in this chapter 11 proceeding, it is vital that the Debtor maintain its Cash Management System.

51.     The Debtor maintains current and accurate accounting records of daily cash transactions and submits that the continuation of this Cash Management System will help prevent undue disruption to the Debtor's business operations while protecting the Debtor's cash for the benefit of the estate.  Therefore, I believe that the relief sought in the Cash Management Motion is essential and in the best interests of the Debtor's estate.

**H.      Motion for Entry of an Order Pursuant to Sections 105(a), 363(b), and 507(a) of the Bankruptcy Code (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Compensation, and Employee Benefits, and (B) Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing**

52.     By the Wage Motion, the Debtor seeks authority to, among other things, satisfy certain of its prepetition obligations to its current employees (the "Employees") and independent contractors (the "Independent Contractors"), reimburse Employees and Independent Contractors for prepetition expenses that were incurred on behalf of the Debtor and pay prepetition payroll-

related taxes associated with the Debtor's employee wage claims and other similar tax obligations. This relief is critical to the Debtor's business and reorganization efforts.

53. In addition, the Debtor is requesting an order authorizing the banks at which the Debtor maintains its debtor in possession operating account relating to payroll to receive, process, honor and pay all payroll and employee benefit-related checks, drafts, wires, or automated clearing house transfers, provided sufficient funds are available to honor all such payments, without regard to when the applicable payroll check was issued.

54. I believe that any delay in paying prepetition employee obligations will adversely impact the Debtor's relationship with its Employees and Independent Contractors and will irreparably impair the Employees' and Independent Contractors' morale, dedication, confidence and cooperation in the chapter 11 process. At this early stage in the case, the Debtor simply cannot risk the substantial damage to its business that would inevitably result from a decline in the Employees' and Independent Contractors' morale and cooperation attributable to the Debtor's failure to pay wages, salary, benefits and other similar items.

I. **Motion of Debtor for Entry of Interim and Final Orders Pursuant to Section 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services to, or Discriminating Against, the Debtor on Account of Prepetition Invoices, (II) Determining that the Utilities are Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

55. By this motion, and to ensure the continued provision of utility services (the "Utility Services") to the Debtor, the Debtor seeks entry of an order prohibiting providers of utility services (the "Utility Companies") from altering, refusing, or discontinuing services to, or discriminating against the Debtor on account of prepetition invoices, determining that the Utility Companies are adequately assured of future payment, and establishing procedures for determining adequate assurance of payment. The Debtor proposes to establish a segregated

account into which the Debtor will deposit the sum of approximately $20,000, which is equal to approximately two weeks of Utility Services calculated on a historical basis (collectively, the "Utility Deposit") and, additionally, has proposed procedures to address any request made by the Utility Companies for additional adequate assurance.

56.     Any disruption of the Utility Services at the Debtor's headquarters, maintenance or production locations would cause irreparable harm to the Debtor's business operations and its estate.   The Debtor has established a good payment history with virtually all of its Utility Companies.  To the best of the Debtor's knowledge, the Debtor has no defaults or arrearages of any significance with respect to the Debtor's undisputed Utility Services invoices.   For the forgoing reasons, the Debtor submits, and I believe, that the relief requested in this motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved.

**J.      Motion for Entry of an Order (I) Authorizing the Debtor to Reinstate Prepetition Insurance Coverage and Pay Prepetition Amounts Under Its Insurance Programs, and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing**

57.     By this Motion, the Debtor seeks authority to pay certain prepetition obligations owing under its Insurance Programs in order to reinstate and continue its prepetition insurance coverage.   In the ordinary course of its business, the Debtor maintained various Insurance Programs providing coverage for, among other things, general liability, property damage, workers' compensation, and directors and officers liability.   These Insurance Programs are essential to the preservation of the Debtor's business, properties and assets.

58.     Due to its financial difficulties, the Debtor was unable to pay certain installment amounts as such payments came due and, as a result, the Insurance Policies were cancelled.  The Debtor is requesting authority to pay all past due amounts in order to reinstate the Insurance

Policies.[7] The reinstatement and continuation of the Debtor's Insurance Programs is critical to the ongoing operation of its business and necessary to protect the estate from potentially substantial liability. For the forgoing reasons, the Debtor submits, and I believe, that the relief requested in this motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved.

---

[7] The Debtor believes it may not be able to obtain new insurance policies from different carriers on equal or better terms as the Insurance Policies; however, it is still exploring this option in an effort to obtain the best deal available.

## CONCLUSION

In furtherance of the reorganization efforts, the Debtor respectfully requests that the orders granting the relief requested in the First Day Motions be entered.

Dated: October 21, 2010

Anthony Power
CEO
Emivest Aerospace Corporation