## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| EMIVEST AEROSPACE CORPORATION, | : | Case No. 10-13391 (MFW) |
| Debtor.[1] | : | |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507, BANKRUPTCY RULE 4001, AND LOCAL RULE 4001-2 (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION; AND (IV) SCHEDULING A FINAL HEARING

Emivest Aerospace Corporation, as debtor and debtor in possession (the "Debtor" or the "Borrower") in the above-captioned chapter 11 case, by and through its proposed counsel, Morris, Nichols, Arsht & Tunnell LLP, hereby files this motion pursuant to sections 105(a), 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (the "Interim Order"), substantially in the form annexed hereto as Exhibit A, and a final order (the "Final Order" and, together with the Interim Order, the "Orders"), authorizing the Debtor to (a) enter into a financing arrangement (the "DIP Facility") as provided for in the Debtor-in-Possession Credit and Security Agreement, substantially in the form attached hereto as Exhibit B, (b) use Cash

---

[1] The last four digits of the Debtor's federal tax identification number are 8827. The Debtor's mailing address and corporate headquarters is 1770 Skyplace Blvd., San Antonio, TX 78216.

Collateral (as defined below), (c) grant liens and provide super-priority administrative expense status, (d) grant adequate protection, and (e) prescribe the form and manner of notice and scheduling hearings with respect to the relief requested herein (the "Motion"). In support of the Motion, the Debtor, by and through its undersigned proposed counsel, respectfully represents as follows:

## RELIEF REQUESTED

1. By this Motion, the Debtor is seeking, inter alia:

    (a) authorization to obtain senior secured postpetition financing, consisting of a term loan facility in an amount not to exceed $4,000,000 (the "DIP Facility"), substantially on the terms and conditions set forth in the Debtor-in-Possession Credit and Security Agreement (the "DIP Credit Agreement" and, together with any and all other related documents and agreements entered into in connection with or related to the DIP Facility, the "DIP Documents"), by and among the Debtor, Counsel RB Capital, LLC, as agent and lender ("Counsel RB" or "DIP Agent") and EAI Capital, LLC (together with Counsel RB, the "DIP Lenders");

    (b) authorization for the Debtor to enter into the DIP Credit Agreement and to perform such other and further acts as may be necessary or appropriate in connection with the DIP Credit Agreement;

    (c) subject only to the Carve-Out and Permitted Liens,[2] to grant DIP Lenders super-priority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in connection with all claims of the DIP Lenders under the DIP Credit Agreement;

    (d) as security for the repayment of the borrowings and all other fees and obligations arising under the DIP Credit Agreement, authorization to grant to the DIP Lenders security interests in and liens upon the DIP Collateral, subject to the Carve-Out and Permitted Liens;

    (e) authorization to use cash collateral, within the meaning of section 363(a) of the Bankruptcy Code, and authorization to use the proceeds of the DIP Facility to fund the costs associated with the Debtor's chapter 11 bankruptcy filing and the maintenance of the Debtor's assets while the Debtor is marketed for sale as a going concern;

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the DIP Credit Agreement. To the extent that there is any conflict between this Motion and the Interim Order, the Interim Order shall control.

(f)     pursuant to section 362 of the Bankruptcy Code, modification of the automatic stay to the extent set forth in the DIP Credit Agreement;

(g)     pursuant to Bankruptcy Rule 4001, to schedule a preliminary hearing on this Motion and obtain authorization, from the entry of the Interim Order until the final hearing (the "Final Hearing"), to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate; and

(h)     pursuant to Bankruptcy Rule 4001, to schedule a Final Hearing on this Motion and to establish notice procedures in respect of the Final Hearing by this Court to consider entry of the Final Order authorizing the Debtor to borrow the balance of the DIP Facility on a final basis.

## BACKGROUND

2.      On October 20, 2010 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No trustee, examiner, or creditors' committee has been appointed in this chapter 11 case.

4.      The factual background regarding the Debtor, including its current and historical business operations and the events precipitating this chapter 11 filing, is set forth in detail in the Declaration of Anthony Power in Support of the Debtor's Chapter 11 Petition and First Day Pleadings (the "Power Declaration"), and is incorporated herein by reference.

A.      **The Prepetition Secured Indebtedness**

5.      As set forth in the Power Declaration, to evidence the Debtor's indebtedness in respect of a certain loan received from Emivest Aviation (US) LLC (the "Prepetition Secured Party"), the Debtor executed a certain Secured Revolving Note, dated as of January 1, 2009 (the "Prepetition Secured Note") in favor of the Prepetition Secured Party in the original principal

amount of $97,500,000. The Debtor's obligations under the Prepetition Secured Note bear interest at a rate of seven percent (7%) per annum. As of October 18, 2010, an aggregate principal amount of $35,841,439.91, together with accrued interest in the amount of $2,857,059.59, was outstanding under the Prepetition Secured Note.

6.      Pursuant to that certain Security Agreement, dated as of January 1, 2009 (the "Prepetition Security Agreement" and, together with the Prepetition Secured Note and any and all related documents and agreements entered into in connection therewith, the "Prepetition Secured Credit Documents"), among the Prepetition Secured Party and the Debtor, the Debtor's obligations under the Prepetition Secured Note are secured by a blanket lien on all of the Debtor's personal property wherever located and then owned or thereafter acquired by the Debtor and all interest, distributions, options, warrants, increases, profits, proceeds and income received therefrom (collectively, the "Prepetition Collateral").

7.      In addition, in connection with a certain arbitration award against the Debtor and in favor of Wells Fargo Securities, LLC, f/k/a Wachovia Capital Markets, LLC ("Wells Fargo"), Wells Fargo has asserted a judgment lien in the principal amount of $4,269,950.50 against certain of the Debtor's assets located in San Antonio, Texas.

8.      Further, in connection with certain tax obligations owing by the Debtor, the Texas State Comptroller of Public Accounts (the "Texas Comptroller") has asserted a lien in the principal amount of $1,195,463.16 against certain of the Debtor's assets located in San Antonio, Texas.

**B.      Events Leading to the Chapter 11 Filing**

9.      As discussed in more detail in the Power Declaration, since commencing commercial production in late 2005, the Debtor has suffered from a lack of sufficient working

capital resources to fund materials necessary in the production process. Moreover, the Debtor has incurred significant work in process write-downs for product cost in excess of anticipated sales price as a result of the inherent production inefficiencies and low initial production volumes typically associated with transitioning a complex product from development to commercial production. Despite the implementation of numerous cost saving methods, the Debtor remains over-leveraged and is facing significant liquidity constraints. Given this current position, the Debtor simply cannot continue to operate outside of chapter 11.

10.     In July 2010, the Debtor retained Morgan Joseph & Co. Inc. ("Morgan Joseph") as its financial advisor. Prior to filing this chapter 11 case, the Debtor, with the assistance of Morgan Joseph, pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of certain or all of the Debtor's assets or businesses.

## C.     The Debtor in Possession Financing

11.     In connection with the Debtor's restructuring efforts, Morgan Joseph, on behalf of the Debtor, contacted approximately forty-five (45) financial institutions to determine whether they were interested in providing postpetition financing to the Debtor. Substantially all of those financial institutions contacted spoke with the Debtor and/or its advisors regarding various diligence items and were provided with diligence information concerning the Debtor.

12.     Of the forty-five financial institutions that were contacted, three (3) submitted term sheets to the Debtor and its advisors regarding postpetition financing, including the DIP Agent. The Debtor and its advisors reviewed these term sheets and engaged in extensive negotiations with these parties in an effort to obtain postpetition financing on the best possible terms.

13.     The Debtor ultimately decided that the proposal for debtor in possession financing advanced by the DIP Lenders was the best available under the circumstances and adequately addressed the Debtor's reasonably foreseeable working capital needs, while maintaining the going concern value of the Debtor's business pending a sale of the company.  The financing affords the Debtor an opportunity to be sold as a going concern in its entirety by January 31, 2010.  If the company is not sold, the Debtor will benefit from the marketing and consulting services in the DIP Credit Agreement that will be utilized to liquidate the assets for the benefit of creditors and the estate.  The various terms, fees and charges required by the DIP Lenders under the DIP Facility are reasonable and appropriate under the circumstances and Wells Fargo, the Texas Comptroller, and the Prepetition Secured Party have consented to having their liens primed as set forth in the DIP Documents.

14.     If this Motion is not approved and the Debtor does not obtain authorization to borrow under the DIP Documents, the Debtor will suffer immediate and irreparable harm. Without the funds available through the DIP Facility, the Debtor will be unable to provide working capital necessary to maintain the Debtor's assets while it seeks a buyer, and to fund a liquidation of the assets if necessary, which would adversely affect the value of the Debtor's business as a going concern.

15.     For the foregoing reasons, the DIP Facility is in the best interest of the Debtor's estate, creditors, and other parties in interest.

## JURISDICTION

16.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief

requested in this Motion are sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2.

## THE DIP FINANCING

17. Consistent with Bankruptcy Rule 4001(c)(1) and this Court's requirements under Local Rule 4001-2(a)(i) and (ii), the principal terms of the DIP Facility and Interim Order are as follows:[3]

| | |
|---|---|
| Borrower: | Emivest Aerospace Corporation, a Delaware corporation ("Borrower" or the "Debtor"). |
| DIP Lenders: | Counsel RB Capital, LLC and EAI Capital, LLC. |
| Agent: | Counsel RB Capital, LLC, as Agent. |
| DIP Facility: | A term loan in an amount not to exceed $4,000,000 to be funded in separate advances, with (i) an initial advance in a principal or face amount of $1,000,000 (the "Initial Advance") to be funded upon entry of the Interim Order, (ii) a second advance in the amount of $2,000,000 (the "Second Advance") to be funded upon entry of the Final Order, and (iii) a final advance in the amount of $1,000,000 (the "Final Advance") to be funded on the date that is thirty (30) days after the date of entry of the Final Order. |
| Use of Proceeds: | The proceeds of the advances under the DIP Facility shall be used by the Borrower for the purpose of funding the Borrower's costs and expenses associated with the bankruptcy case, for the purpose of preserving and maintaining the value Debtor's assets pending a sale, all in accordance with a certain budget which is substantially in the form attached to the DIP Credit Agreement as Exhibit A (the "Budget"); provided, however, the proceeds of the advances under the DIP Facility may not be used to finance any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing any claims or causes of actionn against the DIP Agent, DIP Lenders, or their counsel or advisors arising from or relating to the DIP Credit Agreement and/or investigating, challenging or raising any defenses to the indebtedness and/or liens under the DIP Credit Agreement. |

---

[3] The terms and conditions of the DIP Documents set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. This summary is qualified in its entirety by the provisions of the DIP Documents and the Interim Order. The Debtor reserve all rights in connection with the Interim Order. Unless otherwise specified, terms have the same definitions as those in the DIP Documents.

| | |
|---|---|
| Maturity Date: | February 10, 2011. |
| Carve-Out: | The "Carve-Out" is defined as: (i) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (ii) subject to the terms and conditions of this Interim Financing Order, (a) all unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, but prior to an Event of Default under the Credit Facility, and approved or permitted by an order of the Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees", by attorneys, accountants and other professionals retained by the Debtor or any official committee of unsecured creditors (collectively, the "Professionals"), and (b) Allowed Professional Fees incurred subsequent to an Event of Default to the extent consistent with the Budget, in an aggregate sum not to exceed $450,000 (the "Professional Fee Carve-Out"). |
| Interest: | The principal amount of the advance shall bear interest at the rate of $40,000 per month or such lesser amount prorated for the number of days elapsed in the months in which the Initial Advance is made and the month during which the Termination Date occurs and during which any advance is outstanding, computed on the basis of actual number of calendar days in which any advance is outstanding. |
| Commitment Fee: | Two hundred fifty thousand dollars ($250,000) which fee shall be (i) fully earned and non-refundable upon execution of the DIP Credit Agreement, (ii) added to the indebtedness due and owing thereunder, and (iii) shall be paid by the Borrower on the Termination Date. |
| Exit Fee: | Two hundred fifty thousand dollars ($250,000) payable on the Termination Date. |
| Redemption Payment: | Provided that no Event of Default shall have occurred, the DIP Lenders will agree to waive (i) the Commitment Fee, (ii) all accrued and unpaid interest on all advances and (iii) the Exit Fee in exchange for a payment on the Termination Date of seven hundred thousand dollars ($700,000) (the "Redemption Fee"); provided, however, if the outstanding principal amount of the advance, all accrued and unpaid interest thereon and other amounts due and payable on the DIP Documents are paid in full on or before the date that is three months after the date of the Initial Advance, the amount of the Redemption Fee shall be six hundred fifty thousand dollars ($650,000). |
| Voluntary Prepayment: | The Borrower may prepay the advances in whole but not in part prior to the Termination Date and terminate the DIP Facility if it gives the DIP Agent at least three (3) calendar days advance written notice prior to the proposed prepayment. Upon such prepayment and termination, all indebtedness shall be immediately due and payable, including an amount not less than the Redemption Fee. |
| Mandatory Prepayment: | Upon receipt by Borrower of the net cash proceeds arising from any Sale Transaction, Borrower shall pay or cause to be paid to the DIP Agent no |

later than one business day following such receipt, an amount equal to 100% of such net cash proceeds of any such Sale Transaction. Upon receipt by Borrower of proceeds arising from any Casualty or Condemnation yielding gross cash proceeds, Borrower shall pay or cause to be paid to the DIP Agent no later than one Business Day following such receipt an amount equal to 100% of the net cash proceeds thereof.

Security:

The DIP Facility will be secured by a continuing priming first priority lien and security interest, subject to the Carve-Out and Permitted Liens, on all rights and title of the Borrower in and to accounts, chattel paper and electronic chattel paper, deposit accounts, documents, documents of title, equipment, inventory, general intangibles, certain leases, intellectual property rights, goods, instruments, investment property, letter-of-credit rights, letters of credit; together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (v) all collateral subject to the Lien of any Security Document; (vi) any money, or other assets of the Borrower that now or hereafter come into the possession, custody, or control of the DIP Lenders; (vii) proceeds of any and all of the foregoing; (viii) books and records of the Borrower, including all mail or electronic mail addressed to the Borrower; and (ix) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Borrower now has or hereafter acquires any right (collectively, the "DIP Collateral").

Superpriority
Administrative Expense
Claim:

Subject to the Carve-Out and Permitted Liens, the indebtedness of the Borrower under the DIP Credit Agreement shall constitute, in accordance with section 364(c) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Borrower.

Monthly Reports:

Within two business days after the end of each month, the Borrower will deliver or cause to be delivered to the DIP Agent a reconciliation of the actual disbursements of the Borrower and existing advances under the DIP Credit Agreement for such month to the budgeted line item amounts set forth in the Budget for such month, provided that, upon the occurrence and during the continuation of an event that has a Material Adverse Effect, the Borrower shall provide such reports on a weekly basis, two (2) business days after the end of each week.

Consulting and
Marketing Services:

With respect to the Leased Properties, from and after the occurrence of an Event of Default and subject to the entry of a Final Order, the Agent shall provide on an exclusive basis the following services (the "Real Estate

Services"):[4]

a) Solicit interested parties for the sale, assignment, sublease or other disposition of each Leased Property, and market each Leased Property in accordance in the manner determined by the Agent;

b) If the Agent causes any Leased Property to be sold, assigned, subleased, or otherwise disposed of, Agent shall earn a fee equal to 10% of the Gross Sale Proceeds (the "Leased Property Disposition Fee"). For purposes of this section, "Gross Sale Proceeds" shall mean the aggregate cash or non-cash consideration received by the Borrower in consideration of the Leased Property, including any amounts to be received by the Borrower under any subleasing arrangement. The value of non-cash consideration paid for a Leased Property shall be determined by mutual agreement between Agent and the Borrower. The amounts payable under this Section shall be paid in a lump sum at the closing for the applicable Leased Property;

c) Agent shall be responsible for any other fees or commissions payable to any cooperating brokers in connection with the disposition of the Leased Properties.

In the event that Agent, after engaging in good faith marketing and sale efforts with respect to any Leased Property, determines that an affiliate of the Agent (an "Affiliate") is the highest or otherwise best potential purchaser for such Leased Property, then Agent must provide the Borrower with documentation of its marketing and sale efforts to third parties other than its Affiliate. Upon review of such documentation, the Borrower, after consultation with the Agent, reserves its right to request that Agent remarket such Leased Property one last time, for a period of no more than 30 days unless Agent agrees in writing to a longer re-marketing period, should the Borrower determine that Agent's efforts did not produce the highest or otherwise best bid for such Leased Property.

With respect to the Tangible and Other Assets, from and after the occurrence of an Event of Default and subject to the entry of a Final Order, the Agent shall provide on an exclusive basis following services (the "Tangible and Other Assets Services"):

a) Develop an advertising and marketing plan for the auction of the Borrower's Equipment, Inventory, Intellectual Property Rights, Accounts, General Intangibles, customer lists and other assets of the Borrower (the "Tangible and Other Assets"), to be provided to and discussed with the Borrower;

b) From and after the occurrence of an Event of Default:

a. implement the advertising and marketing plan as

---

[4] Hilco Industrial, LLC and Hilco Real Estate, LLC (together, "Hilco") are the two members of EAI Capital, LLC. Hilco is one of the nation's leading asset disposition companies.

determined by Agent in Agent's discretion to maximize the net recovery on the Tangible and Other Assets;

b. prepare for the sale of the Tangible and Other Assets, including gathering specifications and photographs for pictorial brochures;

c. make the Tangible and Other Assets, as applicable, available for viewing by potential buyers on an appointment-only basis;

d. as agent for the Debtor, auction the Tangible and Other Assets for cash to the highest bidder "as is," "where is," free and clear of all interests and liens pursuant to Section 363 of the Bankruptcy Code, and in accordance with the terms of the Credit Facility;

e. charge and collect on behalf of the Borrower from all purchasers any purchase price together with all applicable taxes in connection therewith;

f. deposit all auction proceeds into a separate client trust account controlled by Agent; and

g. submit a complete auction report to the Borrower within three weeks after the collection of funds from the auction.

**Conditions:** The availability of the initial advance is conditioned upon the satisfaction of certain conditions precedent, including, without limitation, the following conditions:

(a)  The DIP Agent's receipt of properly executed DIP Documents in a form and substance satisfactory to it.

(b)  Payment of all fees and expenses due under the terms of the DIP Credit Agreement through the date of the initial advance.

(c)  The DIP Agent's receipt of a budget in a form and substance satisfactory to it.

(d) The entry of the Interim Financing Order.

(e)  Delivery of certificates of insurance showing the DIP Agent as loss payee and an additional insured.

The availability of all advances are subject to further conditions precedent, including, without limitation:

(a)  The representations and warranties set forth in the DIP Credit Agreement are correct in all material respects.

(b) The absence of an Event of Default.

(c) The making of any such advance shall not contravene any law, rule or

regulation applicable to the DIP Lenders.

(d) No Material Adverse Effect has occurred and is continuing other than (x) any adverse change or impairment resulting from the filing of the Borrower's bankruptcy petition and commencement of the chapter 11 case, (y) the liquidation of the Borrower's assets or (z) the effect or diminution of value caused by the wind down of operations or the sale, as a line, going concern or in liquidation, of the Borrower's business or assets.

Events of Default:   The following, among other things, constitute Events of Default under the DIP Credit Agreement:

(a) default in payment of indebtedness under the DIP Documents;

(b) failure to comply with terms, covenants, or agreements contained in the DIP Documents, which is not cured within five (5) days after such failure or default;

(c) failure to meet the date by which any Sale Transaction Events are to have occurred;

(d) filing by the Borrower of any motion or proceeding that could reasonably be expected to result in the impairment of the DIP Agent's or DIP Lenders' rights under the DIP Credit Agreement;

(e) expiration or termination of the Borrower's exclusive periods to file and confirm a plan of reorganization;

(f) the filing of a motion by the Borrower for entry of an order staying or otherwise prohibiting the prosecution of any enforcement action or any motion or pleading seeking to challenge the DIP Agent's liens or otherwise commencing any cause of action against the DIP Agent or the DIP Lenders;

(g) any representation or warranty made by the Borrower in the DIP Documents is incorrect in any material respect;

(h) the rendering against Borrower of an arbitration award, a final judgment, decree or order for the payment of money in excess of $25,000 or a postpetition lien on any of the DIP Collateral and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of 30 consecutive days without a stay of execution;

(i) a Change of Control occurs;

(j) an event of default shall occur and be continuing under any Security Document;

(k) the DIP Agent believes in good faith that the prospect of payment in full of any part of the indebtedness, or that full performance by the

Borrower under the DIP Documents, is impaired, or that there has occurred after the Petition Date any event giving rise to a Material Adverse Effect;

(l)  (i) any impairment of the DIP Collateral that has a Material Adverse Effect, (ii) termination of the Borrower's lease of either of certain leased properties, or (iii) the termination of any state or federal license or authorization or contract that has a Material Adverse Effect;

(m)  the Borrower (except following the DIP Agent's prior written request or with the DIP Agent's express prior written consent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the DIP Documents;

(n)  the Borrower shall file, or any other person shall obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization which does not provide for the full, final, and irrevocable repayment of all of the obligations of the Borrower to the DIP Lenders upon the effectiveness of such plan, unless the DIP Agent has expressly joined in or consented to such plan in writing;

(o)  the Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the DIP Agent under the Financing Orders or the DIP Documents or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted hereunder or under the Financing Orders;

(p)  the Financing Orders shall cease to be in full force and effect after the date of entry thereof (whether due to modification, reversal, revocation, remand, stay, rescission, vacation, amendment, or otherwise) without the prior written consent of DIP Agent;

(q)  the entry of an order converting the chapter 11 case to a chapter 7 case under the Bankruptcy Code, or dismissing the chapter 11 case or any subsequent chapter 7 case either voluntarily or involuntarily;

(r)  the entry of an order (i) which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code with respect to any material contract, lease, or obligation or against any critical vendor; (ii) allowing a third party to proceed against any material assets or contracts of the Borrower; (iii) staying or otherwise prohibiting the prosecution of any enforcement action by the DIP Agent; or (iv) otherwise adversely affecting the DIP Agent's liens, claims, or rights and remedies;

(s)  if any creditor of the Borrower receives any adequate protection payment which is not fully acceptable to the DIP Agent in its sole

discretion, other than as set forth in the Financing Orders, or any lien is granted as adequate protection other than as set forth in the Financing Orders;

(t) a custodian or a trustee or examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code for the Borrower or any of its properties; or

(u) the Sale Transaction Agreement, once executed, shall cease to be in full force and effect and any order entered by the Bankruptcy Court approving such Sale Transaction Agreement shall be modified, reversed, superseded, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of DIP Agent.

(v) the Final Financing Order has not been entered by the Bankruptcy Court on or before November 15, 2010.

| | |
|---|---|
| Remedies After Event of Default: | During any Default Period, upon three (3) days' notice to Borrower, the automatic stay under section 362 of the Bankruptcy Code shall be deemed lifted or modified to the extent necessary to allow the DIP Agent to exercise any and all rights and remedies set forth in the DIP Documents, including, but not limited to, the rights of the Agent to market and sell the Leased Property and the Tangible and Other Assets of the Borrower in accordance with the Consulting and Marketing Services under the DIP Credit Agreement and the fees payable to the Agent in connection therewith. |
| Adequate Protection: | As adequate protection for any diminution in the value of Wells Fargo's collateral resulting from the Borrower's use of cash collateral, the priming liens in favor of the DIP Facility, or otherwise, the Borrower shall: (a) pay to Wells Fargo, out of the proceeds received by the Borrower from the initial advance under the DIP Facility and within five (5) Business Days of the Debtor's receipt of such initial advance, an amount equal to $250,000 in partial satisfaction of Wells Fargo's claim against the Borrower; (b) grant to Wells Fargo a superpriority administrative claim in an amount equal to $750,000, in partial satisfaction of Wells Fargo's claim against the Debtor, subject only to the Carve-Out, Permitted Liens, and the Superpriority Claim granted to Agent and Lenders in respect of the Obligations; and (c) as security for the payment of such superpriority administrative expense claim granted to Wells Fargo, grant to Wells Fargo a valid, perfected replacement security interest in and junior lien (the "Wells Fargo Adequate Protection Liens") upon all the collateral of the same type and category in which the Prepetition Secured Party had prepetition liens (such collateral, defined below as the Replacement Collateral), senior to the Prepetition Secured Party Adequate Protection Liens (as defined below) and any other liens held by the Prepetition Secured Party in the Prepetition Collateral or the Replacement Collateral, and subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, and (iii) Permitted Liens. |

As adequate protection for any diminution in the value of the Texas Comptroller's collateral resulting from the Borrower's use of cash collateral, the priming liens in favor of the DIP Facility, or otherwise, the Borrower shall: (a) pay to the Texas Comptroller, out of the proceeds received by the Debtor from the second advance under the DIP Facility and within five (5) Business Days of the Debtor's receipt of such second advance, an amount equal to $135,000 in partial satisfaction of the Texas Comptroller's claim against the Debtor; (b) pay to the Texas Comptroller, out of the proceeds received by the Debtor from the third advance under the DIP Facility and within five (5) Business Days of the Debtor's receipt of such third advance, an amount equal to $65,000 in partial satisfaction of the Texas Comptroller's claim against the Debtor; (c) grant to the Texas Comptroller a superpriority administrative expense claim in an amount equal to $750,000, in partial satisfaction of the Texas Comptroller's claim against the Debtor, subject and subordinate only to the Carve-Out, Permitted Liens, and the Superpriority Claim granted to Agent and Lenders in respect of the Obligations; and (d) as security for the payment of such superpriority administrative expense claim granted to the Texas Comptroller, grant to the Texas Comptroller a valid, perfected replacement security interest in and junior lien (the "Texas Comptroller Adequate Protection Liens") upon all the collateral of the same type and category in which the Prepetition Secured Party had prepetition liens (such collateral, defined below as the Replacement Collateral), senior to the Prepetition Secured Party Adequate Protection Liens (as defined below) and any other liens held by the Prepetition Secured Party in the Prepetition Collateral or the Replacement Collateral, and subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, and (iii) Permitted Liens.

As adequate protection for any diminution in the value of the Prepetition Secured Party's collateral resulting from the Borrower's use of cash collateral, the priming liens in favor of the DIP Facility, or otherwise, the Borrower shall: (a) grant to the Prepetition Secured Party a valid, perfected replacement security interest in and junior lien upon all the collateral (the "Prepetition Secured Party Adequate Protection Liens" and, together with the Wells Fargo Adequate Protection Liens and the Texas Comptroller Adequate Protection Liens, the "Adequate Protection Liens"), of the same type and category in which it had prepetition liens (such collateral, the "Replacement Collateral"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, (iii) Permitted Liens, and (iv) the Wells Fargo Adequate Protection Liens and the Texas Comptroller Adequate Protection Liens; and (b) provide for a superpriority administrative claim, subject only to the claims of the DIP Facility, the Carve-Out, Permitted Liens, and the superpriority claims granted to Wells Fargo and the Texas Comptroller.

| 506(c) Waiver: | Subject to entry of the Final Order, Borrower and the Borrower's bankruptcy estate waive any claims to surcharge the DIP Collateral under section 506(c) of the Bankruptcy Code, excluding, however, any such claims for matters provided for in the Budget and incurred prior to the occurrence of an Event of Default and termination of the DIP Credit |

Agreement but not paid by the Borrower.

Sale Transaction:    Each Sale Transaction Event shall have occurred on or before the date set forth in the following Sale Transaction Schedule:

(i) the Bankruptcy Court shall have entered the Sale Order on or before January 31, 2011; and

(ii) the Sale Transaction shall be consummated pursuant to the terms of the applicable Sale Transaction Agreement on February 10, 2011.

18.    In addition, Local Rule 4001-2 requires the disclosure of certain provisions of the DIP Credit Agreement and the Interim Order. The following disclosures are intended to comply with the requirements of the Local Rules. The Debtor believes that the following provisions are justified and necessary in the context and circumstances of this case.

(a)    Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors. Neither the DIP Documents nor the Interim Order provide for cross-collateralization protection.

(b)    Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition liens or the waiver of claims against the secured creditor without first giving parties in interest an opportunity to conduct an investigation. Although the Interim Order contains the Debtor's stipulations with respect to the validity, perfection, and amount of liens held by the Prepetition Secured Party, the Interim Order provides that any party in interest with standing to do so shall have until the earlier of (i) 75 days after the Petition Date or (ii) 60 days following the formation of a Committee pursuant to section 1102 of the Bankruptcy Code, provided that any such deadline is subject to extension as may be specified by this Court for cause shown, to challenge the validity, enforceability, priority or extent of the prepetition secured obligations or the prepetition liens on the Prepetition Collateral. (Interim Order §§ 1.2, 5.10).

(c)    Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. While the Interim Order provides for a waiver of rights under section 506(c) of the Bankruptcy Code with respect to the DIP Collateral, the Replacement Collateral, and

the Prepetition Collateral, such waiver is effective only upon the entry of the Final Order. (Interim Order § 4.2).

(d)     Local Rule 4001-2(a)(i)(D) requires the disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code. The Interim Order does not provide for the granting of liens on the Debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code.

(e)     Local Rule 4001-2(a)(i)(E) requires the disclosure of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(a) of the Bankruptcy Code. Neither the DIP Documents nor the Interim Order contain any such provisions.

(f)     Local Rule 4001-2(a)(i)(F) requires the disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. Neither the DIP Documents nor the Interim Order provide any such disparate treatment.

(g)     Local Rule 4001-2(a)(i)(G) requires the disclosure of provisions that prime any secured lien without the consent of that lienor. Neither the DIP Documents nor the Interim Order provide for the priming of any secured lien without the consent of the lienor. The Prepetition Secured Party, the Texas Comptroller, and Wells Fargo have consented to the DIP Liens priming their liens in exchange for the adequate protections provided to them.

**BASIS FOR RELIEF**

A.     **The Requested Relief Should Be Granted Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

19.     As set forth above, the Debtor's ability to maximize the value of its estate hinges upon its being able to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy

Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property. 11 U.S.C. § 364(c).

20. Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1).

21. Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)  the [debtor] is unable to obtain credit otherwise; and
>
> (B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

22. The focus of a bankruptcy court's approval of a financing agreement pursuant to section 364 should be whether the transaction would enhance the value of the debtor's assets. Courts advocate using a "holistic approach" to evaluate super-priority postpetition financing agreements that focuses on the transaction as a whole, not just on the priming of liens. See In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa 1991) ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant

benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.").

23.     In furtherance of this approach, courts consider a number of factors, including, without limitation:   (a) whether alternative financing is available on any other basis (e.g., whether any better offers, bids or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business; (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s);   (d) whether the proposed financing agreement adequately protects prepetition secured creditors; and (e) whether the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors. See In re Aqua Assocs., 123 B.R. 192 (Bankr. E.D. Pa 1991); In re Crouse Group, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987); Bland v. Farmworker Creditors, 308 B.R. 109, 113–14 (S.D. Ga. 2003).   Each of these considerations has been met here.

**(i)     The DIP Facility Represents the Best Financing Available**

24.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source.   See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe

Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

25.    Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); In re Ames Dep't Stores, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

26.    As discussed above, the Debtor has effectively solicited proposals for financing from various institutions and engaged in intense negotiations and diligence efforts in an effort to secure debtor in possession financing on the best terms available. The Debtor simply was unable to procure satisfactory alternative financing on terms as good, or better, than those provided by the DIP Lenders. Accordingly, the Debtor's efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

**(ii)    The DIP Facility Is Necessary to Preserve the Assets of the Debtor's Estate**

27.    As debtor in possession, the Debtor has a fiduciary duty to protect and maximize the estate's assets. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003). The DIP Facility, if approved, will provide essential working capital, allowing the

Debtor to maintain the value of its assets pending a sale by the end of the year. Without the DIP Facility, the Debtor will be unable to preserve the going-concern value of its estate, thereby endangering the success of this chapter 11 case.

28. Accordingly, the DIP Facility is necessary to preserve the assets of the Debtor's estate.

### (iii) The Terms of the DIP Documents Are Fair, Reasonable, and Adequate Under the Circumstances

29. In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. See In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See Transcript of Record at 740:4–6, In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

30. The DIP Documents were negotiated in good faith and at arm's-length among the parties, culminating in a carefully-crafted agreement designed to maintain the Debtor's business as a going concern pending a sale and preserve value for all parties in interest. Given the urgent needs of the Debtor to obtain financial and operational stability for the benefit of all parties in interest, the terms of the proposed DIP Documents are the best available. Indeed, when viewed in its totality, the DIP Documents reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and supported by fair consideration.

31.     In addition, the proposed DIP Documents provide that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out.  In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  Id. at 40.

**(iv)     The Debtor's Proposed Adequate Protection Is Appropriate**

32.     To the extent a secured creditor's interest in the collateral constitutes a valid and perfected security interest and lien as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility.  See 11 U.S.C. § 364(d)(1)(B).  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

33.     The proposed adequate protection is typical under the circumstances and is comprised of, with respect to the Prepetition Secured Party, the granting of replacement liens and superpriority claims in respect of any diminution in value and, with respect to both the Texas Comptroller and Wells Fargo, the granting of replacement liens, the granting of superpriority claims, and payments out of the proceeds of the DIP Facility in partial satisfaction of the Texas

Comptroller's and Wells Fargo's claim against the Debtor. This adequate protection has been consented to by the primed Prepetition Secured Party, Texas Comptroller, and Wells Fargo.

**(v)     The Debtor Has Exercised Its Business Judgment in Entering Into the DIP Facility**

34.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

35.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. See, e.g., In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" In re Dura Auto. Sys. Inc., No. 06-11202

(KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., Inc., 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

36.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  In re Curlew Valley Assocs., 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); see also In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor).  Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513–14.

37.     As described above, the Debtor has exercised sound business judgment in determining the appropriateness of the DIP Facility and has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Documents.  The DIP Documents contain terms that are the best available under the circumstances.

38.     The funds provided by the DIP Facility are essential to enable the Debtor to maintain the value of its assets and business through the pendency of this chapter 11 case pending the sale.  Indeed, failure to obtain approval of the DIP Facility will irreparably harm the going-concern value of its business which, in turn, will adversely affect the value ultimately received by stakeholders.

39.     Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtor respectfully submits that it should be granted authority to enter into the DIP Documents and obtain funds from the DIP Lenders on the secured and administrative super-priority basis described herein.

**B.      The Debtor's Request for Use of Cash Collateral is Appropriate**

40.      The Debtor's use of property of its estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

41.      Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtor to use cash collateral as long as the applicable secured creditors consent or are adequately protected. See In re McCormick, 354 B.R. 246, 251 (Bankr. C D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected). "Cash Collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

42.      The Debtor has an urgent need for the immediate use of the cash collateral pending the final hearing on this Motion and seeks to use all cash collateral existing on or after the Petition Date.  The Debtor requires the use of the cash collateral to, among other things, maintain the going concern value of its assets pending a sale and pay the costs and expenses associated with the administration of this chapter 11 case.  The Prepetition Secured Party, the Texas Comptroller, and Wells Fargo consent to the Debtor's use of the cash collateral upon the terms and conditions set forth in the Orders.  Moreover, courts in this district have granted similar relief in other recent chapter 11 cases.  See, e.g., In re Aleris Int'l, Inc., Case No. 09-

10478 (BLS) (Bankr. D. Del. Mar. 18, 2009); In re Motor Coach Indus. Int'l, Inc., No. 08-12136 (BLS) (Bankr. D. Del. Oct. 7, 2008); In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. March 7, 2008); In re Buffets Holdings, Inc., No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008); In re Pope & Talbot, Inc., No. 07-11738 (CSS) (Bankr. D. Del. Dec. 7, 2007).

**C.     Modification of the Automatic Stay is Warranted**

43.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Documents, the Interim Order, and the Final Order (including, but not limited to, their rights under Article VII of the DIP Credit Agreement), and to take various actions without further order of or application to the Court.  However, the DIP Lenders must provide the Debtor with three (3) days' written notice prior to exercising any enforcement rights or remedies in respect of the DIP Collateral or upon a shorter period of time after notice and a hearing.  Moreover, the Debtor and any other parties in interest may seek within the three (3) day notice period an expedited hearing before this Court solely for the purpose of considering whether, in fact, an Event of Default has occurred and is continuing.

44.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Documents and the proposed Orders.

## INTERIM APPROVAL OF THE DIP FACILITY

45.     As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen

(14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

46.     Given the immediate and irreparable harm to be suffered by the Debtor absent interim relief, the Debtor respectfully requests that the Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtor, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Documents and to utilize cash collateral.

**NO PRIOR REQUEST**

47.     No prior request for the relief sought herein has been made to this or any other court.

**NOTICE**

48.     Notice of this Motion has been given to: (i) the twenty (20) largest creditors listed in the Debtor's list of unsecured creditors; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) the DIP Lenders and Agent; (iv) counsel to the DIP Lenders and Agent; (v) the Prepetition Secured Party; (vi) Wells Fargo; (vii) the Texas Comptroller, (viii) the Internal Revenue Service; (ix) all known parties that may be asserting a lien against the DIP Collateral; (x) all appropriate state taxing authorities; (xi) all landlords, owners, and/or operators of premises at which any of the Debtor's inventory and/or equipment is located, including the Leased Property; and (xii) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules (collectively, the "Initial Notice Parties"). The Debtor submits that, under the

circumstances, no further notice of the hearing on the interim financing is necessary and requests that any further notice be dispensed with and waived.

49.     The Debtor further respectfully requests that the Court schedule the Final Hearing and authorize it to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to (i) the Initial Notice Parties; (ii) any party that has filed prior to such date a request for notices with this Court; and (iii) counsel for any official committee(s). The Debtor requests that the Court consider such notice of the Final Hearing, including without limitation, notice that the Debtor will seek approval at the Final Hearing of a waiver of rights under Bankruptcy Code section 506(c), to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (i) enter an order substantially in the form of the proposed Interim Order attached hereto as Exhibit A; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (iii) grant such other and further relief as this Court deems just and proper.

Dated: October 21, 2010
       Wilmington, Delaware

           MORRIS, NICHOLS, ARSHT & TUNNELL LLP

           Robert J. Dehney, (No. 3578)
           Daniel B. Butz (No. 4227)
           Matthew B. Harvey (No. 5186)
           1201 North Market Street, 18th Fl.
           P.O. Box 1347
           Wilmington, DE 19899
           Telephone: 302.658.9200
           Facsimile: 302.425.4673

           *Proposed Counsel for Debtor and*
           *Debtor in Possession*