Bankruptcy Code, on such terms and conditions acceptable to the Agent in its reasonable discretion and approved by the Bankruptcy Court in accordance with the Sale Transaction Schedule.

"Sale Transaction Bidding Procedures" shall mean certain procedures approved by the Bankruptcy Court and acceptable to the Agent pursuant to which Borrower shall conduct the Sale Transaction pursuant to the Sale Transaction Schedule, including without limitation, the solicitation of competing offers, the review and evaluation of offers, the conducting of an auction, the deadline by which responses to the Sale Transaction Motion and replies thereto are to be filed, and the time periods by which such events or tasks are to be accomplished or occur.

"Sale Transaction Event" shall mean each of the events listed under the definition of Sale Transaction Schedule.

"Sale Transaction Schedule" shall mean the following schedule of events which are to occur and be accomplished on or prior to the applicable date with respect to the Sale Transaction:

      i.      The Sale Order Motion shall have been filed with the Bankruptcy Court within five (5) Business Days after the Petition Date;

      ii.      the Bankruptcy Court shall have entered the Sale Order on or before January 31, 2010; and

      iii.      the Sale Transaction shall be consummated pursuant to the terms of the applicable Sale Transaction Agreement on or before February 10, 2011.

"San Antonio Lease" means that certain San Antonio International Airport Lease dated March 28, 1986 and numbered 124099, as approved by City Ordinance number 62582 adopted March 27, 1986 by and between the City of San Antonio, as Lessor, and Jaffe-Aerospace Corp., as Lessee, as thereafter assigned to Borrower, as the same has been amended, from time to time.

"Second Advance" has the meaning set forth in Section 2.1(b).

"Security Documents" means the this Agreement, the Aircraft Security Agreement, any Deposit Account Control Agreements, the Leasehold Mortgages, the Assignment of Licenses, the Intellectual Property Security Agreement, any other Loan Document and other document delivered to the Agent from time to time to secure the Obligations.

"Security Interest" is defined in Section 3.1.

"Subordinated Creditors" means those creditors that are subordinated pursuant to the terms of the Financing Orders.

"Subordinated Obligations" has the meaning set forth in the Subordination Agreement.

"Subordination Agreement" means a subordination agreement executed by Emivest US, in favor of the Agent, in form and substance satisfactory to the Agent, and acknowledged by the

Borrower, pursuant to which the obligations of the Debtor to Emivest US and any Liens in favor of Emivest US in the Collateral securing the Subordinated Obligations are subordinated to the Obligations of the Borrower hereunder and Liens of the Agent in the Collateral, as such agreement may be amended, modified or supplemented from time to time.

"Subsidiary" means any Person of which more than fifty percent (50%) of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, regardless of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by the Borrower, by the Borrower and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Tangible and Other Assets" is defined in Section 7.2(a)(i).

"Tangible and Other Assets Disposition Fee" is defined in Section 7.2(a)(iv).

"Termination Date" means the earliest of (i) the Maturity Date, (ii) the date the Borrowers terminate the Credit Facility pursuant to the terms hereof, or (iii) the date the Agent demands payment of the Obligations, following an Event of Default, pursuant to Section 8.2.

"Texas Tax Lien" means that certain Texas State Tax Lien in the original principal amount of $1,195,463.16 filed against Borrower by the Texas State Comptroller of Public Accounts on July 27, 2010 and August 2, 2010 in the Official Public Records of Bexar County, Texas.

"UCC" means the Uniform Commercial Code in effect in the state designated in this Agreement as the state whose laws shall govern this Agreement, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

"Wachovia Lien" means that certain Abstract of Judgment lien in the principal amount of $4,269,950.50 filed against Borrower by Wells Fargo Securities, LLC, f/k/a Wachovia Capital Markets, LLC on July 1, 2010 in the Official Public Records of Bexar County, Texas.

"West Virginia Lease" means that certain Lease and Airport Use Agreement, dated as of April 19, 1985, by and between Eastern West Virginia Airport Authority, a West Virginia public corporation, as lessor, and Sino-Swearingen, L.P., a Delaware limited partnership, n/k/a Emivest Aerospace Corporation, a Delaware corporation, as lessee.

Section 1.2.    Other Definitional Terms; Rules of Interpretation.   The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP.   All terms defined in the UCC and not otherwise defined herein have the meanings assigned to them in the UCC.  References to Articles, Sections, subsections, Exhibits, Schedules and the like, are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided.   Terms used herein but not otherwise defined shall have the meanings ascribed to such terms the Financing Orders.   The words

"include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or". Defined terms include in the singular number the plural and in the plural number the singular. Reference to any agreement (including the Loan Documents), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof (and, if applicable, in accordance with the terms hereof and the other Loan Documents), except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor. Reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder.

## ARTICLE II

## AMOUNT AND TERMS OF THE CREDIT FACILITY

Section 2.1.    Advances.    The Lenders agree, subject to the terms and conditions of this Agreement and the Financing Orders, to make up to three (3) advances (the "Advances") to the Borrower from time to time from the date that all of the conditions set forth in Section 4.1 are satisfied (the "Funding Date") to and until (but not including) the Termination Date, as follows:

(a)    the Lenders shall make the initial Advance in an amount equal to $1,000,000 (the "Initial Advance"), upon the entry by the Bankruptcy Court of the Interim Financing Order ;

(b)    the Lenders shall make a second Advance in an amount equal to the difference between (i) $2,000,000 and (ii) the amount of the Professional Fee Carve-Out (the "Second Advance"), upon the entry by the Bankruptcy Court of the Final Financing Order; and

(c)    the Lenders shall make a final Advance in the amount of $1,000,000 (the "Final Advance") thirty (30) days after the date of the Second Advance; provided, however, that the Lenders shall not be obligated to make the Final Advance in the event that either the Wachovia Lien or the Texas State Lien has not been released or subordinated to the Agent's Lien on the Collateral in a manner satisfactory to the Agent in its sole discretion.

Section 2.2.    Procedures for Advances.    The Lenders shall have no obligation (a) to make an Advance to the extent that the amount of the requested Advances exceeds Availability or (b) to make an Advance to or for the benefit of the Borrower to the extent the amount of the requested Advance exceeds the Borrowing Base. Advances that are borrowed and repaid may not be reborrowed. The Borrowers' obligation to pay the Advances shall be evidenced by the Note and shall be secured by the Collateral.

Section 2.3.    Disbursement of Advances.    Upon fulfillment of the applicable conditions set forth in Article IV, the Lenders shall disburse the proceeds of the requested Advance by wire

to the Borrower's operating account identified by Borrower to Agent unless the Lender and the Borrower shall agree to another manner of disbursement. The Lenders may also initiate an Advance and disburse the proceeds to any third Person in such amounts as the Agent, in its sole discretion, deems necessary to protect its interest in any Collateral or to purchase Collateral or to exercise any other rights granted to it by the Borrower under Section 6.15.

Section 2.4.    Interest; Default Interest Rate; Application of Payments; Participations; Usury.

(a)    Interest. Except as provided in Section 2.4(d), the principal amount of the Advances shall bear interest at the rate of $40,000 per month or such lesser amount prorated for the number of days elapsed during the month in which the Initial Advance is made and in the month in which the repayment of the Indebtedness occurs.

(b)    Application of Payments. Payments shall be applied to the Indebtedness on the Business Day of receipt by the Agent in the Agent's general account, but the amount of principal paid shall continue to accrue interest at the interest rate applicable under the terms of this Agreement from the calendar day the Agent receives the payment, and continuing through the end of the first Business Day following receipt of the payment. The Lenders shall apply payments in satisfaction of Indebtedness in such order as the Lenders determine in their sole discretion.

(c)    Participations. If any Person shall acquire a participation in the Advances, the Borrower shall be obligated to the Lenders to pay the full amount of all interest calculated under this Section 2.4, along with all other fees, charges and other amounts due under this Agreement, regardless if such Person elects to accept interest with respect to its participation at a lower rate than that calculated under this Section 2.4, or otherwise elects to accept less than its pro rata share of such fees, charges and other amounts due under this Agreement.

(d)    Usury. In any event no rate change shall be put into effect which would result in a rate greater than the highest rate permitted by law. Notwithstanding anything to the contrary contained in any Loan Document, all agreements which either now are or which shall become agreements between the Borrower and the Lenders are hereby limited so that in no contingency or event whatsoever shall the total liability for payments in the nature of interest, additional interest and other charges exceed the applicable limits imposed by any applicable usury laws. If any payments in the nature of interest, additional interest and other charges made under any Loan Document are held to be in excess of the limits imposed by any applicable usury laws, it is agreed that any such amount held to be in excess shall be considered payment of principal hereunder, and the indebtedness evidenced hereby shall be reduced by such amount so that the total liability for payments in the nature of interest, additional interest and other charges shall not exceed the applicable limits imposed by any applicable usury laws, in compliance with the desires of the Borrower and the Lenders. This provision shall never be superseded or waived and shall control every other provision of the Loan Documents and all agreements between the Borrower and the Lenders, or their successors and assigns.

Section 2.5.    Fees.

(a)     Commitment Fee.  The Borrower shall pay the Lenders a commitment fee of $250,000 (the "Commitment Fee"), which fee shall be (i) fully earned and non-refundable upon execution of this Agreement, (ii) added to the Indebtedness due and owing hereunder and (iii) shall be paid by the Borrower on the Termination Date.

(b)     Exit Fee.  The Borrower shall pay to the Lenders an exit fee of Two Hundred Fifty Thousand ($250,000) Dollars payable on the Termination Date (the "Exit Fee").

(c)     Redemption Fee.  Provided that no Event of Default shall have occurred, the Lenders will agree to waive (i) the Commitment Fee, (ii) all accrued and unpaid interest on the Advances and (iii) the Exit Fee in exchange for a payment on the Termination Date of Seven Hundred Thousand ($700,000) Dollars (the "Redemption Fee"); provided, however, if the outstanding principal amount of the Advances, all accrued and unpaid interest thereon and other amounts due and payable on the Loan Documents are paid in full on or before the date that is three months after the date of the Initial Advance, the amount of the Redemption Fee shall be Six Hundred Fifty Thousand ($650,000) Dollars; and, provided further, however, if the Wachovia Lien has not been released or subordinated to the Agent's Lien on the Collateral on or before the date that is thirty (30) days after the date Final Financing Order has been entered, then the Redemption Fee shall be Eight Hundred Fifty Thousand Dollars ($850,000).

(d)     Leased Property Disposition Fee, Tangible and Other Asset Disposition Fee and Buyer's Premium Fee.  With respect to the services to be provided by the Agent pursuant to Article VII, the Agent shall be entitled to the payment of the Leased Property Disposition Fee, Tangible and Other Asset Disposition Fee and Buyer's Premium Fee in accordance with the provisions of Article VII.

Section 2.6.     Time for Interest Payments; Payment on Non-Business Days; Computation of Interest and Fees.

(a)     Time For Interest Payments.  Accrued and unpaid interest accruing on the Advances shall be due and payable on the Termination Date.

(b)     Payment on Non Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest on the Advances or the fees hereunder, as the case may be.

(c)     Computation of Interest.  Interest accruing on the outstanding principal balance of the Advances hereunder outstanding from time to time shall be computed on the basis of actual number of calendar days in which any Advance is outstanding.

Section 2.7.     Voluntary Prepayment; Termination of the Credit Facility by the Borrower.  Except as otherwise provided herein, the Borrower may prepay the Advances in whole but not in part prior to the Termination Date and terminate the Credit Facility if it gives the Agent at least 3 calendar days advance written notice prior to the proposed prepayment. Upon such prepayment and termination, and subject to Section 2.5(c), all other Indebtedness in addition to the Advances shall be immediately due and payable, including but not limited to an amount equal to not less than the Redemption Fee.

Section 2.8.    Mandatory Prepayment.    The Borrower shall repay the Advances as follows:

(a)    Sale Transaction Proceeds.    Upon receipt by Borrower of the Net Cash Proceeds arising from any Sale Transaction or from the sale of any of the Collateral, Borrower shall pay or cause to be paid to the Agent no later than one Business Day following such receipt, an amount equal to 100% of such Net Cash Proceeds of any such Sale Transaction or sale up to the amount of the Obligations.

(b)    Casualty/Condemnation.    Upon receipt by Borrower of proceeds arising from any Casualty or Condemnation yielding gross cash proceeds, Borrower shall pay or cause to be paid to the Agent no later than one Business Day following such receipt an amount equal to 100% of the Net Cash Proceeds thereof up to the amount of the Obligations.

(c)    Certain Professional Fees.    Following an Event of Default, the Agent may demand and the Borrower shall repay to the Lenders that portion of any outstanding Advances that pursuant to the Budget were advanced to fund any professional fees that have not been incurred as of the date of notice of such Event of Default.

(d)    Mandatory Prepayment Date. The Borrower agrees that all amounts owing under clauses (a) and (b) of this Section 2.8, shall be due and payable no later than one Business Day following receipt thereof by the Borrower (such date, the "Mandatory Prepayment Payment Date"). On the Mandatory Prepayment Payment Date, the Borrower shall provide to the Agent, along with the applicable payment, an executed prepayment notice calculation in a form acceptable to Agent.

Section 2.9.    Use of Proceeds.    The Borrower shall use the proceeds of Advances for the purpose of funding certain post-petition costs and expenses of the Borrower in accordance with the Budget. No proceeds of any Advance may be utilized by the Borrower to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing any claims or causes of action against the Agent, Lenders, or its counsel or advisors (including advisors to their counsel), arising from or relating to this Agreement and/or investigating, challenging or raising any defenses to the Indebtedness and/or Liens under this Agreement.

Section 2.10.    Liability Records.    The Agent may maintain from time to time, at its discretion, records as to the Indebtedness. All entries made on any such record, if presented to Borrower, shall be presumed correct until the Borrower establishes the contrary. Upon the Agent's demand, the Borrower will admit and certify in writing the exact principal balance of the Indebtedness that the Borrower then asserts to be outstanding. Any billing statement or accounting rendered by the Agent shall be conclusive and fully binding on the Borrower unless the Borrower gives the Agent specific written notice of exception within 30 days after receipt.

Section 2.11.    Single Loan.    All Advances to Borrower and all of the other Indebtedness of Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrower secured by all of the Collateral.

Section 2.12. <u>Grants, Rights and Remedies</u>. The Liens, security interests and the administrative priority granted pursuant to Article II may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Interim Financing Order, the Final Financing Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agent hereunder and thereunder are cumulative.

Section 2.13. <u>Perfection</u>. The Liens and security interests securing the Indebtedness, as granted in Article II, shall be deemed valid and perfected by entry of the Interim Financing Order and entry of the Interim Financing Order shall have occurred on or before the date of any Advance hereunder. The Agent shall be permitted, but is not required, to file any financing statements, mortgages, leasehold mortgages, security agreements, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, the Financing Orders or any other Loan Document, and such Liens and security interests shall be deemed perfected without Agent taking any action whatsoever. Notwithstanding the foregoing, Borrower agrees, promptly upon request by Agent, to take all actions reasonably requested by Agent to perfect a first priority Lien in all or any portion of the Collateral (subject to Permitted Liens).

Section 2.14. <u>Waiver of any Priming Rights</u> . Upon the Closing Date, and on behalf of itself and its estates, and for so long as any Indebtedness shall be outstanding, the Borrower hereby irrevocably waives any right pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien of equal or greater priority than the Lien securing the Indebtedness, or to approve a claim of equal or greater priority than the Indebtedness.

Section 2.15. <u>Waiver of Claims to Surcharge</u>. In accordance with the Interim Financing Order and Final Financing Order, Borrower and the Borrower's bankruptcy estate hereby waive any claims to surcharge the Collateral under section 506(c) of the Bankruptcy Code, excluding, however, any such claims for matters provided for in the Budget and incurred prior to the occurrence of an Event of Default and termination of this Agreement but not paid by the Borrower (subject to Agent's rights to object to any such claims).

## ARTICLE III

## SECURITY INTEREST; OCCUPANCY; SETOFF

Section 3.1. <u>Grant of Security Interest</u>. The Borrower hereby pledges, assigns and grants to the Agent, for the benefit of itself and as agent for the Lenders, a continuing first priority lien and security interest (subject only to (i) the Carve-Out and (ii) Permitted Liens), in accordance with Section 364(d)(1) of the Bankruptcy Code (collectively referred to as the "Security Interest") in the Collateral, as security for the payment and performance of the Indebtedness due hereunder. Upon request by the Agent, the Borrower will grant to the Agent, for the benefit of itself and as agent for the Lenders, a security interest in all commercial tort claims that the Borrower may have against any Person.

Section 3.2. <u>Lien Perfection; Further Assurances</u>. The Interim Financing Order, and if and when it becomes effective, the Final Financing Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Agent's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, leasehold mortgage, preferred mortgages (formerly known as preferred ship mortgages) or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Agent in and to the Collateral or to entitle the Agent to the priorities granted herein; *provided, however*, the Borrower shall execute such instruments, assignments, mortgages, or documents as are necessary to perfect Agent's Liens upon any of the Collateral and shall take such other action as may be reasonably required to perfect or to continue the perfection of Agent's Liens upon the Collateral. The Borrower hereby irrevocably authorizes the Agent at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of Delaware or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC of the State of Borrower's location for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to the Borrower, and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Borrower agrees to furnish any such information to the Agent promptly upon request. The Borrower also ratifies its authorization for the Agent to have filed in any UCC jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof. No such filing or recordation shall be necessary or required in order to create or perfect any such Lien. At Agent's request, Borrower shall also promptly execute or cause to be executed and shall deliver to Agent any and all documents, instruments and agreements deemed necessary by Agent to give effect to or carry out the terms or intent of the Loan Documents hereunder. For purposes of any such financing statements, the Borrower represents and warrants that the following information is true and correct:

Name and address of the Borrower:

> Emivest Aerospace Corporation
> 1770 Skyplace Boulevard
> San Antonio, TX 78201
> Federal Employer Identification No. _____
> Organizational Identification No. _____

Section 3.3. <u>Superpriority Administrative Expense Claim</u>. Subject to the Carve-Out and Permitted Liens, the Indebtedness of the Borrower arising hereunder after the Closing Date shall constitute, in accordance with Section 364(c) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of

the Bankruptcy Code. Agent shall have a superpriority administrative expense claim against the Borrower's estate pursuant to Section 364(c) of the Bankruptcy Code for the Indebtedness and all related costs and expenses, which shall be prior, senior and superior to any other claim, including any other superpriority administrative expense claim of any kind or nature, except as provided herein and/or in the Financing Orders. The Indebtedness of the Borrower hereunder are claims to be afforded priority over administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code, as provided herein and/or in the Financing Orders and secured by liens pursuant to Section 364 of the Bankruptcy Code as provided herein.

Section 3.4.  <u>Notification of Account Debtors and Other Obligors</u>.  The Agent may, at any time during a Default Period, notify any account debtor or other Person obligated to pay the amount due that such right to payment has been assigned or transferred to the Agent for security and shall be paid directly to the Agent.  The Borrower will join in giving such notice if the Agent so requests.  At any time after the Borrower or the Agent gives such notice to an account debtor or other obligor, the Agent may, but need not, in the Agent's name or in the Borrower's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such right to payment, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any such account debtor or other obligor.  Upon the occurrence of an Event of Default and during the continuation thereof, the Agent may, in the Agent's name or in the Borrower's name, as the Borrower's agent and attorney-in-fact, notify the United States Postal Service for delivery of the Borrower's mail to any address designated by the Agent, provided that Agent shall also notify Borrower promptly after it provides such notice to the United States Postal Service and/or otherwise intercept the Borrower's mail, and receive, open and dispose of the Borrower's mail, applying all Collateral as permitted under this Agreement and holding all other mail for the Borrower's account or forwarding such mail to the Borrower's last known address.

Section 3.5.  <u>Assignment of Insurance</u>.  As additional security for the payment and performance of the Indebtedness, the Borrower hereby assigns to the Agent any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of the Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto, and the Borrower hereby directs the issuer of any such policy to pay all such monies directly to the Agent.  At any time, whether or not a Default Period then exists, the Agent may (but need not), in the Agent's name or in the Borrower's name, execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy.  Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Agent to be applied, at the option of the Agent, either to the prepayment of the Indebtedness or shall be disbursed to the Borrower under staged payment terms reasonably satisfactory to the Agent for application to the cost of repairs, replacements, or restorations.  Any such repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction.

Section 3.6.    Occupancy.

(a)    The Borrower hereby irrevocably grants to the Agent the right to take possession of the Premises at any time during a Default Period within three (3) days of Borrower's receipt of a Default notice from Agent, to the exclusion of Borrower.

(b)    The Agent may use the Premises only to hold, process, manufacture, sell, use, store, liquidate, realize upon or otherwise dispose of items that are Collateral and for other purposes that the Agent may in good faith deem to be related or incidental purposes.

(c)    The Agent's right to hold the Premises shall cease and terminate upon the earlier of (i) payment in full and discharge of all Indebtedness and termination of the Credit Facility, and (ii) final sale or disposition of all items constituting Collateral and delivery of all such items to purchasers.

(d)    The Agent shall not be obligated to pay or account for any rent or other compensation for the possession, occupancy or use of any of the Premises; provided, however, that if the Agent does pay or account for any rent or other compensation for the possession, occupancy or use of any of the Premises, the Borrower shall reimburse the Agent promptly for the full amount thereof.  In addition, the Borrower will pay, or reimburse the Agent for, all taxes, fees, duties, imposts, charges and expenses at any time incurred by or imposed upon the Agent by reason of the execution, delivery, existence, recordation, performance or enforcement of this Agreement or the provisions of this Section 3.6.

Section 3.7.    License.  Without limiting the generality of any other Security Document, the Borrower hereby grants to the Agent for so long as any Indebtedness remains outstanding hereunder a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of the Borrower for the purpose of:  (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by the Borrower for its own manufacturing; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

Section 3.8.    Setoff.  The Agent may at any time or from time to time, at its sole discretion and without demand and without notice to anyone, setoff any liability owed to the Borrower by the Lenders, whether or not due, against any outstanding Indebtedness that is due and payable.  In addition, each other Person holding a participating interest in any Indebtedness shall have the right to appropriate or setoff any deposit or other liability then owed by such Person to the Borrower, whether or not due, and apply the same to the payment of said participating interest, as fully as if such Person had lent directly to the Borrower the amount of such participating interest.

Section 3.9.    Collateral.  This Agreement does not contemplate a sale of accounts, contract rights or chattel paper, and, as provided by law, the Borrower is entitled to any surplus and shall remain liable for any deficiency.  The Agent's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a

bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral. The Agent shall not be obligated to preserve any rights the Borrower may have against prior parties, to realize on the Collateral at all or in any particular manner or order or to apply any cash proceeds of the Collateral in any particular order of application. The Agent has no obligation to clean-up or otherwise prepare the Collateral for sale but shall make the Collateral available for clean-up or preparation in accordance with the Sale Transaction Schedule. The Borrower waives any right it may have to require the Agent or the Lenders to pursue any third Person for any of the Indebtedness.

Section 3.10. <u>Survival</u>. The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent and Lenders pursuant to this Agreement, the Financing Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)     except for the Carve-Out and Permitted Liens, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lenders against the Borrower in respect of any Indebtedness;

(b)     except as provided in Section 3.1, the Liens in favor of the Agent set forth in Section 3.1 hereof shall constitute valid and perfected priming first priority Liens and security interests and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)     the Liens in favor of the Agent set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Agent file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

## ARTICLE IV

## CONDITIONS OF LENDING

Section 4.1.     <u>Conditions Precedent to the Initial Advance</u>. The Lenders' obligation to make the Initial Advance shall be subject to the condition precedent that the Agent shall have received all of the following, each properly executed by the appropriate party and in form and substance satisfactory to the Agent:

(a)     This Agreement.

(b)     The Note.

(c)     Each other Loan Document.

(d)     The Interim Financing Order shall have been entered by the Bankruptcy Court not later than October 29, 2010, and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Agent.

(e)     Certificates of insurance for the policies listed in Schedule 4.1(e) attached hereto, with any applicable hazard insurance containing a lender's loss payable endorsement in the Agent's favor and with all liability insurance naming the Agent as an additional insured.

(f)     The Subordination Agreement.

(g)     Payment of all fees due under the terms of this Agreement through the date of the initial Advance and payment of all expenses incurred by the Agent and Lenders through such date and that are required to be paid by the Borrower under this Agreement.

(h)     A Customer Identification Information form and such other forms and verification as the Agent may need to comply with the U.S.A. Patriot Act.

(i)     On or before the Closing Date, Agent shall have received the Budget, in form and substance satisfactory to the Agent.  The Budget will be in the form of a 13-week Budget dated October __, 2010 and annexed hereto as Exhibit A, with such modifications (if any) as are agreed to by the Borrower and Agent.

(j)     No litigation has commenced or has been threatened which has not already been disclosed in writing to the Agent, which, if successful, would have a material adverse impact on the assets of the Borrower taken as a whole or its ability to perform any material Obligation or which challenges the validity or enforceability of all or any part of this Agreement or any other Loan Document.

(k)     Such other documents as the Agent in its reasonable discretion may require.

Section 4.2.     Conditions Precedent to All Advances.  The Lenders' obligation to make each Advance shall be subject to the further conditions precedent that::

(a)     The representations and warranties contained in Article V are correct in all material respects on and as of the date of such Advance as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date;

(b)     no event has occurred and is continuing, or would result from such Advance which constitutes a Default or an Event of Default;

(c)     the making of such Advance shall not contravene any law, rule or regulation applicable to any Lender;

21

(d) the Agent shall have received such other agreements, certificates, instruments, approvals, and other documents referenced hereunder, each in form and substance satisfactory to the Agent, as the Agent may reasonably request;

(e) No Material Adverse Effect has occurred and is continuing other than (x) any adverse change or impairment resulting from the filing of the Borrower's bankruptcy petition and commencement of the Chapter 11 Case, (y) the liquidation of the Borrower's assets or (z) the effect or diminution of value caused by the wind down of operations or the sale, as a line, going concern or in liquidation, of the Borrower's business or assets; and

(f) on the date of any Advance, Borrower shall have timely met all deadlines set forth in the Sale Transaction Schedule, unless otherwise expressly agreed to in writing by the Agent in its sole discretion.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Agent and Lenders as follows:

Section 5.1. <u>Existence and Power; Name Chief Executive Office; Inventory and Equipment Locations; Federal Employer Identification Number and Organizational Identification Number</u>. The Borrower is a corporation, duly organized and validly existing under the laws of the State of Delaware and is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary, except where failure so to be licensed or qualified would not have a Material Adverse Effect. The Borrower has all requisite power and authority to conduct its business, to own its properties and to execute and deliver, and to perform all of its obligations under, the Loan Documents. During the seven (7) years preceding the date hereof, the Borrower has done business solely under the names set forth in Schedule 5.1 or as set forth in the recitals hereof. The Borrower's chief executive office and principal place of business is located at the address set forth in Schedule 5.1, and all of the Borrower's records relating to its business or the Collateral are kept at that location. All Inventory and Equipment is located at that location or at one of the other locations listed in Schedule 5.1. The Borrower's federal employer identification number and organization identification number are set forth on Section 5.1.

Section 5.2. <u>Capitalization</u>. Schedule 5.2 constitutes a correct and complete list of all ownership interests of the Borrower and rights to acquire ownership interests including the record holder, number of interests and percentage interests on a fully diluted basis, and an organizational chart showing the ownership structure of all Subsidiaries of the Borrower.

Section 5.3. <u>Authorization of Borrowing; No Conflict as to Law or Agreements</u>. The execution, delivery and performance by the Borrower of the Loan Documents and the borrowings from time to time hereunder have been duly authorized by all necessary corporate and shareholder action and do not and will not (i) require any consent or approval of any other Person; (ii) other than entry of the Financing Orders, require any authorization, consent or

approval by, or registration, declaration or filing with, or notice to, any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or any third party, except such authorization, consent, approval, registration, declaration, filing or notice as has been obtained, accomplished or given prior to the date hereof; (iii) violate any provision of any law, rule or regulation (including Regulation X of the Board of Governors of the Federal Reserve System) or of any order, writ, injunction or decree presently in effect having applicability to the Borrower or of the Borrower's Constituent Documents; (iv) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which any Loan Party is a party or by which it or its properties may be bound or affected; or (v) result in, or require, the creation or imposition of any Lien (other than the Security Interest) upon or with respect to any of the properties now owned or hereafter acquired by the Borrower.

Section 5.4. <u>Legal Agreements</u>. This Agreement constitutes and, upon due execution by the Borrower, the other Loan Documents will constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, subject to entry of the Financing Orders acceptable to the Agent in its sole discretion.

Section 5.5. <u>Subsidiaries</u>. Except as set forth in Schedule 5.5 hereto, the Borrower has no Subsidiaries.

Section 5.6. <u>Budget</u>. On or before the Closing Date, the Borrower has furnished to the Agent the Budget. The Budget when delivered shall be believed by the Borrower at the time furnished to be reasonable, shall have been prepared on a reasonable basis and in good faith by the Borrower, and shall have been based on assumptions believed by the Borrower to be reasonable at the time made and upon the best information then reasonably available to the Borrower, and the Borrower shall not be aware of any facts or information that would lead it to believe that such Budget is incorrect or misleading in any material respect.

Section 5.7. <u>Litigation</u>. There are no actions, suits or proceedings pending or, to the Borrower's knowledge, threatened against or affecting the Borrower or any of its Affiliates or the properties of the Borrower or any of its Affiliates before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which is reasonably likely to have a Material Adverse Effect, except as set forth on Schedule 5.7.

Section 5.8. <u>Regulation U</u>. The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

Section 5.9. <u>Taxes</u>. The Borrower has paid or caused to be paid to the proper authorities when due all federal, state, provincial, and local taxes required to be withheld by each of them. The Borrower has filed all federal, provincial, state and local tax returns which to the knowledge of the Officers of the Borrower, are required to be filed, and, except as set forth on Schedule 5.9, the Borrower has paid or caused to be paid to the respective taxing authorities all

taxes as shown on said returns or on any assessment received by any of them to the extent such taxes have become due.

Section 5.10. <u>Titles and Liens</u>. Except as set forth on Schedule 5.9, the Borrower has good and absolute title to all Collateral free and clear of all Liens other than Permitted Liens. No financing statement filed pursuant to the UCC naming any Loan Party as debtor is on file in any office except to perfect only Permitted Liens.

Section 5.11. <u>Intellectual Property Rights</u>.

(a)     <u>Owned Intellectual Property</u>. Schedule 5.11 is a complete list of all patents, applications for patents, registered trademarks, applications to register trademarks, registered service marks, applications to register service marks, registered designs, mask works, trade dress and copyrights for which the Borrower is an owner of record as of the date hereof (the "Owned Intellectual Property"). Except as disclosed on Schedule 5.11, (i) the Borrower owns the Owned Intellectual Property free and clear of all restrictions (including covenants not to sue a third party), court orders, injunctions, decrees, writs or Liens, whether by written agreement or otherwise, other than Permitted Liens (ii) no Person other than the Borrower owns or, except in the ordinary course of business and set forth on Schedule 5.11, has been granted any right in the Owned Intellectual Property, (iii) all material Owned Intellectual Property is valid, subsisting and enforceable and (iv) the Borrower has taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

(b)     <u>Intellectual Property Rights Licensed from Others</u>. Schedule 5.11 is a complete list of all agreements under which the Borrower has licensed Intellectual Property Rights from another Person ("Licensed Intellectual Property") as of the date hereof other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("Off-the-shelf Software") and a summary of any ongoing payments the Borrower is obligated to make with respect thereto. Except as disclosed on Schedule 5.11 and in written agreements, copies of which have been given to the Agent, the Borrower's licenses to use the Licensed Intellectual Property are free and clear of all restrictions, Liens (other than Permitted Liens), court orders, injunctions, decrees, or writs, whether by written agreement or otherwise. Except as disclosed on Schedule 5.11, the Borrower is not obligated or under any liability whatsoever to make any payments of a material nature by way of royalties, fees or otherwise to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(c)     <u>Other Intellectual Property Needed for Business</u>. Except for Off-the-shelf Software and as disclosed on Schedule 5.11, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights as of the date hereof used or necessary to conduct the Borrower's business in all material respects as it is presently conducted or as the Borrower reasonably foresees conducting it.

(d)     <u>Infringement</u>. Except as disclosed on Schedule 5.11, the Borrower has no knowledge of, and have not received any written claim or notice alleging, any Infringement of another Person's Intellectual Property Rights (including any written claim that any Loan Party must license or refrain from using the Intellectual Property Rights of any third party) nor, to the

Borrower's knowledge, is there any threatened claim, in each case insofar as would reasonably be likely to have a Material Adverse Effect.

Section 5.12. <u>Leases.</u> Except as described on Schedule 5.12, each lease for the Leased Properties is valid and enforceable in accordance with its terms and is in full force and effect, other than as a result of the commencement of the Chapter 11 Case. Except as described on Schedule 5.12, no default by any party to any such real property lease exists other than as a result of the commencement of the Chapter 11 Case. The Borrower has granted the Agent access to true, correct and complete copies of all such real property leases. No material portion of the Collateral is located at any real estate location other than the Leased Properties.

Section 5.13. <u>Default.</u> The Borrower is in compliance with all provisions of all agreements, instruments, decrees and orders to which it is a party or by which it or its property is bound or affected, the breach or default of which would reasonably be likely to have a Material Adverse Effect.

Section 5.14. <u>Trade Names.</u> All material trade names or styles under which either Borrower will sell inventory or create Accounts or lease property, or to which instruments in payment of sales of inventory for cash or of Accounts or evidencing payment for leases of property may be made payable, are listed on Schedule 5.14.

Section 5.15. <u>Submissions to Agent.</u> All financial and other information provided to the Agent by or on behalf of the Borrower in connection with the Borrower's request for the credit facilities contemplated hereby (i) except as to projections, valuations or pro forma financial statements, is true and correct in all material respects, (ii) does not omit any material fact necessary, in light of the circumstances under which provided, to make such information not misleading and, (iii) as to projections, valuations or pro forma financial statements, present a good faith opinion as to such projections, valuations and pro forma condition and results.

Section 5.16. <u>Financing Statements.</u> Notwithstanding the provision of Section 3.2 of this Agreement, each Borrower has authorized the filing of financing statements pursuant to the UCC sufficient when filed to perfect the Security Interest and the other security interests created by the Security Documents. When the Interim Financing Order is entered, the Agent will have a valid and perfected security interest in all Collateral which is capable of being perfected by filing of appropriate financing statements. None of the Collateral is or will become a fixture on real estate, unless a sufficient fixture filing is in effect with respect thereto.

Section 5.17. <u>Rights to Payment.</u> Each right to payment and each instrument, document, chattel paper and other agreement constituting or evidencing Collateral is (or, in the case of all future Collateral, will be when arising or issued) the valid, genuine and legally enforceable obligation, subject to no defense, setoff or counterclaim, of the account debtor or other obligor named therein or in the Borrower's records pertaining thereto as being obligated to pay such obligation.

Section 5.18. <u>Environmental Laws.</u> Except as otherwise disclosed on Schedule 5.18, or as could not reasonably be expected to result in material liability under any applicable Environmental Laws:

(a)     the Borrower has compiled in all respects with all applicable Environmental Laws;

(b)     the Borrower has obtained all permits necessary for its current operations under Environmental Laws, and all such permits are in good standing and the Borrower is in compliance with all material terms and conditions of such permits;

(c)     neither Borrower nor any of their respective predecessors in interest, has in violation of applicable law stored, treated, emitted, released, handled, disposed of or arranged to dispose of any Hazardous Substances;

(d)     the Borrower has not received any summons, complaint, order, or similar written notice indicating that it is not currently in compliance with, or that any Governmental Authority is investigating its compliance with, any Environmental Laws or that it is or may be liable to any other Person as a result of a release or threatened release of a Hazardous Substances;

(e)     none of the present or past operations of the Borrower is the subject of any current investigation by any Governmental Authority evaluating whether any remedial action is needed to respond to a release or threatened release of a Hazardous Substances;

(f)     there is not now, nor has there ever been, on or in the Leased Properties:

(i)     any underground storage tanks or surface impoundments,

(ii)     any asbestos-containing material, or

(iii)     any polychlorinated biphenyls (PCBs) used in hydraulic oils, electrical transformers, or other equipment.

(g)     the Borrower has not filed any notice under any requirement of Environmental Law reporting a spill or accidental and unpermitted release or discharge of a Hazardous Substances into the environment;

(h)     the Borrower has not entered into any negotiations or settlement agreements with any Person (including the prior or current owner of any of its property) imposing material obligations or liabilities on the Borrower with respect to any remedial action in response to the release of a Hazardous Substances or environmentally related claim that has not been satisfied prior to the Closing Date; and

(i)     no Lien created or incurred pursuant to any Environmental Law has attached to any Leased Property.

Section 5.19.    Administrative Priority; Lien Priority.

(a)     The Indebtedness of the Borrowers will, at all times after the Closing Date, constitute allowed administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all

administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code;

(b)      Pursuant to Section 364(d)(1) of the Bankruptcy Code and the Financing Orders, subject to any Permitted Liens, all Indebtedness shall be secured by a perfected priming first priority Lien on the Collateral; and

(c)      On the Effective Date, the Interim Financing Order is, and upon entry of the Final Financing Order the Final Financing Order shall be, in full force and effect and have not been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to the Agent in its sole discretion and are not subject to a pending appeal or stayed in any respect.

Section 5.20.  Liens.  Schedule 5.20 sets forth, to the knowledge of the Borrower, all Liens affecting the Collateral and all material information (including, without limitation, the party asserting the claims, the amount claimed as being owed and the Collateral which is the subject of such claim) relating to each outstanding claim asserted against the Borrower and the Collateral by any Person who alleges it has supplied any labor and/or materials relating to any Collateral and which remain unpaid as of the date hereof.

Section 5.21.  Title.  The Borrower owns good and valid title to its personal property, in each case free and clear of all Liens whatsoever except the Agent's Liens and the Permitted Liens.

Section 5.22.  Condemnation.  No Condemnation has been commenced or, to the Borrower's actual knowledge, is contemplated as of the date hereof with respect to any Leased Property or for the relocation of roadways providing access to any such Leased Property.

Section 5.23.  USA Patriot Act.

To the extent applicable, the Borrower is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA Patriot Act").  No part of the proceeds of the Advances will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

Section 5.24.  The Chapter 11 Case.

The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and has not been dismissed as of the date of this Agreement.  The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules and the rules and procedures of the Bankruptcy Court.

# ARTICLE VI

## COVENANTS

So long as the Indebtedness shall remain unpaid or the Credit Facility shall remain outstanding, the Borrower will comply with the following requirements, unless the Agent shall otherwise consent in writing:

Section 6.1. <u>Reporting Requirements</u>. The Borrower will deliver, or cause to be delivered, to the Agent each of the following, which shall be in form and detail acceptable to the Lender:

(a)    <u>Investment Banker Status Report</u>. Semi-monthly on the 15th and the last day of every month, or more frequently if the Agent so requires, a report from the Borrower's Investment Banker as to the status of the Investment Banker's progress in marketing for sale all or substantially all of the Borrower's assets to one or more buyers and the status of the Borrower's progress in complying with the Sales Transaction Schedule.

(b)    <u>Litigation</u>. Immediately after the commencement thereof, notice in writing of all litigation and of all proceedings before any governmental or regulatory agency affecting the Borrower which seek a monetary recovery against the Borrower in excess of $50,000 or seeks to enjoin the Transactions contemplated hereby or challenges the validity or enforceability of this Agreement or the Agent's Liens on the Collateral

(c)    <u>Defaults</u>. When any Officer of the Borrower becomes aware of the probable occurrence of any Default or Event of Default or a Material Adverse Effect, and no later than three (3) days after such Officer becomes aware of such Default or Event of Default or Material Adverse Effect, notice of such occurrence, together with a detailed statement by an Executive Officer of the Borrower stating whether the Default or Event of Default or Material Adverse Effect can be cured, and if so, the steps being taken by the Loan Party to cure such Default or Event of Default or Material Adverse Effect.

(d)    <u>Officers and Directors</u>. Promptly upon knowledge thereof, notice of any change in the persons constituting the Borrower's Executive Officers and Directors.

(e)    <u>Collateral</u>. Promptly upon knowledge thereof, notice of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of payment thereof.

(f)    <u>Violations of Law</u>. Promptly upon knowledge thereof, notice of the Borrower's violation of any law, rule or regulation, the non-compliance with which would reasonably be likely to result in a Material Adverse Effect on the Borrower.

(g)    <u>Monthly Reports</u>. Within two (2) Business Days after the end of each month, a reconciliation, in form and substance acceptable to the Agent substantially consistent with the Borrower's form of Budget annexed hereto as <u>Exhibit A</u>, of the actual disbursements of the Borrower and existing Advances under this Agreement for such month to the budgeted line item amounts set forth in the Budget for such month; provided, that, upon the occurrence and during

the continuance of a an event that has a Material Adverse Effect, the Borrower shall provide such reports on a weekly basis, two (2) Business Days after the end of each week.

(h)     <u>Trustee Reports</u>. All operating reports provided to the Office of the United States Trustee for the District of Delaware.

(i)     <u>Chapter 11 Case Pleadings</u>. Promptly after filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Borrower in the Chapter 11 Case, which papers and documents shall also be given or served on the Agent and the Agent's counsel; *provided, however*, to the extent the Borrower reasonably believes any such pleadings may impair or otherwise affect the Agent or the Lenders or any of their rights or remedies, the Borrowers shall provide copies of such pleadings to the Agent and the Agent's counsel at least two (2) full Business Days prior to such documents being filed.

(j)     <u>Sale Order Motion.</u> Within five (5) Business Days of the Petition Date, the Borrower shall file with the Bankruptcy Court for its approval a motion for the approval of the Sale Order (the "Sale Order Motion"), and serve notice of such motion in accordance with the applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

(k)     <u>Committee Reports.</u> Promptly after sending thereof, copies of all written reports given by the Borrower to any official or unofficial creditors' committee in the Chapter 11 Case, other than any such reports subject to privilege; <u>provided</u> that the Borrower may redact any confidential information contained in any such report if it provides to the Agent a summary of the nature of the information so redacted.

Section 6.2.     <u>Use of Proceeds and Operations</u>. The Borrower shall use the proceeds from the Advances in accordance with the Budget and will engage in no operations, business or activities other than to maintain the Collateral for sale in accordance with this Agreement and the Chapter 11 Case.

Section 6.3.     <u>Permitted Liens; Financing Statements</u>.

(a)     The Borrower will not create, incur or suffer to exist any Lien upon or of any of its assets, now owned or hereafter acquired, to secure any indebtedness; excluding, however, from the operation of the foregoing, the following (each a "Permitted Lien"; collectively, "Permitted Liens"):

(i)     In the case of any Leased Property, covenants, restrictions, rights, easements and minor irregularities in title reflected on Schedule B to a title policy covering such Leased Property and acceptable to Agent and which do not materially interfere with the Borrower's business or operations as presently conducted;

(ii)     Liens in existence on the date hereof and that are listed in Schedule 6.3 hereto;

(iii)     The Security Interest and Liens created by the Security Documents;

(iv)     Deposits made in the ordinary course of business of the Borrower (including, without limitation, security deposits of leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations and other similar obligations arising as a result of progress payments under government contracts, in an aggregate amount not to exceed $50,000;

(v)     Liens for taxes not yet due and payable or for taxes being contested in good faith by appropriate proceedings which are sufficient to prevent imminent foreclosure of such Liens; provided, that Borrower shall immediately pay and satisfy such Lien in the event there is any risk of forfeiture of any Collateral but may after paying and satisfying such Lien continue to prosecute any contest relating thereto; and

(vi)     Statutory, common law or contractual rights of set-off or Liens on money coming into possession of any depository or other financial institution in the ordinary course of business.

(b)     The Borrower will not amend any financing statements in favor of the Agent except as permitted by law.

Section 6.4.     <u>Indebtedness</u>.  The Borrower will not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or advances or any indebtedness for borrowed money or letters of credit issued on Borrower's behalf, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except:

(a)     Any indebtedness of the Borrower in existence on the date hereof and listed in Schedule 6.4 hereto;

(b)     Any indebtedness relating to Permitted Liens;

(c)     Indebtedness to trade creditors incurred in the ordinary course of business;

(d)     Deferred taxes, to the extent permitted or required to be accounted for under GAAP; and

(e)     Indebtedness incurred pursuant to this Agreement.

Section 6.5.     <u>Books and Records; Collateral Examination, Inspection and Appraisals</u>.

(a)     The Borrower will keep accurate books of record and account for itself pertaining to the Collateral and pertaining to the its business and financial condition and such other matters as the Agent may from time to time request in which true and complete entries will be made in accordance with GAAP and, upon the Agent's request, will permit any officer, employee, attorney, accountant or other agent of the Agent to audit, review, make extracts from or copy any and all company and financial books and records of the Borrower at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for

verification of amounts owed to the Borrower, and to discuss the Borrower's affairs with any of its Directors or Executive Officers.

(b)     The Borrower will permit the Agent or its employees, accountants, attorneys or agents, to examine and inspect any Collateral, the Mortgaged Property or any other property of the Borrower at any time during ordinary business hours.

Section 6.6.     Compliance with Laws.

(a)     The Borrower shall (i) comply with the requirements of applicable laws and regulations, including, without limitation, the Financing Orders, the non-compliance with which would materially and adversely affect its business or its financial condition and (ii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state, provincial or local law, statute or ordinance.

(b)     The Borrower shall (i) ensure, and cause each Subsidiary to ensure, that no Owner shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not use or permit the use of the proceeds of the Credit Facility or any other financial accommodation from the Lenders to violate any of the foreign asset control regulations of OFAC or other applicable law, (iii) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act as required by federal law and the Agent's and Lenders' policies and practices.

Section 6.7.     Payment of Taxes and Other Claims.     The Borrower will pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including the Collateral) or upon or against the creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach thereto, (b) all federal, state, provincial and local taxes required to be withheld by it, and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of the Borrower; provided, that the Borrower shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

Section 6.8.     Maintenance of Properties.

(a)     The Borrower will keep and maintain the Collateral and all of their other properties necessary or useful in its business in all material respects in good condition, repair and working order (normal wear and tear excepted). The Borrower will take all commercially reasonable steps necessary to protect and maintain its material Intellectual Property Rights.

(b)     The Borrower will defend the Collateral against all Liens (other than Permitted Liens), claims or demands of all Persons (other than the Agent) claiming the Collateral or any interest therein. The Borrower will keep all Collateral free and clear of all Liens except Permitted Liens. The Borrower will take all commercially reasonable steps necessary to prosecute any Person Infringing its material Intellectual Property Rights and to defend itself

against any Person accusing it of Infringing any Person's Intellectual Property Rights which would reasonably be likely to result in a Material Adverse Effect.

Section 6.9.   Insurance.  The Borrower will obtain and at all times maintain insurance with insurers acceptable to the Agent, in such amounts, on such terms (including any deductibles) and against such risks as may from time to time be required by the Agent, but in all events in such amounts and against such risks as is usually carried by companies engaged in similar business and owning similar properties as the Borrower.  Without limiting the generality of the foregoing, the Borrower will at all times keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles) and such other risks and in such amounts as the Agent may reasonably request, with any loss payable to the Agent to the extent of its interest, and all policies of such insurance shall contain a lender's loss payable endorsement for the Agent's benefit consistent with this Agreement.

Section 6.10.   Preservation of Existence.  The Borrower will preserve and maintain its existence and all of its material rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in all material respects in an orderly, efficient and regular manner.

Section 6.11.   Delivery of Instruments, etc.  Upon request by the Agent, the Borrower will promptly deliver to the Agent in pledge all instruments, documents and chattel paper constituting Collateral, duly endorsed or assigned by the Borrower.

Section 6.12.   Sale or Transfer of Assets.

(a)      Except as contemplated by the Sale Transaction Agreement, this Agreement or otherwise expressly consented to in writing by Agent, the Borrower will not sell, lease, assign, transfer or otherwise dispose of (i) all or a substantial part of its assets, or (ii) any Collateral or any interest therein (whether in one transaction or in a series of transactions) to any other Person. Other than as contemplated by the Sale Transaction Agreement, this Agreement and pursuant to a Sale Order, or otherwise expressly consented to in writing by Agent, the Borrower will not transfer any part of its ownership interest in any material Intellectual Property Rights or permit any agreement under which it has licensed material Licensed Intellectual Property to lapse.  The Borrower will not license any other Person to use any of the Borrower's Intellectual Property Rights.

(b)      Borrower shall timely meet all deadlines set forth in the Sale Transaction Schedule, unless otherwise expressly agreed to by Agent in writing in its sole discretion.

Section 6.13.   Consolidation and Merger; Asset Acquisitions.  The Borrower will not consolidate or amalgamate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation, amalgamation or merger) all or substantially all the assets of any other Person.

Section 6.14.   Place of Business; Name.  The Borrower will not transfer its chief executive office or principal place of business, or move, relocate, close or sell any business location.  The Borrower will not permit any tangible Collateral or any records pertaining to the

Collateral to be located in any state, province or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest. The Borrower will not change its name or jurisdiction of organization.

Section 6.15. <u>Performance by the Agent</u>. If any Loan Party at any time fails to perform or observe any of the foregoing covenants contained in this Article VI or elsewhere herein, immediately upon the occurrence of such failure, the Agent may, but need not, perform or observe such covenant on behalf and in the name, place and stead of the Borrower (or, at the Agent's option, in the Agent's name) and may, but need not, take any and all other actions which the Agent may reasonably deem necessary to cure or correct such failure (including the payment of taxes, the satisfaction of Liens, the performance of obligations owed to account debtors or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and the Borrower shall thereupon pay to the Agent on demand the amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Agent in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Agent, together with interest thereon from the date expended or incurred at the Default Rate. To facilitate the Agent's performance or observance of such covenants of the Borrower, the Borrower hereby irrevocably appoints the Agent, or the Agent's delegate, acting alone, as the Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file in the name and on behalf of the Borrower any and all instruments, documents, assignments, security agreements, financing statements, applications for insurance and other agreements required to be obtained, executed, delivered or endorsed by the Borrower hereunder.

Section 6.16. <u>Sale Transaction</u>.

(a)    The Sale Transaction Agreement, together with any order entered by the Bankruptcy Court approving such agreement, shall not be modified, amended, superseded, or terminated absent the prior written consent of the Agent which shall not be unreasonably withheld, conditioned or delayed; such agreement shall provide for the consummation of the Sale Transaction in accordance with the Sale Transaction Schedule.

(b)    The Borrower shall comply with the Sale Transaction Schedule. Without limiting the foregoing and for the purposes of clarity, each Sale Transaction Event shall have occurred on or before the date set forth therefor in the Sale Transaction Schedule.

Section 6.17. <u>Financing Orders; Administrative Priority; Lien Priority; Payment of Claims</u>.

The Borrower will not:

(a)    At any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Financing Orders, except for modifications and amendments agreed to by the Agent in its sole discretion in advance and in writing;

(b)     at any time, suffer to exist a priority for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Agent in respect of the Obligations;

(c)     at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Liens in favor of the Agent in respect of the Collateral, except for Permitted Liens; and

(d)     prior to the date on which all Obligations have been fully and indefeasibly paid and satisfied, the Borrower shall not pay any administrative expense claims except (i) Obligations due and payable hereunder, (ii) administrative expenses incurred in the ordinary course of the Borrower's business as contemplated by this Agreement and the Budget annexed hereto as Exhibit A, and (iii) any administrative expenses subject to the Carve-Out.

## ARTICLE VII

## CONSULTING AND MARKETING SERVICES

Section 7.1.    Real Estate Services.  With respect to the Leased Properties, from and after the occurrence of an Event of Default, Agent and the Borrower agree as follows:

(a)     Agent shall provide on an exclusive basis the following services (the "Real Estate Services"):

(i)     solicit interested parties for the sale, assignment, sublease or other disposition of each Leased Property, and market each Leased Property in the manner determined by the Agent in its discretion;

(ii)    If the Agent causes any Leased Property to be sold, assigned, subleased, or otherwise disposed of, Agent shall earn a fee equal to 10% of the Gross Sale Proceeds (the "Leased Property Disposition Fee").  For purposes of this Section 7.1(a)(ii), "Gross Sale Proceeds" shall mean the aggregate cash or non-cash consideration received by the Borrower in consideration of the Leased Property, including any amounts to be received by the Borrower under any subleasing arrangement.  The value of non-cash consideration paid for a Leased Property shall be determined by mutual agreement between Agent and the Borrower.  The amounts payable under this Section 7.1(a)(ii) shall be paid in a lump sum at the closing for the applicable Leased Property;

(iii)   Agent shall be responsible for any other fees or commissions payable to any cooperating brokers in connection with the disposition of the Leased Properties.

(b)     In the event that Agent, after engaging in good faith marketing and sale efforts with respect to any Leased Property, determines that an affiliate of the Agent (an "Affiliate") is the highest or otherwise best potential purchaser for such Leased Property, then Agent must provide the Borrower with documentation of its marketing and sale efforts to third parties other

than its Affiliate. Upon review of such documentation, the Borrower, after consultation with the Agent, reserves its right to request that Agent remarket such Leased Property one last time, for a period not to exceed thirty (30) days unless Agent agrees in writing to a longer re-marketing period, should the Borrower determine that Agent's efforts did not produce the highest or otherwise best bid for such Leased Property.

Section 7.2. <u>Tangible and Other Asset Services</u>. With respect to the Tangible and Other Assets (as defined below), from and after the occurrence of an Event of Default, Agent and the Borrower agree as follows:

(a) Agent shall provide on an exclusive basis the following services (the "Tangible and Other Assets Services"):

(i) Develop an advertising and marketing plan for the auction of the Borrower's Equipment, Inventory, Intellectual Property Rights, Accounts, General Intangibles, customer lists and other assets (other than the Leased Property) of the Borrower (the "Tangible and Other Assets"), to be provided to and discussed with the Borrower;

(ii) From and after the occurrence of an Event of Default.

(1) implement the advertising and marketing plan as determined by Agent in its discretion to maximize the net recovery on the Tangible and Other Assets;

(2) prepare for the sale of the Tangible and Other Assets, including gathering specifications and photographs for pictorial brochures;

(3) make the Tangible and Other Assets, as applicable, available for viewing by potential buyers on an appointment-only basis;

(4) as agent for the Borrower, auction the Tangible and Other Assets for cash to the highest bidder "as is," "where is," free and clear of Liens pursuant to Section 363 of the Bankruptcy Code and in accordance with the terms of this Agreement;

(5) charge and collect on behalf of the Borrower from all purchasers any purchase price together with all applicable taxes in connection therewith;

(6) deposit all auction proceeds into a separate client trust account controlled by Agent; and

(7) submit a complete auction report to the Borrower within three weeks after the collection of funds from the auction.

(iii) In connection with the Tangible and Other Asset Services to be provided by Agent hereunder, the Borrower hereby grants to Agent the following rights and authority:

(1) Agent shall be entitled to use the name "Emivest Aerospace Corporation" and similar derivations in all of its advertising and promotional activities related to this Agreement.

(2)     Agent shall have the right to enter and occupy the Leased Properties during Sale Period solely for the purpose of performing its obligations under this Article VII. Agent shall have quiet enjoyment of the Leased Properties during its occupation of the Leased Properties with no interference from any labor unions or any other third parties. Agent will occupy the Leased Properties as a licensee and agent of the Borrower and shall not be obligated to pay any rent or other charges therefore. The Borrower agrees to continue to provide and pay for all utilities during the course of Agent's occupancy; including, without limitation (i) active and working telephone lines and any T1 or DSL service currently provided to the Leased Properties, and (ii) its current trash removal service. The Borrower agrees to maintain and bear the cost of any existing security personnel on the Leased Properties during the Sale Period. The Company acknowledges that Agent is not an insurer of the Borrower's personal property. Agent shall have the right to abandon any Equipment and Inventory and Other Assets not sold.

(3)     Agent and Borrower agree that Agent shall have all of the rights and powers of the Borrower, as a debtor-in-possession under the Bankruptcy Code, to sell all or substantially all of the assets of the Borrower free and clear of Liens, pursuant to Section 363 of the Bankruptcy Code, without the consent of the Borrower and to execute and deliver in connection with any such sale such bills of sale, assignments and other instruments to convey title to each Leased Property and the Tangible and Other Assets free and clear of Liens.

(4)     Agent and the Borrower agree, and the Borrower hereby expressly acknowledges, that Agent shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found on the Leased Properties or in the Equipment and Inventory. The Borrower shall be responsible for ensuring that the Borrower possesses and is in compliance with all Environmental Laws that are required for the operation of the Borrower's business. The Borrower hereby agrees to defend, indemnify and hold Agent harmless from any and all claims, losses, damages and liabilities of any kind whatsoever which arise from or are in connection with any Environmental Laws.

(iv)     In consideration of its services hereunder, Agent shall be entitled to retain a commission equal to ten percent (10%) of the Gross Proceeds from the sale of the Tangible and Other Assets (the "Tangible and Other Asset Disposition Fee"). In addition, Agent shall be entitled to charge and retain for its own account an industry standard buyer's premium of thirteen and one half percent (13.5%) for onsite bidders and sixteen percent (16%) for web bidders for the Tangible and Other Assets that are auctioned or sold (the "Buyer's Premium Fee"). For purposes of clarification, the Buyer's Premium Fee is a fee charged in addition to the sale price of any Tangible and Other Assets and is paid for by the buyer. Such Buyer's Premium Fee shall be withheld by Agent upon collection of proceeds from applicable buyer(s). "Gross Proceeds" shall be defined as cumulative gross proceeds from the sale of any Tangible and Other Assets, exclusive of sales taxes.

Section 7.3. <u>Covenants</u>. From and after the occurrence of an Event of Default, the following apply with respect to the Tangible and Other Asset Services and the Real Estate Services:

(a)     The Sale Period shall commence upon an Event of Default and notice from the Agent to the Borrower that the Agent is exercising its rights under this Article VII to market and sell the Leased Properties and Tangible and Other Assets (the "Sale Period Commencement Date") and shall expire the earlier of (i) eighteen (18) months after the Sale Period Commencement Date or (ii) the date the Tangible and Other Assets are sold and removed from the Leased Properties (unless abandoned in accordance herewith). In the event this Agreement expires pursuant to "(i)" of the preceding sentence, thereafter the Sale Period shall be automatically extended for successive thirty (30) day periods. In all events, however, if the Tangible and Other Assets are sold, the term shall expire no earlier than thirty (30) days following the sale in order to permit the Tangible and Other Assets to be removed from the Leased Properties.

(b)     During the Sale Period, Agent shall serve as the Borrower's exclusive agent with respect to the Real Estate Services and Tangible and Other Asset Services. All communications and inquiries regarding the Assets, regardless of whether directed to the Borrower (including but not limited to its officers, agents and employees), shall be redirected to Agent. The Borrower acknowledges that Agent or its affiliated entities may be engaged to sell or market similar assets by other persons or entities, and that any such engagement shall not constitute or be deemed to be a violation of this Agreement.

(c)     The Company shall pay Agent for all reasonable and customary Expenses (defined below) incurred in connection with the performance of the Real Estate Services and Tangible and Other Asset Services proposed hereunder. "Expenses" means all out-of-pocket expenses incurred in connection with performance of the contemplated services, including, without limitation: reasonable expenses of marketing, promotional, advertising, and transportation; long distance telephone charges; postage and courier/overnight express fees. The Borrower and Agent agree that Expenses will be paid from the proceeds of the sale of the Lease Properties and Tangible and Other Assets and not by the Borrower.

Section 7.4. <u>Indemnification.</u>

(a)     The Agent shall indemnify and hold Borrower and its members, officers, directors, employees, and principals (collectively, "Borrower Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (i) the willful or negligent acts or omissions of Agent (other than Borrower Indemnified Parties); and (ii) the material breach of any material provision of this Article VII by the Agent, except claims arising from Borrower's negligence, intentional acts or unlawful behavior ("Borrower Indemnified Claims").

(b)     The Borrower shall indemnify and hold Agent and its members, officers, directors, employees, and principals (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (i) the willful or negligent acts or omissions of

Borrower (other than Agent Indemnified Parties), (ii) any liability or other claims asserted by the Borrower's previous brokers, and (iii) the material breach of any material provision of this Article VII by the Borrower, except claims arising from Agent's negligence, intentional acts or unlawful behavior ("Agent Indemnified Claims").

Section 7.5. <u>TECHNOLOGY DISCLAIMER</u>: AGENT DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN ANY WEBSITE USED IN CONNECTION WITH THE SALE OF THE LEASED PROPERTIES AND THE TANGIBLE AND OTHER ASSETS, INCLUDING ANY THIRD-PARTY SOFTWARE, PRODUCTS OR OTHER MATERIALS USED IN CONNECTION WITH ANY SUCH WEBSITE, WILL BE TIMELY, SECURE, UNINTERRUPTED, OR THAT DEFECTS WILL BE CORRECTED.

## ARTICLE VIII

## EVENTS OF DEFAULT, RIGHTS AND REMEDIES

Section 8.1. <u>Events of Default</u>. "Event of Default", wherever used herein, means any one of the following events:

(a) Default in the payment of the Note, or any default with respect to payment of any other Indebtedness due from the Borrower to the Lenders as such Indebtedness becomes due and payable;

(b) The Borrower shall fail to comply or shall Default in the performance of any term, covenant or agreement contained in this Agreement, the Loan Documents, the Financing Orders, the Sale Order or any documents executed in connection with any of the foregoing, which is not cured within five (5) days after such failure or default;

(c) The Borrower shall fail to file the Sale Order Motion within five (5) Business Days after the Petition Date or shall fail to meet the date by which any of the Sale Transaction Events are to have occurred;

(d) Except as otherwise permitted by this Agreement or otherwise consented to in writing by the Agent, any ownership interest in the assets of a Borrower shall be sold or transferred in any transaction other than a Sale Transaction, or shall become subject to a Lien;

(e) The filing by the Borrower of any motion or proceeding that could reasonably be expected to result in impairment of the Agent's or Lenders' rights under this Agreement, including any motion to surcharge the Lenders or the Collateral under 11 U.S.C. § 506(c) or otherwise;

(f) The filing of a motion by the Borrower for entry of an order staying or otherwise prohibiting the prosecution of any enforcement action or any motion or pleading seeking to challenge the Agent's Liens or otherwise commencing any cause of action against the Agent or the Lenders;

(g)     The Final Financing Order has not been entered by the Bankruptcy Court on or before November 30, 2010;

(h)     Expiration or termination of the Borrower's exclusive periods to file and confirm a plan of reorganization;

(i)     Any representation or warranty made by the Borrower in this Agreement or in any agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with this Agreement shall be incorrect in any material respect;

(j)     The rendering against Borrower of an arbitration award, a final judgment, decree or order for the payment of money in excess of $25,000 or a postpetition lien on any of the Collateral and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of 30 consecutive days without a stay of execution;

(k)     A Change of Control occurs;

(l)     An event of default shall occur and be continuing under any Security Document;

(m)     The Agent believes in good faith that the prospect of payment in full of any part of the Indebtedness, or that full performance by the Borrower under the Loan Documents, is impaired, or that there has occurred after the Petition Date any event giving rise to a Material Adverse Effect;

(n)     (i) Any impairment of the Collateral that has a Material Adverse Effect, (ii) termination of the Borrower's lease of either of the Leased Properties, or (iii) the termination of any state or federal license or authorization or contract that has a Material Adverse Effect;

(o)     The Borrower (except following the Agent's prior written request or with the Agent's express prior written consent, which consent shall not be implied from any other action, inaction, or acquiescence of the Agent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the Loan Documents;

(p)     The Borrower shall file, or any other person shall obtain Bankruptcy Court approval of a Disclosure Statement for a plan of reorganization which does not provide for the full, final, and irrevocable repayment of all of the Obligations of the Borrower to the Lenders upon the effectiveness of such plan, unless the Agent has expressly joined in or consented to such plan in writing;

(q)     The Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Agent under the Financing Orders or the Loan Documents or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted hereunder or under the Financing Orders;

(r)     Either of the Financing Orders shall cease to be in full force and effect after the date of entry thereof (whether due to modification, reversal, revocation, remand, stay, recission, vacation, amendment, or otherwise) without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent);

(s)     The entry of an order converting the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissing the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(t)     The entry of an order (a) which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code with respect to any material contract, lease, or obligation or against any critical vendor; (b) allowing a third party to proceed against any material assets or contracts of the Borrower; (c) staying or otherwise prohibiting the prosecution of any enforcement action by Agent; or (d) otherwise adversely affecting the Agent's liens, claims, or rights and remedies;

(u)     If any creditor of the Borrower receives any adequate protection payment which is not fully acceptable to the Agent in its sole discretion, other than as set forth in the Financing Orders, or any Lien is granted as adequate protection other than as set forth in the Financing Orders;

(v)     A custodian or a trustee or examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code for the Borrower or any of its properties; or

(w)     The Sale Transaction Agreement, once executed, shall cease to be in full force and effect and any order entered by the Bankruptcy Court approving such Sale Transaction Agreement shall be modified, reversed, superseded, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent).

Section 8.2.    Rights and Remedies.  During any Default Period, upon three (3) days' notice to Borrower, the Agent may exercise any or all of the following rights and remedies, and the automatic stay provided under Section 362 of the Bankruptcy Code shall be deemed lifted or modified to the extent necessary to allow the Agent to take the actions described in this Section and Article VII, or under any other Loan Document, without further notice or a hearing, and the Borrower hereby waives all rights with respect to any such action by Agent:

(a)     The Agent may, by notice to the Borrower, declare the Commitment to be terminated, whereupon the same shall forthwith terminate;

(b)     The Agent may, by notice to the Borrower, declare the Indebtedness to be forthwith due and payable, whereupon all Indebtedness shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Borrower hereby expressly waive;

(c)     The Agent may exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of

Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which the Borrower hereby expressly waive) and the right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties), and at any sale of any of the Collateral, the Agent may credit bid all or any portion of the Indebtedness. In connection with the foregoing exercise of any such rights and remedies, the Borrower will on demand assemble the Collateral and make it available to the Agent at a place to be designated by the Agent which is reasonably convenient to both parties;

(d)     The Agent may exercise and enforce its rights and remedies under the Financing Orders and/or the Security Documents;

(e)     The Agent may exercise any other rights and remedies available to it by law or agreement;

(f)     The Agent shall be entitled to seek the appointment of a Chapter 11 trustee and have an expedited hearing with respect to such request, on not less than three (3) Business Days notice, subject to the Bankruptcy Court's calendar; and

(g)     The Agent may take all actions and exercise all rights granted to it under Article VII of this Agreement and after the payment of any Leased Property Disposition Fee, Tangible and Other Asset Disposition Fee, Buyer Premium Fee and any expenses incurred by Agent for which it is to be reimbursed under Article VII, apply any remaining proceeds from the sale of the Collateral to the Indebtedness.

Section 8.3.   Certain Notices.   If notice to a Loan Party of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given (in the manner specified in Section 8.3) at least ten calendar days before the date of intended disposition or other action.

## ARTICLE IX

### AGENCY PROVISIONS

Section 9.1.   Appointment and Authorization.   Each Lender hereby designates and appoints the Agent as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. The Agent agrees to act as such on the express conditions contained in this Article IX. The provisions of this Article IX are solely for the benefit of the Agent and the Lenders and Borrower shall not have rights as a third party beneficiary of any of the provisions contained herein other than as expressly provided in Section 9.8. Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions,

responsibilities, duties, obligations, or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Agreement with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The Agent shall only exercise or refrain from exercising any rights or take or refrain from taking any actions which the Agent is expressly entitled to take or assert under this Agreement and the other Loan Documents with the prior consent of all of the Lenders.

Section 9.2.    Delegation of Duties.  With the prior consent of all of the Lenders, the Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees, or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any agent, employee, or attorney-in-fact that it selects as long as such selection was made without gross negligence or willful misconduct

Section 9.3.    Liability of the Agent.  Agent shall not (a) be liable for any action taken or omitted to be taken by it at the direction of the Lenders under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation, or warranty made by Borrower or any Affiliate of Borrower, or any officer thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement, or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability, or sufficiency of this Agreement or any other Loan Document, or for any failure of Borrower to perform its obligations hereunder or thereunder. Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books, or records of Borrower or any Affiliate of Borrower.

Section 9.4.    Reliance by the Agent.  The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telephone or telephone message, statement, or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower), independent accountants, and other experts selected by the Agent and approved by all of the Lenders. With the prior consent of all of the Lenders, the Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of all of the Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

Section 9.5.    Notice of Default.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  The Agent will notify the Lenders of its receipt of any such notice.  The Agent shall take such action with respect to such Default or Event of Default as may be requested by all of the Lenders.

Section 9.6.    Credit Decision.  Each Lender acknowledges that Agent has not made any representation or warranty to it, and that no act by the Agent hereinafter taken, including any review of the affairs of the Borrower and its Affiliates, shall be deemed to constitute any representation or warranty by the Agent to any Lender.  Each Lender represents to the Agent that it has, independently and without reliance upon the Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition, and creditworthiness of the Borrower and its Affiliates, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower.  Each Lender also represents that it will, independently and without reliance upon the Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals, and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition, and creditworthiness of the Borrower.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by the Agent, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition, or creditworthiness of the Borrower which may come into the possession of the Agent.

Section 9.7.    Indemnification.  THE LENDERS SHALL INDEMNIFY UPON DEMAND THE AGENT (TO THE EXTENT NOT REIMBURSED BY OR ON BEHALF OF THE BORROWER AND WITHOUT LIMITING THE OBLIGATION OF THE BORROWER TO DO SO), PRO RATA, FROM AND AGAINST ANY AND ALL INDEMNIFIED LIABILITIES AS SUCH TERM IS DEFINED IN SECTION 10.6; PROVIDED, HOWEVER THAT NO LENDER SHALL BE LIABLE FOR THE PAYMENT TO AGENT OF ANY PORTION OF SUCH AGENT INDEMNIFIED LIABILITIES THAT ARE FOUND BY A FINAL AND NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED SOLELY FROM AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  WITHOUT LIMITATION OF THE FOREGOING, EACH LENDER. SHALL REIMBURSE THE AGENT UPON DEMAND FOR ITS RATABLE SHARE OF ANY COSTS OR OUT-OF-POCKET EXPENSES (INCLUDING ATTORNEY COSTS) INCURRED BY THE AGENT IN CONNECTION WITH THE PREPARATION, EXECUTION, DELIVERY, ADMINISTRATION, MODIFICATION, AMENDMENT, OR ENFORCEMENT (WHETHER THROUGH NEGOTIATIONS, LEGAL PROCEEDINGS, OR OTHERWISE) OF, OR LEGAL ADVICE IN RESPECT OF RIGHTS OR RESPONSIBILITIES UNDER, THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY DOCUMENT CONTEMPLATED BY OR REFERRED TO HEREIN, TO THE EXTENT THAT THE AGENT IS NOT REIMBURSED FOR SUCH EXPENSES BY OR ON BEHALF OF THE

BORROWER. THE UNDERTAKING IN THIS SECTION SHALL SURVIVE THE PAYMENT OF ALL OBLIGATIONS HEREUNDER AND THE RESIGNATION OR REPLACEMENT OF THE AGENT.

Section 9.8. <u>Successor Agent</u>. The Agent may resign as Agent upon thirty (30) days notice to the Lenders, such resignation to be effective upon the acceptance of a successor agent to its appointment as Agent. If the Agent resigns under this Agreement, the Lenders shall appoint a successor agent for the Lenders. If no successor agent is appointed prior to the effective date of the resignation of the Agent, the Agent may appoint, after consulting with the Lenders, a successor agent. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor agent and the retiring Agent's appointment, powers, and duties as the Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 9.8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement.

Section 9.9. <u>Collateral Matters.</u>

(a) With the prior consent of all of the Lenders, the Agent is authorized to release any Lien upon any Collateral.

(b) Upon receipt by the Agent of any authorization required pursuant to Section 9.9(a) to release any Liens upon particular types or items of Collateral, and upon at least five (5) Business Days prior written request (or such shorter time period as the Lenders may agree) by the Borrower, the Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens upon such Collateral; provided, however, that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's judgment, would expose the Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Borrower in respect of) all interests retained by Borrower, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

Section 9.10. <u>Restrictions on Actions by the Lenders; Sharing of Payments.</u>

(a) Each of the Lenders agrees that it shall not, without the consent of all of the Lenders, set-off against the Obligations, any amounts owing by such Lender to Borrower or any accounts of Borrower now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless agreed to by all of the Lenders, take or cause to be taken any action to enforce its rights under this Agreement or against Borrower, including the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b) If at any time or times any Lender shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the Obligations owing to such Lender arising under, or relating to, this Agreement or the other Loan Documents,

except for any such proceeds or payments received by such Lender from the Agent pursuant to the terms of this Agreement, or (ii) payments from the Agent in excess of such Lender's portion of all such distributions by the Agent, such Lender shall (A) promptly turn the same over to the Agent, in kind, and with such endorsements as may be required to negotiate the same to the Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied in accordance with the applicable provisions of this Agreement; provided, however, that if all or part of such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

Section 9.11. <u>Agency for Perfection</u>. Each Lender hereby appoints each other Lender as agent for the purpose of perfecting the Lenders' security interest in assets which, in accordance with Article 9 of the UCC can be perfected only by possession. Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

Section 9.12. <u>Payments by the Agent to the Lenders</u>. All payments to be made by the Agent to the Lenders shall be made by bank wire transfer or internal transfer of immediately available funds to each Lender pursuant to wire transfer instructions delivered in writing to the Agent, or pursuant to such other wire transfer instructions as each party may designate for itself by written notice to the Agent. Concurrently with each such payment, the Agent shall identify whether such payment (or any portion thereof) represents principal, premium, or interest.

Section 9.13. <u>Concerning the Collateral and the Related Loan Documents</u>. Each Lender agrees that any action taken by the Agent or the Lenders, as applicable, in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral, and the exercise by the Agent or the Lenders, as applicable, of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

Section 9.14. <u>Relation Among the Lenders</u>. The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

## ARTICLE X

## MISCELLANEOUS

Section 10.1. <u>No Waiver; Cumulative Remedies; Compliance with Laws</u>. No failure or delay by the Agent in exercising any right, power or remedy under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or

remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under the Loan Documents. The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law. The Agent may comply with any applicable state, provincial or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

Section 10.2. <u>Amendments, Etc</u>. No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom or any release of a Security Interest shall be effective unless the same shall be in writing and signed by the Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

Section 10.3. <u>Notices; Communication of Confidential Information; Requests for Accounting</u>. Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for under the Loan Documents shall be in writing and shall be (a) personally delivered, (b) sent by first class United States mail, (c) sent by overnight courier of national reputation, (d) transmitted by telecopy, or (e) sent as electronic mail, in each case delivered or sent to the party to whom notice is being given to the business address, telecopier number, or e mail address set forth below next to its signature or, as to each party, at such other business address, telecopier number, or e-mail address as it may hereafter designate in writing to the other party pursuant to the terms of this Section. All such notices, requests, demands and other communications shall be deemed to be an authenticated record communicated or given on (a) the date received if personally delivered, (b) when deposited in the mail if delivered by mail, (c) the date delivered to the courier if delivered by overnight courier, or (d) the date of transmission if sent by telecopy or by e mail, except that notices or requests delivered to the Agent pursuant to any of the provisions of Article II shall not be effective until received by the Agent. All notices, financial information, or other business records sent by any party to this Agreement may be transmitted, sent, or otherwise communicated via such medium as the sending party may deem appropriate and commercially reasonable; provided, however, that the risk that the confidentiality or privacy of such notices, financial information, or other business records sent by either party may be compromised shall be borne exclusively by the Borrower. All requests for an accounting under Section 9-210 of the UCC (i) shall be made in a writing signed by a Person authorized under Section 2.2(b), (ii) shall be personally delivered, sent by registered or certified mail, return receipt requested, or by overnight courier of national reputation, (iii) shall be deemed to be sent when received by the Agent and (iv) shall otherwise comply with the requirements of Section 9-210 of the UCC. The Borrower requests that the Agent respond to all such requests which on their face appear to come from an authorized individual and releases the Agent and Lenders from any liability for so responding.

Section 10.4. <u>Further Documents</u>. The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Agent may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Agent or Lenders' rights under the Loan

Documents and to sell and transfer any of the Leased Property or Tangible and Other Assets upon their sale by the Agent pursuant to the provisions of Article VII hereof, including without limitation motions in the Chapter 11 Case under Section 363 of the Bankruptcy Code (but any failure to request or assure that a Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion); provided, however, that same shall not increase the Obligations, representations or warranties of the Borrower hereunder. Promptly upon Agent's request, Borrower shall execute and deliver to Agent a power of attorney authorizing Agent to execute in the name, and on behalf, of the Borrower any and all documents reasonably necessary to consummate a sale of Collateral after an Event of Default.

Section 10.5.  <u>Costs and Expenses</u>.  The Borrower shall pay on demand all actual costs and expenses, including reasonable attorneys' fees, incurred by the Agent and Lenders in connection with the Indebtedness, this Agreement, the Loan Documents, and any other document or agreement related hereto or thereto, and the transactions contemplated hereby, including all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection and enforcement of the Indebtedness and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest.

Section 10.6.  <u>Indemnity</u>.  In addition to the payment of expenses pursuant to Section 10.5, the Borrower shall indemnify, defend and hold harmless the Agent and Lenders, and any of its participants, parent corporations, subsidiary corporations, affiliated corporations, successor corporations, and all present and future officers, directors, employees, attorneys and agents of the foregoing (the "Indemnitees") from and against any of the following (collectively, "Indemnified Liabilities"):

(i)     Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents or the making of the Advances; and

(ii)     Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel) in connection with the foregoing and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the Loan Documents or the use or intended use of the proceeds of the Advances.

Notwithstanding the foregoing, the Borrower shall not be obligated to indemnify any Indemnitee for any Indemnified Liability caused by the gross negligence or willful misconduct of such Indemnitee, as finally determined by a court of competent jurisdiction.

If any investigative, judicial or administrative proceeding arising from any of the foregoing is brought against any Indemnitee, upon such Indemnitee's request, the Borrower, or counsel designated by the Borrower and satisfactory to the Indemnitee, will resist and defend

such action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at the Borrower's sole cost and expense. Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding. If the foregoing undertaking to indemnify, defend and hold harmless may be held to be unenforceable because it violates any law or public policy, the Borrower shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. The Borrower's obligations under this Section 10.6 shall survive the termination of this Agreement and the discharge of the Borrower's other obligations hereunder.

Section 10.7. <u>Participants</u>. Each Lender and its participants, if any, are not partners or joint venturers, and such Lender shall not have any liability or responsibility for any obligation, act or omission of any of its participants. All rights and powers specifically conferred upon any Lender may be transferred or delegated to any Lender's participants, successors or assigns.

Section 10.8. <u>Execution in Counterparts; Telefacsimile Execution</u>. This Agreement and other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement or any other Loan Document by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Any party delivering an executed counterpart of this Agreement or any other Loan Document by telefacsimile also shall deliver an original executed counterpart of this Agreement or such other Loan Document but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document.

Section 10.9. <u>Retention of Borrower's Records</u>. The Agent and Lenders shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings, or other papers delivered to the Agent or any Lender by the Borrower or in connection with the Loan Documents for more than 30 days after receipt by the Agent or any Lender. If there is a special need to retain specific records, the Borrower must inform the Agent of its need to retain those records with particularity, which must be delivered in accordance with the notice provisions of Section 10.3 within 30 days of the Agent or any Lender taking control of same.

Section 10.10. <u>Binding Effect; Assignment; Complete Agreement; Sharing Information; Confidentiality</u>. The Loan Documents shall be binding upon and inure to the benefit of the Borrower and the Agent and Lenders and their respective successors and assigns, except that the Borrower shall not have the right to assign their rights thereunder or any interest therein without the Agent's prior written consent. To the extent permitted by law, the Borrower waives and will not assert against any assignee any claims, defenses or set-offs which the Borrower could assert against the Agent. This Agreement shall also bind all Persons who become a party to this Agreement as a borrower. This Agreement, together with the Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof. To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents, this Agreement shall control. The Agent and Lenders may share information regarding the Borrower with respective Affiliate's accountants, lawyers and other advisors and the Borrower waives any right of confidentiality it may have with respect to all such sharing of information. Any other provision

of this Agreement or the other Loan Documents notwithstanding, Agent and Lenders and such other parties shall use reasonable efforts in accordance with its policies and procedures in place from time to time to maintain the confidentiality of the financial and business information it obtains from the Borrower and to prevent the inappropriate dissemination and disclosure thereof, provided, that nothing in this Agreement or the other Loan Documents shall prohibit the Agent and Lenders from providing any information regarding the Borrower to internal auditors, other operating divisions of Agent, any Lender, any Lender affiliates, or in response to a request from a regulatory authority having jurisdiction over the Agent or any Lender.

Section 10.11. <u>Severability of Provisions</u>.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

Section 10.12. <u>Headings</u>.  Article, Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.13. <u>Election of Remedies; Subordination</u>.

(a)    <u>Election of Remedies</u>.  If the Agent may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving Agent a security interest in or lien upon any Collateral, whether owned by the Borrower, either by judicial foreclosure or by non judicial sale or enforcement, the Agent may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section.  If, in the exercise of any of its rights and remedies, Agent shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against the Borrower, whether because of any applicable laws pertaining to "election of remedies" or the like, the Borrower hereby consents to such action by Agent and waives any claim based upon such action.  Any election of remedies that results in the denial or impairment of the right of Agent to seek a deficiency judgment against the Borrower shall not impair the Borrower's obligation to pay the full amount of the Indebtedness.  In the event Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, Agent may bid all or less than the amount of the Indebtedness and the amount of such bid need not be paid by Agent but shall be credited against the Indebtedness.  The amount of the successful bid at any such sale, whether Agent or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Indebtedness shall be conclusively deemed to be the amount of the Indebtedness guaranteed under this Section, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Agent might otherwise be entitled but for such bidding at any such sale.

(b)    <u>Subordination</u>.

(1)    Borrower covenants and agrees that the payment of all indebtedness, principal, interest, fees, charges, expenses, attorneys' fees and any other sum, obligation or liability owing by Borrower, including any intercompany loans or trade payables or royalty or licensing fees (collectively, the "Intercompany Obligations"),

is subordinated, to the extent and in the manner provided in this Section 10.13(b), to the prior payment in full of all Indebtedness (herein, the "Senior Obligations") and that the subordination is for the benefit of the Lenders, and Lenders may enforce such provisions directly.

(2)     Borrower hereby (i) authorizes Agent to demand specific performance of the terms of this Section 10.13(b), whether or not Borrower shall have complied with any of the provisions hereof applicable to it, at any time when such Borrower shall have failed to comply with any provisions of this Section 10.13 which are applicable to it and (ii) irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

(3)     Upon any distribution of assets of Borrower in any dissolution, winding up, liquidation or reorganization (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

(i)     The Lenders shall first be entitled to receive payment in full in cash of the Senior Obligations before Borrower is entitled to receive any payment on account of the Intercompany Obligations.

(ii)     Any payment or distribution of assets of Borrower of any kind or character, whether in cash, property or securities, to which Borrower would be entitled except for the provisions of this Section 10.13(b), shall be paid by the liquidating trustee or agent or other person making such payment or distribution directly to the Lenders, to the extent necessary to make payment in full of all Senior Obligations remaining unpaid after giving effect to any concurrent payment or distribution or provisions therefor to the Lenders.

(iii)     In the event that notwithstanding the foregoing provisions of this Section 10.13, any payment or distribution of assets of Borrower of any kind or character, whether in cash, property or securities, shall be received by Borrower on account of the Intercompany Obligations before all Senior Obligations are paid in full, such payment or distribution shall be received and held in trust for and shall be paid over to the Lenders for application to the payment of the Senior Obligations until all of the Senior Obligations shall have been paid in full, after giving effect to any concurrent payment or distribution or provision therefor to the Lender.

No right of the Lenders or any other present or future holders of any Senior Obligations to enforce the subordination provisions herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Borrower or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by Borrower with the terms hereof, regardless of any knowledge thereof which any such holder may have or be otherwise charged with.

Section 10.14. <u>Governing Law; Jurisdiction, Venue</u>.   The Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of

the State of Delaware, except that at all times the provisions for the creation, perfection and enforcement of the liens and security interests granted by Borrower pursuant to the other Loan Documents with respect to the any Leased Properties may be governed by, and construed according to, the laws of the state where such Leased Property is located. In the event that the Bankruptcy Court does not have or fails to exercise jurisdiction with respect to any action or proceeding arising out of or in connection with this Agreement or any other Loan Document, the parties hereto hereby (i) consent to the personal jurisdiction of the state and federal courts located in the State of Delaware in connection with any controversy related to this Agreement or any other Loan Document; (ii) waive any argument that venue in any such forum is not convenient; (iii) agree that any litigation initiated by the Agent or Borrower in connection with this Agreement or the other Loan Documents shall be venued in either the state or federal courts located in the State of Delaware; and (iv) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing herein contained shall, or shall be construed so as to, limit the right of the Agent to bring actions, suits or proceedings with respect to the obligations and liabilities of the Borrower under, or any other matter arising out of or in connection with, the Loan Documents, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, in the courts of whatever jurisdiction in which the office of the Agent may be located or assets of the Borrower may be found or otherwise shall to Parent seem appropriate, or to affect the right to service of process in any jurisdiction in any other manner permitted by the law.

Section 10.15. <u>Agent and Lenders as Party-in-Interest</u>. The Borrower hereby stipulates and agrees that the Agents and Lenders are and shall remain a party in interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of their rights or remedies under applicable law or documentation. Without limitation of the foregoing, the Agent and Lenders shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Advances, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease); *provided* that the Agent and Lenders will not exercise such right if the action or inaction by the Borrower which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

Section 10.16. <u>Waiver of Right to Obtain Alternative Financing</u>. In consideration of the Advances to be made to the Borrower by the Lenders, Borrower hereby further waives any right it may have to obtain an order by the Bankruptcy Court authorizing the Borrower to obtain financing pursuant to Section 364 of the Bankruptcy Code from any person other than the Lenders, unless such financing would result in all of the Obligations to the Lenders (whether arising before, on or after the date of this Agreement) being paid in full, in cash, on or before the expiration of the term of this Agreement.

Section 10.17. <u>Credit Bids</u>. Nothing herein shall affect, and the Agent shall maintain, the Agent's right to credit bid its claims under this Agreement and the Financing Orders pursuant to Section 363(k) of the Bankruptcy Code.

[Remainder of this page intentionally left blank]

THE BORROWER, AGENT AND LENDERS WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date set forth in the initial caption of this Agreement.

**<u>BORROWER:</u>**

**EMIVEST AEROSPACE CORPORATION**

By: _____
     Name:
     Title:

**<u>LENDERS:</u>**

**COUNSEL RB CAPITAL, LLC**

By: _____
     Name:
     Title:

**EAI CAPITAL, LLC**

By: _____
     Name:
     Title:

**<u>AGENT:</u>**

**COUNSEL RB CAPITAL, LLC**

By: _____
     Name:
     Title:

# Schedule 4.1(e)

## Insurance Policies

**Schedule 6.3**

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Emivest Aerospace Corporation | DE, SOS | SJ30 Aircraft I, LLC | UCC Original | 2009 1724738 | 06/01/09 | Specific Aircraft Equipment |
| Emivest Aerospace Corporation | DE, SOS | Liebherr-International Deutchland GmbH | UCC original | 2010 0652598 | 2/24/10 | Specific Equipment including all parts, components, modules, sections, equipment, attachments, accessories and supplies therefore and all proceeds of every kind of all of the foregoing. |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Emivest Aerospace Corporation | DE, SOS | Wells Fargo Securities, LLC | UCC Original | 2010 2579807 | 7/26/10 | All claims, demands, causes of action, and rights of recovery against any person or entity that may be liable to Debtor for indemnity, breach of contract, contribution or any other legal or equitable theory of recovery available to Debtor in connection with the American Arbitration Association's arbitration award against Debtor and in favor of SP entered on Nov. 12, 2009 and all cash and non-cash proceeds and products of the claims, any proceeds. |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Emivest Aerospace Corporation | WV, Berkeley County | Plaintiff: State of the WV, State Tax department | State tax Lien | 20100025439 | 6/18/10 | Notice of Tax lien filed in the sum of $1,261.61 for the period of 12/31/09 |
| Emivest Aerospace Corporation | WV, Berkeley County | | State tax Lien | 20100031387 | 7/27/10 | Notice of Tax lien filed in the sum of $2,536.87 |
| Emivest Aerospace Corporation | Bexar County, TX | Geo Strata Environmental Consultants, Inc. | Mechanic's Lien | Volume 13939, Page 1444 | 4/14/2009 | Amount: 23,747.81 |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Sino Swearingen Aircraft Corporation | DE, SOS | CIT Technology Financing Services, Inc. | UCC original | 5109743 6 | 4/05/05 | Specific Computer Equipment (canon) plus all other types of office equipment and products, computers, security systems and other items of equipment and including all replacements, upgrades and substitutions hereafter occurring to all of the foregoing equipment and all now existing and future attachments, parts, accessories and add-ons for all of the foregoing items and types of equipment and proceeds and products thereof. |
| Sino Swearingen Aircraft Corporation | DE, SOS | Liebherr-International Deutschland GmbH | UCC Original | 6251519 5 | 7/20/06 | Specific Aircraft equipment including all parts, components, models, sections, equipment, attachments, accessories and all supplies therefore and all proceeds of every kind of all of the foregoing |
| Sino Swearingen Aircraft Corporation | DE, SOS | Cisco Systems Capital Corporation | UCC original | 6339293 3 | 9/14/06 | Specific equipment including all components, additions, upgrades, attachments, accessions, substitutions, replacements and proceeds of the foregoing |
| Sino Swearingen Aircraft Corporation | DE, SOS | Lloyd Everard | UCC original | 2007 3814646 | 10/10/07 | Specific Aircraft equipment including all components, modules, sections, equipment attachments, accessories and supplies therefore and proceeds of the foregoing |
| Sino Swearingen Aircraft Corporation | DE, SOS | 921 BE, LLC | UCC original | 2007 3837340 | 10/11/07 | Specific Aircraft equipment including all components, modules, sections, equipment attachments, accessories and supplies therefore and proceeds of the foregoing |
| Sino Swearingen Aircraft Corporation | TX, SOS | Cisco Systems Capital Corporation | UCC Original | 06-0023976881 | 7/17/06 | Schedule I (not attached) including all additions, attachments, accessions, substations, replacements and proceeds of such collateral |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Sino Swearingen Aircraft Corporation | TX, SOS | Action Aviation | UCC Original | 07-0021631989 | 6/26/07 | Sino Swearingen specific serial number 008 |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Sino Swearingen Aircraft Corporation | Berkley County, WV | | UCC/Federal Tax Lien/Mechanic's lien/ Local Judgment | | | Notice of Tax Lien in the amount of $2,536.87 for period of 1/1/10-3/31/10 |
| Sino Swearingen Aircraft Corporation | Berkley County, WV | | State Tax Lien | 20100031387 | 7/27/10 | |
| Sino Swearingen Aircraft Corporation | Berkley County, WV | | Tax Lien | Volume 42, Page 606 | 1/30/2003 | Worker's Compensation Lien in the amount of $10,225.16 |
| Sino Swearingen Aircraft Corporation | DE, SOS | Déjà vu Consulting Inc. | UCC original | 2007 0058387 | 1/05/07 | Specific equipment including all components, modules, attachments, supplies therefore and proceeds of the foregoing |

**Exhibit A to Debtor-in-Possession Credit and Security Agreement**

**Budget**

# Emivest Aerospace Corporation
## DIP Budget
(Amounts in Thousands of US Dollars)

*Emivest Aerospace Corporation*
*DIP Budget*

| | Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | | Oct 18 | Oct 25 | Nov 01 | Nov 08 | Nov 15 | Nov 22 | Nov 29 | Dec 06 | Dec 13 | Dec 20 | Dec 27 | Jan 03 | Jan 10 | Jan 17 | Jan 24 | Jan 31 | Feb 07 | Feb 14 | Oct 18 to Feb 20 |
| | | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2011 | 2011 | 2011 | 2011 | 2011 | 2011 | 2011 | Feb 20 |
| **Operating Activities** | | | | | | | | | | | | | | | | | | | | |
| Cash Receipts | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Payroll | | (61) | (42) | (56) | (46) | (56) | (46) | (56) | (46) | (56) | (46) | (56) | (46) | (56) | (46) | (56) | (46) | (56) | (56) | (507) |
| Tax Payments | | (246) | (40) | (40) | (65) | (2) | (2) | (60) | (2) | (63) | (2) | (74) | (40) | (93) | (64) | (81) | (327) | (59) | (59) | (827) |
| Insurance / 401(K) / Employee Benefit Payments | | (100) | (17) | (17) | (12) | (16) | (13) | (1) | (15) | (5) | (15) | (10) | (15) | (2) | (15) | (10) | (15) | (10) | (5) | (270) |
| Facility Rents and Maintenance | | (4) | (5) | (5) | (6) | (5) | (6) | (4) | (5) | (8) | (9) | (9) | (4) | (4) | (4) | (2) | (4) | (2) | (2) | (79) |
| Leased Equipment | | (1) | (3) | (7) | (2) | (2) | (2) | (1) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (1) |
| Utilities | | (5) | (3) | (13) | (3) | (3) | (3) | (9) | (3) | (9) | (3) | (9) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (32) |
| Texas State Taxes | | 0 | (5) | (5) | (133) | (2) | (4) | (2) | (21) | (63) | (21) | (9) | (2) | (2) | (21) | (4) | (2) | (2) | (2) | (114) |
| Other Vendors | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (20) | 0 | 0 | (200) | 0 | 0 | 0 | 0 | 0 | 0 | (200) |
| Net Operating Cash Flow | | (204) | (86) | (124) | (270) | (58) | (59) | (69) | (356) | (125) | (78) | (74) | (373) | (60) | (64) | (81) | (44) | (60) | (59) | ($2,154) |
| **Investing Activities** | | | | | | | | | | | | | | | | | | | | |
| Capital Expenditures | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Cash Flow from Investments | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Financing and Other Activities** | | | | | | | | | | | | | | | | | | | | |
| Cash Advances from EEDC | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Required Cash Deposits to Vendors, etc. | | (355) | (53) | (53) | (53) | (10) | (53) | (53) | (214) | (140) | (96) | (40) | (226) | (93) | (96) | (40) | (317) | (53) | (53) | (1,615) |
| Professional Fees (as incurred) | | 355 | 53 | 53 | (450) | 109 | 53 | 53 | (350) | 140 | 96 | 40 | (246) | 113 | 96 | 40 | (251) | 53 | (184) | $0 |
| Accrued and Paid Professional Fees | | - | - | - | (133) | - | - | - | (164.0) | - | - | - | (164.0) | - | - | - | (291.0) | - | 184 | 184 |
| Net Cash Flow from Financing and Other | | ($485) | $0 | ($134) | ($278) | ($58) | ($59) | ($69) | ($356) | ($125) | ($78) | ($74) | ($373) | ($60) | ($64) | ($81) | ($46) | ($60) | ($59) | ($1,383) |
| **Net Cash Flow Before DIP Financing** | | ($489) | ($86) | ($124) | ($278) | ($58) | ($59) | ($69) | ($356) | ($125) | ($78) | ($74) | ($373) | ($60) | ($64) | ($81) | ($337) | ($60) | ($59) | ($3,537) |
| **DIP Financing** | | | | | | | | | | | | | | | | | | | | |
| Amounts Funded Under DIP Facility | | $1,000 | $0 | $0 | $2,000 | $0 | $0 | $0 | $0 | $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,000 |
| Closing Costs Payable to DIP Provider | | 0 | 0 | 0 | (150) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (150) |
| Paydown of DIP Facility | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Cash Flow from DIP Financing | | $1,000 | $0 | $0 | $1,850 | $0 | $0 | $0 | $0 | $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,850 |
| **Net Cash Flow After DIP Financing** | | $312 | ($86) | ($124) | $1,062 | ($58) | ($59) | ($69) | ($356) | $875 | ($78) | ($74) | ($373) | ($60) | ($64) | ($81) | ($337) | ($60) | ($59) | $313 |
| **Change in Cash Position and Liquidity** | | | | | | | | | | | | | | | | | | | | |
| Beginning Cash | | $0 | $312 | $226 | $101 | $1,164 | $1,106 | $1,047 | $978 | $623 | $1,498 | $1,420 | $1,346 | $973 | $913 | $850 | $769 | $432 | $372 | $0 |
| Net Change in Cash During Period | | 312 | (86) | (124) | 1,062 | (58) | (59) | (69) | (356) | 875 | (78) | (74) | (373) | (60) | (64) | (81) | (337) | (60) | (59) | (150) |
| Ending Cash | | $312 | $226 | $101 | $1,164 | $1,106 | $1,047 | $978 | $623 | $1,498 | $1,420 | $1,346 | $973 | $913 | $850 | $769 | $432 | $372 | $313 | 313 |
| PLUS: Availability Under DIP Facility | | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 96 | 0 | 0 | 0 | 96 | 0 | 0 | 0 | 40 | 0 |
| Total Liquidity | | $312 | $226 | $101 | $1,164 | $1,106 | $1,047 | $978 | $623 | $1,498 | $1,420 | $1,346 | $973 | $913 | $850 | $769 | $432 | $372 | $313 | $313 |
| **DIP Balance** | | | | | | | | | | | | | | | | | | | | |
| Beginning DIP Balance | | $0 | $312 | $226 | $1,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $4,250 | $4,250 | $4,330 | $4,330 | $4,330 | $4,370 | $4,370 | $4,370 | $4,370 | $0 |
| Principal Funding | | 1,000 | (86) | (123) | 2,000 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,000 |
| Fees / Interest (PIK pursuant to Redemption Payment) | | 250 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 80 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 40 | 410 |
| Ending DIP Balance | | $1,250 | $1,250 | $1,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $4,250 | $4,330 | $4,330 | $4,330 | $4,370 | $4,370 | $4,370 | $4,370 | $4,370 | $4,410 | $4,410 |

*Draft and Subject to Revision*
*Privileged and Confidential*

## Budget Compliance Certificate

To:    [Agent]
Date:  [_____, **2010**]
Subject:

      In accordance with our Debtor-in-Possession Credit and Security Agreement dated October ___, 2010 (as amended from time to time, the "DIP Credit Agreement"), attached are the financial statements of _____ (the "Borrower") dated [_____, **2010**](the "Reporting Date") and the year-to-date period then ended (the "Current Financials"). All terms used in this certificate have the meanings given in the DIP Credit Agreement.

    **A.**    **Preparation and Accuracy of Financial Statements.**  I certify that the Current Financials fairly and accurately present the Borrowers' financial condition as of the Reporting Date.

    **B.**    **Name of Borrower; Merger and Consolidation Related Issues.**  I certify that:

(Check one)

☐    The Borrower has not, since the date of the DIP Credit Agreement, changed its name or jurisdiction of organization, nor has it consolidated or merged with another Person.

☐    The Borrower has, since the date of the DIP Credit Agreement, either changed its name or jurisdiction of organization, or both, or has consolidated or merged with another Person, which change, consolidation or merger: ☐ was consented to in advance by Agent in writing, and/or ☐ is more fully described in the statement of facts attached to this Certificate.

    **C.**    **Events of Default.**  I certify that:

(Check one)

☐    I have no actual knowledge of the occurrence of a Default or an Event of Default under the DIP Credit Agreement, except as previously reported to the Agent in writing.

☐    I have knowledge of a Default or an Event of Default under the DIP Credit Agreement not previously reported to the Agent in writing, as more fully described in the statement of facts attached to this Certificate.

    **D.**    **Litigation Matters.**  I certify that:

(Check one)

☐    I have no actual knowledge of any material adverse change to the litigation exposure of the Borrower or any of its Affiliates

☐    I have knowledge of material adverse changes to the litigation exposure of the Borrower or any of its Affiliates not previously disclosed in Schedule ___, as more fully described in the statement of facts attached to this Certificate.

**E.**    **Compliance with Budget.** I further certify that:

(Check and complete each of the following)

1.    **Compliance with Budget.** Borrower ☐ has ☐ has not complied in all respects with the covenants and restrictions set forth in Section 6.1(g) of the DIP Credit Agreement, and as a consequence Borrower ☐ is ☐ is not in compliance with Section 6.1(g) of the DIP Credit Agreement.

Attached are statements of all relevant facts and computations in reasonable detail sufficient to evidence Borrower's compliance with the financial covenants referred to above, which computations were made in accordance with GAAP.

**EMIVEST AEROSPACE CORPORATION**

By:_____

Its:_____

**Exhibit C to Debtor-in-Possession Credit and Security Agreement**

Form of Interim Financing Order
(To be attached)

**Exhibit D to Debtor-in-Possession Credit and Security Agreement**

**Premises**

The Premises referred to in the Debtor-in-Possession Credit and Security Agreement are legally described as follows:

**[To be completed by Borrower]**

## SECURED PROMISSORY NOTE

$4,000,000                                                                October __, 2010

For value received, the undersigned, **EMIVEST AEROSPACE CORPORATION** (the "Borrower", hereby promise to pay to the order of _____ (collectively, the "Lenders"), acting through its Agent, _____, on the Termination Date referenced in the Debtor-in-Possession Credit and Security Agreement dated the same date as this Secured Promissory Note (this "Note") that was entered into by the Lenders and the Borrower (as amended from time to time, the "Credit Agreement"), at Agent's office located at _____, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of Four Million Dollars ($4,000,000) or the aggregate unpaid principal amount of all Advances made by the Lenders to the Borrower under the Credit Agreement, together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Note is fully paid at the rate from time to time in effect under the Credit Agreement.

This Note is the Note referenced in the Credit Agreement, and is subject to the terms of the Credit Agreement, which provides, among other things, for acceleration hereof. Principal and interest due hereunder shall be payable as provided in the Credit Agreement, and this Note may be prepaid only in accordance with the terms of the Credit Agreement. This Note is secured, among other things, pursuant to the Credit Agreement and the Financing Orders and Security Documents, each as therein defined, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

The Borrower shall pay all actual costs of collection, including reasonable attorneys' fees and legal expenses if this Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

[Signatures on next page]

**EMIVEST AEROSPACE CORPORATION**

By:_____

Its:_____

**Exhibit F to Debtor-in-Possession Credit and Security Agreement**

Form of Aircraft Security Agreement

(To be attached)

**Exhibit G to Debtor-in-Possession Credit and Security Agreement**

Form of Intellectual Property Security Agreement

(To be attached)