# EXHIBIT B TO MOTION

# DEBTOR-IN-POSSESSION
# CREDIT AND SECURITY AGREEMENT

## BY AND AMONG

## EMIVEST AEROSPACE CORPORATION

### AND

## COUNSEL RB CAPITAL, LLC
### AND
## EAI CAPITAL, LLC

### AND

## COUNSEL RB CAPITAL, LLC, as Agent

**October \_\_\_, 2010**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ........................................................................... 1
    Section 1.1.   Definitions.................................................................. 1
    Section 1.2.   Other Definitional Terms; Rules of Interpretation................................ 11

ARTICLE II AMOUNT AND TERMS OF THE CREDIT FACILITY ........................ 12
    Section 2.1.   Advances. ................................................................. 12
    Section 2.2.   Procedures for Advances ................................................. 12
    Section 2.3.   Disbursement of Advances ............................................... 12
    Section 2.4.   Interest; Default Interest Rate; Application of Payments; Participations; Usury.............................................................................. 13
    Section 2.5.   Fees .......................................................................... 133
    Section 2.6.   Time for Interest Payments; Payment on Non-Business Days; Computation of Interest and Fees ...................................... 14
    Section 2.7.   Voluntary Prepayment; Termination of the Credit Facility by the Borrower ................................................................... 14
    Section 2.8.   Mandatory Prepayment. .................................................. 15
    Section 2.9.   Use of Proceeds. .......................................................... 15
    Section 2.10.  Liability Records.......................................................... 15
    Section 2.11.  Single Loan ................................................................ 15
    Section 2.12.  Grants, Rights and Remedies............................................ 16
    Section 2.13.  Perfection .................................................................. 16
    Section 2.14.  Waiver of any Priming Rights .......................................... 16
    Section 2.15.  Waiver of Claims to Surcharge ........................................ 16

ARTICLE III SECURITY INTEREST; OCCUPANCY; SETOFF ................. 16
    Section 3.1.   Grant of Security Interest................................................ 16
    Section 3.2.   Lien Perfection; Further Assurances................................... 17
    Section 3.3.   Superpriority Administrative Expense Claim.......................... 17
    Section 3.4.   Notification of Account Debtors and Other Obligors.................. 18
    Section 3.5.   Assignment of Insurance................................................. 18
    Section 3.6.   Occupancy.................................................................. 19
    Section 3.7.   License ..................................................................... 19
    Section 3.8.   Setoff....................................................................... 19
    Section 3.9.   Collateral................................................................... 19
    Section 3.10.  Survival .................................................................... 20

ARTICLE IV CONDITIONS OF LENDING ............................................... 20
    Section 4.1.   Conditions Precedent to the Initial Advance ........................ 20
    Section 4.2.   Conditions Precedent to All Advances ............................... 21

ARTICLE V REPRESENTATIONS AND WARRANTIES............................. 22

Section 5.1.    Existence and Power; Name Chief Executive Office; Inventory and
                Equipment Locations; Federal Employer Identification Number and
                Organizational Identification Number ................................................ 22
Section 5.2.    Capitalization ...................................................................................... 22
Section 5.3.    Authorization of Borrowing; No Conflict as to Law or Agreements ... 22
Section 5.4.    Legal Agreements ................................................................................ 23
Section 5.5.    Subsidiaries ......................................................................................... 23
Section 5.6.    Budget .................................................................................................. 23
Section 5.7.    Litigation ............................................................................................. 23
Section 5.8.    Regulation U ........................................................................................ 23
Section 5.9.    Taxes ................................................................................................... 23
Section 5.10.   Titles and Liens ................................................................................... 24
Section 5.11.   Intellectual Property Rights ................................................................ 24
Section 5.12.   Leases ................................................................................................ 244
Section 5.13.   Default ................................................................................................. 25
Section 5.14.   Trade Names ....................................................................................... 25
Section 5.15.   Submissions to Agent .......................................................................... 25
Section 5.16.   Financing Statements .......................................................................... 25
Section 5.17.   Rights to Payment ............................................................................... 25
Section 5.18.   Environmental Laws ............................................................................ 25
Section 5.19.   Administrative Priority; Lien Priority .................................................. 26
Section 5.20.   Liens. ................................................................................................... 27
Section 5.21.   Title. .................................................................................................... 27
Section 5.22.   Condemnation. .................................................................................... 27
Section 5.23.   USA Patriot Act. .................................................................................. 27
Section 5.24.   The Chapter 11 Case ........................................................................... 27

ARTICLE VI COVENANTS ................................................................................. 28
Section 6.1.    Reporting Requirements ...................................................................... 28
Section 6.2.    Use of Proceeds and Operations .......................................................... 29
Section 6.3.    Permitted Liens; Financing Statements ................................................ 29
Section 6.4.    Indebtedness ........................................................................................ 30
Section 6.5.    Books and Records; Collateral Examination, Inspection and Appraisals
                ............................................................................................................. 30
Section 6.6.    Compliance with Laws ......................................................................... 31
Section 6.7.    Payment of Taxes and Other Claims .................................................... 31
Section 6.8.    Maintenance of Properties ................................................................... 31
Section 6.9.    Insurance ............................................................................................. 32
Section 6.10.   Preservation of Existence .................................................................... 32
Section 6.11.   Delivery of Instruments, etc. ............................................................... 32
Section 6.12.   Sale or Transfer of Assets ................................................................... 32
Section 6.13.   Consolidation and Merger; Asset Acquisitions .................................... 32
Section 6.14.   Place of Business; Name ...................................................................... 32
Section 6.15.   Performance by the Agent .................................................................... 33
Section 6.16.   Sale Transaction .................................................................................. 33
Section 6.17.   Financing Orders; Administrative Priority; Lien Priority; Payment of
                Claims ................................................................................................. 33

ARTICLE VII CONSULTING AND MARKETING SERVICES .................................. 34
    Section 7.1.    Real Estate Services. ................................................................. 34
    Section 7.2.    Tangible and Other Asset Services ...................................... 35
    Section 7.3.    Covenants. ............................................................................ 376
    Section 7.4.    Indemnification ................................................................... 37
    Section 7.5.    TECHNOLOGY DISCLAIMER ........................................ 38

ARTICLE VIII EVENTS OF DEFAULT, RIGHTS AND REMEDIES ...................... 38
    Section 8.1.    Events of Default ................................................................ 38
    Section 8.2.    Rights and Remedies ......................................................... 40
    Section 8.3.    Certain Notices................................................................... 41

ARTICLE IX AGENCY PROVISIONS ...................................................................... 41
    Section 9.1.    Appointment & Authorization ........................................... 41
    Section 9.2.    Delegation of Duties .......................................................... 41
    Section 9.3.    Liability of the Agent ......................................................... 41
    Section 9.4.    Reliance by the Agent ........................................................ 42
    Section 9.5.    Notice of Default................................................................ 42
    Section 9.6.    Credit Decision .................................................................. 42
    Section 9.7.    Indemnification .................................................................. 43
    Section 9.8.    Successor Agent ................................................................. 43
    Section 9.9.    Collateral Matters.............................................................. 43
    Section 9.10.  Restriction on Actions by the Lenders; Sharing of Prepayments ......... 44
    Section 9.11.  Agency for Perfection ....................................................... 44
    Section 9.12.  Payments by the Agent to the Lenders ............................. 45
    Section 9.13.  Concerning the Collateral and the Related Loan Documents.............. 45
    Section 9.14.  Relation Among the Lenders ............................................. 45

ARTICLE X MISCELLANEOUS ............................................................................... 45
    Section 10.1.  No Waiver; Cumulative Remedies; Compliance with Laws ............... 45
    Section 10.2.  Amendments, Etc................................................................ 46
    Section 10.3.  Notices; Communication of Confidential Information; Requests for
                  Accounting.......................................................................... 46
    Section 10.4.  Further Documents ............................................................ 46
    Section 10.5.  Costs and Expenses............................................................ 47
    Section 10.6.  Indemnity ........................................................................... 47
    Section 10.7.  Participants......................................................................... 48
    Section 10.8.  Execution in Counterparts; Telefacsimile Execution ........... 48
    Section 10.9.  Retention of Borrower's Records ...................................... 48
    Section 10.10. Binding Effect; Assignment; Complete Agreement; Sharing
                  Information; Confidentiality .............................................. 48
    Section 10.11. Severability of Provisions ................................................. 49
    Section 10.12. Headings ............................................................................ 49
    Section 10.13. Election of Remedies; Subordination ................................ 49
    Section 10.14. Governing Law; Jurisdiction, Venue ................................. 50
    Section 10.15. Agent and Lenders as Party-in-Interest............................. 51
    Section 10.16. Waiver of Right to Obtain Alternative Financing................ 51

Section 10.17. Credit Bids ........................................................................................ 51

SCHEDULE 4.1(e) INSURANCE POLICIES

EXHIBITS
    Exhibit A - Budget
    Exhibit B - Budget Compliance Certificate
    Exhibit C - Form of Interim Financing Order
    Exhibit D - Premises
    Exhibit E - Secured Promissory Note
    Exhibit F - Form of Aircraft Security Agreement
    Exhibit G - Form of Intellectual Property Security Agreement

# DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

## Dated October ___, 2010

Emivest Aerospace Corporation, a Delaware corporation and a debtor-in-possession (the "Borrower"), Counsel RB Capital, LLC, a Delaware limited liability company ("Counsel RB Lender") and EAI Capital, LLC a Delaware limited liability company ("Hilco Lender", and together with the Counsel RB Lender, individually a "Lender" and collectively the "Lenders") and Counsel RB Capital, LLC, a Delaware limited liability company and in its capacity as the agent for the Lenders (the "Agent"), hereby agree as follows:

WHEREAS, on October __, 2010 (the "<u>Petition Date</u>"), the Borrower commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, and the Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor-in-possession;

WHEREAS, Borrower is unable to obtain funds or credit on any other terms; and

WHEREAS, the Borrower has asked the Lenders to make post-petition loans and advances to the Borrower in an aggregate principal amount not to exceed $4,000,000 at any time outstanding;

WHEREAS, the Borrower has asked and the Agent is willing to provide the consulting and marketing services provided for in Article VII of this Agreement; and

WHEREAS, Lenders are willing to provide such financing and the Agent is willing to provide such marketing and consulting services, subject to the terms and conditions set forth herein, including that all of the Obligations hereunder and under the other Loan Documents constitute allowed superpriority administrative expense claims pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code in the Chapter 11 Case and are secured by a priming first priority lien on substantially all of Borrower's personal property and interests in real estate, in each case as set forth herein and in the Financing Orders;

NOW THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1. <u>Definitions</u>. Except as otherwise expressly provided in this Agreement, the following terms shall have the meanings given them in this Section:

"Accounts" shall have the meaning given it under the UCC.

"Advance Rate" means sixty percent (60%).

"Advance" is defined in Section 2.1.

"Affiliate" or "Affiliates" means any Person controlled by, controlling or under common control with the Borrower, including any Subsidiary of the Borrower. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Debtor-in-Possession Credit and Security Agreement, as it may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"Aircraft Security Agreement" means the Aircraft Security Agreement by and between the Agent and the Borrower in the form attached hereto as Exhibit F, as it may be amended, supplemented or modified from time to time.

"Allowed Professional Fees" has the meaning specified in the Financing Orders.

"Assignment of Licenses" means that certain Assignment of Licenses by Borrower in favor of Lenders of even date herewith, as it may be amended, supplemented or modified from time to time.

"Availability" means the amount, if any, by which the Borrowing Base exceeds the outstanding principal balance of the aggregate amount of the Advances.

"Avoidance Actions" means any and all causes of action, grievances, arbitrations, actions, suits, demands, demand letters, claims, complaints, notices of non-compliance or violation, enforcement actions, investigations or proceedings that Borrower may assert under Chapter 5 of the Bankruptcy Code or any similar applicable law.

"Bankruptcy Code", means Title 11 of the United States Code, as amended from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court having competent jurisdiction over the Chapter 11 Case.

"Borrowing Base" means at any time the lesser of:

(a)     The Maximum Advance Amount; or

(b)     The sum of:

(i)     The product of the Advance Rate times the Net Orderly Liquidation Value of the Borrower's Equipment and Inventory and Leased Property as of the date of the Initial Advance; less

(ii)     The Interest Reserve; and less

(iii)     The amount of the Carve-Out.

"Budget" means the projections showing all projected cash disbursements (with reasonable identification of cash disbursements) for the Borrower delivered pursuant to Section 5.6 to the Agent, covering the period commencing on the Closing Date and ending thirteen (13) weeks thereafter, with respect to operations of the Borrower and maintenance of its assets while the Borrower is marketed for sale. The Budget shall be substantially in the form of <u>Exhibit A</u> annexed hereto and made a part hereof.

"Budget Compliance Certificate" means a written certificate, substantially in the form annexed hereto as <u>Exhibit B</u>, signed by an authorized officer of the Borrower, who shall be acceptable to the Agent, delivered weekly pursuant to Section 6.1(g) to the Agent, which shall, <em>inter alia</em>, (i) reflect the Borrower's cash disbursements for the immediately preceding week, including a comparison of such cash disbursements with those projected for such week, (ii) confirm that the proceeds of the Advances to be used during the upcoming week are for one of the types of cash disbursements set forth in the Budget and in compliance with the maximum amounts permitted to be expended thereunder for the relevant time period in accordance with the Budget, and (iii) certify that no Default or Event of Default has occurred and/or is continuing, or, if a Default or an Event of Default has occurred and/or is continuing, the description of such Default or Event of Default.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

"Buyer's Premium Fee" is defined in Section 7.2(a)(iv).

"Carve-Out" has the meaning specified in the Financing Orders; provided, that, the lien priority and the payment $150,000 of the Allowed Professional Fees under the Carve-Out are subject to the provisions of Section 2.5.2 of the Interim Financing Order.

"Casualty" means a fire, explosion, flood, hurricane, tsunami, collapse, earthquake or other occurrence damaging all or any portion of any Leased Property.

"Chapter 11 Case" means the Chapter 11 case commenced by the Borrower on the Petition Date in the Bankruptcy Court.

"Change of Control" means the occurrence of any of the following events:

(a)    Any Person or "group" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934) who is not a Five Percent Owner on the Funding Date is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a Person will be deemed to have "beneficial ownership" of all securities that such Person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than twenty percent (20%) of the voting power of all classes of equity securities of a Borrower;

(b)    Any Person or "group" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934) who is not a Five Percent Owner on the Funding Date is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a Person will be deemed to have "beneficial ownership" of all

securities that such Person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than twenty percent (20%) of the voting power of all classes of equity securities of Parent; or

(c)     During any consecutive two-year period, individuals who at the beginning of such period constituted the board of Directors of the Borrower (together with any new Directors whose election to such board of Directors, or whose nomination for election by the Owners of the Borrower, was approved by a vote of two thirds of the Directors then still in office who were either Directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the board of Directors of the Borrower then in office.

"Claim" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

"Closing Date" means the date upon which the Interim Financing Order has been entered and all conditions precedent to the Initial Advance and this Agreement have been satisfied or waived by the Agent in writing.

"Collateral" means all right of title and interest of the Borrower in and to Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, documents of title, Equipment, Inventory, General Intangibles, the San Antonio Lease, the West Virginia Lease, Avoidance Actions, Intellectual Property Rights, goods, instruments, Investment Property, letter-of-credit rights, letters of credit; together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (v) all collateral subject to the Lien of any Security Document; (vi) any money, or other assets of the Borrower that now or hereafter come into the possession, custody, or control of the Lenders; (vii) proceeds of any and all of the foregoing; (viii) books and records of the Borrower, including all mail or electronic mail addressed to the Borrower; and (ix) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Borrower now has or hereafter acquires any rights.

"Commitment" means the Lenders' commitment to make each of the Advances to the Borrower in accordance with this Agreement.

"Commitment Fee" has the meaning ascribed to such term in Section 2.5(a).

"Condemnation" means a taking or voluntary conveyance of all or part of any of the Leased Properties or any interest in or right accruing to or use of any of the Leased Properties, as the result of, or in settlement of, any condemnation or other eminent domain proceeding by any Governmental Authority.

"Constituent Documents" means with respect to any Person, as applicable, such Person's certificate of incorporation, articles of incorporation, by-laws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or agreement governing such

Person's existence, organization or management or concerning disposition of ownership interests of such Person or voting rights among such Person's owners.

"Credit Facility" means the credit facility under which the Initial Advance shall be funded and the additional Advances subject to the Borrowing Base shall be made available to the Borrower by the Lenders in accordance with the terms of this Agreement.

"Debt" means, of a Person as of a given date, all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet for such Person and shall also include the aggregate payments required to be made by such Person at any time under any lease that is considered a capitalized lease under GAAP.

"Default" means an event that, with giving of notice or passage of time or both, would constitute an Event of Default.

"Default Period" means any period of time beginning on the day a Default or Event of Default occurs and ending on the date identified by the Agent in writing as the date that such Default or Event of Default has been cured or waived.

"Deposit Account Control Agreement" means each deposit account control agreement relating to each deposit account maintained by a Borrower with a depository bank, among Agent, the Borrower and such depositary bank, in form and substance acceptable to Agent.

"Dollars" or "$" means lawful currency of the United States of America.

"Emivest US" means Emivest Aviation (US), LLC, a Delaware limited liability company.

"Environmental Law" means any federal, state, provincial, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"Equipment" shall have the meaning given it under the UCC.

"Event of Default" is defined in Section 8.1.

"Executive Officer" means, when used with reference to the Borrower, its president, its chief executive officer, its chief financial officer and any vice president in charge of a principal business unit, division or function (such as sales, administration or finance).

"Exit Fee" has the meaning ascribed to that term in Section 2.5(b).

"Fees" shall mean collectively the Commitment Fee, the Exit Fee, the Redemption Fee, the Leased Property Disposition Fee, the Tangible and Other Assets Disposition Fee, the Buyer's Premium Fee and any other fees that may be due and payable hereunder to the Agent or the Lenders.

"Final Advance" has the meaning set forth in Section 2.1(c).

"Final Financing Order" means a final order of the Bankruptcy Court pursuant to section 364 of the Bankruptcy Code, approving this Agreement, the other Loan Documents, confirming the Interim Financing Order, and authorizing on a final basis the incurrence by the Borrower of permanent post-petition secured and super priority indebtedness in accordance with this Agreement, including, without limitation, the provisions of Article VII, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, which is in form and substance satisfactory to the Agent in its sole discretion.

"Financing Orders" means each and both the Interim Financing Order and the Final Financing Order.

"Five Percent Owner" means the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of an amount equal or greater than five percent (5%) of the voting power of all classes of equity securities of Parent.

"Funding Date" is defined in Section 2.1.

"GAAP" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements described in Section 6.1

"General Intangibles" means "general intangibles" as defined in under the UCC.

"Hazardous Substances" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law.

"Indebtedness" is used herein in its most comprehensive sense and means any and all advances, debts, commissions, Fees, obligations and liabilities of the Borrower to the Lenders and Agent, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether the Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

"Indemnified Liabilities" is defined in Section10.6.

"Indemnitees" is defined in Section 10.6.

"Infringement" or "Infringing" when used with respect to Intellectual Property Rights means any infringement or other violation of Intellectual Property Rights.

"Initial Advance" is defined in Section 2.1(a).

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, patent registrations, service marks, trade dress, trade secrets, trademarks, trade names, designs or mask works.

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement in the form attached hereto as Exhibit G, as the same may be amended, modified or supplemented.

"Interest Reserve" means an amount equal to $40,000 per month and that would accrue for the period commencing on the Closing Date and ending on the Termination Date; provided, that, the monthly Interest Reserve amount for the month in which the Initial Advance is made and for the month in which the Maturity Date occurs shall be prorated for the number of days elapsed in any such month.

"Interim Financing Order" means that certain order entered by the Bankruptcy Court in substantially the form of Exhibit C hereto and otherwise in form and substance satisfactory to the Agent in its sole discretion, which shall include, among other items, the unrestricted ability of Borrower to mortgage the Borrower's interest in the Leased Property to Lenders or their designee.

"Inventory" shall have the meaning given it under the UCC.

"Investment Banker" means Morgan Joseph LLC or such similar professional retained by the Borrower to market and solicit buyers for all or substantially all of the Borrower's assets.

"Investment Property" shall have the meaning given it under the UCC.

"Leased Property" means individually each, and "Leased Properties" means collectively both, of (i) that certain real property located at located at 731 Novak Drive, West Virginia, subject to the West Virginia Lease and (ii) that certain real property located at 1770 Skyplace Boulevard, San Antonio, Texas, subject to the San Antonio Lease.

"Leased Property Disposition Fee" is defined in Section 7.1(a)(ii)

"Leasehold Mortgages" means collectively the Leasehold Deed of Trust, Assignment of Leases and Rents and Security Agreements, each dated as of the date hereof, upon each Leased Property, as the same may be modified, amended or restated from time to time.

"Lender" and "Lenders" are defined in the preamble to the Agreement.

"Licensed Intellectual Property" is defined in Section 5.11(b).

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"Loan Documents" means this Agreement, the Note, the Financing Orders, the Security Documents, together with every other agreement, note, document, contract or instrument to which the Borrower now or in the future may be a party with the Lenders or the Agent and which is required by the Agent.

"Material Adverse Effect" means any of the following:

(i)     A material adverse effect on the business, operations, results of operations, assets, liabilities or financial condition of the Borrower;

(ii)     A material adverse effect on the ability of the Borrower to perform its obligations under the Loan Documents;

(iii)     A material adverse effect on the ability of the Agent to enforce the Obligations or to realize the intended benefits of the Security Documents, including a material adverse effect on the validity or enforceability of any Loan Documents, or on the status, existence, perfection, priority (subject to Permitted Liens) or enforceability of any Lien securing payment or performance of the Indebtedness; or

(iv)     Any claim against the Borrower or threat of litigation not already disclosed in writing to the Agent as of the Closing Date, which if determined adversely to the Borrower would cause the Borrower to be liable to pay an amount, after allowance for all applicable insurance coverage, exceeding $75,000 or would result in the occurrence of an event described in clauses (i), (ii) or (iii) above.

"Maturity Date" means February 10, 2011.

"Maximum Advance Amount" means $4,000,000.

"Net Cash Proceeds" means in connection with any asset sale, the cash proceeds (including any cash payments received by way of deferred payment whether pursuant to a note, installment receivable or otherwise, but only as and when actually received) from such asset sale, net of (i) attorneys' fees, accountants' fees, investment banking fees, brokerage commissions and amounts required to be applied to the repayment of any portion of the Debt secured by a Lien not prohibited hereunder on the asset which is the subject of such sale, and (ii) taxes paid or reasonably estimated to be payable as a result of such asset sale.

"Net Orderly Liquidation Value" means a professional opinion, which may be provided by Hilco Appraisal Services, LLC, of the estimated most probable Net Cash Proceeds which could typically be realized at a properly advertised and professionally managed liquidation sale, conducted under orderly sale conditions for an extended period of time (usually six to nine months), under the economic trends existing at the time of the appraisal. For purposes of the Advances hereunder, the Agent and the Borrower agree that the Net Orderly Liquidation Value is an amount such that the product of the Advance Rate and the Net Orderly Liquidation Value of the Borrower's Equipment and Inventory and Leased Property is equal to not less than the Maximum Advance Amount.

"Note" means the Borrower's Secured Promissory Note, payable to the order of the Lenders in substantially the form of Exhibit E hereto, as same may be renewed and amended from time to time, and all replacements thereto.

"Obligations" means each and every other debt, liability and obligation of every type and description which the Borrower may now or at any time hereafter owe to the Lenders or their

Affiliates or Subsidiaries, including without limitation, all Advances, Indebtedness, Fees and other obligations hereunder and under the other Loan Documents, whether such debt, fee, liability or obligation now exists or is hereafter created or incurred, whether it arises in a transaction involving the Lenders alone or in a transaction involving other creditors of the Borrower, and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several, and including all Obligations, and whether arising under any Loan Document between the Borrower and the Lenders, whether now in effect or subsequently entered into.

"Officer" means an officer if the applicable Borrower.

"OFAC" is defined in Section 6.6(b).

"Owned Intellectual Property" is defined in Section 5.11(a).

"Payments" means transfers of cash from Borrower to Lenders on account of the Obligations.

"Permitted Lien" and "Permitted Liens" are defined in Section 6.3(a).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Petition Date" has the meaning set forth in the recitals of this Agreement.

"Premises" means all locations where the Borrower conducts its business and has any rights of possession, including the locations legally described in Exhibit D attached hereto.

"Professional Fee Carve-Out" has the meaning specified in the Financing Orders.

"Redemption Fee" has the meaning ascribed to that term in Section 2.5(c).

"Sale Order" means a final order approved by the Bankruptcy Court in form and substance satisfactory to the Agent, and no longer subject to appeal or the possibility of appeal, (a) approving the Sale Transaction Bidding Procedures and, if the Borrower enters into a Sales Transaction Agreement, the Sale Transaction and (b) authorizing the Agent upon an Event of Default to sell, free and clear of Liens all of Borrower's Leased Property and Tangible and Other Assets pursuant to the provisions of Article VII.

"Sale Order Motion" has the meaning set forth in Section 6.1(j).

"Sale Transaction" shall mean the sale or disposition of the entire business of Borrower as a going concern pursuant to Section 363 of the Bankruptcy Code, in accordance with the terms and conditions of a Sale Transaction Agreement.

"Sale Transaction Agreement" shall mean such agreement that provides for the sale or disposition of the entire business of Borrower as a going concern pursuant to Section 363 of the

Bankruptcy Code, on such terms and conditions acceptable to the Agent in its reasonable discretion and approved by the Bankruptcy Court in accordance with the Sale Transaction Schedule.

"Sale Transaction Bidding Procedures" shall mean certain procedures approved by the Bankruptcy Court and acceptable to the Agent pursuant to which Borrower shall conduct the Sale Transaction pursuant to the Sale Transaction Schedule, including without limitation, the solicitation of competing offers, the review and evaluation of offers, the conducting of an auction, the deadline by which responses to the Sale Transaction Motion and replies thereto are to be filed, and the time periods by which such events or tasks are to be accomplished or occur.

"Sale Transaction Event" shall mean each of the events listed under the definition of Sale Transaction Schedule.

"Sale Transaction Schedule" shall mean the following schedule of events which are to occur and be accomplished on or prior to the applicable date with respect to the Sale Transaction:

> i.    The Sale Order Motion shall have been filed with the Bankruptcy Court within five (5) Business Days after the Petition Date;
>
> ii.   the Bankruptcy Court shall have entered the Sale Order on or before January 31, 2010; and
>
> iii.  the Sale Transaction shall be consummated pursuant to the terms of the applicable Sale Transaction Agreement on or before February 10, 2011.

"San Antonio Lease" means that certain San Antonio International Airport Lease dated March 28, 1986 and numbered 124099, as approved by City Ordinance number 62582 adopted March 27, 1986 by and between the City of San Antonio, as Lessor, and Jaffe-Aerospace Corp., as Lessee, as thereafter assigned to Borrower, as the same has been amended, from time to time.

"Second Advance" has the meaning set forth in Section 2.1(b).

"Security Documents" means the this Agreement, the Aircraft Security Agreement, any Deposit Account Control Agreements, the Leasehold Mortgages, the Assignment of Licenses, the Intellectual Property Security Agreement, any other Loan Document and other document delivered to the Agent from time to time to secure the Obligations.

"Security Interest" is defined in Section 3.1.

"Subordinated Creditors" means those creditors that are subordinated pursuant to the terms of the Financing Orders.

"Subordinated Obligations" has the meaning set forth in the Subordination Agreement.

"Subordination Agreement" means a subordination agreement executed by Emivest US, in favor of the Agent, in form and substance satisfactory to the Agent, and acknowledged by the

Borrower, pursuant to which the obligations of the Debtor to Emivest US and any Liens in favor of Emivest US in the Collateral securing the Subordinated Obligations are subordinated to the Obligations of the Borrower hereunder and Liens of the Agent in the Collateral, as such agreement may be amended, modified or supplemented from time to time.

"Subsidiary" means any Person of which more than fifty percent (50%) of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, regardless of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by the Borrower, by the Borrower and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Tangible and Other Assets" is defined in Section 7.2(a)(i).

"Tangible and Other Assets Disposition Fee" is defined in Section 7.2(a)(iv).

"Termination Date" means the earliest of (i) the Maturity Date, (ii) the date the Borrowers terminate the Credit Facility pursuant to the terms hereof, or (iii) the date the Agent demands payment of the Obligations, following an Event of Default, pursuant to Section 8.2.

"Texas Tax Lien" means that certain Texas State Tax Lien in the original principal amount of $1,195,463.16 filed against Borrower by the Texas State Comptroller of Public Accounts on July 27, 2010 and August 2, 2010 in the Official Public Records of Bexar County, Texas.

"UCC" means the Uniform Commercial Code in effect in the state designated in this Agreement as the state whose laws shall govern this Agreement, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

"Wachovia Lien" means that certain Abstract of Judgment lien in the principal amount of $4,269,950.50 filed against Borrower by Wells Fargo Securities, LLC, f/k/a Wachovia Capital Markets, LLC on July 1, 2010 in the Official Public Records of Bexar County, Texas.

"West Virginia Lease" means that certain Lease and Airport Use Agreement, dated as of April 19, 1985, by and between Eastern West Virginia Airport Authority, a West Virginia public corporation, as lessor, and Sino-Swearingen, L.P., a Delaware limited partnership, n/k/a Emivest Aerospace Corporation, a Delaware corporation, as lessee.

Section 1.2.    Other Definitional Terms; Rules of Interpretation.    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP. All terms defined in the UCC and not otherwise defined herein have the meanings assigned to them in the UCC. References to Articles, Sections, subsections, Exhibits, Schedules and the like, are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided. Terms used herein but not otherwise defined shall have the meanings ascribed to such terms the Financing Orders. The words

"include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or". Defined terms include in the singular number the plural and in the plural number the singular. Reference to any agreement (including the Loan Documents), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof (and, if applicable, in accordance with the terms hereof and the other Loan Documents), except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor. Reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder.

## ARTICLE II

## AMOUNT AND TERMS OF THE CREDIT FACILITY

Section 2.1.    Advances.  The Lenders agree, subject to the terms and conditions of this Agreement and the Financing Orders, to make up to three (3) advances (the "Advances") to the Borrower from time to time from the date that all of the conditions set forth in Section 4.1 are satisfied (the "Funding Date") to and until (but not including) the Termination Date, as follows:

> (a)  the Lenders shall make the initial Advance in an amount equal to $1,000,000 (the "Initial Advance"), upon the entry by the Bankruptcy Court of the Interim Financing Order ;

> (b)  the Lenders shall make a second Advance in an amount equal to the difference between (i) $2,000,000 and (ii) the amount of the Professional Fee Carve-Out (the "Second Advance"), upon the entry by the Bankruptcy Court of the Final Financing Order; and

> (c)  the Lenders shall make a final Advance in the amount of $1,000,000 (the "Final Advance") thirty (30) days after the date of the Second Advance; provided, however, that the Lenders shall not be obligated to make the Final Advance in the event that either the Wachovia Lien or the Texas State Lien has not been released or subordinated to the Agent's Lien on the Collateral in a manner satisfactory to the Agent in its sole discretion.

Section 2.2.    Procedures for Advances.  The Lenders shall have no obligation (a) to make an Advance to the extent that the amount of the requested Advances exceeds Availability or (b) to make an Advance to or for the benefit of the Borrower to the extent the amount of the requested Advance exceeds the Borrowing Base.  Advances that are borrowed and repaid may not be reborrowed.  The Borrowers' obligation to pay the Advances shall be evidenced by the Note and shall be secured by the Collateral.

Section 2.3.    Disbursement of Advances.  Upon fulfillment of the applicable conditions set forth in Article IV, the Lenders shall disburse the proceeds of the requested Advance by wire

to the Borrower's operating account identified by Borrower to Agent unless the Lender and the Borrower shall agree to another manner of disbursement. The Lenders may also initiate an Advance and disburse the proceeds to any third Person in such amounts as the Agent, in its sole discretion, deems necessary to protect its interest in any Collateral or to purchase Collateral or to exercise any other rights granted to it by the Borrower under Section 6.15.

Section 2.4. Interest; Default Interest Rate; Application of Payments; Participations; Usury.

(a) Interest. Except as provided in Section 2.4(d), the principal amount of the Advances shall bear interest at the rate of $40,000 per month or such lesser amount prorated for the number of days elapsed during the month in which the Initial Advance is made and in the month in which the repayment of the Indebtedness occurs.

(b) Application of Payments. Payments shall be applied to the Indebtedness on the Business Day of receipt by the Agent in the Agent's general account, but the amount of principal paid shall continue to accrue interest at the interest rate applicable under the terms of this Agreement from the calendar day the Agent receives the payment, and continuing through the end of the first Business Day following receipt of the payment. The Lenders shall apply payments in satisfaction of Indebtedness in such order as the Lenders determine in their sole discretion.

(c) Participations. If any Person shall acquire a participation in the Advances, the Borrower shall be obligated to the Lenders to pay the full amount of all interest calculated under this Section 2.4, along with all other fees, charges and other amounts due under this Agreement, regardless if such Person elects to accept interest with respect to its participation at a lower rate than that calculated under this Section 2.4, or otherwise elects to accept less than its pro rata share of such fees, charges and other amounts due under this Agreement.

(d) Usury. In any event no rate change shall be put into effect which would result in a rate greater than the highest rate permitted by law. Notwithstanding anything to the contrary contained in any Loan Document, all agreements which either now are or which shall become agreements between the Borrower and the Lenders are hereby limited so that in no contingency or event whatsoever shall the total liability for payments in the nature of interest, additional interest and other charges exceed the applicable limits imposed by any applicable usury laws. If any payments in the nature of interest, additional interest and other charges made under any Loan Document are held to be in excess of the limits imposed by any applicable usury laws, it is agreed that any such amount held to be in excess shall be considered payment of principal hereunder, and the indebtedness evidenced hereby shall be reduced by such amount so that the total liability for payments in the nature of interest, additional interest and other charges shall not exceed the applicable limits imposed by any applicable usury laws, in compliance with the desires of the Borrower and the Lenders. This provision shall never be superseded or waived and shall control every other provision of the Loan Documents and all agreements between the Borrower and the Lenders, or their successors and assigns.

Section 2.5. Fees.

(a)     Commitment Fee.  The Borrower shall pay the Lenders a commitment fee of $250,000 (the "Commitment Fee"), which fee shall be (i) fully earned and non-refundable upon execution of this Agreement, (ii) added to the Indebtedness due and owing hereunder and (iii) shall be paid by the Borrower on the Termination Date.

(b)     Exit Fee.  The Borrower shall pay to the Lenders an exit fee of Two Hundred Fifty Thousand ($250,000) Dollars payable on the Termination Date (the "Exit Fee").

(c)     Redemption Fee.  Provided that no Event of Default shall have occurred, the Lenders will agree to waive (i) the Commitment Fee, (ii) all accrued and unpaid interest on the Advances and (iii) the Exit Fee in exchange for a payment on the Termination Date of Seven Hundred Thousand ($700,000) Dollars (the "Redemption Fee"); provided, however, if the outstanding principal amount of the Advances, all accrued and unpaid interest thereon and other amounts due and payable on the Loan Documents are paid in full on or before the date that is three months after the date of the Initial Advance, the amount of the Redemption Fee shall be Six Hundred Fifty Thousand ($650,000) Dollars; and, provided further, however, if the Wachovia Lien has not been released or subordinated to the Agent's Lien on the Collateral on or before the date that is thirty (30) days after the date Final Financing Order has been entered, then the Redemption Fee shall be Eight Hundred Fifty Thousand Dollars ($850,000).

(d)     Leased Property Disposition Fee, Tangible and Other Asset Disposition Fee and Buyer's Premium Fee.  With respect to the services to be provided by the Agent pursuant to Article VII, the Agent shall be entitled to the payment of the Leased Property Disposition Fee, Tangible and Other Asset Disposition Fee and Buyer's Premium Fee in accordance with the provisions of Article VII.

Section 2.6.    Time for Interest Payments; Payment on Non-Business Days; Computation of Interest and Fees.

(a)     Time For Interest Payments.  Accrued and unpaid interest accruing on the Advances shall be due and payable on the Termination Date.

(b)     Payment on Non Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest on the Advances or the fees hereunder, as the case may be.

(c)     Computation of Interest.  Interest accruing on the outstanding principal balance of the Advances hereunder outstanding from time to time shall be computed on the basis of actual number of calendar days in which any Advance is outstanding.

Section 2.7.    Voluntary Prepayment; Termination of the Credit Facility by the Borrower.  Except as otherwise provided herein, the Borrower may prepay the Advances in whole but not in part prior to the Termination Date and terminate the Credit Facility if it gives the Agent at least 3 calendar days advance written notice prior to the proposed prepayment. Upon such prepayment and termination, and subject to Section 2.5(c), all other Indebtedness in addition to the Advances shall be immediately due and payable, including but not limited to an amount equal to not less than the Redemption Fee.

Section 2.8.  Mandatory Prepayment.  The Borrower shall repay the Advances as follows:

(a)  Sale Transaction Proceeds.  Upon receipt by Borrower of the Net Cash Proceeds arising from any Sale Transaction or from the sale of any of the Collateral, Borrower shall pay or cause to be paid to the Agent no later than one Business Day following such receipt, an amount equal to 100% of such Net Cash Proceeds of any such Sale Transaction or sale up to the amount of the Obligations.

(b)  Casualty/Condemnation.  Upon receipt by Borrower of proceeds arising from any Casualty or Condemnation yielding gross cash proceeds, Borrower shall pay or cause to be paid to the Agent no later than one Business Day following such receipt an amount equal to 100% of the Net Cash Proceeds thereof up to the amount of the Obligations.

(c)  Certain Professional Fees.  Following an Event of Default, the Agent may demand and the Borrower shall repay to the Lenders that portion of any outstanding Advances that pursuant to the Budget were advanced to fund any professional fees that have not been incurred as of the date of notice of such Event of Default.

(d)  Mandatory Prepayment Date. The Borrower agrees that all amounts owing under clauses (a) and (b) of this Section 2.8, shall be due and payable no later than one Business Day following receipt thereof by the Borrower (such date, the "Mandatory Prepayment Payment Date").  On the Mandatory Prepayment Payment Date, the Borrower shall provide to the Agent, along with the applicable payment, an executed prepayment notice calculation in a form acceptable to Agent.

Section 2.9.  Use of Proceeds.  The Borrower shall use the proceeds of Advances for the purpose of funding certain post-petition costs and expenses of the Borrower in accordance with the Budget.  No proceeds of any Advance may be utilized by the Borrower to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing any claims or causes of action against the Agent, Lenders, or its counsel or advisors (including advisors to their counsel), arising from or relating to this Agreement and/or investigating, challenging or raising any defenses to the Indebtedness and/or Liens under this Agreement.

Section 2.10.  Liability Records.  The Agent may maintain from time to time, at its discretion, records as to the Indebtedness.  All entries made on any such record, if presented to Borrower, shall be presumed correct until the Borrower establishes the contrary.  Upon the Agent's demand, the Borrower will admit and certify in writing the exact principal balance of the Indebtedness that the Borrower then asserts to be outstanding.  Any billing statement or accounting rendered by the Agent shall be conclusive and fully binding on the Borrower unless the Borrower gives the Agent specific written notice of exception within 30 days after receipt.

Section 2.11.  Single Loan.  All Advances to Borrower and all of the other Indebtedness of Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrower secured by all of the Collateral.

Section 2.12. <u>Grants, Rights and Remedies</u>. The Liens, security interests and the administrative priority granted pursuant to Article II may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Interim Financing Order, the Final Financing Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agent hereunder and thereunder are cumulative.

Section 2.13. <u>Perfection</u>. The Liens and security interests securing the Indebtedness, as granted in Article II, shall be deemed valid and perfected by entry of the Interim Financing Order and entry of the Interim Financing Order shall have occurred on or before the date of any Advance hereunder. The Agent shall be permitted, but is not required, to file any financing statements, mortgages, leasehold mortgages, security agreements, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, the Financing Orders or any other Loan Document, and such Liens and security interests shall be deemed perfected without Agent taking any action whatsoever. Notwithstanding the foregoing, Borrower agrees, promptly upon request by Agent, to take all actions reasonably requested by Agent to perfect a first priority Lien in all or any portion of the Collateral (subject to Permitted Liens).

Section 2.14. <u>Waiver of any Priming Rights</u> . Upon the Closing Date, and on behalf of itself and its estates, and for so long as any Indebtedness shall be outstanding, the Borrower hereby irrevocably waives any right pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien of equal or greater priority than the Lien securing the Indebtedness, or to approve a claim of equal or greater priority than the Indebtedness.

Section 2.15. <u>Waiver of Claims to Surcharge</u>. In accordance with the Interim Financing Order and Final Financing Order, Borrower and the Borrower's bankruptcy estate hereby waive any claims to surcharge the Collateral under section 506(c) of the Bankruptcy Code, excluding, however, any such claims for matters provided for in the Budget and incurred prior to the occurrence of an Event of Default and termination of this Agreement but not paid by the Borrower (subject to Agent's rights to object to any such claims).

## ARTICLE III

## SECURITY INTEREST; OCCUPANCY; SETOFF

Section 3.1. <u>Grant of Security Interest</u>. The Borrower hereby pledges, assigns and grants to the Agent, for the benefit of itself and as agent for the Lenders, a continuing first priority lien and security interest (subject only to (i) the Carve-Out and (ii) Permitted Liens), in accordance with Section 364(d)(1) of the Bankruptcy Code (collectively referred to as the "Security Interest") in the Collateral, as security for the payment and performance of the Indebtedness due hereunder. Upon request by the Agent, the Borrower will grant to the Agent, for the benefit of itself and as agent for the Lenders, a security interest in all commercial tort claims that the Borrower may have against any Person.

Section 3.2. <u>Lien Perfection; Further Assurances</u>. The Interim Financing Order, and if and when it becomes effective, the Final Financing Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Agent's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, leasehold mortgage, preferred mortgages (formerly known as preferred ship mortgages) or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Agent in and to the Collateral or to entitle the Agent to the priorities granted herein; *provided, however*, the Borrower shall execute such instruments, assignments, mortgages, or documents as are necessary to perfect Agent's Liens upon any of the Collateral and shall take such other action as may be reasonably required to perfect or to continue the perfection of Agent's Liens upon the Collateral. The Borrower hereby irrevocably authorizes the Agent at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of Delaware or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC of the State of Borrower's location for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to the Borrower, and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Borrower agrees to furnish any such information to the Agent promptly upon request. The Borrower also ratifies its authorization for the Agent to have filed in any UCC jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof. No such filing or recordation shall be necessary or required in order to create or perfect any such Lien. At Agent's request, Borrower shall also promptly execute or cause to be executed and shall deliver to Agent any and all documents, instruments and agreements deemed necessary by Agent to give effect to or carry out the terms or intent of the Loan Documents hereunder. For purposes of any such financing statements, the Borrower represents and warrants that the following information is true and correct:

Name and address of the Borrower:

> Emivest Aerospace Corporation
> 1770 Skyplace Boulevard
> San Antonio, TX 78201
> Federal Employer Identification No. _____
> Organizational Identification No. _____

Section 3.3. <u>Superpriority Administrative Expense Claim</u>. Subject to the Carve-Out and Permitted Liens, the Indebtedness of the Borrower arising hereunder after the Closing Date shall constitute, in accordance with Section 364(c) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of

the Bankruptcy Code. Agent shall have a superpriority administrative expense claim against the Borrower's estate pursuant to Section 364(c) of the Bankruptcy Code for the Indebtedness and all related costs and expenses, which shall be prior, senior and superior to any other claim, including any other superpriority administrative expense claim of any kind or nature, except as provided herein and/or in the Financing Orders. The Indebtedness of the Borrower hereunder are claims to be afforded priority over administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code, as provided herein and/or in the Financing Orders and secured by liens pursuant to Section 364 of the Bankruptcy Code as provided herein.

Section 3.4. <u>Notification of Account Debtors and Other Obligors</u>. The Agent may, at any time during a Default Period, notify any account debtor or other Person obligated to pay the amount due that such right to payment has been assigned or transferred to the Agent for security and shall be paid directly to the Agent. The Borrower will join in giving such notice if the Agent so requests. At any time after the Borrower or the Agent gives such notice to an account debtor or other obligor, the Agent may, but need not, in the Agent's name or in the Borrower's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such right to payment, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any such account debtor or other obligor. Upon the occurrence of an Event of Default and during the continuation thereof, the Agent may, in the Agent's name or in the Borrower's name, as the Borrower's agent and attorney-in-fact, notify the United States Postal Service for delivery of the Borrower's mail to any address designated by the Agent, provided that Agent shall also notify Borrower promptly after it provides such notice to the United States Postal Service and/or otherwise intercept the Borrower's mail, and receive, open and dispose of the Borrower's mail, applying all Collateral as permitted under this Agreement and holding all other mail for the Borrower's account or forwarding such mail to the Borrower's last known address.

Section 3.5. <u>Assignment of Insurance</u>. As additional security for the payment and performance of the Indebtedness, the Borrower hereby assigns to the Agent any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of the Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto, and the Borrower hereby directs the issuer of any such policy to pay all such monies directly to the Agent. At any time, whether or not a Default Period then exists, the Agent may (but need not), in the Agent's name or in the Borrower's name, execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy. Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Agent to be applied, at the option of the Agent, either to the prepayment of the Indebtedness or shall be disbursed to the Borrower under staged payment terms reasonably satisfactory to the Agent for application to the cost of repairs, replacements, or restorations. Any such repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction.

Section 3.6.  Occupancy.

(a)  The Borrower hereby irrevocably grants to the Agent the right to take possession of the Premises at any time during a Default Period within three (3) days of Borrower's receipt of a Default notice from Agent, to the exclusion of Borrower.

(b)  The Agent may use the Premises only to hold, process, manufacture, sell, use, store, liquidate, realize upon or otherwise dispose of items that are Collateral and for other purposes that the Agent may in good faith deem to be related or incidental purposes.

(c)  The Agent's right to hold the Premises shall cease and terminate upon the earlier of (i) payment in full and discharge of all Indebtedness and termination of the Credit Facility, and (ii) final sale or disposition of all items constituting Collateral and delivery of all such items to purchasers.

(d)  The Agent shall not be obligated to pay or account for any rent or other compensation for the possession, occupancy or use of any of the Premises; provided, however, that if the Agent does pay or account for any rent or other compensation for the possession, occupancy or use of any of the Premises, the Borrower shall reimburse the Agent promptly for the full amount thereof.  In addition, the Borrower will pay, or reimburse the Agent for, all taxes, fees, duties, imposts, charges and expenses at any time incurred by or imposed upon the Agent by reason of the execution, delivery, existence, recordation, performance or enforcement of this Agreement or the provisions of this Section 3.6.

Section 3.7.  License.  Without limiting the generality of any other Security Document, the Borrower hereby grants to the Agent for so long as any Indebtedness remains outstanding hereunder a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of the Borrower for the purpose of:  (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by the Borrower for its own manufacturing; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

Section 3.8.  Setoff.  The Agent may at any time or from time to time, at its sole discretion and without demand and without notice to anyone, setoff any liability owed to the Borrower by the Lenders, whether or not due, against any outstanding Indebtedness that is due and payable.  In addition, each other Person holding a participating interest in any Indebtedness shall have the right to appropriate or setoff any deposit or other liability then owed by such Person to the Borrower, whether or not due, and apply the same to the payment of said participating interest, as fully as if such Person had lent directly to the Borrower the amount of such participating interest.

Section 3.9.  Collateral.  This Agreement does not contemplate a sale of accounts, contract rights or chattel paper, and, as provided by law, the Borrower is entitled to any surplus and shall remain liable for any deficiency.  The Agent's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a

bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral. The Agent shall not be obligated to preserve any rights the Borrower may have against prior parties, to realize on the Collateral at all or in any particular manner or order or to apply any cash proceeds of the Collateral in any particular order of application. The Agent has no obligation to clean-up or otherwise prepare the Collateral for sale but shall make the Collateral available for clean-up or preparation in accordance with the Sale Transaction Schedule. The Borrower waives any right it may have to require the Agent or the Lenders to pursue any third Person for any of the Indebtedness.

Section 3.10. <u>Survival</u>. The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent and Lenders pursuant to this Agreement, the Financing Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)     except for the Carve-Out and Permitted Liens, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lenders against the Borrower in respect of any Indebtedness;

(b)     except as provided in Section 3.1, the Liens in favor of the Agent set forth in Section 3.1 hereof shall constitute valid and perfected priming first priority Liens and security interests and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)     the Liens in favor of the Agent set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Agent file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

## ARTICLE IV

## CONDITIONS OF LENDING

Section 4.1.     <u>Conditions Precedent to the Initial Advance</u>. The Lenders' obligation to make the Initial Advance shall be subject to the condition precedent that the Agent shall have received all of the following, each properly executed by the appropriate party and in form and substance satisfactory to the Agent:

(a)     This Agreement.

(b)     The Note.

(c)     Each other Loan Document.

(d)     The Interim Financing Order shall have been entered by the Bankruptcy Court not later than October 29, 2010, and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Agent.

(e)     Certificates of insurance for the policies listed in Schedule 4.1(e) attached hereto, with any applicable hazard insurance containing a lender's loss payable endorsement in the Agent's favor and with all liability insurance naming the Agent as an additional insured.

(f)     The Subordination Agreement.

(g)     Payment of all fees due under the terms of this Agreement through the date of the initial Advance and payment of all expenses incurred by the Agent and Lenders through such date and that are required to be paid by the Borrower under this Agreement.

(h)     A Customer Identification Information form and such other forms and verification as the Agent may need to comply with the U.S.A. Patriot Act.

(i)     On or before the Closing Date, Agent shall have received the Budget, in form and substance satisfactory to the Agent. The Budget will be in the form of a 13-week Budget dated October __, 2010 and annexed hereto as <u>Exhibit A</u>, with such modifications (if any) as are agreed to by the Borrower and Agent.

(j)     No litigation has commenced or has been threatened which has not already been disclosed in writing to the Agent, which, if successful, would have a material adverse impact on the assets of the Borrower taken as a whole or its ability to perform any material Obligation or which challenges the validity or enforceability of all or any part of this Agreement or any other Loan Document.

(k)     Such other documents as the Agent in its reasonable discretion may require.

Section 4.2.     <u>Conditions Precedent to All Advances</u>.  The Lenders' obligation to make each Advance shall be subject to the further conditions precedent that::

(a)     The representations and warranties contained in Article V are correct in all material respects on and as of the date of such Advance as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date;

(b)     no event has occurred and is continuing, or would result from such Advance which constitutes a Default or an Event of Default;

(c)     the making of such Advance shall not contravene any law, rule or regulation applicable to any Lender;

(d)     the Agent shall have received such other agreements, certificates, instruments, approvals, and other documents referenced hereunder, each in form and substance satisfactory to the Agent, as the Agent may reasonably request;

(e)     No Material Adverse Effect has occurred and is continuing other than (x) any adverse change or impairment resulting from the filing of the Borrower's bankruptcy petition and commencement of the Chapter 11 Case, (y) the liquidation of the Borrower's assets or (z) the effect or diminution of value caused by the wind down of operations or the sale, as a line, going concern or in liquidation, of the Borrower's business or assets; and

(f)     on the date of any Advance, Borrower shall have timely met all deadlines set forth in the Sale Transaction Schedule, unless otherwise expressly agreed to in writing by the Agent in its sole discretion.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Agent and Lenders as follows:

Section 5.1.     Existence and Power; Name Chief Executive Office; Inventory and Equipment Locations; Federal Employer Identification Number and Organizational Identification Number.  The Borrower is a corporation, duly organized and validly existing under the laws of the State of Delaware and is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary, except where failure so to be licensed or qualified would not have a Material Adverse Effect.  The Borrower has all requisite power and authority to conduct its business, to own its properties and to execute and deliver, and to perform all of its obligations under, the Loan Documents.  During the seven (7) years preceding the date hereof, the Borrower has done business solely under the names set forth in Schedule 5.1 or as set forth in the recitals hereof.  The Borrower's chief executive office and principal place of business is located at the address set forth in Schedule 5.1, and all of the Borrower's records relating to its business or the Collateral are kept at that location.  All Inventory and Equipment is located at that location or at one of the other locations listed in Schedule 5.1.  The Borrower's federal employer identification number and organization identification number are set forth on Section 5.1.

Section 5.2.     Capitalization.  Schedule 5.2 constitutes a correct and complete list of all ownership interests of the Borrower and rights to acquire ownership interests including the record holder, number of interests and percentage interests on a fully diluted basis, and an organizational chart showing the ownership structure of all Subsidiaries of the Borrower.

Section 5.3.     Authorization of Borrowing; No Conflict as to Law or Agreements.  The execution, delivery and performance by the Borrower of the Loan Documents and the borrowings from time to time hereunder have been duly authorized by all necessary corporate and shareholder action and do not and will not (i) require any consent or approval of any other Person; (ii) other than entry of the Financing Orders, require any authorization, consent or

approval by, or registration, declaration or filing with, or notice to, any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or any third party, except such authorization, consent, approval, registration, declaration, filing or notice as has been obtained, accomplished or given prior to the date hereof; (iii) violate any provision of any law, rule or regulation (including Regulation X of the Board of Governors of the Federal Reserve System) or of any order, writ, injunction or decree presently in effect having applicability to the Borrower or of the Borrower's Constituent Documents; (iv) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which any Loan Party is a party or by which it or its properties may be bound or affected; or (v) result in, or require, the creation or imposition of any Lien (other than the Security Interest) upon or with respect to any of the properties now owned or hereafter acquired by the Borrower.

Section 5.4. <u>Legal Agreements</u>. This Agreement constitutes and, upon due execution by the Borrower, the other Loan Documents will constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, subject to entry of the Financing Orders acceptable to the Agent in its sole discretion.

Section 5.5. <u>Subsidiaries</u>. Except as set forth in Schedule 5.5 hereto, the Borrower has no Subsidiaries.

Section 5.6. <u>Budget</u>. On or before the Closing Date, the Borrower has furnished to the Agent the Budget. The Budget when delivered shall be believed by the Borrower at the time furnished to be reasonable, shall have been prepared on a reasonable basis and in good faith by the Borrower, and shall have been based on assumptions believed by the Borrower to be reasonable at the time made and upon the best information then reasonably available to the Borrower, and the Borrower shall not be aware of any facts or information that would lead it to believe that such Budget is incorrect or misleading in any material respect.

Section 5.7. <u>Litigation</u>. There are no actions, suits or proceedings pending or, to the Borrower's knowledge, threatened against or affecting the Borrower or any of its Affiliates or the properties of the Borrower or any of its Affiliates before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which is reasonably likely to have a Material Adverse Effect, except as set forth on Schedule 5.7.

Section 5.8. <u>Regulation U</u>. The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

Section 5.9. <u>Taxes</u>. The Borrower has paid or caused to be paid to the proper authorities when due all federal, state, provincial, and local taxes required to be withheld by each of them. The Borrower has filed all federal, provincial, state and local tax returns which to the knowledge of the Officers of the Borrower, are required to be filed, and, except as set forth on Schedule 5.9, the Borrower has paid or caused to be paid to the respective taxing authorities all

taxes as shown on said returns or on any assessment received by any of them to the extent such taxes have become due.

Section 5.10. <u>Titles and Liens</u>. Except as set forth on Schedule 5.9, the Borrower has good and absolute title to all Collateral free and clear of all Liens other than Permitted Liens. No financing statement filed pursuant to the UCC naming any Loan Party as debtor is on file in any office except to perfect only Permitted Liens.

Section 5.11. <u>Intellectual Property Rights</u>.

(a)  <u>Owned Intellectual Property</u>.  Schedule 5.11 is a complete list of all patents, applications for patents, registered trademarks, applications to register trademarks, registered service marks, applications to register service marks, registered designs, mask works, trade dress and copyrights for which the Borrower is an owner of record as of the date hereof (the "Owned Intellectual Property"). Except as disclosed on Schedule 5.11, (i) the Borrower owns the Owned Intellectual Property free and clear of all restrictions (including covenants not to sue a third party), court orders, injunctions, decrees, writs or Liens, whether by written agreement or otherwise, other than Permitted Liens (ii) no Person other than the Borrower owns or, except in the ordinary course of business and set forth on Schedule 5.11, has been granted any right in the Owned Intellectual Property, (iii) all material Owned Intellectual Property is valid, subsisting and enforceable and (iv) the Borrower has taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

(b)  <u>Intellectual Property Rights Licensed from Others</u>.  Schedule 5.11 is a complete list of all agreements under which the Borrower has licensed Intellectual Property Rights from another Person ("Licensed Intellectual Property") as of the date hereof other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("Off-the-shelf Software") and a summary of any ongoing payments the Borrower is obligated to make with respect thereto. Except as disclosed on Schedule 5.11 and in written agreements, copies of which have been given to the Agent, the Borrower's licenses to use the Licensed Intellectual Property are free and clear of all restrictions, Liens (other than Permitted Liens), court orders, injunctions, decrees, or writs, whether by written agreement or otherwise. Except as disclosed on Schedule 5.11, the Borrower is not obligated or under any liability whatsoever to make any payments of a material nature by way of royalties, fees or otherwise to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(c)  <u>Other Intellectual Property Needed for Business</u>. Except for Off-the-shelf Software and as disclosed on Schedule 5.11, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights as of the date hereof used or necessary to conduct the Borrower's business in all material respects as it is presently conducted or as the Borrower reasonably foresees conducting it.

(d)  <u>Infringement</u>. Except as disclosed on Schedule 5.11, the Borrower has no knowledge of, and have not received any written claim or notice alleging, any Infringement of another Person's Intellectual Property Rights (including any written claim that any Loan Party must license or refrain from using the Intellectual Property Rights of any third party) nor, to the

Borrower's knowledge, is there any threatened claim, in each case insofar as would reasonably be likely to have a Material Adverse Effect.

Section 5.12. <u>Leases.</u> Except as described on Schedule 5.12, each lease for the Leased Properties is valid and enforceable in accordance with its terms and is in full force and effect, other than as a result of the commencement of the Chapter 11 Case. Except as described on Schedule 5.12, no default by any party to any such real property lease exists other than as a result of the commencement of the Chapter 11 Case. The Borrower has granted the Agent access to true, correct and complete copies of all such real property leases. No material portion of the Collateral is located at any real estate location other than the Leased Properties.

Section 5.13. <u>Default.</u> The Borrower is in compliance with all provisions of all agreements, instruments, decrees and orders to which it is a party or by which it or its property is bound or affected, the breach or default of which would reasonably be likely to have a Material Adverse Effect.

Section 5.14. <u>Trade Names.</u> All material trade names or styles under which either Borrower will sell inventory or create Accounts or lease property, or to which instruments in payment of sales of inventory for cash or of Accounts or evidencing payment for leases of property may be made payable, are listed on Schedule 5.14.

Section 5.15. <u>Submissions to Agent.</u> All financial and other information provided to the Agent by or on behalf of the Borrower in connection with the Borrower's request for the credit facilities contemplated hereby (i) except as to projections, valuations or pro forma financial statements, is true and correct in all material respects, (ii) does not omit any material fact necessary, in light of the circumstances under which provided, to make such information not misleading and, (iii) as to projections, valuations or pro forma financial statements, present a good faith opinion as to such projections, valuations and pro forma condition and results.

Section 5.16. <u>Financing Statements.</u> Notwithstanding the provision of Section 3.2 of this Agreement, each Borrower has authorized the filing of financing statements pursuant to the UCC sufficient when filed to perfect the Security Interest and the other security interests created by the Security Documents. When the Interim Financing Order is entered, the Agent will have a valid and perfected security interest in all Collateral which is capable of being perfected by filing of appropriate financing statements. None of the Collateral is or will become a fixture on real estate, unless a sufficient fixture filing is in effect with respect thereto.

Section 5.17. <u>Rights to Payment.</u> Each right to payment and each instrument, document, chattel paper and other agreement constituting or evidencing Collateral is (or, in the case of all future Collateral, will be when arising or issued) the valid, genuine and legally enforceable obligation, subject to no defense, setoff or counterclaim, of the account debtor or other obligor named therein or in the Borrower's records pertaining thereto as being obligated to pay such obligation.

Section 5.18. <u>Environmental Laws.</u> Except as otherwise disclosed on Schedule 5.18, or as could not reasonably be expected to result in material liability under any applicable Environmental Laws:

(a)     the Borrower has compiled in all respects with all applicable Environmental Laws;

(b)     the Borrower has obtained all permits necessary for its current operations under Environmental Laws, and all such permits are in good standing and the Borrower is in compliance with all material terms and conditions of such permits;

(c)     neither Borrower nor any of their respective predecessors in interest, has in violation of applicable law stored, treated, emitted, released, handled, disposed of or arranged to dispose of any Hazardous Substances;

(d)     the Borrower has not received any summons, complaint, order, or similar written notice indicating that it is not currently in compliance with, or that any Governmental Authority is investigating its compliance with, any Environmental Laws or that it is or may be liable to any other Person as a result of a release or threatened release of a Hazardous Substances;

(e)     none of the present or past operations of the Borrower is the subject of any current investigation by any Governmental Authority evaluating whether any remedial action is needed to respond to a release or threatened release of a Hazardous Substances;

(f)     there is not now, nor has there ever been, on or in the Leased Properties:

    (i)     any underground storage tanks or surface impoundments,

    (ii)    any asbestos-containing material, or

    (iii)   any polychlorinated biphenyls (PCBs) used in hydraulic oils, electrical transformers, or other equipment.

(g)     the Borrower has not filed any notice under any requirement of Environmental Law reporting a spill or accidental and unpermitted release or discharge of a Hazardous Substances into the environment;

(h)     the Borrower has not entered into any negotiations or settlement agreements with any Person (including the prior or current owner of any of its property) imposing material obligations or liabilities on the Borrower with respect to any remedial action in response to the release of a Hazardous Substances or environmentally related claim that has not been satisfied prior to the Closing Date; and

(i)     no Lien created or incurred pursuant to any Environmental Law has attached to any Leased Property.

Section 5.19.   <u>Administrative Priority; Lien Priority</u>.

(a)     The Indebtedness of the Borrowers will, at all times after the Closing Date, constitute allowed administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all

administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code;

(b) Pursuant to Section 364(d)(1) of the Bankruptcy Code and the Financing Orders, subject to any Permitted Liens, all Indebtedness shall be secured by a perfected priming first priority Lien on the Collateral; and

(c) On the Effective Date, the Interim Financing Order is, and upon entry of the Final Financing Order the Final Financing Order shall be, in full force and effect and have not been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to the Agent in its sole discretion and are not subject to a pending appeal or stayed in any respect.

Section 5.20. Liens. Schedule 5.20 sets forth, to the knowledge of the Borrower, all Liens affecting the Collateral and all material information (including, without limitation, the party asserting the claims, the amount claimed as being owed and the Collateral which is the subject of such claim) relating to each outstanding claim asserted against the Borrower and the Collateral by any Person who alleges it has supplied any labor and/or materials relating to any Collateral and which remain unpaid as of the date hereof.

Section 5.21. Title. The Borrower owns good and valid title to its personal property, in each case free and clear of all Liens whatsoever except the Agent's Liens and the Permitted Liens.

Section 5.22. Condemnation. No Condemnation has been commenced or, to the Borrower's actual knowledge, is contemplated as of the date hereof with respect to any Leased Property or for the relocation of roadways providing access to any such Leased Property.

Section 5.23. USA Patriot Act.

To the extent applicable, the Borrower is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA Patriot Act"). No part of the proceeds of the Advances will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

Section 5.24. The Chapter 11 Case.

The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and has not been dismissed as of the date of this Agreement. The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules and the rules and procedures of the Bankruptcy Court.

## ARTICLE VI

## COVENANTS

So long as the Indebtedness shall remain unpaid or the Credit Facility shall remain outstanding, the Borrower will comply with the following requirements, unless the Agent shall otherwise consent in writing:

Section 6.1. <u>Reporting Requirements</u>. The Borrower will deliver, or cause to be delivered, to the Agent each of the following, which shall be in form and detail acceptable to the Lender:

(a) <u>Investment Banker Status Report</u>. Semi-monthly on the 15th and the last day of every month, or more frequently if the Agent so requires, a report from the Borrower's Investment Banker as to the status of the Investment Banker's progress in marketing for sale all or substantially all of the Borrower's assets to one or more buyers and the status of the Borrower's progress in complying with the Sales Transaction Schedule.

(b) <u>Litigation</u>. Immediately after the commencement thereof, notice in writing of all litigation and of all proceedings before any governmental or regulatory agency affecting the Borrower which seek a monetary recovery against the Borrower in excess of $50,000 or seeks to enjoin the Transactions contemplated hereby or challenges the validity or enforceability of this Agreement or the Agent's Liens on the Collateral

(c) <u>Defaults</u>. When any Officer of the Borrower becomes aware of the probable occurrence of any Default or Event of Default or a Material Adverse Effect, and no later than three (3) days after such Officer becomes aware of such Default or Event of Default or Material Adverse Effect, notice of such occurrence, together with a detailed statement by an Executive Officer of the Borrower stating whether the Default or Event of Default or Material Adverse Effect can be cured, and if so, the steps being taken by the Loan Party to cure such Default or Event of Default or Material Adverse Effect.

(d) <u>Officers and Directors</u>. Promptly upon knowledge thereof, notice of any change in the persons constituting the Borrower's Executive Officers and Directors.

(e) <u>Collateral</u>. Promptly upon knowledge thereof, notice of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of payment thereof.

(f) <u>Violations of Law</u>. Promptly upon knowledge thereof, notice of the Borrower's violation of any law, rule or regulation, the non-compliance with which would reasonably be likely to result in a Material Adverse Effect on the Borrower.

(g) <u>Monthly Reports</u>. Within two (2) Business Days after the end of each month, a reconciliation, in form and substance acceptable to the Agent substantially consistent with the Borrower's form of Budget annexed hereto as <u>Exhibit A</u>, of the actual disbursements of the Borrower and existing Advances under this Agreement for such month to the budgeted line item amounts set forth in the Budget for such month; provided, that, upon the occurrence and during