the continuance of a an event that has a Material Adverse Effect, the Borrower shall provide such reports on a weekly basis, two (2) Business Days after the end of each week.

(h)     Trustee Reports.  All operating reports provided to the Office of the United States Trustee for the District of Delaware.

(i)     Chapter 11 Case Pleadings.  Promptly after filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Borrower in the Chapter 11 Case, which papers and documents shall also be given or served on the Agent and the Agent's counsel; *provided, however*, to the extent the Borrower reasonably believes any such pleadings may impair or otherwise affect the Agent or the Lenders or any of their rights or remedies, the Borrowers shall provide copies of such pleadings to the Agent and the Agent's counsel at least two (2) full Business Days prior to such documents being filed.

(j)     Sale Order Motion.  Within five (5) Business Days of the Petition Date, the Borrower shall file with the Bankruptcy Court for its approval a motion for the approval of the Sale Order (the "Sale Order Motion"), and serve notice of such motion in accordance with the applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

(k)     Committee Reports.  Promptly after sending thereof, copies of all written reports given by the Borrower to any official or unofficial creditors' committee in the Chapter 11 Case, other than any such reports subject to privilege; provided that the Borrower may redact any confidential information contained in any such report if it provides to the Agent a summary of the nature of the information so redacted.

Section 6.2.     Use of Proceeds and Operations.  The Borrower shall use the proceeds from the Advances in accordance with the Budget and will engage in no operations, business or activities other than to maintain the Collateral for sale in accordance with this Agreement and the Chapter 11 Case.

Section 6.3.     Permitted Liens; Financing Statements.

(a)     The Borrower will not create, incur or suffer to exist any Lien upon or of any of its assets, now owned or hereafter acquired, to secure any indebtedness; excluding, however, from the operation of the foregoing, the following (each a "Permitted Lien"; collectively, "Permitted Liens"):

(i)     In the case of any Leased Property, covenants, restrictions, rights, easements and minor irregularities in title reflected on Schedule B to a title policy covering such Leased Property and acceptable to Agent and which do not materially interfere with the Borrower's business or operations as presently conducted;

(ii)     Liens in existence on the date hereof and that are listed in Schedule 6.3 hereto;

(iii)     The Security Interest and Liens created by the Security Documents;

(iv)     Deposits made in the ordinary course of business of the Borrower (including, without limitation, security deposits of leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations and other similar obligations arising as a result of progress payments under government contracts, in an aggregate amount not to exceed $50,000;

(v)     Liens for taxes not yet due and payable or for taxes being contested in good faith by appropriate proceedings which are sufficient to prevent imminent foreclosure of such Liens; provided, that Borrower shall immediately pay and satisfy such Lien in the event there is any risk of forfeiture of any Collateral but may after paying and satisfying such Lien continue to prosecute any contest relating thereto; and

(vi)     Statutory, common law or contractual rights of set-off or Liens on money coming into possession of any depository or other financial institution in the ordinary course of business.

(b)     The Borrower will not amend any financing statements in favor of the Agent except as permitted by law.

Section 6.4.     Indebtedness.  The Borrower will not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or advances or any indebtedness for borrowed money or letters of credit issued on Borrower's behalf, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except:

(a)     Any indebtedness of the Borrower in existence on the date hereof and listed in Schedule 6.4 hereto;

(b)     Any indebtedness relating to Permitted Liens;

(c)     Indebtedness to trade creditors incurred in the ordinary course of business;

(d)     Deferred taxes, to the extent permitted or required to be accounted for under GAAP; and

(e)     Indebtedness incurred pursuant to this Agreement.

Section 6.5.     Books and Records; Collateral Examination, Inspection and Appraisals.

(a)     The Borrower will keep accurate books of record and account for itself pertaining to the Collateral and pertaining to the its business and financial condition and such other matters as the Agent may from time to time request in which true and complete entries will be made in accordance with GAAP and, upon the Agent's request, will permit any officer, employee, attorney, accountant or other agent of the Agent to audit, review, make extracts from or copy any and all company and financial books and records of the Borrower at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for

verification of amounts owed to the Borrower, and to discuss the Borrower's affairs with any of its Directors or Executive Officers.

(b)     The Borrower will permit the Agent or its employees, accountants, attorneys or agents, to examine and inspect any Collateral, the Mortgaged Property or any other property of the Borrower at any time during ordinary business hours.

Section 6.6.     Compliance with Laws.

(a)     The Borrower shall (i) comply with the requirements of applicable laws and regulations, including, without limitation, the Financing Orders, the non-compliance with which would materially and adversely affect its business or its financial condition and (ii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state, provincial or local law, statute or ordinance.

(b)     The Borrower shall (i) ensure, and cause each Subsidiary to ensure, that no Owner shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not use or permit the use of the proceeds of the Credit Facility or any other financial accommodation from the Lenders to violate any of the foreign asset control regulations of OFAC or other applicable law, (iii) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act as required by federal law and the Agent's and Lenders' policies and practices.

Section 6.7.     Payment of Taxes and Other Claims.  The Borrower will pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including the Collateral) or upon or against the creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach thereto, (b) all federal, state, provincial and local taxes required to be withheld by it, and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of the Borrower; provided, that the Borrower shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

Section 6.8.     Maintenance of Properties.

(a)     The Borrower will keep and maintain the Collateral and all of their other properties necessary or useful in its business in all material respects in good condition, repair and working order (normal wear and tear excepted).  The Borrower will take all commercially reasonable steps necessary to protect and maintain its material Intellectual Property Rights.

(b)     The Borrower will defend the Collateral against all Liens (other than Permitted Liens), claims or demands of all Persons (other than the Agent) claiming the Collateral or any interest therein.  The Borrower will keep all Collateral free and clear of all Liens except Permitted Liens.  The Borrower will take all commercially reasonable steps necessary to prosecute any Person Infringing its material Intellectual Property Rights and to defend itself

31

against any Person accusing it of Infringing any Person's Intellectual Property Rights which would reasonably be likely to result in a Material Adverse Effect.

Section 6.9. <u>Insurance</u>. The Borrower will obtain and at all times maintain insurance with insurers acceptable to the Agent, in such amounts, on such terms (including any deductibles) and against such risks as may from time to time be required by the Agent, but in all events in such amounts and against such risks as is usually carried by companies engaged in similar business and owning similar properties as the Borrower. Without limiting the generality of the foregoing, the Borrower will at all times keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles) and such other risks and in such amounts as the Agent may reasonably request, with any loss payable to the Agent to the extent of its interest, and all policies of such insurance shall contain a lender's loss payable endorsement for the Agent's benefit consistent with this Agreement.

Section 6.10. <u>Preservation of Existence</u>. The Borrower will preserve and maintain its existence and all of its material rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in all material respects in an orderly, efficient and regular manner.

Section 6.11. <u>Delivery of Instruments, etc</u>. Upon request by the Agent, the Borrower will promptly deliver to the Agent in pledge all instruments, documents and chattel paper constituting Collateral, duly endorsed or assigned by the Borrower.

Section 6.12. <u>Sale or Transfer of Assets</u>.

(a)    Except as contemplated by the Sale Transaction Agreement, this Agreement or otherwise expressly consented to in writing by Agent, the Borrower will not sell, lease, assign, transfer or otherwise dispose of (i) all or a substantial part of its assets, or (ii) any Collateral or any interest therein (whether in one transaction or in a series of transactions) to any other Person. Other than as contemplated by the Sale Transaction Agreement, this Agreement and pursuant to a Sale Order, or otherwise expressly consented to in writing by Agent, the Borrower will not transfer any part of its ownership interest in any material Intellectual Property Rights or permit any agreement under which it has licensed material Licensed Intellectual Property to lapse. The Borrower will not license any other Person to use any of the Borrower's Intellectual Property Rights.

(b)    Borrower shall timely meet all deadlines set forth in the Sale Transaction Schedule, unless otherwise expressly agreed to by Agent in writing in its sole discretion.

Section 6.13. <u>Consolidation and Merger; Asset Acquisitions</u>. The Borrower will not consolidate or amalgamate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation, amalgamation or merger) all or substantially all the assets of any other Person.

Section 6.14. <u>Place of Business; Name</u>. The Borrower will not transfer its chief executive office or principal place of business, or move, relocate, close or sell any business location. The Borrower will not permit any tangible Collateral or any records pertaining to the

Collateral to be located in any state, province or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest. The Borrower will not change its name or jurisdiction of organization.

Section 6.15. <u>Performance by the Agent</u>. If any Loan Party at any time fails to perform or observe any of the foregoing covenants contained in this Article VI or elsewhere herein, immediately upon the occurrence of such failure, the Agent may, but need not, perform or observe such covenant on behalf and in the name, place and stead of the Borrower (or, at the Agent's option, in the Agent's name) and may, but need not, take any and all other actions which the Agent may reasonably deem necessary to cure or correct such failure (including the payment of taxes, the satisfaction of Liens, the performance of obligations owed to account debtors or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and the Borrower shall thereupon pay to the Agent on demand the amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Agent in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Agent, together with interest thereon from the date expended or incurred at the Default Rate. To facilitate the Agent's performance or observance of such covenants of the Borrower, the Borrower hereby irrevocably appoints the Agent, or the Agent's delegate, acting alone, as the Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file in the name and on behalf of the Borrower any and all instruments, documents, assignments, security agreements, financing statements, applications for insurance and other agreements required to be obtained, executed, delivered or endorsed by the Borrower hereunder.

Section 6.16. <u>Sale Transaction</u>.

(a)     The Sale Transaction Agreement, together with any order entered by the Bankruptcy Court approving such agreement, shall not be modified, amended, superseded, or terminated absent the prior written consent of the Agent which shall not be unreasonably withheld, conditioned or delayed; such agreement shall provide for the consummation of the Sale Transaction in accordance with the Sale Transaction Schedule.

(b)     The Borrower shall comply with the Sale Transaction Schedule. Without limiting the foregoing and for the purposes of clarity, each Sale Transaction Event shall have occurred on or before the date set forth therefor in the Sale Transaction Schedule.

Section 6.17. <u>Financing Orders; Administrative Priority; Lien Priority; Payment of Claims</u>.

The Borrower will not:

(a)     At any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Financing Orders, except for modifications and amendments agreed to by the Agent in its sole discretion in advance and in writing;

(b)     at any time, suffer to exist a priority for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Agent in respect of the Obligations;

(c)     at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Liens in favor of the Agent in respect of the Collateral, except for Permitted Liens; and

(d)     prior to the date on which all Obligations have been fully and indefeasibly paid and satisfied, the Borrower shall not pay any administrative expense claims except (i) Obligations due and payable hereunder, (ii) administrative expenses incurred in the ordinary course of the Borrower's business as contemplated by this Agreement and the Budget annexed hereto as Exhibit A, and (iii) any administrative expenses subject to the Carve-Out.

## ARTICLE VII

## CONSULTING AND MARKETING SERVICES

Section 7.1.   Real Estate Services.   With respect to the Leased Properties, from and after the occurrence of an Event of Default, Agent and the Borrower agree as follows:

(a)     Agent shall provide on an exclusive basis the following services (the "Real Estate Services"):

(i)     solicit interested parties for the sale, assignment, sublease or other disposition of each Leased Property, and market each Leased Property in the manner determined by the Agent in its discretion;

(ii)     If the Agent causes any Leased Property to be sold, assigned, subleased, or otherwise disposed of, Agent shall earn a fee equal to 10% of the Gross Sale Proceeds (the "Leased Property Disposition Fee").   For purposes of this Section 7.1(a)(ii), "Gross Sale Proceeds" shall mean the aggregate cash or non-cash consideration received by the Borrower in consideration of the Leased Property, including any amounts to be received by the Borrower under any subleasing arrangement.   The value of non-cash consideration paid for a Leased Property shall be determined by mutual agreement between Agent and the Borrower.   The amounts payable under this Section 7.1(a)(ii) shall be paid in a lump sum at the closing for the applicable Leased Property;

(iii)     Agent shall be responsible for any other fees or commissions payable to any cooperating brokers in connection with the disposition of the Leased Properties.

(b)     In the event that Agent, after engaging in good faith marketing and sale efforts with respect to any Leased Property, determines that an affiliate of the Agent (an "Affiliate") is the highest or otherwise best potential purchaser for such Leased Property, then Agent must provide the Borrower with documentation of its marketing and sale efforts to third parties other

than its Affiliate.  Upon review of such documentation, the Borrower, after consultation with the Agent, reserves its right to request that Agent remarket such Leased Property one last time, for a period not to exceed thirty (30) days unless Agent agrees in writing to a longer re-marketing period, should the Borrower determine that Agent's efforts did not produce the highest or otherwise best bid for such Leased Property.

Section 7.2.  <u>Tangible and Other Asset Services</u>.  With respect to the Tangible and Other Assets (as defined below), from and after the occurrence of an Event of Default, Agent and the Borrower agree as follows:

(a)  Agent shall provide on an exclusive basis the following services (the "Tangible and Other Assets Services"):

(i)  Develop an advertising and marketing plan for the auction of the Borrower's Equipment, Inventory, Intellectual Property Rights, Accounts, General Intangibles, customer lists and other assets (other than the Leased Property) of the Borrower (the "Tangible and Other Assets"), to be provided to and discussed with the Borrower;

(ii)  From and after the occurrence of an Event of Default.

(1)  implement the advertising and marketing plan as determined by Agent in its discretion to maximize the net recovery on the Tangible and Other Assets;

(2)  prepare for the sale of the Tangible and Other Assets, including gathering specifications and photographs for pictorial brochures;

(3)  make the Tangible and Other Assets, as applicable, available for viewing by potential buyers on an appointment-only basis;

(4)  as agent for the Borrower, auction the Tangible and Other Assets for cash to the highest bidder "as is," "where is," free and clear of Liens pursuant to Section 363 of the Bankruptcy Code and in accordance with the terms of this Agreement;

(5)  charge and collect on behalf of the Borrower from all purchasers any purchase price together with all applicable taxes in connection therewith;

(6)  deposit all auction proceeds into a separate client trust account controlled by Agent; and

(7)  submit a complete auction report to the Borrower within three weeks after the collection of funds from the auction.

(iii)  In connection with the Tangible and Other Asset Services to be provided by Agent hereunder, the Borrower hereby grants to Agent the following rights and authority:

(1)  Agent shall be entitled to use the name "Emivest Aerospace Corporation" and similar derivations in all of its advertising and promotional activities related to this Agreement.

(2)     Agent shall have the right to enter and occupy the Leased Properties during Sale Period solely for the purpose of performing its obligations under this Article VII.  Agent shall have quiet enjoyment of the Leased Properties during its occupation of the Leased Properties with no interference from any labor unions or any other third parties.  Agent will occupy the Leased Properties as a licensee and agent of the Borrower and shall not be obligated to pay any rent or other charges therefore.  The Borrower agrees to continue to provide and pay for all utilities during the course of Agent's occupancy; including, without limitation (i) active and working telephone lines and any T1 or DSL service currently provided to the Leased Properties, and (ii) its current trash removal service.  The Borrower agrees to maintain and bear the cost of any existing security personnel on the Leased Properties during the Sale Period.   The Company acknowledges that Agent is not an insurer of the Borrower's personal property.  Agent shall have the right to abandon any Equipment and Inventory and Other Assets not sold.

(3)     Agent and Borrower agree that Agent shall have all of the rights and powers of the Borrower, as a debtor-in-possession under the Bankruptcy Code, to sell all or substantially all of the assets of the Borrower free and clear of Liens, pursuant to Section 363 of the Bankruptcy Code, without the consent of the Borrower and to execute and deliver in connection with any such sale such bills of sale, assignments and other instruments to convey title to each Leased Property and the Tangible and Other Assets free and clear of Liens.

(4)     Agent and the Borrower agree, and the Borrower hereby expressly acknowledges, that Agent shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found on the Leased Properties or in the Equipment and Inventory.  The Borrower shall be responsible for ensuring that the Borrower possesses and is in compliance with all Environmental Laws that are required for the operation of the Borrower's business.  The Borrower hereby agrees to defend, indemnify and hold Agent harmless from any and all claims, losses, damages and liabilities of any kind whatsoever which arise from or are in connection with any Environmental Laws.

(iv)     In consideration of its services hereunder, Agent shall be entitled to retain a commission equal to ten percent (10%) of the Gross Proceeds from the sale of the Tangible and Other Assets (the "Tangible and Other Asset Disposition Fee").  In addition, Agent shall be entitled to charge and retain for its own account an industry standard buyer's premium of thirteen and one half percent (13.5%) for onsite bidders and sixteen percent (16%) for web bidders for the Tangible and Other Assets that are auctioned or sold (the "Buyer's Premium Fee").  For purposes of clarification, the Buyer's Premium Fee is a fee charged in addition to the sale price of any Tangible and Other Assets and is paid for by the buyer.  Such Buyer's Premium Fee shall be withheld by Agent upon collection of proceeds from applicable buyer(s).  "Gross Proceeds" shall be defined as cumulative gross proceeds from the sale of any Tangible and Other Assets, exclusive of sales taxes.

Section 7.3. <u>Covenants</u>. From and after the occurrence of an Event of Default, the following apply with respect to the Tangible and Other Asset Services and the Real Estate Services:

(a)     The Sale Period shall commence upon an Event of Default and notice from the Agent to the Borrower that the Agent is exercising its rights under this Article VII to market and sell the Leased Properties and Tangible and Other Assets (the "Sale Period Commencement Date") and shall expire the earlier of (i) eighteen (18) months after the Sale Period Commencement Date or (ii) the date the Tangible and Other Assets are sold and removed from the Leased Properties (unless abandoned in accordance herewith). In the event this Agreement expires pursuant to "(i)" of the preceding sentence, thereafter the Sale Period shall be automatically extended for successive thirty (30) day periods. In all events, however, if the Tangible and Other Assets are sold, the term shall expire no earlier than thirty (30) days following the sale in order to permit the Tangible and Other Assets to be removed from the Leased Properties.

(b)     During the Sale Period, Agent shall serve as the Borrower's exclusive agent with respect to the Real Estate Services and Tangible and Other Asset Services. All communications and inquiries regarding the Assets, regardless of whether directed to the Borrower (including but not limited to its officers, agents and employees), shall be redirected to Agent. The Borrower acknowledges that Agent or its affiliated entities may be engaged to sell or market similar assets by other persons or entities, and that any such engagement shall not constitute or be deemed to be a violation of this Agreement.

(c)     The Company shall pay Agent for all reasonable and customary Expenses (defined below) incurred in connection with the performance of the Real Estate Services and Tangible and Other Asset Services proposed hereunder. "Expenses" means all out-of-pocket expenses incurred in connection with performance of the contemplated services, including, without limitation: reasonable expenses of marketing, promotional, advertising, and transportation; long distance telephone charges; postage and courier/overnight express fees. The Borrower and Agent agree that Expenses will be paid from the proceeds of the sale of the Lease Properties and Tangible and Other Assets and not by the Borrower.

Section 7.4. <u>Indemnification.</u>

(a)     The Agent shall indemnify and hold Borrower and its members, officers, directors, employees, and principals (collectively, "Borrower Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (i) the willful or negligent acts or omissions of Agent (other than Borrower Indemnified Parties); and (ii) the material breach of any material provision of this Article VII by the Agent, except claims arising from Borrower's negligence, intentional acts or unlawful behavior ("Borrower Indemnified Claims").

(b)     The Borrower shall indemnify and hold Agent and its members, officers, directors, employees, and principals (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (i) the willful or negligent acts or omissions of

Borrower (other than Agent Indemnified Parties), (ii) any liability or other claims asserted by the Borrower's previous brokers, and (iii) the material breach of any material provision of this Article VII by the Borrower, except claims arising from Agent's negligence, intentional acts or unlawful behavior ("Agent Indemnified Claims").

Section 7.5.  TECHNOLOGY DISCLAIMER:  AGENT DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN ANY WEBSITE USED IN CONNECTION WITH THE SALE OF THE LEASED PROPERTIES AND THE TANGIBLE AND OTHER ASSETS, INCLUDING ANY THIRD-PARTY SOFTWARE, PRODUCTS OR OTHER MATERIALS USED IN CONNECTION WITH ANY SUCH WEBSITE, WILL BE TIMELY, SECURE, UNINTERRUPTED, OR THAT DEFECTS WILL BE CORRECTED.

## ARTICLE VIII

## EVENTS OF DEFAULT, RIGHTS AND REMEDIES

Section 8.1.  Events of Default.  "Event of Default", wherever used herein, means any one of the following events:

(a)  Default in the payment of the Note, or any default with respect to payment of any other Indebtedness due from the Borrower to the Lenders as such Indebtedness becomes due and payable;

(b)  The Borrower shall fail to comply or shall Default in the performance of any term, covenant or agreement contained in this Agreement, the Loan Documents, the Financing Orders, the Sale Order or any documents executed in connection with any of the foregoing, which is not cured within five (5) days after such failure or default;

(c)  The Borrower shall fail to file the Sale Order Motion within five (5) Business Days after the Petition Date or shall fail to meet the date by which any of the Sale Transaction Events are to have occurred;

(d)  Except as otherwise permitted by this Agreement or otherwise consented to in writing by the Agent, any ownership interest in the assets of a Borrower shall be sold or transferred in any transaction other than a Sale Transaction, or shall become subject to a Lien;

(e)  The filing by the Borrower of any motion or proceeding that could reasonably be expected to result in impairment of the Agent's or Lenders' rights under this Agreement, including any motion to surcharge the Lenders or the Collateral under 11 U.S.C. § 506(c) or otherwise;

(f)  The filing of a motion by the Borrower for entry of an order staying or otherwise prohibiting the prosecution of any enforcement action or any motion or pleading seeking to challenge the Agent's Liens or otherwise commencing any cause of action against the Agent or the Lenders;

(g)     The Final Financing Order has not been entered by the Bankruptcy Court on or before November 30, 2010;

(h)     Expiration or termination of the Borrower's exclusive periods to file and confirm a plan of reorganization;

(i)     Any representation or warranty made by the Borrower in this Agreement or in any agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with this Agreement shall be incorrect in any material respect;

(j)     The rendering against Borrower of an arbitration award, a final judgment, decree or order for the payment of money in excess of $25,000 or a postpetition lien on any of the Collateral and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of 30 consecutive days without a stay of execution;

(k)     A Change of Control occurs;

(l)     An event of default shall occur and be continuing under any Security Document;

(m)     The Agent believes in good faith that the prospect of payment in full of any part of the Indebtedness, or that full performance by the Borrower under the Loan Documents, is impaired, or that there has occurred after the Petition Date any event giving rise to a Material Adverse Effect;

(n)     (i) Any impairment of the Collateral that has a Material Adverse Effect, (ii) termination of the Borrower's lease of either of the Leased Properties, or (iii) the termination of any state or federal license or authorization or contract that has a Material Adverse Effect;

(o)     The Borrower (except following the Agent's prior written request or with the Agent's express prior written consent, which consent shall not be implied from any other action, inaction, or acquiescence of the Agent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the Loan Documents;

(p)     The Borrower shall file, or any other person shall obtain Bankruptcy Court approval of a Disclosure Statement for a plan of reorganization which does not provide for the full, final, and irrevocable repayment of all of the Obligations of the Borrower to the Lenders upon the effectiveness of such plan, unless the Agent has expressly joined in or consented to such plan in writing;

(q)     The Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Agent under the Financing Orders or the Loan Documents or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted hereunder or under the Financing Orders;

(r)     Either of the Financing Orders shall cease to be in full force and effect after the date of entry thereof (whether due to modification, reversal, revocation, remand, stay, recission, vacation, amendment, or otherwise) without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent);

(s)     The entry of an order converting the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissing the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(t)     The entry of an order (a) which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code with respect to any material contract, lease, or obligation or against any critical vendor; (b) allowing a third party to proceed against any material assets or contracts of the Borrower; (c) staying or otherwise prohibiting the prosecution of any enforcement action by Agent; or (d) otherwise adversely affecting the Agent's liens, claims, or rights and remedies;

(u)     If any creditor of the Borrower receives any adequate protection payment which is not fully acceptable to the Agent in its sole discretion, other than as set forth in the Financing Orders, or any Lien is granted as adequate protection other than as set forth in the Financing Orders;

(v)     A custodian or a trustee or examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code for the Borrower or any of its properties; or

(w)     The Sale Transaction Agreement, once executed, shall cease to be in full force and effect and any order entered by the Bankruptcy Court approving such Sale Transaction Agreement shall be modified, reversed, superseded, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent).

Section 8.2.    Rights and Remedies. During any Default Period, upon three (3) days' notice to Borrower, the Agent may exercise any or all of the following rights and remedies, and the automatic stay provided under Section 362 of the Bankruptcy Code shall be deemed lifted or modified to the extent necessary to allow the Agent to take the actions described in this Section and Article VII, or under any other Loan Document, without further notice or a hearing, and the Borrower hereby waives all rights with respect to any such action by Agent:

(a)     The Agent may, by notice to the Borrower, declare the Commitment to be terminated, whereupon the same shall forthwith terminate;

(b)     The Agent may, by notice to the Borrower, declare the Indebtedness to be forthwith due and payable, whereupon all Indebtedness shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Borrower hereby expressly waive;

(c)     The Agent may exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of

Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which the Borrower hereby expressly waive) and the right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties), and at any sale of any of the Collateral, the Agent may credit bid all or any portion of the Indebtedness. In connection with the foregoing exercise of any such rights and remedies, the Borrower will on demand assemble the Collateral and make it available to the Agent at a place to be designated by the Agent which is reasonably convenient to both parties;

(d)     The Agent may exercise and enforce its rights and remedies under the Financing Orders and/or the Security Documents;

(e)     The Agent may exercise any other rights and remedies available to it by law or agreement;

(f)     The Agent shall be entitled to seek the appointment of a Chapter 11 trustee and have an expedited hearing with respect to such request, on not less than three (3) Business Days notice, subject to the Bankruptcy Court's calendar; and

(g)     The Agent may take all actions and exercise all rights granted to it under Article VII of this Agreement and after the payment of any Leased Property Disposition Fee, Tangible and Other Asset Disposition Fee, Buyer Premium Fee and any expenses incurred by Agent for which it is to be reimbursed under Article VII, apply any remaining proceeds from the sale of the Collateral to the Indebtedness.

Section 8.3.    Certain Notices.  If notice to a Loan Party of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given (in the manner specified in Section 8.3) at least ten calendar days before the date of intended disposition or other action.

# ARTICLE IX

## AGENCY PROVISIONS

Section 9.1.    Appointment and Authorization.  Each Lender hereby designates and appoints the Agent as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  The Agent agrees to act as such on the express conditions contained in this Article IX.  The provisions of this Article IX are solely for the benefit of the Agent and the Lenders and Borrower shall not have rights as a third party beneficiary of any of the provisions contained herein other than as expressly provided in Section 9.8.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions,

responsibilities, duties, obligations, or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Agreement with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The Agent shall only exercise or refrain from exercising any rights or take or refrain from taking any actions which the Agent is expressly entitled to take or assert under this Agreement and the other Loan Documents with the prior consent of all of the Lenders.

Section 9.2.   <u>Delegation of Duties</u>.   With the prior consent of all of the Lenders, the Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees, or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any agent, employee, or attorney-in-fact that it selects as long as such selection was made without gross negligence or willful misconduct

Section 9.3.   <u>Liability of the Agent</u>.   Agent shall not (a) be liable for any action taken or omitted to be taken by it at the direction of the Lenders under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation, or warranty made by Borrower or any Affiliate of Borrower, or any officer thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement, or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability, or sufficiency of this Agreement or any other Loan Document, or for any failure of Borrower to perform its obligations hereunder or thereunder. Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books, or records of Borrower or any Affiliate of Borrower.

Section 9.4.   <u>Reliance by the Agent</u>.   The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telephone or telephone message, statement, or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower), independent accountants, and other experts selected by the Agent and approved by all of the Lenders. With the prior consent of all of the Lenders, the Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of all of the Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

Section 9.5. <u>Notice of Default</u>. The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Agent will notify the Lenders of its receipt of any such notice. The Agent shall take such action with respect to such Default or Event of Default as may be requested by all of the Lenders.

Section 9.6. <u>Credit Decision</u>. Each Lender acknowledges that Agent has not made any representation or warranty to it, and that no act by the Agent hereinafter taken, including any review of the affairs of the Borrower and its Affiliates, shall be deemed to constitute any representation or warranty by the Agent to any Lender. Each Lender represents to the Agent that it has, independently and without reliance upon the Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition, and creditworthiness of the Borrower and its Affiliates, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower. Each Lender also represents that it will, independently and without reliance upon the Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals, and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition, and creditworthiness of the Borrower. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by the Agent, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition, or creditworthiness of the Borrower which may come into the possession of the Agent.

Section 9.7. <u>Indemnification</u>. THE LENDERS SHALL INDEMNIFY UPON DEMAND THE AGENT (TO THE EXTENT NOT REIMBURSED BY OR ON BEHALF OF THE BORROWER AND WITHOUT LIMITING THE OBLIGATION OF THE BORROWER TO DO SO), PRO RATA, FROM AND AGAINST ANY AND ALL INDEMNIFIED LIABILITIES AS SUCH TERM IS DEFINED IN SECTION 10.6; PROVIDED, HOWEVER THAT NO LENDER SHALL BE LIABLE FOR THE PAYMENT TO AGENT OF ANY PORTION OF SUCH AGENT INDEMNIFIED LIABILITIES THAT ARE FOUND BY A FINAL AND NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED SOLELY FROM AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. WITHOUT LIMITATION OF THE FOREGOING, EACH LENDER. SHALL REIMBURSE THE AGENT UPON DEMAND FOR ITS RATABLE SHARE OF ANY COSTS OR OUT-OF-POCKET EXPENSES (INCLUDING ATTORNEY COSTS) INCURRED BY THE AGENT IN CONNECTION WITH THE PREPARATION, EXECUTION, DELIVERY, ADMINISTRATION, MODIFICATION, AMENDMENT, OR ENFORCEMENT (WHETHER THROUGH NEGOTIATIONS, LEGAL PROCEEDINGS, OR OTHERWISE) OF, OR LEGAL ADVICE IN RESPECT OF RIGHTS OR RESPONSIBILITIES UNDER, THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY DOCUMENT CONTEMPLATED BY OR REFERRED TO HEREIN, TO THE EXTENT THAT THE AGENT IS NOT REIMBURSED FOR SUCH EXPENSES BY OR ON BEHALF OF THE

BORROWER. THE UNDERTAKING IN THIS SECTION SHALL SURVIVE THE PAYMENT OF ALL OBLIGATIONS HEREUNDER AND THE RESIGNATION OR REPLACEMENT OF THE AGENT.

Section 9.8. <u>Successor Agent</u>. The Agent may resign as Agent upon thirty (30) days notice to the Lenders, such resignation to be effective upon the acceptance of a successor agent to its appointment as Agent. If the Agent resigns under this Agreement, the Lenders shall appoint a successor agent for the Lenders. If no successor agent is appointed prior to the effective date of the resignation of the Agent, the Agent may appoint, after consulting with the Lenders, a successor agent. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor agent and the retiring Agent's appointment, powers, and duties as the Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 9.8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement.

Section 9.9. <u>Collateral Matters.</u>

(a) With the prior consent of all of the Lenders, the Agent is authorized to release any Lien upon any Collateral.

(b) Upon receipt by the Agent of any authorization required pursuant to Section 9.9(a) to release any Liens upon particular types or items of Collateral, and upon at least five (5) Business Days prior written request (or such shorter time period as the Lenders may agree) by the Borrower, the Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens upon such Collateral; provided, however, that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's judgment, would expose the Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Borrower in respect of) all interests retained by Borrower, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

Section 9.10. <u>Restrictions on Actions by the Lenders; Sharing of Payments.</u>

(a) Each of the Lenders agrees that it shall not, without the consent of all of the Lenders, set-off against the Obligations, any amounts owing by such Lender to Borrower or any accounts of Borrower now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless agreed to by all of the Lenders, take or cause to be taken any action to enforce its rights under this Agreement or against Borrower, including the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b) If at any time or times any Lender shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the Obligations owing to such Lender arising under, or relating to, this Agreement or the other Loan Documents,

except for any such proceeds or payments received by such Lender from the Agent pursuant to the terms of this Agreement, or (ii) payments from the Agent in excess of such Lender's portion of all such distributions by the Agent, such Lender shall (A) promptly turn the same over to the Agent, in kind, and with such endorsements as may be required to negotiate the same to the Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied in accordance with the applicable provisions of this Agreement; provided, however, that if all or part of such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

Section 9.11.  Agency for Perfection.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting the Lenders' security interest in assets which, in accordance with Article 9 of the UCC can be perfected only by possession.  Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

Section 9.12.  Payments by the Agent to the Lenders.  All payments to be made by the Agent to the Lenders shall be made by bank wire transfer or internal transfer of immediately available funds to each Lender pursuant to wire transfer instructions delivered in writing to the Agent, or pursuant to such other wire transfer instructions as each party may designate for itself by written notice to the Agent.  Concurrently with each such payment, the Agent shall identify whether such payment (or any portion thereof) represents principal, premium, or interest.

Section 9.13.  Concerning the Collateral and the Related Loan Documents.  Each Lender agrees that any action taken by the Agent or the Lenders, as applicable, in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral, and the exercise by the Agent or the Lenders, as applicable, of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

Section 9.14.  Relation Among the Lenders.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

## ARTICLE X

## MISCELLANEOUS

Section 10.1.  No Waiver; Cumulative Remedies; Compliance with Laws.  No failure or delay by the Agent in exercising any right, power or remedy under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or

remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under the Loan Documents. The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law. The Agent may comply with any applicable state, provincial or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

Section 10.2. <u>Amendments, Etc</u>. No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom or any release of a Security Interest shall be effective unless the same shall be in writing and signed by the Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

Section 10.3. <u>Notices; Communication of Confidential Information; Requests for Accounting</u>. Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for under the Loan Documents shall be in writing and shall be (a) personally delivered, (b) sent by first class United States mail, (c) sent by overnight courier of national reputation, (d) transmitted by telecopy, or (e) sent as electronic mail, in each case delivered or sent to the party to whom notice is being given to the business address, telecopier number, or e mail address set forth below next to its signature or, as to each party, at such other business address, telecopier number, or e-mail address as it may hereafter designate in writing to the other party pursuant to the terms of this Section. All such notices, requests, demands and other communications shall be deemed to be an authenticated record communicated or given on (a) the date received if personally delivered, (b) when deposited in the mail if delivered by mail, (c) the date delivered to the courier if delivered by overnight courier, or (d) the date of transmission if sent by telecopy or by e mail, except that notices or requests delivered to the Agent pursuant to any of the provisions of Article II shall not be effective until received by the Agent. All notices, financial information, or other business records sent by any party to this Agreement may be transmitted, sent, or otherwise communicated via such medium as the sending party may deem appropriate and commercially reasonable; <u>provided</u>, <u>however</u>, that the risk that the confidentiality or privacy of such notices, financial information, or other business records sent by either party may be compromised shall be borne exclusively by the Borrower. All requests for an accounting under Section 9-210 of the UCC (i) shall be made in a writing signed by a Person authorized under Section 2.2(b), (ii) shall be personally delivered, sent by registered or certified mail, return receipt requested, or by overnight courier of national reputation, (iii) shall be deemed to be sent when received by the Agent and (iv) shall otherwise comply with the requirements of Section 9-210 of the UCC. The Borrower requests that the Agent respond to all such requests which on their face appear to come from an authorized individual and releases the Agent and Lenders from any liability for so responding.

Section 10.4. <u>Further Documents</u>. The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Agent may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Agent or Lenders' rights under the Loan

Documents and to sell and transfer any of the Leased Property or Tangible and Other Assets upon their sale by the Agent pursuant to the provisions of Article VII hereof, including without limitation motions in the Chapter 11 Case under Section 363 of the Bankruptcy Code (but any failure to request or assure that a Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion); provided, however, that same shall not increase the Obligations, representations or warranties of the Borrower hereunder. Promptly upon Agent's request, Borrower shall execute and deliver to Agent a power of attorney authorizing Agent to execute in the name, and on behalf, of the Borrower any and all documents reasonably necessary to consummate a sale of Collateral after an Event of Default.

Section 10.5. <u>Costs and Expenses</u>. The Borrower shall pay on demand all actual costs and expenses, including reasonable attorneys' fees, incurred by the Agent and Lenders in connection with the Indebtedness, this Agreement, the Loan Documents, and any other document or agreement related hereto or thereto, and the transactions contemplated hereby, including all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection and enforcement of the Indebtedness and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest.

Section 10.6. <u>Indemnity</u>. In addition to the payment of expenses pursuant to Section 10.5, the Borrower shall indemnify, defend and hold harmless the Agent and Lenders, and any of its participants, parent corporations, subsidiary corporations, affiliated corporations, successor corporations, and all present and future officers, directors, employees, attorneys and agents of the foregoing (the "Indemnitees") from and against any of the following (collectively, "Indemnified Liabilities"):

(i)     Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents or the making of the Advances; and

(ii)     Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel) in connection with the foregoing and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the Loan Documents or the use or intended use of the proceeds of the Advances.

Notwithstanding the foregoing, the Borrower shall not be obligated to indemnify any Indemnitee for any Indemnified Liability caused by the gross negligence or willful misconduct of such Indemnitee, as finally determined by a court of competent jurisdiction.

If any investigative, judicial or administrative proceeding arising from any of the foregoing is brought against any Indemnitee, upon such Indemnitee's request, the Borrower, or counsel designated by the Borrower and satisfactory to the Indemnitee, will resist and defend

such action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at the Borrower's sole cost and expense. Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding. If the foregoing undertaking to indemnify, defend and hold harmless may be held to be unenforceable because it violates any law or public policy, the Borrower shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. The Borrower's obligations under this Section 10.6 shall survive the termination of this Agreement and the discharge of the Borrower's other obligations hereunder.

Section 10.7. <u>Participants</u>. Each Lender and its participants, if any, are not partners or joint venturers, and such Lender shall not have any liability or responsibility for any obligation, act or omission of any of its participants. All rights and powers specifically conferred upon any Lender may be transferred or delegated to any Lender's participants, successors or assigns.

Section 10.8. <u>Execution in Counterparts; Telefacsimile Execution</u>. This Agreement and other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement or any other Loan Document by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Any party delivering an executed counterpart of this Agreement or any other Loan Document by telefacsimile also shall deliver an original executed counterpart of this Agreement or such other Loan Document but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document.

Section 10.9. <u>Retention of Borrower's Records</u>. The Agent and Lenders shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings, or other papers delivered to the Agent or any Lender by the Borrower or in connection with the Loan Documents for more than 30 days after receipt by the Agent or any Lender. If there is a special need to retain specific records, the Borrower must inform the Agent of its need to retain those records with particularity, which must be delivered in accordance with the notice provisions of Section 10.3 within 30 days of the Agent or any Lender taking control of same.

Section 10.10. <u>Binding Effect; Assignment; Complete Agreement; Sharing Information; Confidentiality</u>. The Loan Documents shall be binding upon and inure to the benefit of the Borrower and the Agent and Lenders and their respective successors and assigns, except that the Borrower shall not have the right to assign their rights thereunder or any interest therein without the Agent's prior written consent. To the extent permitted by law, the Borrower waives and will not assert against any assignee any claims, defenses or set-offs which the Borrower could assert against the Agent. This Agreement shall also bind all Persons who become a party to this Agreement as a borrower. This Agreement, together with the Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof. To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents, this Agreement shall control. The Agent and Lenders may share information regarding the Borrower with respective Affiliate's accountants, lawyers and other advisors and the Borrower waives any right of confidentiality it may have with respect to all such sharing of information. Any other provision

of this Agreement or the other Loan Documents notwithstanding, Agent and Lenders and such other parties shall use reasonable efforts in accordance with its policies and procedures in place from time to time to maintain the confidentiality of the financial and business information it obtains from the Borrower and to prevent the inappropriate dissemination and disclosure thereof, provided, that nothing in this Agreement or the other Loan Documents shall prohibit the Agent and Lenders from providing any information regarding the Borrower to internal auditors, other operating divisions of Agent, any Lender, any Lender affiliates, or in response to a request from a regulatory authority having jurisdiction over the Agent or any Lender.

Section 10.11. <u>Severability of Provisions</u>.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

Section 10.12. <u>Headings</u>.  Article, Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.13. <u>Election of Remedies; Subordination</u>.

(a)      <u>Election of Remedies</u>.  If the Agent may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving Agent a security interest in or lien upon any Collateral, whether owned by the Borrower, either by judicial foreclosure or by non judicial sale or enforcement, the Agent may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section.  If, in the exercise of any of its rights and remedies, Agent shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against the Borrower, whether because of any applicable laws pertaining to "election of remedies" or the like, the Borrower hereby consents to such action by Agent and waives any claim based upon such action.  Any election of remedies that results in the denial or impairment of the right of Agent to seek a deficiency judgment against the Borrower shall not impair the Borrower's obligation to pay the full amount of the Indebtedness. In the event Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, Agent may bid all or less than the amount of the Indebtedness and the amount of such bid need not be paid by Agent but shall be credited against the Indebtedness. The amount of the successful bid at any such sale, whether Agent or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Indebtedness shall be conclusively deemed to be the amount of the Indebtedness guaranteed under this Section, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Agent might otherwise be entitled but for such bidding at any such sale.

(b)      <u>Subordination</u>.

(1)      Borrower covenants and agrees that the payment of all indebtedness, principal, interest, fees, charges, expenses, attorneys' fees and any other sum, obligation or liability owing by Borrower, including any intercompany loans or trade payables or royalty or licensing fees (collectively, the "Intercompany Obligations"),

is subordinated, to the extent and in the manner provided in this Section 10.13(b), to the prior payment in full of all Indebtedness (herein, the "Senior Obligations") and that the subordination is for the benefit of the Lenders, and Lenders may enforce such provisions directly.

(2)     Borrower hereby (i) authorizes Agent to demand specific performance of the terms of this Section 10.13(b), whether or not Borrower shall have complied with any of the provisions hereof applicable to it, at any time when such Borrower shall have failed to comply with any provisions of this Section 10.13 which are applicable to it and (ii) irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

(3)     Upon any distribution of assets of Borrower in any dissolution, winding up, liquidation or reorganization (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

(i)     The Lenders shall first be entitled to receive payment in full in cash of the Senior Obligations before Borrower is entitled to receive any payment on account of the Intercompany Obligations.

(ii)     Any payment or distribution of assets of Borrower of any kind or character, whether in cash, property or securities, to which Borrower would be entitled except for the provisions of this Section 10.13(b), shall be paid by the liquidating trustee or agent or other person making such payment or distribution directly to the Lenders, to the extent necessary to make payment in full of all Senior Obligations remaining unpaid after giving effect to any concurrent payment or distribution or provisions therefor to the Lenders.

(iii)     In the event that notwithstanding the foregoing provisions of this Section 10.13, any payment or distribution of assets of Borrower of any kind or character, whether in cash, property or securities, shall be received by Borrower on account of the Intercompany Obligations before all Senior Obligations are paid in full, such payment or distribution shall be received and held in trust for and shall be paid over to the Lenders for application to the payment of the Senior Obligations until all of the Senior Obligations shall have been paid in full, after giving effect to any concurrent payment or distribution or provision therefor to the Lender.

No right of the Lenders or any other present or future holders of any Senior Obligations to enforce the subordination provisions herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Borrower or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by Borrower with the terms hereof, regardless of any knowledge thereof which any such holder may have or be otherwise charged with.

Section 10.14. Governing Law; Jurisdiction, Venue.     The Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of

the State of Delaware, except that at all times the provisions for the creation, perfection and enforcement of the liens and security interests granted by Borrower pursuant to the other Loan Documents with respect to the any Leased Properties may be governed by, and construed according to, the laws of the state where such Leased Property is located. In the event that the Bankruptcy Court does not have or fails to exercise jurisdiction with respect to any action or proceeding arising out of or in connection with this Agreement or any other Loan Document, the parties hereto hereby (i) consent to the personal jurisdiction of the state and federal courts located in the State of Delaware in connection with any controversy related to this Agreement or any other Loan Document; (ii) waive any argument that venue in any such forum is not convenient; (iii) agree that any litigation initiated by the Agent or Borrower in connection with this Agreement or the other Loan Documents shall be venued in either the state or federal courts located in the State of Delaware; and (iv) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing herein contained shall, or shall be construed so as to, limit the right of the Agent to bring actions, suits or proceedings with respect to the obligations and liabilities of the Borrower under, or any other matter arising out of or in connection with, the Loan Documents, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, in the courts of whatever jurisdiction in which the office of the Agent may be located or assets of the Borrower may be found or otherwise shall to Parent seem appropriate, or to affect the right to service of process in any jurisdiction in any other manner permitted by the law.

Section 10.15. <u>Agent and Lenders as Party-in-Interest</u>. The Borrower hereby stipulates and agrees that the Agents and Lenders are and shall remain a party in interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of their rights or remedies under applicable law or documentation. Without limitation of the foregoing, the Agent and Lenders shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Advances, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease); *provided* that the Agent and Lenders will not exercise such right if the action or inaction by the Borrower which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

Section 10.16. <u>Waiver of Right to Obtain Alternative Financing</u>. In consideration of the Advances to be made to the Borrower by the Lenders, Borrower hereby further waives any right it may have to obtain an order by the Bankruptcy Court authorizing the Borrower to obtain financing pursuant to Section 364 of the Bankruptcy Code from any person other than the Lenders, unless such financing would result in all of the Obligations to the Lenders (whether arising before, on or after the date of this Agreement) being paid in full, in cash, on or before the expiration of the term of this Agreement.

Section 10.17. <u>Credit Bids</u>. Nothing herein shall affect, and the Agent shall maintain, the Agent's right to credit bid its claims under this Agreement and the Financing Orders pursuant to Section 363(k) of the Bankruptcy Code.

[Remainder of this page intentionally left blank]

THE BORROWER, AGENT AND LENDERS WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date set forth in the initial caption of this Agreement.

**BORROWER:**

**EMIVEST AEROSPACE CORPORATION**

By: _____
      Name:
      Title:

**LENDERS:**

**COUNSEL RB CAPITAL, LLC**

By: _____
      Name:
      Title:

**EAI CAPITAL, LLC**

By: _____
      Name:
      Title:

**AGENT:**

**COUNSEL RB CAPITAL, LLC**

By: _____
      Name:
      Title:

**Schedule 4.1(e)**

**Insurance Policies**

**Schedule 6.3**

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Emivest Aerospace Corporation | DE, SOS | SJ30 Aircraft I, LLC | UCC Original | 2009 1724738 | 06/01/09 | Specific Aircraft Equipment |
| Emivest Aerospace Corporation | DE, SOS | Liebherr-International Deutchland GmbH | UCC original | 2010 0652598 | 2/24/10 | Specific Equipment including all parts, components, modules, sections, equipment, attachments, accessories and supplies therefore and all proceeds of every kind of all of the foregoing. |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Emivest Aerospace Corporation | DE, SOS | Wells Fargo Securities, LLC | UCC Original | 2010 2579807 | 7/26/10 | All claims, demands, causes of action, and rights of recovery against any person or entity that may be liable to Debtor for indemnity, breach of contract, contribution or any other legal or equitable theory of recovery available to Debtor in connection with the American Arbitration Association's arbitration award against Debtor and in favor of SP entered on Nov. 12, 2009 and all cash and non-cash proceeds and products of the claims, any proceeds. |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Emivest Aerospace Corporation | WV, Berkeley County | Plaintiff: State of the WV, State Tax department | State tax Lien | 20100025439 | 6/18/10 | Notice of Tax lien filed in the sum of $1,261.61 for the period of 12/31/09 |
| Emivest Aerospace Corporation | WV, Berkeley County | | State tax Lien | 20100031387 | 7/27/10 | Notice of Tax lien filed in the sum of $2,536.87 |
| Emivest Aerospace Corporation | Bexar County, TX | Geo Strata Environmental Consultants, Inc. | Mechanic's Lien | Volume 13939, Page 1444 | 4/14/2009 | Amount: 23,747.81 |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
|---|---|---|---|---|---|---|
| Sino Swearingen Aircraft Corporation | DE, SOS | CIT Technology Financing Services, Inc. | UCC original | 5109743 6 | 4/05/05 | Specific Computer Equipment (canon) plus all other types of office equipment and products, computers, security systems and other items of equipment and including all replacements, upgrades and substitutions hereafter occurring to all of the foregoing equipment and all now existing and future attachments, parts, accessories and add-ons for all of the foregoing items and types of equipment and proceeds and products thereof. |
| Sino Swearingen Aircraft Corporation | DE, SOS | Liebherr-International Deutschland GmbH | UCC Original | 6251519 5 | 7/20/06 | Specific Aircraft equipment including all parts, components, models, sections, equipment, attachments, accessories and all supplies therefore and all proceeds of every kind of all of the foregoing |
| Sino Swearingen Aircraft Corporation | DE, SOS | Cisco Systems Capital Corporation | UCC original | 6339293 3 | 9/14/06 | Specific equipment including all components, additions, upgrades, attachments, accessions, substitutions, replacements and proceeds of the foregoing |
| Sino Swearingen Aircraft Corporation | DE, SOS | Lloyd Everard | UCC original | 2007 3814646 | 10/10/07 | Specific Aircraft equipment including all components, modules, sections, equipment attachments, accessories and supplies therefore and proceeds of the foregoing |
| Sino Swearingen Aircraft Corporation | DE, SOS | 921 BE, LLC | UCC original | 2007 3837340 | 10/11/07 | Specific Aircraft equipment including all components, modules, sections, equipment attachments, accessories and supplies therefore and proceeds of the foregoing |
| Sino Swearingen Aircraft Corporation | TX, SOS | Cisco Systems Capital Corporation | UCC Original | 06-0023976881 | 7/17/06 | Schedule I (not attached) including all additions, attachments, accessions, substations, replacements and proceeds of such collateral |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
| --- | --- | --- | --- | --- | --- | --- |
| Sino Swearingen Aircraft Corporation | TX, SOS | Action Aviation | UCC Original | 07-0021631989 | 6/26/07 | Sino Swearingen specific serial number 008 |

| Debtor | Jurisdiction | Secured Party | Type of Filing | File Number | File Date | Collateral |
| --- | --- | --- | --- | --- | --- | --- |
| Sino Swearingen Aircraft Corporation | Berkley County, WV | | UCC/Federal Tax Lien/Mechanic's lien/ Local Judgment | | | |
| Sino Swearingen Aircraft Corporation | Berkley County, WV | | State Tax Lien | 20100031387 | 7/27/10 | Notice of Tax Lien in the amount of $2,536.87 for period of 1/1/10-3/31/10 |
| Sino Swearingen Aircraft Corporation | Berkley County, WV | | Tax Lien | Volume 42, Page 606 | 1/30/2003 | Worker's Compensation Lien in the amount of $10,225.16 |
| Sino Swearingen Aircraft Corporation | DE, SOS | Déjà vu Consulting Inc. | UCC original | 2007 0058387 | 1/05/07 | Specific equipment including all components, modules, attachments, supplies therefore and proceeds of the foregoing |

**Exhibit A to Debtor-in-Possession Credit and Security Agreement**

**Budget**

**Enivest Aerospace Corporation**
**DIP Budget**
(Amounts in Thousands of US Dollars)

| | Week 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | Oct 18 | Oct 25 | Nov 01 | Nov 08 | Nov 15 | Nov 22 | Nov 29 | Dec 06 | Dec 13 | Dec 20 | Dec 27 | Jan 03 | Jan 10 | Jan 17 | Jan 24 | Jan 31 | Feb 07 | Feb 14 | Oct 18 to Feb 20 |
| | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2011 | 2011 | 2011 | 2011 | 2011 | 2011 | 2011 | |
| **Operating Activities** | | | | | | | | | | | | | | | | | | | |
| Cash Receipts | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Payroll | (81) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (56) | (1,004) |
| Tax Payments | (256) | (42) | (40) | (63) | 0 | 0 | 0 | (60) | 0 | 0 | 0 | (40) | 0 | 0 | 0 | 0 | 0 | 0 | (603) |
| Insurance / 401(k) / Employee Benefit Payments | (100) | (8) | (8) | (8) | (9) | (21) | (8) | (8) | (15) | (21) | (8) | (8) | (21) | (8) | (21) | (8) | (21) | (9) | (320) |
| Facility Rent and Maintenance | (4) | (17) | (17) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (23) | (22) | (22) | (329) |
| Leased Equipment | 0 | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (12) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (152) |
| Utilities | (1) | (8) | (8) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (17) | (15) | (15) | (15) | (254) |
| Texas State Taxes | (1) | 0 | (15) | (33) | 0 | 0 | 0 | 0 | 0 | (31) | 0 | 0 | 0 | (21) | 0 | 0 | 0 | 0 | (114) |
| Other Vendors | (204) | (8) | (6) | (133) | (2) | (2) | (2) | (14) | (63) | (3) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (455) |
| Net Operating Cash Flow | (646) | (146) | (124) | (378) | (55) | (59) | (40) | (200) | (125) | (176) | (74) | (157) | (140) | (64) | (81) | (140) | (109) | (111) | (3,154) |
| **Investing Activities** | | | | | | | | | | | | | | | | | | | |
| Capital Expenditures | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Cash Flow from Investments | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Financing and Other Activities** | | | | | | | | | | | | | | | | | | | |
| Cash Advances from EEDC | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Required Cash Deposits to Vendors, etc. | 0 | 0 | 0 | (150) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (150) |
| Professional Fees (as incurred) | (353) | (53) | (53) | (53) | (100) | (53) | (53) | (53) | (148) | (98) | (40) | (40) | (115) | (96) | (40) | (40) | (40) | (184) | (1,615) |
| Accrued and Paid Professional Fees | 353 | 53 | 53 | (458) | 109 | 53 | 53 | (214) | 148 | 96 | 40 | (270) | 115 | 96 | 40 | (251) | 53 | 184 | |
| Net Cash Flow from Financing and Other | - | - | - | (100) | - | - | - | (264.0) | - | - | - | (316.0) | - | - | - | (251.0) | - | - | (316.0) |
| **Net Cash Flow Before DIP Financing** | (646) | (146) | (124) | (378) | (55) | (59) | (40) | (200) | (125) | (176) | (74) | (157) | (140) | (64) | (81) | (140) | (109) | (111) | (3,337) |
| **DIP Financing** | | | | | | | | | | | | | | | | | | | |
| Amounts Funded Under DIP Facility | $1,000 | $0 | $0 | $2,000 | $0 | $0 | $0 | $0 | $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,000 |
| Closing Costs Payable to DIP Provider | (353) | 0 | 0 | (150) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Paydown of DIP Facility | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Net Cash Flow from DIP Financing | $1,000 | $0 | $0 | $1,850 | $0 | $0 | $0 | $0 | $1,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,850 |
| **Net Cash Flow After DIP Financing** | $312 | ($86) | ($124) | $1,062 | ($38) | ($59) | ($40) | ($350) | $875 | ($70) | ($74) | ($373) | ($60) | ($64) | ($81) | ($337) | ($60) | ($59) | ($1,383) |
| **Change in Cash Position and Liquidity** | | | | | | | | | | | | | | | | | | | |
| Beginning Cash | $0 | $312 | $226 | $101 | $1,164 | $1,106 | $1,047 | $978 | $623 | $1,498 | $1,420 | $1,346 | $973 | $913 | $850 | $769 | $432 | $372 | $0 |
| Net Change in Cash During Period | 312 | (86) | (124) | 1,062 | (38) | (59) | (40) | (350) | 875 | (70) | (74) | (373) | (60) | (64) | (81) | (337) | (60) | (59) | 333 |
| Ending Cash | $312 | $226 | $101 | $1,164 | $1,106 | $1,047 | $978 | $623 | $1,498 | $1,420 | $1,346 | $973 | $913 | $850 | $769 | $432 | $372 | $313 | $313 |
| PLUS: Availability Under DIP Facility | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 40 | 40 |
| Total Liquidity | $312 | $226 | $101 | $1,164 | $1,106 | $1,047 | $978 | $623 | $1,498 | $1,420 | $1,346 | $973 | $913 | $850 | $769 | $432 | $372 | $313 | $313 |
| **DIP Balance** | | | | | | | | | | | | | | | | | | | |
| Beginning DIP Balance | $0 | $1,250 | $1,250 | $1,250 | $3,250 | $3,290 | $3,290 | $3,290 | $3,290 | $4,290 | $4,290 | $4,330 | $4,330 | $4,330 | $4,370 | $4,370 | $4,370 | $4,370 | $0 |
| Principal Funding | 1,000 | 0 | 0 | 2,000 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,000 |
| Fees / Interest (PIK pursuant to Redemption Payment) | 250 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 40 | 410 |
| Ending DIP Balance | $1,250 | $1,250 | $1,250 | $3,250 | $3,290 | $3,290 | $3,290 | $3,290 | $4,290 | $4,330 | $4,330 | $4,330 | $4,330 | $4,370 | $4,370 | $4,370 | $4,370 | $4,410 | $4,410 |

Draft and Subject to Revision
Privileged and Confidential

**Exhibit B to Debtor-in-Possession Credit and Security Agreement**

**Budget Compliance Certificate**

To:    [Agent]
Date:  [_____, **2010**]
Subject:

      In accordance with our Debtor-in-Possession Credit and Security Agreement dated October ___, 2010 (as amended from time to time, the "DIP Credit Agreement"), attached are the financial statements of _____ (the "Borrower") dated [_____, **2010**](the "Reporting Date") and the year-to-date period then ended (the "Current Financials"). All terms used in this certificate have the meanings given in the DIP Credit Agreement.

    A.     **Preparation and Accuracy of Financial Statements.** I certify that the Current Financials fairly and accurately present the Borrowers' financial condition as of the Reporting Date.

    B.     **Name of Borrower; Merger and Consolidation Related Issues.** I certify that:

(Check one)

☐    The Borrower has not, since the date of the DIP Credit Agreement, changed its name or jurisdiction of organization, nor has it consolidated or merged with another Person.

☐    The Borrower has, since the date of the DIP Credit Agreement, either changed its name or jurisdiction of organization, or both, or has consolidated or merged with another Person, which change, consolidation or merger: ☐ was consented to in advance by Agent in writing, and/or ☐ is more fully described in the statement of facts attached to this Certificate.

    C.     **Events of Default.** I certify that:

(Check one)

☐    I have no actual knowledge of the occurrence of a Default or an Event of Default under the DIP Credit Agreement, except as previously reported to the Agent in writing.

☐    I have knowledge of a Default or an Event of Default under the DIP Credit Agreement not previously reported to the Agent in writing, as more fully described in the statement of facts attached to this Certificate.

    D.     **Litigation Matters.** I certify that:

(Check one)

☐ I have no actual knowledge of any material adverse change to the litigation exposure of the Borrower or any of its Affiliates

☐ I have knowledge of material adverse changes to the litigation exposure of the Borrower or any of its Affiliates not previously disclosed in Schedule ___, as more fully described in the statement of facts attached to this Certificate.

**E.** **Compliance with Budget.** I further certify that:

*(Check and complete each of the following)*

1. **Compliance with Budget.** Borrower ☐ has ☐ has not complied in all respects with the covenants and restrictions set forth in Section 6.1(g) of the DIP Credit Agreement, and as a consequence Borrower ☐ is ☐ is not in compliance with Section 6.1(g) of the DIP Credit Agreement.

Attached are statements of all relevant facts and computations in reasonable detail sufficient to evidence Borrower's compliance with the financial covenants referred to above, which computations were made in accordance with GAAP.

**EMIVEST AEROSPACE CORPORATION**

By:_____

Its:_____

**Exhibit C to Debtor-in-Possession Credit and Security Agreement**

Form of Interim Financing Order
(To be attached)

**Exhibit D to Debtor-in-Possession Credit and Security Agreement**

**Premises**

The Premises referred to in the Debtor-in-Possession Credit and Security Agreement are legally described as follows:

**[To be completed by Borrower]**

## SECURED PROMISSORY NOTE

$4,000,000                                                          October __, 2010

 For value received, the undersigned, **EMIVEST AEROSPACE CORPORATION** (the "Borrower", hereby promise to pay to the order of _____ (collectively, the "Lenders"), acting through its Agent, _____, on the Termination Date referenced in the Debtor-in-Possession Credit and Security Agreement dated the same date as this Secured Promissory Note (this "Note") that was entered into by the Lenders and the Borrower (as amended from time to time, the "Credit Agreement"), at Agent's office located at _____, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of Four Million Dollars ($4,000,000) or the aggregate unpaid principal amount of all Advances made by the Lenders to the Borrower under the Credit Agreement, together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Note is fully paid at the rate from time to time in effect under the Credit Agreement.

 This Note is the Note referenced in the Credit Agreement, and is subject to the terms of the Credit Agreement, which provides, among other things, for acceleration hereof. Principal and interest due hereunder shall be payable as provided in the Credit Agreement, and this Note may be prepaid only in accordance with the terms of the Credit Agreement. This Note is secured, among other things, pursuant to the Credit Agreement and the Financing Orders and Security Documents, each as therein defined, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

 The Borrower shall pay all actual costs of collection, including reasonable attorneys' fees and legal expenses if this Note is not paid when due, whether or not legal proceedings are commenced.

 Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

[Signatures on next page]

**EMIVEST AEROSPACE CORPORATION**

By:_____

Its:_____

**Exhibit F to Debtor-in-Possession Credit and Security Agreement**

Form of Aircraft Security Agreement

(To be attached)

**Exhibit G to Debtor-in-Possession Credit and Security Agreement**

Form of Intellectual Property Security Agreement

(To be attached)