## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EMIVEST AEROSPACE CORPORATION, | : | Case No. 10-13391 (MFW) |
| | : | |
| Debtor.[1] | : | **Requested Hearing Date:** |
| | : | **January 31, 2011 (ET)** |
| | : | **Requested Objection Deadline:** |
| | : | **January 28, 2011 at 4:00 p.m. (ET)** |

**NOTICE OF EMERGENCY MOTION OF THE DEBTOR FOR ENTRY OF AN
ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO A
CERTAIN ASSET PURCHASE AGREEMENT BETWEEN THE PURCHASER
AND THE DEBTOR, (II) AUTHORIZING AND APPROVING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (III) AUTHORIZING
AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, (IV) APPROVING AND AUTHORIZING
THE PURCHASER PROTECTIONS, AND (V) GRANTING RELATED RELIEF**

PLEASE TAKE NOTICE THAT on January 14, 2011, Emivest Aerospace
Corporation, the above-captioned debtor and debtor in possession (the "Debtor"), filed the
attached **Emergency Motion of the Debtor for Entry of an Order (I) Authorizing the Debtor
to Enter into a Certain Asset Purchase Agreement Between the Purchaser and the Debtor,
(II) Authorizing and Approving the Sale of Substantially All of the Debtor's Assets Free
and Clear of All Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing and
Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases,
and (IV) Granting Related Relief** (the "Sale Motion").

PLEASE TAKE FURTHER NOTICE THAT, contemporaneously the filing of the
Sale Motion, the Debtor has filed a motion requesting that that the Sale Motion be heard on
shortened notice (the "Motion to Shorten Notice"). By the Motion to Shorten Notice, the Debtor
has requested the entry of an order setting the deadline to object to the Sale Motion as **January
28, 2011 at 4:00 p.m. (ET)** (the "Objection Deadline"). Objections, if any, to the relief
requested in the Sale Motion, must be filed on or before the Objection Deadline with the Clerk of
the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd
Floor, Wilmington, Delaware 19801. At the same time, you must serve such objection so that it
is actually received on or before the Objection Deadline by: (a) counsel to the Debtor, Morris,
Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Flr., P.O. Box 1347,
Wilmington, DE 19899 (Attn: Robert J. Dehney, Esq. and Daniel B. Butz, Esq.), (b) special

---

[1]  The last four digits of the Debtor's federal tax identification number are 8827. The Debtor's
mailing address and corporate headquarters is 1770 Skyplace Blvd., San Antonio, TX 78216.

counsel to the Debtor, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 (Attn: Timothy W. Walsh, Esq. and Daniel G. Egan, Esq.), and (c) counsel to the Purchaser, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022 (Attn: Michael H. Torkin, Esq.). Only objections made in writing and timely filed and received in accordance with the procedures above will be considered.

PLEASE TAKE FURTHER NOTICE THAT, PURSUANT TO THE MOTION TO SHORTEN NOTICE, THE DEBTOR HAS REQUESTED THAT A HEARING ON THE RELIEF REQUESTED IN THE SALE MOTION BE HELD ON **JANUARY 31, 2011 AT A TIME TO BE DETERMINED (ET)**, BEFORE THE HONORABLE MARY F. WALRATH, UNITED STATES BANKRUPTCY JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 4TH FLOOR, COURTROOM 5, WILMINGTON, DELAWARE 19801.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE SALE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: January 14, 2011
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Robert J. Dehney (No. 3578)
Daniel B. Butz (No. 4227)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: 302.658.9200
Facsimile: 302.425.4673

*Counsel for Debtor and*
*Debtor in Possession*

-and-

Timothy W. Walsh
Daniel G. Egan
DLA PIPER LLP (US)
1251 Avenue of the Americas, 25th Flr.
New York, New York 10020
Telephone: 212.335.4500
Facsimile: 212.335.4501

*Special Counsel for Debtor and*
*Debtor in Possession*

4039157.2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EMIVEST AEROSPACE CORPORATION, | : | Case No. 10-13391 (MFW) |
| | : | |
| Debtor.[1] | : | **Requested Hearing Date:** |
| | : | **January 31, 2011 (ET)** |
| | : | **Requested Objection Deadline:** |
| | : | **January 28, 2011 at 4:00 p.m. (ET)** |

**EMERGENCY MOTION OF THE DEBTOR FOR ENTRY OF AN
ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO A
CERTAIN ASSET PURCHASE AGREEMENT BETWEEN THE PURCHASER
AND THE DEBTOR, (II) AUTHORIZING AND APPROVING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (III) AUTHORIZING
AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, (IV) APPROVING AND AUTHORIZING
THE PURCHASER PROTECTIONS, AND (V) GRANTING RELATED RELIEF**

Emivest Aerospace Corporation, as debtor and debtor in possession (the "Debtor") in the

above-captioned chapter 11 case, by and through its undersigned counsel, Morris, Nichols, Arsht

& Tunnell LLP and DLA Piper LLP (US), hereby files this emergency motion, pursuant to

sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the

"Bankruptcy Code"), rules 2002, 6004, 6006, and 9006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules for the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order,

(i) authorizing the Debtor to enter into a certain asset purchase agreement between the Debtor

and a certain purchaser (the "Purchaser"),[2] (ii) authorizing and approving the sale of substantially

---

[1]  The last four digits of the Debtor's federal tax identification number are 8827. The Debtor's
mailing address and corporate headquarters is 1770 Skyplace Blvd., San Antonio, TX 78216.

[2]  The identity of the Purchaser remains sensitive information and, at the Purchaser's request,
the Debtor has agreed to not reveal the Purchaser's identity in this Motion. The Purchaser's

all of the Debtor's assets free and clear of all liens, claims, encumbrances and other interests to the Purchaser, (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith, (iv) approving and authorizing the Purchaser Protections (as defined herein) and (v) granting certain related relief (the "Motion"). In support of the Motion, the Debtor respectfully represents as follows:

## BACKGROUND

1.      On October 20, 2010 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      No trustee or examiner has been appointed in this chapter 11 case.

3.      On November 4, 2010, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") in this case.

4.      The factual background regarding the Debtor, including its current and historical business operations and the events precipitating this chapter 11 filing, is set forth in detail in the Declaration of Anthony Power in Support of the Debtor's Chapter 11 Petition and First Day Pleadings (the "Power Declaration"), and is incorporated herein by reference.

### A.      Events Leading to the Chapter 11 Filing and the Debtor's Decision to Sell Its Assets

5.      As discussed in more detail in the Power Declaration, since commencing commercial production in late 2005, the Debtor has suffered from a lack of sufficient working

identity will be revealed at such time as the Asset Purchase Agreement (as defined herein) is filed with this Court.

2

capital resources to fund materials necessary in the production process. Moreover, the Debtor has incurred significant work in process write-downs for product cost in excess of anticipated sales price as a result of the inherent production inefficiencies and low initial production volumes typically associated with transitioning a complex product from development to commercial production. Despite the implementation of numerous cost saving methods, the Debtor remains over-leveraged and is facing significant liquidity constraints.

6.     In July 2010, the Debtor retained Morgan Joseph & Co. Inc. ("Morgan Joseph") as its financial advisor. Prior to filing this chapter 11 case, the Debtor, with the assistance of Morgan Joseph, pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of certain or all of the Debtor's assets or businesses. The Debtor ultimately determined that a chapter 11 filing was necessary and that the value of its estate would be best maximized and preserved through a sale of its assets pursuant to section 363 of the Bankruptcy Code.

7.     The Debtor, with the assistance of Morgan Joseph, extensively negotiated with a number of institutions regarding postpetition financing, and determined that the proposal advanced by Counsel RB Capital, LLC ("Counsel RB") and EAI Capital, LLC ("EAI")[3] was the best available under the circumstances and would maintain the going concern value of the Debtor's business pending a sale of the company. Accordingly, the Debtor, Counsel RB, as agent (the "Agent"), and Counsel RB and EAI, as lenders (together, the "Lenders"), entered into that a certain Debtor-in-Possession Credit and Security Agreement (as amended, the "Existing

---

[3]   Hilco Industrial, LLC and Hilco Real Estate, LLC (together, "Hilco") are the two members of EAI Capital, LLC. Hilco is one of the nation's leading asset disposition companies.

DIP Credit Agreement"), the terms of which have been approved on a final basis by order of this Court dated November 24, 2010 (the "Final DIP Order") (Doc. No. 110).

8.  Pursuant to the terms of the Existing DIP Credit Agreement, the Debtor must (i) obtain entry of an order approving a sale of all or substantially all of the Debtor's assets on or before January 31, 2011, and (ii) consummate a sale of all or substantially all of the Debtor's assets on or before February 10, 2011, which date may be extended under certain conditions as set forth in the Existing DIP Credit Agreement. The Debtor has requested an extension of these deadlines from the Agent and Lender; however, such requests for an extension have been denied. Therefore, the Debtor is required to comply with the current sale transaction schedule set forth in the Existing DIP Credit Agreement in order to avoid an Event of Default from occurring under the Existing DIP Credit Agreement.

9.  The Debtor does not have the financial wherewithal to continue to operate its business throughout a prolonged chapter 11 process and believes that, unless a sale is expeditiously consummated, there may be a significant deterioration in the value of its business. Accordingly, a prompt sale as set forth herein will maximize the value of the Debtor's estate for the benefit of creditors and other interested parties and is essential to a successful result in this chapter 11 case.

**B.  Marketing Efforts and Agreement with the Purchaser**

10.  The Debtor, with the assistance of Morgan Joseph, has solicited over 100 potential purchasers, many of which expressed a genuine interest in purchasing the Debtor's assets. These interested parties were provided due diligence materials regarding the Debtor's business operations and its assets and were given the opportunity to conduct their own due diligence, subject to the execution of an appropriate confidentiality agreement.

11.     The Debtor and the Purchaser engaged in extensive negotiations over the past several weeks regarding a sale of the Debtor's assets. During this time, the Debtor continued to solicit offers from and facilitate diligence efforts for various other parties expressing an interest in acquiring the Debtor's assets. However, no party has thus far offered definitive terms for the purchase of the Debtor's assets besides the Purchaser. The negotiations with the Purchaser were conducted at arm's-length and in good faith and culminated in a term sheet (the "Term Sheet") setting forth various terms and conditions for the purchase by the Purchaser of substantially all of the Debtor's assets. A true and correct copy of the Term Sheet is attached hereto as Exhibit A. The Debtor and the Purchaser are in the process of finalizing an Asset Purchase Agreement providing for the sale of substantially all of the Debtor's assets to the purchaser (as may be amended or supplemented, the "Asset Purchase Agreement"), which the Debtor will submit to the Court as soon as possible after it is finalized.

12.     A summary of certain principal terms of the sale of substantially all of the Debtor's assets to the Purchaser is as follows:[4]

| Purchase Price | The total consideration to be paid by the Purchaser in consideration of the sale, transfer and assignment of the Acquired Assets (as defined below) is $19 million in cash (the "Purchase Price") plus the assumption by the Purchaser of certain assumed liabilities and certain funding for ongoing operating costs and expenses associated with this chapter 11 case to the extent waived by the Purchaser. |
| --- | --- |
| Deposit | The Purchaser shall deliver to the Debtor an irrevocable letter of credit in an amount equal to $1.9 million which shall be effective immediately after entry of an order by the bankruptcy court approving the sale of substantially all of the Debtor's |

---

[4]   To the extent that there are any inconsistencies between the terms set forth herein and in the actual terms set forth in the Asset Purchase Agreement between the Debtor and the Purchaser that will be submitted to this Court, the terms of the Asset Purchase Agreement shall control.

| | |
|---|---|
| | assets to the Purchaser. The amount to be drawn under the letter of credit shall be immediately payable to the Debtor upon the earlier to occur of (a) the Closing, and (b) Seller's termination of the Asset Purchase Agreement pursuant to certain of its rights thereunder, to the extent (i) such termination is resulted from or as a consequence of Purchaser's material uncured breach of any of its covenants, representations and warranties under the Asset Purchase Agreement and (ii) the Debtor is not in any material breach of its covenants, representations or warranties under the Asset Purchase Agreement, the Existing DIP Credit Agreement or any other DIP financing agreement. |
| Closing Date | The closing of the sale shall take place on the date which is five (5) business days after the day upon which all of the conditions set forth in the Asset Purchase Agreement between the Debtor and the Purchaser have been satisfied or, if permissible, waived by the Debtor and/or Purchaser (as applicable), or on such other date as Debtor and Purchaser may mutually agree upon in writing (the "Closing Date"). |
| Acquired Assets | The assets being purchased from the Debtor include, among other things, the Debtor's right, title, and interest in certain real property and other unexpired leases and executory contracts, owned real property, furniture, fixtures, equipment, machinery, other tangible personal property, intangible personal property, inventory, vehicles, accounts receivable, certain claims and causes of action, licenses, permits, and books and records (collectively, the "Acquired Assets"). |
| Excluded Assets | Excluded assets include, among other things, cash and cash equivalents, avoidance actions and all other claims or actions the Debtor may have against any of its officers, directors, shareholders or creditors, the Debtor's rights in connection with a certain arbitration proceeding between the Debtor and certain current and former shareholders, and executory contracts and unexpired leases that are not assumed and assigned to the Purchaser. |
| Assumed Liabilities | The Purchaser shall, effective as of the Closing Date, assume from the Debtor and perform, discharge and pay, when due, liabilities arising from or in connection with executory contracts and unexpired leases assigned to Purchaser and liabilities arising |

| | following the Closing Date solely to the extent related to the operation or ownership of the Acquired Assets. |
|---|---|
| Excluded Liabilities | Excluded liabilities include, among other things, (i) certain liabilities of the Debtor and its affiliates and liabilities of the shareholders, directors, officers, employees and agents of Debtor and their affiliates that relate to or arise out of a condition, situation, set of circumstances, occurrence, act or omission existing or occurring on or before the Closing Date, (ii) liabilities arising out of assets excluded from the sale, (iii) liabilities in respect of contracts and leases of the Debtor that are not assigned to Purchaser, (iv) liabilities of the Debtor in respect of indebtedness arising prior to the Petition Date, (v) liabilities for expenses incurred by the Debtor or any of its affiliates in connection with the bankruptcy proceedings, and (vi) certain tax obligations of the Debtor. |
| Representations, Warranties, and Covenants | The Asset Purchase Agreement will contain usual and customary representations, warranties, and covenants for similar bankruptcy section 363 sale transactions. |
| 25-Day Fiduciary-Out Period | For a period of twenty-five (25) days immediately following entry of an order approving the sale of the Acquired Assets to Purchaser, unless waived by the Debtor in its sole discretion (the "Fiduciary-Out Period"), the Debtor shall have the right to continue to market its assets for sale and solicit and negotiate higher and better offers for such assets from potential purchasers other than the Purchaser. In order to qualify as a higher and better offer, any such proposal must be reasonably likely to be consummated in a timely manner, be for a value of at least $21 million, and be on terms and conditions no less favorable to the Debtor than those set forth in the Asset Purchase Agreement with the Purchaser (any such proposal, as more specifically set forth in the Asset Purchase Agreement, a "Superior Proposal"). The Debtor shall have sole discretion in determining if a proposal qualifies as a Superior Proposal. In the event that the Debtor receives a Superior Proposal during the Fiduciary-Out Period, the Purchaser shall have the right (the "Matching/Topping Right") to deliver to the Debtor an unconditional written offer to improve the terms and conditions contained in the Asset Purchase Agreement so long as the Deemed Value of such improved offer is at least equal to the Deemed Value of such pending Superior Proposal. If the |

| | |
|---|---|
| | Purchaser has not exercised the Matching/Topping Right within four business days after receipt by the Debtor of such Superior Proposal, the Debtor may enter into a definitive agreement for such Superior Proposal or seek bankruptcy court approval for such Superior Proposal or such definitive agreement, in which case the Asset Purchase Agreement with the Purchaser shall terminate in accordance with its terms. |
| Purchaser Protections | (A) In the event that, during the Fiduciary-Out Period, the Debtor enters into an agreement with a purchaser other than the Purchaser that submits a Superior Proposal or (B) upon termination of the Asset Purchase Agreement under certain other circumstances, the Purchaser shall be entitled to receive (i) a break-up fee (the "Break-Up Fee") in the amount of $1 million and (ii) reimbursement for all reasonable and actual costs and expenses up to, but not to exceed, $1 million that may be incurred by the Purchaser in connection with its negotiation and execution of the Asset Purchase Agreement (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Purchaser Protections"). |
| Funding by the Purchaser | Following the expiration of the Fiduciary-Out Period or a waiver of such period by the Debtor, the Purchaser will fund all ongoing operating costs and expenses associated with this chapter 11 case, including the payment of all interest payments that will accrue with respect to all outstanding advances under the Existing DIP Credit Agreement (the "OPEX Funding"), pursuant to a budget to be agreed upon by the Debtor, the Purchaser, and the Agent, through the date that is the earlier of (a) the Closing Date, (b) termination of the Asset Purchase Agreement between Debtor and Purchaser, and (c) denial by the Committee on Foreign Investment in the United States of the transactions contemplated by the Asset Purchase Agreement. Purchaser will waive repayment of the OPEX Funding at the Closing. It is anticipated that a credit agreement setting forth the specific terms of such funding will be executed and submitted to Court for approval on or before February 15, 2011. |

C.    **The Consulting and Marketing Services**

13.    Pursuant to the Existing DIP Credit Agreement, which was approved on a final basis in the Final DIP Order, the Debtor has agreed that if the company is not sold in accordance with the sale transaction schedule set forth therein, or if an event of default occurs under the Existing DIP Credit Agreement, the Lenders and Agent will provide the Debtor with certain marketing and consulting services ("Consulting and Marketing Services"), including, but not limited to, the marketing and sale of the Debtor's assets, all as more fully set forth in Article VII of the Existing DIP Credit Agreement.  The Debtor believes that the Consulting and Marketing Services will help avoid irreparable harm to the estate by maximizing the value of the Debtor's assets in the event that, among other things, the Debtor is unable to consummate a sale of the Acquired Assets to the Purchaser or another entity in accordance with the sale transaction schedule set forth in the Existing DIP Credit Agreement.

## JURISDICTION

14.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9006, and Local Rule 6004-1.

## RELIEF REQUESTED

15.    By this Motion, the Debtor requests entry of an order,[5] (i) authorizing the Debtor to enter into the Asset Purchase Agreement between the Debtor and the Purchaser,

---

[5]    A proposed form of order (the "Sale Order" ) will be submitted to the Court within two (2) business days of the filing of this Motion.

(ii) authorizing and approving the sale of substantially all of the Debtor's assets free and clear of all liens, claims, encumbrances, and other interests to the Purchaser, (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith, (iv) approving and authorizing the Purchaser Protections, and (v) granting certain related relief.

## BASIS FOR RELIEF REQUESTED

### I.    A Sale of the Assets Under Section 363 of the Bankruptcy Code is Warranted

16.    Ample justification exists for approval of the proposed sale of the Acquired Assets.  Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In addition, section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

17.    The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the debtor.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines, Inc., Case No. 01-00056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

18.    Courts typically consider the following factors in determining whether to approve a sale under section 363 of the Bankruptcy Code:   (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith.  See In re Delaware & Hudson Ry., 124 B.R. at

176; <u>In re Phoenix Steel Corp.</u>, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); <u>In re United</u> <u>Healthcare Sys., Inc.</u>, Case No. 97-1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

19.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  <u>See, e.g.</u>, <u>In re Abbotts Dairies of Pennsylvania,</u> <u>Inc.</u>, 788 F.2d 143 (3d Cir. 1986); <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983).  In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  <u>See In re Food Barn Stores, Inc.</u>, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand.");  <u>In re Integrated Res., Inc.</u>, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (<u>quoting</u> <u>In</u> <u>re Atlanta Packaging Prods., Inc.</u>, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

20.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  <u>Committee of Asbestos-Related Litigants and/or</u> <u>Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  <u>In re Integrated Res.</u>, 147 B.R. at 656 (<u>quoting</u> <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).  Indeed, when applying the "business judgment" standard, courts show great

deference to a debtor's business decisions.  See Pitt v. First Wellington Canyon Assocs.  (In re First Wellington Canyon Assocs.), Case No. 89-C-593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

21.     The Debtor submits that the proposed sale of the Acquired Assets to the Purchaser is within its sound business judgment.  The Debtor, with the assistance of its advisors, has considered all available alternatives and determined that the sale of the Acquired Assets to the Purchaser as set forth herein will maximize value for the Debtor's estate and is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  The Debtor and its advisors conducted a thorough and extensive marketing process for a sale of the Debtor's assets—including by soliciting over 100 potential purchasers from across the globe, negotiating extensively with interested parties in order to achieve the best terms possible, and facilitating due diligence for interested parties—and have determined that the terms and conditions of the sale to the Purchaser, including the Purchase Price, are fair and reasonable and are the best under the circumstances.  In addition, the Fiduciary-Out Period provides the Debtor with the opportunity to solicit higher and better offers for the Debtor's assets, thus ensuring that maximum value is achieved for the estate.  Accordingly, the Debtor respectfully requests that the sale of the Acquired Assets to the Purchaser be approved.

## II.     The Sale of the Assets Should Be Free and Clear of Liens, Claims, and Encumbrances

22.     The Debtor submits that the sale of the Assets should be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances attaching to the proceeds of such sale.

23.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

24.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

25.     Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of liens and interests. See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988)); In re Dundee Equity Corp., Case No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930

F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

26.     The Debtor submits that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Acquired Assets. In particular, section 363(f)(2) will be met in connection with the transactions proposed because each of the parties holding liens, claims or encumbrances on the Assets will consent, or absent any objection to this motion, will be deemed to have consented, to the sale. Further, any such lien, claim or encumbrance will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtor may possess with respect thereto. Accordingly, the Debtor requests that the Acquired Assets be sold and transferred to the Purchaser free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

## III.    The Purchaser Should Be Afforded All Protections Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser

27.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

28.     The Debtor submits that it engaged in extensive arm's-length and good faith negotiations with the Purchaser regarding the sale of substantially all of the Debtor's assets to

Purchaser. Accordingly, the Debtor requests that the Court make a finding at the hearing on this Motion (the "Sale Hearing") and in the Sale Order that the Purchaser has purchased the Acquired Assets in good faith and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

**IV.    The Purchaser Protections Should Be Approved**

29.    Approval of the Purchaser Protections is governed by general administrative expense jurisprudence under section 503(b) of the Bankruptcy Code. See In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2009); Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999). In O'Brien, the Third Circuit concluded that the determination as to whether to approve break-up fees or expense reimbursements "depends upon the requesting party's ability to show that the fees [or expenses] were actually necessary to preserve the value of the estate." O'Brien, 181 F.3d at 535.

30.    The O'Brien court identified at least two instances in which such purchaser protections may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of incentives induces an offeror to research the value of the debtor and submit an offer for the purchase of assets that serves as a minimum or floor on which other offerors can rely, the initial offeror "may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

31.    Here, the Purchaser Protections should be approved because they will provide a clear benefit to the Debtor's estate. The Purchaser Protections will ensure that competing offers received by the Debtor during the Fiduciary-Out Period be materially higher or otherwise better

than the terms and conditions set forth in the Asset Purchase Agreement entered into between the Debtor and the Purchaser. Thus, the Debtor's ability to offer the Purchaser Protections enables it to ensure the sale of substantially all of its assets to a purchaser at a price it believes to be fair while, at the same time, providing the Debtor with the potential of even greater benefit to its estate. See In re Integrated Res., 147 B.R. at 659 (noting that break-up fees are important tools to "maximize the value of the debtor's assets.").

32.     The amount of the Purchaser Protections is reasonable and appropriate in light of the size and nature of the transaction and the efforts that are expected be expended by the Purchaser and are consistent with those previously approved by courts in this district. See In re Accuride Corp., Case No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (approving break-up fee representing more than 7% of offering amount); In re EZ Lube, LLC, Case No. 08-13256 (CSS) (Bankr. D. Del. Sept. 24, 2009) (approving break-up fee equal to 5% of the financing commitment); In re Key Plastics L.L.C. and Key Plastic Fin. Corp., Case No. 08-13324 (MFW) (Bankr. D. Del. Dec. 17, 2008) (approving $1.5 million break-up fee less any commitment fee paid, which represented 7.5% of the $20 million offering amount). Further, only documented, reasonable costs and expenses of the Purchaser will be reimbursed.

33.     Moreover, payment of the Purchaser Protections will not diminish the Debtor's estate. The Debtor does not intend to terminate the Asset Purchase Agreement with the Purchaser if to do so would cause it to incur an obligation to pay the Purchaser Protections, unless the Debtor is terminating in order to accept an alternative offer received during the Fiduciary-Out Period, which offer must be for a value of at least $21 million and be on terms and conditions no less favorable to the Debtor than those set forth in the Asset Purchase Agreement.

Therefore, the Purchaser Protections will increase the likelihood that the price at which the Debtor's assets are sold reflects their true worth.

34.     Due to the current sale transaction schedule set forth in the Existing DIP Credit Agreement, the Debtor did not have sufficient time to seek separate approval of the Purchaser Protections prior to the Sale Hearing. Therefore, by this Motion, the Debtor is seeking entry of an order, among other things, approving and authorizing the Purchaser Protections. The Purchaser Protections are material inducement for Purchaser to enter into the Asset Purchase Agreement and provide the consideration provided thereunder, and the Purchaser would not agree to the sale transaction without the Purchaser Protections.

35.     Accordingly, the Debtor requests that the Court approve and authorize the Purchaser Protections.

## V.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved

### A.    Assumption and Assignment Based on Debtor's Business Judgment

36.     As stated above, to facilitate and effect the sale of its assets, the Debtor also seeks authority to assume and assign certain executory contracts and unexpired leases (the "Assigned Contracts") to the Purchaser.

37.     Section 365(a) and (b) of the Bankruptcy Code authorizes debtors in possession to assume executory contracts or unexpired leases subject to the Court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

38.     The standard that is applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); In re III Enterprises, Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

39.     It is well established that the court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its "business judgment."  See In re Decora Industries, Inc., Case No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard."); see also Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D.

Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).

40.     To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate.").  Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." In re Network Access Solutions, Corp., 330 B.R. at 75.  Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion.  See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985).

41.     In the present case, the Debtor's assumption and assignment of the Assigned Contracts[6] to the Purchaser meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.  The assumption and assignment of the Assigned Contracts are necessary for the Purchaser to conduct business going forward.  Further, in connection with the sale of the Acquired Assets, all applicable cure costs with respect to the Assigned Contracts will be paid in full by the Purchaser at Closing or as soon thereafter as practicable by payment of the cure costs.

---

[6]     Together with the Asset Purchase Agreement, the Debtor will submit a schedule identifying each of the Assigned Contracts.

**B.** **Adequate Assurance of Future Performance**

42.     A debtor in possession may assign an executory contract or unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. 11 U.S.C. § 365(f)(2).

43.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992); In re Rachels Indus., Inc., 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); see also In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]though no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

44.     Adequate assurance of future performance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

45.     To the extent necessary to satisfy the Court, the Debtor will demonstrate at the Sale Hearing that the Purchaser (i) has assets sufficient to provide adequate assurance of future performance and (ii) is willing and able to perform under the Assigned Contracts from and after the Closing Date. The Sale Hearing will therefore provide the Court and other interested parties

the opportunity to evaluate the ability of the Purchaser to provide adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, the Debtor should be authorized to assume and assign the Assigned Contracts.

46.     Attached hereto as <u>Exhibit B</u> is a notice (the "Cure Notice") which will be served on the non-Debtor counterparties to such Assigned Contracts. The Cure Notice will include (i) a description of the Assigned Contract to be assumed, (ii) the name of the counterparty to such Assigned Contract, (iii) the amount, if any, determined by the Debtor to be necessary to be paid to cure any existing default under such Assigned Contract in accordance with sections 365(b) and (f)(2) of the Bankruptcy Code (the "Cure Amount"),[7] (iv) the proposed effective date of the assignment, (v) the identity of the Purchaser, and (vi) the deadline by which any counterparty to such Assigned Contract must object. The Debtor reserves the right to supplement and modify the Cure Notice at any time, provided that to the extent that the Debtor adds a Assigned Contract to the Cure Notice or modifies the Cure Amount, the affected party shall receive a separate notice and an opportunity to object to such addition or modification.

47.     Any objection to the assumption and assignment of any Assigned Contract identified on the Cure Notice, including, without limitation, any objection to the Cure Amount set forth on the Cure Notice or to the ability of the Purchaser to provide adequate assurance of future performance under such Assigned Contract, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with

---

[7]    The Debtor is still ascertaining what, if any, Cure Amounts are necessary to be paid to cure any existing default under the Assigned Contracts. Within two (2) business days of the filing of this Motion, the Debtor will file and serve a supplemental Cure Notice indicating such amounts and the identity of the Purchaser.

appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, and served on (a) counsel to the Debtor, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Flr., P.O. Box 1347, Wilmington, DE 19899 (Attn: Robert J. Dehney, Esq. and Daniel B. Butz, Esq.), (b) special counsel to the Debtor, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 (Attn: Timothy W. Walsh, Esq. and Daniel G. Egan, Esq.), and (c) counsel to the Purchaser, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022 (Attn: Michael H. Torkin, Esq.), **so as to be actually received no later than January 28, 2011 at 4:00 p.m. (Eastern Standard Time) (the "Assignment and Cure Objection Deadline").**

### C. Anti-Assignment Provisions Should be Deemed Unenforceable

48.     To facilitate the assumption, assignment and sale of the Assigned Contracts, the Debtor also requests that the Court enter an order providing that any anti-assignment provisions that may be contained in, or otherwise purporting to affect, the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of such Assigned Contracts, and that any such provisions are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

49.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127 F. 3d 904, 910–11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."), cert. denied, 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or

terminate the contract or lease upon a proposed assumption or assignment thereof. <u>See</u>, <u>e.g.</u>, <u>In re Jamesway Corp.</u>, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (finding that section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

50.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. <u>See In re Rickel Home Centers, Inc.</u>, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in <u>In re Mr. Grocer, Inc.</u>, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

51.     Accordingly, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of any of the Assigned Contracts to the Purchaser and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## VI.     Appointment of a Consumer Privacy Ombudsman

52.     Section 363(b)(1) of the Bankruptcy Code provides that if the Debtor "in connection with offering a product or a service discloses to an individual a policy prohibiting the

transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the [debtor] may not sell or lease personally identifiable information to any person unless" the sale is "consistent with such policy" or a "consumer privacy ombudsman" is appointed. 11 U.S.C. § 363(b)(1).

53.     Section 332 of the Bankruptcy Code governs the appointment of a consumer privacy ombudsman and provides that the Court "shall order the United States trustee to appoint, not later than 7 days before the commencement of the [sale] hearing, 1 disinterested person (other than the United States trustee) to serve as the consumer privacy ombudsman in the case and shall require that notice of such hearing be timely given to such ombudsman." 11 U.S.C. § 332(a). The consumer privacy ombudsman "may appear and be heard at [the sale] hearing and shall provide to the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale . . . of personally identifiable information." 11 U.S.C. § 332(b).

54.     The Debtor currently maintains a certain privacy policy that governs the use of personally-identifiable customer information in conducting its business operations (a copy of the policy is attached hereto as <u>Exhibit C</u>). While the Debtor does not believe that the transfer of the personally-identifiable information contemplated by the Sale Motion is inconsistent with the Debtor's existing privacy policy or public policy, the Debtor's privacy policy does not explicitly provide that such information may be transferred to a purchaser of substantially all of the assets of the Debtor.

55.     To avoid any delay in consummating a sale of the Acquired Assets, and to ensure that a consumer privacy ombudsman is appointed prior to the Sale Hearing, the Debtor is

requesting, in this Motion and in a separate motion for entry of an order shortening the time for notice of the Sale Hearing and directing the U.S. Trustee to appoint a consumer privacy ombudsman, filed concurrently herewith, that the Court direct the U.S. Trustee to appoint, not later than seven (7) days before the commencement of the Sale Hearing, a consumer privacy ombudsman pursuant to sections 332 and 363(b)(1) of the Bankruptcy Code.[8]

## VII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

56.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

57.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 at 6004-18 (L. King., 15th rev. ed. 2008). The treatise further provides

---

[8]    The Debtor reserves the right to withdraw this request in the event it determines that the appointment of a consumer privacy ombudsman is not required based on the information being transferred in connection with the sale.

that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

58.     The Debtor requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the proposed sale of the Acquired Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## RESERVATION OF RIGHTS

59.     The Debtor expressly reserves the right to amend, modify, and/or supplement the relief requested in this Motion in all respects prior to or at the applicable hearing and reserves the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

## NOTICE

60.     No trustee, examiner or statutory creditors' committee has been appointed in this chapter 11 case. Notice of this motion is being provided to (i) the U.S. Trustee, (ii) counsel to the Committee, (iii) Emivest Aviation (US) LLC, (iv) the Lenders and Agent, (v) counsel to the Lenders and Agent, (vi) all counterparties to the Assigned Contracts, (vii) any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets, (viii) the Internal Revenue Service, (ix) counsel to the Purchaser, (x) any entity that has expressed an interest in acquiring the Acquired Assets, and (xi) all parties having filed requests for notice in this chapter 11 case. Due to the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## NO PRIOR REQUEST

61.     No prior request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and granting such other and further relief as this Court deems just and proper.

Dated: January 14, 2011
       Wilmington, Delaware

               MORRIS, NICHOLS, ARSHT & TUNNELL LLP

               Robert J. Dehney (No. 3578)
               Daniel B. Butz (No. 4227)
               Matthew B. Harvey (No. 5186)
               1201 North Market Street, 18th Flr.
               P.O. Box 1347
               Wilmington, DE 19899
               Telephone: 302.658.9200
               Facsimile: 302.425.4673

               *Counsel for Debtor and*
               *Debtor in Possession*

               -and-

               Timothy W. Walsh
               Daniel G. Egan
               DLA PIPER LLP (US)
               1251 Avenue of the Americas, 25th Flr.
               New York, New York 10020
               Telephone: 212.335.4500
               Facsimile: 212.335.4501

               *Special Counsel for Debtor and*
               *Debtor in Possession*