# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EMIVEST AEROSPACE CORPORATION, | : | Case No. 10-13391 (MFW) |
| | : | |
| Debtor.[1] | : | **(Proposed) Hearing Date: February 23, 2011 at a time to be determined.** |
| | : | **(Proposed) Objections Due: February 22, 2011 at 4:00 p.m. (ET)** |

## EMERGENCY MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) APPROVING AUCTION AND BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (III) AUTHORIZING ENTRY INTO STALKING HORSE ASSET PURCHASE AGREEMENT AND APPROVING STALKING HORSE ASSET PROTECTIONS, (IV) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) SCHEDULING AUCTION AND SALE APPROVAL HEARING, AND (VI) APPROVING THE FORM AND MANNER OF SALE NOTICE

Emivest Aerospace Corporation, as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case, by and through its undersigned counsel, Morris, Nichols, Arsht & Tunnell LLP and DLA Piper LLP (US), hereby files this emergency motion pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), rules 2002, 6004, 6006, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order, substantially in the form annexed hereto as Exhibit A, (i) authorizing and approving the sale of

---

[1] The last four digits of the Debtor's federal tax identification number are 8827. The Debtor's mailing address and corporate headquarters is 1770 Skyplace Blvd., San Antonio, TX 78216.

substantially all of the Debtor's assets (the "Assets") free and clear of all liens, claims, encumbrances and other interests, (ii) approving certain auction and bid procedures in connection with the sale of substantially all of the Debtor's Assets, (iii) authorizing the Debtor to enter into a stalking horse purchase agreement and approving certain stalking horse protections, (iv) approving certain procedures related to the assumption and assignment of executory contracts and unexpired leases, (v) scheduling an auction and sale approval hearing, and (vi) approving the form and manner of sale notice (the "Motion"). In support of the Motion, the Debtor, by and through its undersigned counsel, respectfully represents as follows:

## BACKGROUND

1.     On October 20, 2010 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     No trustee or examiner has been appointed in this chapter 11 case.

3.     On November 4, 2010, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") in this case.

4.     The factual background regarding the Debtor, including its current and historical business operations and the events precipitating this chapter 11 filing, is set forth in detail in the Declaration of Anthony Power in Support of the Debtor's Chapter 11 Petition and First Day Pleadings (the "Power Declaration"), and is incorporated herein by reference.

5.     As discussed in more detail in the Power Declaration, since commencing commercial production in late 2005, the Debtor has suffered from a lack of sufficient working capital resources to fund materials necessary in the production process. Moreover, the Debtor

has incurred significant work in process write-downs for product cost in excess of anticipated sales price as a result of the inherent production inefficiencies and low initial production volumes typically associated with transitioning a complex product from development to commercial production. Despite the implementation of numerous cost saving methods, the Debtor remains over-leveraged and is facing significant liquidity constraints.

6. In July 2010, the Debtor retained Morgan Joseph & Co. Inc. ("Morgan Joseph") as its financial advisor. Prior to filing this chapter 11 case, the Debtor, with the assistance of Morgan Joseph, pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of certain or all of the Debtor's assets or businesses. The Debtor ultimately determined that a chapter 11 filing was necessary and that the value of its estate would be best maximized and preserved through a sale of its assets pursuant to section 363 of the Bankruptcy Code.

7. On October 21, 2010, the Debtor filed a motion (the "DIP Motion") seeking, among other things, authorization to enter into a certain Debtor-in-Possession Credit and Security Agreement (as amended, the "DIP Credit Agreement") by and between the Debtor, Counsel RB Capital, LLC, as agent (the "Agent"), and Counsel RB Capital, LLC and EAI Capital, LLC, as lenders (together, the "Lenders"), which provided for postpetition financing for the Debtor on the terms and conditions set forth therein (the "DIP Financing"). On November 24, 2010, the Court entered a final order granting the relief requested in the DIP Motion and approving the terms of the DIP Credit Agreement. Pursuant to the terms of the DIP Credit Agreement, the Debtor must obtain entry of an order approving the sale of substantially all of the Debtor's assets on or before March 16, 2011. The Debtor is required to meet this sale

transaction deadline in order to avoid an Event of Default from occurring under the DIP Credit Agreement.

8.     Since before the commencement of this case, the Debtor and its advisors have been actively marketing the Debtor's assets for sale and seeking potential purchasers. The Debtor, with the assistance of Morgan Joseph, has solicited over 100 potential purchasers, many of which expressed a genuine interest in purchasing the Debtor's assets. These interested parties were provided due diligence materials regarding the Debtor's business operations and its assets and were given the opportunity to conduct their own due diligence, subject to the execution of an appropriate confidentiality agreement.

9.     On October 27, 2010, the Debtor, as required under the terms of the DIP Credit Agreement, filed a motion (the "Initial Sale Motion") seeking, among other things, approval of certain auction and bid procedures in connection with the sale of substantially all of the Debtor's assets (Doc. No. 38). The Initial Sale Motion was subsequently withdrawn on January 7, 2011.

10.    Over the past few months, the Debtor and another potential purchaser have been engaging in extensive negotiations regarding a sale of the Debtor's assets. During this time, the Debtor continued to solicit offers from and facilitate diligence efforts for various other parties expressing an interest in acquiring the Debtor's assets in order to ensure the best deal possible for the estate.

11.    On January 14, 2011, the Debtor filed the *Emergency Motion of Debtor for Entry of an Order (I) Authorizing the Debtor to Enter Into a Certain Asset Purchase Agreement Between the Purchaser and the Debtor, (II) Authorizing and Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing and Approving the Assumption and Assignment of Executory*

*Contracts and Unexpired Leases, (IV) Approving and Authorizing the Purchaser Protections, and (V) Granting Related Relief* (the "January Sale Motion") (Doc. No. 190).

12.     Pursuant to the January Sale Motion, the Debtor sought, among other things, authorization to sell substantially all of its assets to a certain entity. Following the filing of the January Sale Motion, the Debtor and this proposed purchaser continued—and are continuing—to negotiate the terms of the sale; however, as of the date hereof, the parties have been unable to reach an agreement regarding the terms of an asset purchase agreement that may be filed with this Court. Accordingly, contemporaneously herewith, the Debtor is filing a notice of withdrawal of the January Sale Motion.

13.     During this time, the Debtor continued to explore other opportunities to sell the Assets to other interested parties. One such interested party, MT, LLC (the "Stalking Horse Bidder"), emerged and submitted an attractive offer for the Assets. The Debtor and the Stalking Horse Bidder engaged in extensive negotiations regarding a sale of the Assets and ultimately were able to reach an agreement as to the terms and conditions of such sale, as set forth in the Asset Purchase Agreement by and between the Debtor and the Stalking Horse Bidder (the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit B.[2] These negotiations with the Stalking Horse Bidder were conducted at arm's-length and in good faith.

---

[2]     Attached hereto as Exhibit B is a draft copy of the Asset Purchase Agreement. A fully executed copy of the Asset Purchase Agreement in substantially similar form will be filed with the court prior to the hearing on approval of, among other things, the Bid Procedures (as defined herein). Pursuant to the Asset Purchase Agreement, the Stalking Horse Bidder may terminate the agreement if it notifies the Debtor in writing, no later than March 10, 2011, that the Stalking Horse Bidder is terminating the Asset Purchase Agreement because (A) it is not satisfied with the results of its legal and business due diligence examination of the Assets and the condition thereof, which determination shall be in the Stalking Horse Bidder's sole and absolute discretion or (B) it is not prepared to assume the Assigned Contracts.

14.    The Debtor, in its sound business judgment, believes that the Asset Purchase Agreement constitutes the best offer for the Assets received thus far and will initiate a sale process that will maximize value for the Debtor's estate. A summary of certain principal terms of the Asset Purchase Agreement is as follows:[3]

| | |
|---|---|
| Purchase Price | The total consideration to be paid by the Stalking Horse Bidder in consideration of the sale, transfer and assignment of the Assets is $7,625,000 in cash (the "Purchase Price") plus the assumption by the Stalking Horse Bidder of the Assumed Liabilities, including certain secured liabilities in the aggregate amount of $3,212,500 relating to SJ30 aircraft serial nos. 009 and 012. The Purchase Price shall be payable as follows:  (i) $6,675,000 shall be paid at the Closing by wire transfer of immediately available funds; and (ii) the remainder of the Purchase Price (as the same may be adjusted in accordance with the terms of the Asset Purchase Agreement) shall be paid by the Stalking Horse Bidder to the Debtor upon the expiration of the Removal Period. |
| Deposit | The Stalking Horse Bidder shall, prior to or concurrently with the execution of the Asset Purchase Agreement, deposit into escrow 10% of the Purchase Price in immediately available, good funds. The escrow agent shall immediately return to the Stalking Horse Bidder the deposit upon (A) termination of the Asset Purchase Agreement under section 6.01(a) thereof, (B) the Stalking Horse Bidder's termination of the Asset Purchase Agreement under Section 6.01(b) or 6.01(c) thereof, to the extent (i) such termination is resulted from or as a consequence of Debtor's material breach of any of its covenants, representations and warranties under the Asset Purchase Agreement and (ii) the Stalking Horse Bidder is not in any material breach of its covenants, representations or warranties under the Asset Purchase Agreement, or (C) the Stalking Horse Bidder's termination of the Asset Purchase Agreement under |

---

[3]    This summary contains a description of only certain principal terms of the Asset Purchase Agreement. The Asset Purchase Agreement itself should be consulted for a full description of the terms thereof. To the extent that there are any inconsistencies between the terms set forth herein and in the actual terms set forth in the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Asset Purchase Agreement.

| | |
|---|---|
| | Section 6.01(d) thereof. The deposit shall become immediately payable to the Debtor upon the earlier to occur of (a) the Closing, and (b) Debtor's termination of the Asset Purchase Agreement under Section 6.01(b) or 6.01(c) thereof, to the extent (i) such termination is resulted from or as a consequence of the Stalking Horse Bidder's material breach of any of its covenants, representations and warranties under the Asset Purchase Agreement and (ii) Debtor is not in any material breach of its covenants, representations or warranties under the Asset Purchase Agreement. |
| Closing Date | The completion of the transactions contemplated by the Asset Purchase Agreement (the "Closing") shall take place within one business day after the date of entry of an order approving the sale of the Assets to the Stalking Horse Bidder, provided that all of the conditions precedent to Closing set forth in Article V of the Asset Purchase Agreement (other than conditions to be satisfied at the Closing) have been satisfied or, if permissible, waived by the Debtor and/or the Stalking Horse Bidder (as applicable) (the day on which the Closing takes place being the "Closing Date"). |
| Purchased Assets | The Assets being purchased from the Debtor include, among other things, the Debtor's right, title, and interest as of the Closing Date in and to all properties, assets, goodwill and business of every kind and description and wherever located, whether tangible or intangible, real, personal or mixed, directly or indirectly owned by the Debtor or to which the Debtor is directly or indirectly entitled, and in any case, belonging to or used or intended to be used in the Business (other than the Excluded Assets), including in certain equipment and personal property leases and executory contracts, furniture, fixtures, equipment, machinery, other tangible personal property, intangible personal property, inventory, aircraft and aircraft engines, vehicles, accounts receivable, certain claims and causes of action, licenses, permits, and books and records. |
| Excluded Assets | Excluded assets include, among other things, cash and cash equivalents, leased and owned real property, certain customer orders, avoidance actions and all other claims or actions the Debtor may have against any of its officers, directors, shareholders or creditors, the Debtor's rights in connection with a certain arbitration proceeding between the Debtor and certain |

| | |
|---|---|
| | current and former shareholders, and executory contracts and unexpired leases that are not assumed and assigned to the Stalking Horse Bidder. The excluded assets include leasehold interests in San Antonio and West Virginia, which the Debtor and its advisors have valued at an aggregate amount of approximately $5 million. |
| Assumed Liabilities | The Stalking Horse Bidder shall, effective as of the Closing Date, assume those liabilities arising from executory contracts and unexpired leases assigned to the Stalking Horse Bidder, including certain secured liabilities in the aggregate amount of $3,212,500 relating to SJ30 aircraft serial nos. 009 and 012, or from the ownership of the Assets, in each case, first accruing from and after the Closing Date, excluding all cure costs other than cure costs associated with the Hexcel Agreement, which Hexcel Agreement cure costs shall be borne by the Stalking Horse Bidder. |
| Excluded Liabilities | The Stalking Horse Bidder shall not assume or be deemed to have assumed any liabilities of the Debtor other than the Assumed Liabilities. |
| Assumption and Assignment of Contracts | At the Closing, the Debtor shall assign to the Stalking Horse Bidder each of the Assigned Contracts as listed in the Assigned Contracts Schedules attached to the Asset Purchase Agreement. In connection with the assumption and assignment of the Assigned Contracts, at or prior to the Closing, the Debtor, from the proceeds of the Purchase Price, shall pay all cure costs, other than cure costs with respect to the Hexcel Agreement, which the Bankruptcy Court, pursuant to a Final Order, orders to be paid as a condition to Debtor's assumption and assignment to Stalking Horse Bidder of such Assigned Contracts in accordance with section 365 of the Bankruptcy Code. |
| Representations, Warranties, and Covenants | The Asset Purchase Agreement contains usual and customary representations, warranties, and covenants for similar bankruptcy section 363 sale transactions, including representations and warranties by the Stalking Horse Bidder that it has sufficient funds to consummate the transactions contemplated by the Asset Purchase Agreement on the terms set forth in the Asset Purchase Agreement and that on the Closing Date, it will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code |

| | |
|---|---|
| | with respect to the Assigned Contracts. |
| Security Interest and Superpriority Claim | As security for the payment of reimbursement amounts that may be owing by the Debtor pursuant to Section 3.01(c), 3.01(d), and 3.01(e) of the Asset Purchase Agreement, the Debtor, on the terms set forth in the Asset Purchase Agreement, grants to the Stalking Horse Bidder a superpriority administrative expense claim senior to all other administrative expense claims of the Debtor under Section 364(c)(1) of the Bankruptcy Code with respect thereto, and pledges, assigns and grants to the Stalking Horse Bidder, a continuing first priority lien and security interest in the Debtor's interests under the West Virginia Lease together with all buildings and other structures, facilities or improvements currently or hereafter located on the real property that is the subject of the West Virginia Lease. |
| Break-Up Fee and Expense Reimbursement | The Asset Purchase Agreement provides for a break-up fee of three percent (3%) of the Purchase Price and an expense reimbursement in an amount not to exceed $75,000 for all reasonable and actual costs and expenses that may be incurred by the Stalking Horse Bidder in connection with its bid. |
| Removal of Assets from Removal Locations | The Purchaser shall require a period of up to one hundred eighty (180) days following the Closing Date (such period referred to as the "Removal Period") to assemble Assets located at the leased real property described on Schedule 4.08 to the Asset Purchase Agreement (the "Removal Locations") and to remove such Assets from the Removal Locations. As a condition to the Stalking Horse Bidder's obligation to close, in addition to the conditions set forth in Article V of the Asset Purchase Agreement, the Debtor shall deliver to the Stalking Horse Bidder, at or prior to the Closing, written consents from each landlord of the Removal Locations, which consents shall be in form and substance reasonably satisfactory to the Stalking Horse Bidder, granting the Stalking Horse Bidder and its employees, agents, contractors and representatives the right to enter upon, use and occupy such Removal Location solely for the purpose of assembling and removing Assets from such Removal Location, without any liability to such landlord therefor, other than for damages caused by the Stalking Horse Bidder or any of its employees, agents, contractors and representatives resulting from such entry and removal. Each such consent shall further confirm that the Stalking Horse Bidder shall have no liability to such landlord for any rent, charges or other obligations under the real property lease or other rental agreement governing such |

| | |
|---|---|
| | Removal Location. |
| As Is, Where Is | Stalking Horse Bidder is accepting the Assets at the Closing "as is, where is, and with all faults," and, except as otherwise expressly provided in the Asset Purchase Agreement, the Debtor is making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Assets. |

## JURISDICTION

15.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. sections 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. section 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. sections 1408 and 1409.  The statutory predicates for the relief requested in this Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9006, and Local Rule 6004-1.

## RELIEF REQUESTED

16.     By this Motion, the Debtor requests entry of an order, substantially in the form attached hereto as Exhibit A (the "Bid Procedures Order"):

    (i)    authorizing the Debtor to enter into the Asset Purchase Agreement regarding the sale of substantially all of the Debtor's Assets free and clear of all liens, claims, encumbrances and other interests at the Sale Approval Hearing (as defined below);

    (ii)    approving procedures (the "Bid Procedures"),[4] the form of which is attached hereto as Exhibit C, for (a) submitting bids for the purchase of all or substantially all of the Assets, and (b) conducting an auction for the Assets (the "Auction"), in the event that the Debtor receives two or more Qualified Bids for the Assets (one such bid being the bid submitted by the Stalking Horse Bidder);

---

[4]   Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bid Procedures.

(iii)     authorizing the Debtor to (a) enter into the Asset Purchase Agreement, (b) provide the Stalking Horse Bidder with a break-up fee (the "Break-Up Fee") of three percent (3%) of the Purchase Price proposed in the Stalking Horse Bid in the event it is not the Successful Bidder (as defined herein), and (c) reimburse the Stalking Horse Bidder for all reasonable and actual costs and expenses up to, but not to exceed, $75,000, that may be incurred by the Stalking Horse Bidder in connection with its bid in the event it is not the Successful Bidder (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Stalking Horse Protections");

(iv)     approving procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases (the "Leases") in connection with the sale of the Assets and resolution of any objections thereto;

(v)     scheduling (a) a deadline to submit bids for the Assets of March 10, 2011, (b) the date of the Auction for March 14, 2011, and (c) the date of the hearing to consider approval of the proposed sale of the Assets (the "Sale Approval Hearing") for March 16, 2011;

(vi)     approving the form and manner of notice of the deadline to submit bids for the Assets, the date and time of the Auction and the date and time of the Sale Approval Hearing; and

(vii)     granting certain related relief.

**The Auction and Bid Procedures**

17.     To obtain the highest and otherwise best bid for the Assets, the Debtor intends to implement the Bid Procedures attached hereto as Exhibit C, which are substantially similar to the auction and bid procedures set forth in the Initial Sale Motion. The Bid Procedures set forth, among other things, the availability of due diligence for Potential Bidders, the deadline and requirements for submitting a Qualified Bid, the procedures for conducting the Auction, and the criteria for determining the highest and otherwise best Qualified Bid for the Assets (the "Successful Bid").

18.     Pursuant to Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the following summary highlights the material

terms of the Bid Procedures. All parties in interest are referred to the text of the attached Bid Procedures for additional information regarding the proposed procedures.[5]

### A. Bid Deadline

19. Any entity wishing to participate in the Auction (a "<u>Potential Bidder</u>") must submit a Qualified Bid (as defined below) in writing to (i) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Flr., P.O. Box 1347, Wilmington, DE 19899 (Attn: Robert J. Dehney, Esq. and Daniel B. Butz, Esq.); (ii) DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 (Attn: Timothy W. Walsh, Esq. and Daniel G. Egan, Esq.); (iii) Cole, Schotz, Meisel, Forman & Leonard, P.A., 300 East Lombard Street, Suite 2000, Baltimore, Maryland 21202 (Attn: Gary H. Leibowitz, Esq.); (iv) Cohen Tauber Spievack & Wagner P.C., 420 Lexington Avenue, Suite 2400, New York, New York 10170 (Attn: Robert A. Boghosian, Esq.); and (v) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899 (Attn: Bradford J. Sandler, Esq.), **so as to be <u>actually</u> <u>received</u> on or before March 10, 2011 at 5:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>"), which deadline may be extended by the Debtor, in consultation with the Creditors' Committee. No bids submitted after the Bid Deadline shall be considered by the Debtor.

### B. Bid Requirements

20. Only bids for the Assets that constitute "Qualified Bids" will be considered by the Debtor. A "<u>Qualified Bid</u>" is an offer to purchase the Assets, in the form of an asset purchase agreement together with a blackline against the Asset Purchase Agreement, that:

---

[5] To the extent that there are any inconsistencies between the description of the Bid Procedures contained herein and the actual Bid Procedures attached hereto, the terms of the actual Bid Procedures attached hereto control.

(i)     identifies the Assets to be purchased and the consideration to be paid for such Assets;

(ii)    identifies any proposed revisions to the Asset Purchase Agreement;

(iii)   identifies the Potential Bidder and the officer(s) or authorized agent(s) who will appear on behalf of such Potential Bidder;

(iv)    provides evidence, satisfactory to the Debtor in its reasonable discretion, in consultation with the Creditors' Committee, of the Potential Bidder's financial wherewithal and operational ability to consummate the proposed transaction;

(v)     provides that such offer is not subject to any due diligence or financing contingency or further board or similar approval;

(vi)    provides for a good faith deposit (a "Good Faith Deposit"') to be submitted to the Debtor on or before the Bid Deadline in an amount equal to not less than ten percent (10%) of the proposed purchase price;

(vii)   identifies any Contracts or Leases to be assumed and assigned in connection with the proposed purchase of the Assets and provides evidence of the Potential Bidder's ability to provide adequate assurance of future performance under such Contracts and Leases;

(viii)  provides that such offer is irrevocable until the earlier of (a) 20 days after entry of an order approving the sale of the Assets to another Potential Bidder and (b) consummation of the purchase of the Assets by another Potential Bidder;

(ix)    includes a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to submit an offer to purchase the Assets on the terms proposed by such Potential Bidder; and

(x)     contains the form of order approving the proposed transaction that the Potential Bidder would request the Debtor to submit to the Court.

21.     The Stalking Horse Bidder is deemed a Qualified Bidder (as defined below), whose bid shall be deemed a Qualified Bid. The Debtor may, in its business judgment, communicate with any Potential Bidder and may request any additional information reasonably required in connection with the evaluation of any such Potential Bidder or bid submitted by such Potential Bidder.

22. As soon as practicable after a Potential Bidder submits a bid, the Debtor, in consultation with the Creditors' Committee, will determine whether such bid is a Qualified Bid and will notify such Potential Bidder of such determination. The Debtor reserves the right to consider bids for the Assets that do not conform to one or more of the aforementioned requirements, and, in consultation with the Creditors' Committee, may deem such bids to be Qualified Bids notwithstanding such requirements. The Debtor may aggregate separate bids from unaffiliated Potential Bidders to create one Qualified Bid, provided, however, that all such Potential Bidders shall remain subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

### C.    Due Diligence

23. Through and including the Bid Deadline, the Debtor, with the assistance of Morgan Joseph, will afford Potential Bidders the opportunity to conduct a due diligence investigation regarding the Assets in the manner determined by the Debtor, in its business judgment, to be reasonable and appropriate. The Debtor shall not be obligated to furnish access to any information of any kind whatsoever regarding the Assets after the Bid Deadline.

24. Upon request, the Debtor will provide each Potential Bidder with a copy of the Bid Procedures and a form Sale Order, together with a copy of the Asset Purchase Agreement. Should any Potential Bidder desire additional or further information, such Potential Bidder will be required to execute a confidentiality agreement in form and substance satisfactory to the Debtor in its business judgment and on terms that are not more favorable to such Potential Bidder than the confidentiality agreement, if any, executed by the Stalking Horse Bidder. Upon execution of such confidentiality agreement, the applicable Potential Bidder will be given access (through a virtual data room, site inspections or otherwise) to various financial data and other relevant and confidential information. The Debtor, together with Morgan Joseph, will coordinate

all requests for additional information or access from Potential Bidders. The Debtor may, in its discretion, coordinate due diligence investigations such that multiple Potential Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. The Debtor shall not be obligated to furnish access to any such information to any entity that does not execute a confidentiality agreement in form and substance satisfactory to the Debtor in its business judgment. In any event, the Stalking Horse Bidder shall be provided prompt access to all due diligence materials, management presentations, site inspections and other information provided to Potential Bidders that were not previously made available to the Stalking Horse Bidder.

**D.      Credit Bid**

25.      On or before the Bid Deadline, parties holding a valid lien on some or all of the Assets that secures an allowed claim may submit a credit bid for some or all of such Assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code. The Stalking Horse Bidder shall have the right to credit bid up to the full amount of the Break-Up Fee and Expense Reimbursement.

**E.      The Auction**

26.      If two or more Qualified Bids are received on or before the Bid Deadline, the Debtor shall conduct the Auction commencing on **March 14, 2011 at 10:00 a.m. (prevailing Eastern Time)**, at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020, to determine the Successful Bid. The Auction will be transcribed or videotaped. The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction. The Debtor reserves the right to cancel the Auction in its discretion. If the Debtor does not receive any Qualified Bids other than the

Stalking Horse Bid, the Stalking Horse Bidder will be named the Successful Bidder (as defined below).

**F.    Auction Procedures**

27.    Only an entity that has submitted a Qualified Bid (a "Qualified Bidder") as set forth herein is eligible to participate in the Auction; however, the Auction will be conducted openly and all creditors will be permitted to attend.  All participants shall appear in person or through a duly authorized representative.  The Stalking Horse Bid shall serve as the starting bid at the Auction, and Qualified Bidders may submit bids that are higher and better than the aggregate of the Purchase Price plus the value of all Assumed Liabilities (*i.e.*, $11,187,500) plus an initial increment amount equal to the aggregate amount of the Stalking Horse Protections (*i.e.*, $303,750) plus $100,000 (the "Initial Overbid"), and subsequent increments of at least $200,000 (the "Overbid Increments"), provided that the Debtor, in its reasonable discretion, and in consultation with the Creditors' Committee, may adjust the Overbid Increments without further order of the Court.  Each Qualified Bidder shall be required to confirm at the Auction that it has not engaged in any collusion with respect to the bidding or sale.

28.    As soon as practicable following the determination of the Successful Bid, the Debtor shall file a notice with the Court identifying the Qualified Bidder that submits the Successful Bid (the "Successful Bidder") and serve such notice by telecopy, electronic mail transmission, or overnight delivery, upon the following entities:    (i) the U.S. Trustee; (ii) prepetition secured creditors; (iii) counsel to the Creditors' Committee; (iv) the Lenders and Agent; (v) counsel to the Lenders and Agent; (vi) all other parties that have filed notices of appearance in this case; (vii) all Qualified Bidders that have submitted a Qualified Bid; and (viii) all non-Debtor counterparties to the Contracts and Leases proposed to be assumed and assigned under the Successful Bid.

29.     The Debtor may adjourn, continue, re-open or terminate the Auction, subject to any required approval of the Court, and reserves the right to adopt other and further rules and procedures for the Auction that, in its business judgment, will better promote the goals of the Auction.

### G.     Determination of Successful Bid

30.     As soon as reasonably practicable following the Bid Deadline (if only one Qualified Bid is submitted) or the Auction (if two or more Qualified Bids are submitted), the Debtor, in consultation with the Creditors' Committee, shall review each Qualified Bid that has been submitted and the Debtor shall determine, in its reasonable discretion, whether any Qualified Bid is the Successful Bid.  In making such determination, the Debtor shall consider any factor that it deems relevant, including, without limitation, the purchase price, whether the Qualified Bid proposes to purchase less than all of the Assets, the payment of the Break-Up Fee or Expense Reimbursement, any benefit to the Debtor's estate from any proposal to assume liabilities of the Debtor, and those factors affecting the speed and certainty of consummating the sale of the Assets.

31.     As soon as practicable following notification of the determination of the Successful Bid, but in no event later than the first business day following such notification, the Successful Bidder must execute a definitive agreement to purchase the Assets, to the extent not previously executed, in all respects acceptable to the Debtor and consistent with such Successful Bidder's proposed revisions to the Asset Purchase Agreement unless otherwise agreed to by the Debtor.

32.     The presentation of the Successful Bid to the Court for approval does not constitute the Debtor's acceptance of such bid.  The Debtor will be deemed to have accepted the

Successful Bid only when such bid has been approved by the Court pursuant to the Sale Order and the sale of the Assets proposed in such bid has been consummated.

**H.     Back-Up Bid**

33.     The Successful Bidder(s) shall be required to consummate the purchase of the Assets by a date to be determined.  If the Successful Bidder(s) fails to consummate the purchase of the Assets, or any part thereof, then the next highest or otherwise best Qualified Bid (if any) (the "Back-up Bid"), which is irrevocable until the earlier of (i) 20 days after entry of an order approving the sale of the Assets to another Potential Bidder and (ii) consummation of the purchase of the Assets by another Potential Bidder, may be designated by the Debtor as the Successful Bid, and the Debtor shall be authorized, but not required, to consummate the sale of the Assets to the Qualified Bidder that submitted the Back-Up Bid pursuant to the terms of such Back-Up Bid by a date to be determined.  If the Successful Bidder(s) fails to consummate the purchase of the Assets because of a breach, default or failure to perform on the part of such Successful Bidder(s), the Debtor reserves the right to seek all available damages from such Successful Bidder(s).

**I.     Reservation of Rights**

34.     Determination of Successful Bid.  The Debtor reserves the right to (i) determine in its reasonable discretion whether any Qualified Bid is a Successful Bid and (ii) reject, at any time prior to entry of the Sale Order by the Court, without liability, any bid that the Debtor, in its reasonable discretion, determines to be (a) inadequate or insufficient, (b) not in conformity with the Bid Procedures, the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, or (c) contrary to the best interests of the Debtor and its estate.  At or before the Sale Approval Hearing, the Debtor may impose such other terms and conditions on the sale of the Assets as the Debtor may determine to be in the best interests of the Debtor and its estate.

35.  <u>Modification of Bid Procedures</u>.  The Debtor reserves the right to modify the Bid Procedures, in consultation with the Creditors' Committee, without the need for any further order of the Bankruptcy Court, including, without limitation, (i) extending the deadlines set forth in the Bid Procedures, (ii) adjourning the Auction and the Sale Approval Hearing, and (iii) withdrawing any Assets from the sale process at any time prior to or during the Auction.

**J.     Disposition of Good Faith Deposits**

36.  All Good Faith Deposits shall be held in a separate escrow account for the benefit of the Debtor.  As soon as practicable following the consummation of the sale of the Assets, any Good Faith Deposit received from a Qualified Bidder who is not determined to be the Successful Bidder shall be released from escrow and returned to such Qualified Bidder, except that the Good Faith Deposit received from the Back-Up Bidder shall continue to be held in a separate escrow account for the benefit of the Debtor until the expiration of the earlier of (i) 20 days after entry of an order approving the sale of the Assets to the Successful Bidder and (ii) consummation of the purchase of the Assets by the Successful Bidder.  If the Successful Bidder or, if applicable, the Back-Up Bidder, fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default or failure to perform on the part of such Successful Bidder or Back-Up Bidder, as applicable, the Debtor will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder or Back-Up Bidder, as applicable, and such Good Faith Deposit shall irrevocably become property of the Debtor without affecting or reducing any of the Debtor's other rights or claims against such Successful Bidder or Back-Up Bidder, as applicable. If a Successful Bidder or Back-Up Bidder, as applicable, fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default or failure to perform on the part of the Debtor, the Good Faith Deposit deposited by such Successful Bidder or Back-Up Bidder, as applicable, shall be returned to such Successful Bidder or Back-Up Bidder.  If a Successful

Bidder or Back-Up Bidder, as applicable, consummates the purchase of the Assets, the Good Faith Deposit deposited by such Successful Bidder or Back-Up Bidder, as applicable, shall be applied as a credit toward the purchase price for the Assets.

**K.  As Is, Where Is**

37.  The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its estate, or its agents or representatives.  Except as otherwise expressly provided in the Bid Procedures, the Asset Purchase Agreement, or any applicable asset purchase agreement, each Potential Bidder that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Assets prior to making its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith.

**L.  Sale Approval Hearing**

38.  The sale of the Assets and applicable asset purchase agreement shall be presented for authorization and approval by the Court at the Sale Approval Hearing, which the Debtor proposes be held on or before **March 16, 2011 at 10:00 a.m. (prevailing Eastern Time)**, subject to the availability of the Court, which is the current deadline under the DIP Credit Agreement for obtaining entry of an order approving the sale of substantially all of the Debtor's assets.  The Sale Approval Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Approval Hearing.

## Form Asset Purchase Agreement and Sale Order

39.     To facilitate the bidding process, the Debtor is attaching hereto a copy of the Asset Purchase Agreement, upon which bids for the Assets may be predicated.  The use of uniform agreements will enable the Debtor and other parties in interest to easily compare and contrast the differing terms of any bids that may be received.  The Debtor has the right to not consider any bid that does not substantially conform to the Asset Purchase Agreement.

40.     In addition, all Qualified Bids must include a proposed order approving the sale of the Assets to the Potential Bidder.  To facilitate the submission of proposed orders, the Debtor is submitting herewith a form Sale Order, a copy of which is attached hereto as Exhibit D.

## Notice Procedures

41.     The Debtor also requests approval of the proposed form and manner of notice of the Bid Deadline, the Auction and the Sale Approval Hearing.  Specifically, within three (3) business days of entry of the Bid Procedures Order, the Debtor will serve notice of the Bid Deadline, the Auction and the Sale Approval Hearing, substantially in the form attached hereto as Exhibit E (the "Sale Notice"), by first class mail on:

    (i)    the U.S. Trustee;

    (ii)    counsel for the Creditors' Committee;

    (iii)    the Agent and Lenders;

    (iv)    counsel to the Agent and Lenders;

    (v)    counsel to the Stalking Horse Bidder;

    (vi)    all known creditors of the Debtor;

    (vii)    any entity known or reasonably believed to have asserted a security interest in or lien against any of the Assets;

    (viii)    all counterparties to Contracts and Leases;

(ix)     all landlords, owners, and/or operators of premises at which any of the Assets are located;

(x)      all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; and

(xi)     all parties that have requested notice pursuant to Bankruptcy Rule 2002.

42.     Within three (3) business days of the entry of the Bid Procedures Order, the Debtor will publish a notice, in a form to be submitted to the Court (the "Publication Notice"), in *The Wall Street Journal* or *The New York Times* and/or such other publication(s) as the Debtor and its advisors deem appropriate.

43.     Additionally, as soon as practicable following the determination of the Successful Bid, the Debtor shall file a notice with the Court identifying the Successful Bidder and serve such notice by telecopy, electronic mail transmission, or overnight delivery upon the following entities:  (i) the U.S. Trustee; (ii) counsel to the Creditors' Committee; (iii) the Lenders and Agent; (iv) counsel to the Lenders and Agent; (v) all other parties that have filed notices of appearance in this case; (vi) all Qualified Bidders that have submitted a Qualified Bid; (vii) all non-Debtor counterparties to the Contracts and Leases proposed to be assumed and assigned under the Successful Bid; (viii) all landlords, owners, and/or operators of premises at which any of the Assets are located; and (ix) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

### Assumption and Assignment Procedures

44.     To facilitate and consummate the sale of the Assets, the Debtor seeks authority to assume and assign certain Contracts and Leases to the Successful Bidder.  The Debtor is not able to currently identify which Contracts and Leases will require assumption and assignment to the Successful Bidder.  As such, the Debtor further seeks authority to establish the following Assumption and Assignment Procedures:

45. <u>Cure Notice</u>. As soon as practicable after the Debtor ascertains which Contracts and Leases will be assumed and assigned pursuant to any sale of the Assets, the Debtor will file a notice, substantially in the form attached hereto as <u>Exhibit F</u> (the "<u>Cure Notice</u>") with the Court and serve such Cure Notice by first class mail on the non-Debtor counterparties to such Contracts and Leases. The Cure Notice will include (i) the title of the Contract or Lease to be assumed, (ii) the name of the counterparty to such Contract or Lease, (iii) the amount, if any, determined by the Debtor to be necessary to be paid to cure any existing default under such Contract or Lease in accordance with sections 365(b) and (f)(2) of the Bankruptcy Code (the "<u>Cure Amount</u>"), (iv) the proposed effective date of the assignment, (v) the identity of the Successful Bidder and a statement as to such Successful Bidder's ability to perform the Debtor's obligations under such Contract or Lease, and (vi) the deadline by which any counterparty to such Contract or Lease must object. The Debtor reserves the right to supplement and modify the Cure Notice at any time, provided that to the extent that the Debtor adds a Contract or Lease to the Cure Notice or modifies the Cure Amount, the affected party shall receive a separate notice and an opportunity to object to such addition or modification.

46. <u>Objection to Assumption and Assignment of Contracts and Leases</u>. Any objection to the assumption and assignment of any Contract or Lease identified on the Cure Notice, including, without limitation, any objection to the Cure Amount set forth on the Cure Notice or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Contract or Lease, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street,

Wilmington, Delaware 19801, and served on Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Flr., P.O. Box 1347, Wilmington, DE 19899 (Attn: Robert J. Dehney, Esq. and Daniel B. Butz, Esq.), DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 (Attn: Timothy W. Walsh, Esq. and Daniel G. Egan, Esq.), and Cohen Tauber Spievack & Wagner P.C., 420 Lexington Avenue, Suite 2400, New York, New York 10170 (Attn: Robert A. Boghosian, Esq.), **so as to be _actually_ _received_ no later than March 11, 2011 at 5:00 p.m. (prevailing Eastern Time)** (the "Assignment and Cure Objection Deadline").

47.     Requests for Adequate Assurance.     Any request for adequate assurance information (a "Request for Adequate Assurance") must include an email address, postal address and/or facsimile number to which a response to such request will be sent.  Upon receiving a Request for Adequate Assurance, the Debtor shall promptly provide such party with any non-confidential information reasonably related to adequate assurance by email, facsimile or overnight delivery.

48.     Resolution of Objections.     If no objection to the proposed assumption and assignment of a Contract or Lease is timely received by the Assignment and Cure Objection Deadline, then the assumption and assignment is authorized and the respective Cure Amount set forth in the Cure Notice shall be binding upon the counterparty to the Contract or Lease for all purposes and will constitute a final determination of total Cure Amount required to be paid in connection with such assumption and assignment of the Contract or Lease.

49.     To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to the assumption and assignment of any of the Contracts and Leases identified on the Cure Notice, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance,

(ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Contract or Lease, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code, (v) deemed to have agreed that all defaults under the applicable Contract or Lease arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtor shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Contract or Lease shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Contract or Lease or designate an early termination date under the applicable Contract or Lease as a result of any default that occurred and/or was continuing prior to the assignment date, and (vii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Contract or Lease.

50.     If no objection to the proposed assumption and assignment of a Contract or Lease is received by the Assignment and Cure Objection Deadline, counsel for the Debtor may submit to the Court a certificate of no objection and a form of order (a "Certificate of No Objection") granting such assumption and assignment, and serve such Certificate of No Objection on the counterparty to such Contract or Lease.

51.     If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at such later date set by the Court. The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and

assignment of any Contract or Lease. If an objection is filed only with respect to the cure amount listed on the Cure Notice, the Debtor may file a Certificate of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court. The Debtor intends to cooperate with the counterparties to the Contracts and Leases to be assumed and assigned by the Debtor to attempt to reconcile any difference in a particular Cure Amount.

52.     Anti-Assignment Provisions in Contracts or Leases. The Debtor further requests that the Court find that any anti-assignment provisions included in, or otherwise purporting to affect, any Contracts and Leases to be assumed and assigned by the Debtor are unenforceable under section 365(f) of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

## I.     A Sale of the Assets Under Section 363 of the Bankruptcy Code is Warranted and Should be Approved

53.     Ample justification exists for approval of the proposed sale of the Assets to the Stalking Horse Bidder or the Successful Bidder. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

54.     The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del.

1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines, Inc., Case No. 01-00056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

55.     Courts typically consider the following factors in determining whether to approve a sale under section 363 of the Bankruptcy Code:  (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith.  See In re Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., Case No. 97-1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

56.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See, e.g., In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).  In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand.");  In re Integrated Res., Inc., 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

57.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Committee of Asbestos-Related Litigants and/or

Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), Case No. 89-C-593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

58.     The Debtor submits that the proposed sale of the Assets is within its sound business judgment. The Debtor, with the assistance of its advisors, has considered all available alternatives and determined that the sale of the Assets pursuant to the Asset Purchase Agreement—through a consensual 363 sale process governed by the Bid Procedures—will maximize value for the Debtor's estate and is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.

59.     The Debtor and its advisors have thoroughly marketed the Assets for sale and negotiated extensively with several interested parties. The offer submitted by the Stalking Horse Bidder is the best offer received thus far and will maximize value for the Debtor's estate. The sale is a valid exercise of the Debtor's business judgment and is in the best interest of the estate,

creditors, and all parties in interest. Accordingly, the Debtor respectfully requests that the sale of the Assets in accordance with the procedures set forth herein be approved.

## II.    The Sale of the Assets Should Be Free and Clear of Liens, Claims, and Encumbrances

60.    The Debtor submits that the sale of the Assets should be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances attaching to the proceeds of such sale.

61.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

62.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

63.    Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of liens and interests. See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the

five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988)); In re Dundee Equity Corp., Case No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

64.     The Debtor submits that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Assets.  In particular, section 363(f)(2) will be met in connection with the transactions proposed because each of the parties holding liens, claims or encumbrances on the Assets will consent, or absent any objection to this motion, will be deemed to have consented, to the sale.  Further, any such lien, claim or encumbrance will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtor may possess with respect thereto.  See In re Trans World Airlines, Inc., 322 F.3d 283, 290–92 (3d Cir. 2003) (holding that section 363(f) permits sales free and clear of interests and liens on property, with such claims and liens relegated to the proceeds of the sale); Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp., 884 F.2d 80, 83 (3d Cir. 1989) ("Where liens are attached as of the date of the stay, the trustee has the power to sell property free and clear of the liens by taking the liens out of the proceeds of the sale."); In re Aneco Elec. Const., Inc., 377 B.R. 338, 343 (Bankr. M.D. Fla. 2006) ("The commonly accepted method for adequate [sic] protecting a secured creditor when a sale is authorized under § 363(f) is to order

the liens to attach to the proceeds of the sale.") (quoting In re Collins, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995)).

65.     Accordingly, the Debtor requests that the Assets be sold and transferred free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

### III.   The Successful Bidder Should Be Afforded All Protections Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser

66.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

67.     The Debtor submits, and will present evidence at the Sale Approval Hearing, if necessary, that the Asset Purchase Agreement is, and the selection of the Successful Bidder shall be, the product of arm's-length, good-faith negotiations. Accordingly, the Debtor requests that the Court make a finding at the Sale Approval Hearing and in the Sale Order that the Stalking Horse Bidder or Successful Bidder has purchased the Assets in good faith and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

### IV.   The Bid Procedures are Reasonable and Appropriate

68.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or public auction. The Debtor has determined that the sale of the Assets, pursuant to the Bid Procedures and by public auction, will ensure that the

bidding process with respect to the Assets is fair and reasonable and will yield the maximum value for the Debtor's estate and its creditors.

69.     Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997) (D.I. 377); In re Fruehauf Trailer Corp., Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997) (D.I. 439); In re Financial News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

70.     The Bid Procedures set an expedited schedule for conducting the Auction and the Sale Approval Hearing. The Debtor is operating under significant liquidity constraints and, as set forth above, under the terms of the DIP Credit Agreement is required to obtain entry of an order authorizing the sale of the Assets on or before March 16, 2011. Thus, an expedited 363 sale process that provides adequate time for marketing and soliciting of bids is the best mechanism to maximize value under the circumstances.

71.     Similar procedures have been previously approved by this Court. See, e.g., In re Nortel Networks, Inc., Case No. 09-10138 (KG) (Bankr. D. Del. June 30, 2009) (D.I. 1012); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) (D.I. 211); In re Radnor Holdings Corp., Case No. 06-10894 (PJW) (Bankr. D. Del. Sept. 22, 2006) (D.I. 277); In re Russell-Stanley Holdings, Inc., Case No. 05-12339 (MFW) (Bankr. D. Del. Sept. 9, 2005) (D.I. 138); In re Ultimate Elecs., Inc., Case No. 05-10104 (PJW) (Bankr. D.

Del. Mar. 24, 2005) (D.I. 327); In re Polaroid Corp., Case No. 01-10864 (PJW) (Bankr. D. Del. Nov. 19, 2001) (D.I. 159).

72.    Accordingly, the Debtor requests that the Court approve the Bid Procedures, including the timetable for the sale process set forth therein.

## V.    The Stalking Horse Protections Should Be Approved

73.    Approval of the Stalking Horse Protections is governed by general administrative expense jurisprudence under section 503(b) of the Bankruptcy Code. See In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2009); Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999). In O'Brien, the Third Circuit concluded that the determination as to whether to approve break-up fees or expense reimbursements "depends upon the requesting party's ability to show that the fees [or expenses] were actually necessary to preserve the value of the estate." O'Brien, 181 F.3d at 535.

74.    The O'Brien court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

75.    Here, the Stalking Horse Protections and Overbid Increments should be approved because they will provide a clear benefit to the Debtor's estate. The Break-Up Fee and Expense Reimbursement will ensure that any competing bids are materially higher or otherwise better

than the Asset Purchase Agreement. Thus, the Debtor's ability to offer the Break-Up Fee and Expense Reimbursement enables it to ensure the sale of substantially all of the Assets to a contractually-committed bidder at a price it believes to be fair while, at the same time, providing the Debtor with the potential of even greater benefit to its estate. See In re Integrated Res., 147 B.R. at 659 (noting that break-up fees "are important tools to encourage bidding and to maximize the value of the debtor's assets.").

76.    The amount of the Break-Up Fee, Expense Reimbursement, and Overbid Increments is reasonable and appropriate in light of the size and nature of the transaction and the efforts that are expected be expended by the Stalking Horse Bidder. Moreover, only documented, reasonable costs and expenses will be reimbursed as part of the Expense Reimbursement.

77.    Moreover, payment of the Break-Up Fee and Expense Reimbursement will not diminish the Debtor's estate. The Debtor does not intend to terminate the Asset Purchase Agreement if to do so would cause it to incur an obligation to pay the Break-Up Fee and Expense Reimbursement, unless the Debtor is terminating in order to accept an alternative bid, which bid must exceed the value of the offer submitted by the Stalking Horse Bidder by an amount sufficient to, among other things, pay the Break-Up Fee and Expense Reimbursement. Therefore, even if the Stalking Horse Bidder is ultimately not determined to be the Successful Bidder, the Debtor will still have benefited from the higher floor established by the improved bid, thereby increasing the likelihood that the price at which the Assets are sold reflects their true worth.

78.    The Debtor submits that the Stalking Horse Protections and Overbid Increments will not chill bidding on the Assets and will clearly benefit the Debtor's estate. The Stalking

Horse Protections are material inducement for Stalking Horse Bidder to enter into the Asset Purchase Agreement and provide the consideration provided thereunder, and the Stalking Horse Bidder would not agree to the sale transaction without the Stalking Horse Protections.

79. Accordingly, the Debtor requests that the Court approve and authorize the Stalking Horse Protections and Overbid Increments.

## VI. Removal of the Assets from the Leased Premises

80. Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Following the sale of the Assets, the Stalking Horse Bidder or any another Successful Bidder will require access to leased real property locations in order to remove any Assets therefrom.

81. Accordingly, the Debtor and the landlords under the West Virginia Lease (as defined in the Asset Purchase Agreement) and leases with respect to the real property located in San Antonio, Texas (the "San Antonio Leases") should be authorized and directed, notwithstanding anything to the contrary that may be contained in such leases, to allow the Stalking Horse Bidder or Successful Bidder to enter upon and use all leased real property, including all buildings and other structures, facilities or improvements located on the real property, that is the subject of the West Virginia and San Antonio Leases solely for the purpose of allowing the Stalking Horse Bidder or Successful Bidder to assemble and remove any Assets from such locations, without any liability to the landlord therefore, other than damages caused by the Stalking Horse Bidder or Successful Bidder or any of its employees, agents, contractors and representatives resulting from such entry and removal.

82.     The Debtor respectfully requests that the Court grant such relief as is necessary to ensure that the Stalking Horse Bidder or Successful Bidder is allowed access to all locations where the Assets are located in order to remove such Assets purchased from the Debtor.

## VII.     The Notice Procedures are Reasonable and Appropriate

83.     Pursuant to Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the proposed sale, and the deadline for filing objections. The Debtor submits that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the proposed sale of the Assets, the Bid Procedures, the Auction, the Cure Amount, and the Sale Approval Hearing to the Debtor's creditors and all other parties in interest that are entitled to notice, as well all those parties that have expressed a bona fide interest in acquiring the Assets. Based upon the foregoing, the Debtor respectfully requests that the Court approve the notice procedures proposed herein, including the form and manner of service of the Sale Notice.

## VIII.    Assumption and Assignment of Executory
## Contracts and Unexpired Leases Should Be Approved

### A.     Assumption and Assignment Based on Debtor's Business Judgment

84.     As stated above, to facilitate and effect the sale of its assets, the Debtor also seeks authority to assume and assign certain Contracts and Leases to the Stalking Horse Bidder or Successful Bidder.

85.     Section 365(a) and (b) of the Bankruptcy Code authorizes debtors in possession to assume executory contracts or unexpired leases subject to the Court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or

reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an

unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

86.     The standard that is applied by the Third Circuit in determining whether an

executory contract or unexpired lease should be assumed is the debtor's "business judgment"

that the assumption is in its economic best interests. See Sharon Steel Corp. v. National Fuel

Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465

U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by

11 U.S.C. § 1113); In re III Enterprises, Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994)

(citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

87.     It is well established that the court should approve a debtor's motion to assume or

reject an executory contract if the debtor's decision is based on its "business judgment." See In

re Decora Industries, Inc., Case No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002);

Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330

B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory

contract is the business judgment rule."); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard."); see also Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).

88.     To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate."). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." In re Network Access Solutions, Corp., 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985).

89.     In the present case, procedures set forth herein for the Debtor's assumption and assignment of certain Contracts and Leases to the Stalking Horse Bidder or Successful Bidder meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. The assumption and assignment of Contracts and Leases are necessary for any Successful Bidder to conduct business going forward, and since no purchaser would take the Assets without certain Contracts and Leases, the assumption and assignment of such Contracts and Leases is essential to inducing the highest and best offer for the Assets. Further, upon

consummation of the proposed sale of the Assets, the Debtor will no longer continue to operate its business and will therefore have no use for any of the Contracts and Leases utilized in its business. Lastly, the proposed Assumption and Assignment Procedures ensure that all counterparties to Contracts and Leases to be assumed and assigned by the Debtor will have ample notice of such relief and an opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder to provide adequate assurance of future performance.

90. Consequently, the Debtor submits that the Assumption and Assignment Procedures are fair and reasonable and respectfully requests that the Court approve the Assumption and Assignment Procedures and authorize the Debtor to assume and assign any Contracts and Leases to the Successful Bidder.

### B. Adequate Assurance of Future Performance

91. A debtor in possession may assign an executory contract or unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. 11 U.S.C. § 365(f)(2).

92. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992); In re Rachels Indus., Inc., 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); see also In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

93. Adequate assurance of future performance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

94. Pursuant to the Bid Procedures, in order to submit a Qualified Bid for the Assets, all Potential Bidders must provide evidence of such Potential Bidder's ability to provide adequate assurance of future performance under the Contracts and Leases to be assumed and assigned. Moreover, the Assumption and Assignment Procedures permit the non-Debtor counterparties to such Contracts and Leases to request adequate assurance information regarding the Stalking Horse Bidder or Successful Bidder, and afford such counterparties the opportunity to evaluate the ability of the Stalking Horse Bidder or Successful Bidder to provide adequate assurance of future performance under such Contracts and Leases, as required by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, in this regard, the Assumption and Assignment Procedures are reasonable and appropriate and support approval of the assumption and assignment of Contracts and Leases to the Successful Bidder.

### C. Anti-Assignment Provisions Should be Deemed Unenforceable

95. To facilitate the assumption, assignment and sale of Contracts and Leases, the Debtor also requests that the Court enter an order providing that any anti-assignment provisions that may be contained in, or otherwise purporting to affect, the Contracts and Leases to be assumed and assigned shall not restrict, limit or prohibit the assumption, assignment and sale of such Contracts and Leases, and that any such provisions are deemed and found to be

unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

96.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127 F. 3d 904, 910–11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."), cert. denied, 522 U.S. 1148 (1998).  Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (finding that section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

97.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would

> preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

98.     Accordingly, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of any Contracts or Leases to the Stalking Horse Bidder or Successful Bidder and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## IX.     No Consumer Privacy Ombudsman is Necessary

99.     No consumer privacy ombudsman need be appointed under section 363(b)(1) of the Bankruptcy Code because the sale will not involve the transfer of any personally identifiable information in a manner that is not consistent with any privacy policy. The Debtor maintains a certain privacy policy governing the use of personally identifiable information collected or submitted through the Debtor's website. In connection with the sale of the Assets, the Debtor will not be transferring any of information collected through the website to the purchaser of the Assets. Instead, the Debtor will send correspondence to those persons that submitted the such information and, in such correspondence, will provide those persons with appropriate contact information for the purchaser and advise them that they should contact such purchaser if they wish to continue receiving information regarding the Debtor's products. Therefore, appointment of a consumer privacy ombudsman is not required.

## X.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

100.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under

§ 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

101.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY ¶ 6004.10 at 6004-18 (L. King., 15th rev. ed. 2008).  The treatise further provides that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

102.    As described above, time is clearly of the essence.  The DIP Credit Agreement requires the entry of an order approving a sale of the Assets by no later than March 16, 2011, and the Debtor lacks the working capital or access to further financing to rehabilitate its operations. Accordingly, the Debtor requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the proposed sale of the Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

**RESERVATION OF RIGHTS**

103.    The Debtor expressly reserves the right to amend, modify, and/or supplement the relief requested in this Motion in all respects, including, but not limited to, the proposed Bid Procedures attached hereto, prior to or at the applicable hearing and reserves the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

## NOTICE

104.     No trustee, examiner or statutory creditors' committee has been appointed in this chapter 11 case.  Notice of this motion is being provided to (i) the U.S. Trustee, (ii) counsel to the Creditors' Committee, (iii) prepetition secured creditors, (iv) the Lenders and Agent, (v) counsel to the Lenders and Agent, (vi) counsel to the Stalking Horse Bidder, (vii) all counterparties to the Contracts and the Leases, (viii) any entity known or reasonably believed to have asserted a security interest in or lien against any of the Assets, (ix) the Internal Revenue Service, (x) all landlords, owners, and/or operators of premises at which any of the Assets are located; and (xi) all parties having filed requests for notice in this chapter 11 case.  Due to the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## NO PRIOR REQUEST

105.     No prior request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed hereto as <u>Exhibit A</u>, granting the relief requested herein and granting such other and further relief as this Court deems just and proper.

Dated: February 16, 2010
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Robert J. Dehney (No. 3578)
Daniel B. Butz (No. 4227)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 18th Flr.
P.O. Box 1347
Wilmington, DE 19899
Telephone: 302.658.9200
Facsimile: 302.425.4673

*Counsel for Debtor and
Debtor in Possession*

-and-

Timothy W. Walsh
Daniel G. Egan
DLA PIPER LLP (US)
1251 Avenue of the Americas, 25th Flr.
New York, New York 10020
Telephone: 212.335.4500
Facsimile: 212.335.4501

*Special Counsel for Debtor and
Debtor in Possession*
