## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---

|  |  |
|---|---|
| In re: | Chapter 11 |
| EMIVEST AEROSPACE CORPORATION, | Case No. 10-13391 (MFW) |
| Debtor.[1] | **Hearing Date: April 6, 2011 at a time to be determined (Proposed).** **Objections Due: At the hearing (Proposed).** |

---

**EMERGENCY MOTION OF THE DEBTOR FOR
ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (II) AUTHORIZING THE
DEBTOR TO ENTER INTO ASSET PURCHASE AGREEMENT BETWEEN
PURCHASER AND DEBTOR, (III) AUTHORIZING AND APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

Emivest Aerospace Corporation, as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case, by and through its undersigned counsel, Morris, Nichols, Arsht & Tunnell LLP and DLA Piper LLP (US), hereby files this emergency motion pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), rules 2002, 6004, 6006, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order, substantially in the form annexed hereto as Exhibit A, (i) authorizing and approving the sale of substantially all of the Debtor's assets free and clear of all liens, claims, encumbrances and other interests, (ii) authorizing the Debtor to enter into an Asset Purchase Agreement (the "Asset Purchase Agreement") by and between the Debtor and MT, LLC (the "Purchaser"),

---

[1] The last four digits of the Debtor's federal tax identification number are 8827. The Debtor's mailing address and corporate headquarters is 1770 Skyplace Blvd., San Antonio, TX 78216.

(iii) authorizing and approving the assumption and assignment of executory contracts and unexpired leases, and (iv) granting certain related relief (the "Motion"). In support of the Motion, the Debtor, by and through its undersigned counsel, respectfully represents as follows:

## BACKGROUND

1.      On October 20, 2010 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      No trustee or examiner has been appointed in this chapter 11 case.

3.      On November 4, 2010, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") in this case.

4.      Since commencing commercial production in late 2005, the Debtor has suffered from a lack of sufficient working capital resources to fund materials necessary in the production process. Moreover, the Debtor has incurred significant work in process write-downs for product cost in excess of anticipated sales price as a result of the inherent production inefficiencies and low initial production volumes typically associated with transitioning a complex product from development to commercial production. Despite the implementation of numerous cost saving methods, the Debtor remains over-leveraged and is facing significant liquidity constraints.

5.      In July 2010, the Debtor retained Morgan Joseph & Co. Inc. ("Morgan Joseph") as its financial advisor. Prior to filing this chapter 11 case, the Debtor, with the assistance of Morgan Joseph, pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of certain or all of the Debtor's assets or businesses. The Debtor ultimately determined that a chapter 11 filing was necessary and that the value of its

estate would be best maximized and preserved through a sale of its assets pursuant to section 363 of the Bankruptcy Code.

6.       On October 21, 2010, the Debtor filed a motion (the "DIP Motion") seeking, among other things, authorization to enter into a certain Debtor-in-Possession Credit and Security Agreement (as amended, the "DIP Credit Agreement") by and between the Debtor, Counsel RB Capital, LLC, as agent (the "Agent"), and Counsel RB Capital, LLC and EAI Capital, LLC, as lenders (together, the "Lenders"), which provided for postpetition financing for the Debtor on the terms and conditions set forth therein (the "DIP Financing"). On November 24, 2010, the Court entered a final order granting the relief requested in the DIP Motion and approving the terms of the DIP Credit Agreement. Pursuant to the terms of the DIP Credit Agreement, the Debtor must obtain entry of an order approving the sale of substantially all of the Debtor's assets on or before April 6, 2011. The Debtor is required to meet this sale transaction deadline in order to avoid an Event of Default from occurring under the DIP Credit Agreement.

7.       Since before the commencement of this case, the Debtor and its advisors have been actively marketing the Debtor's assets for sale and seeking potential purchasers. The Debtor, with the assistance of Morgan Joseph, has solicited over 100 potential purchasers, many of which expressed a genuine interest in purchasing the Debtor's assets. These interested parties were provided due diligence materials regarding the Debtor's business operations and its assets and were given the opportunity to conduct their own due diligence, subject to the execution of an appropriate confidentiality agreement.

8.       On February 16, 2011, the Debtor filed an emergency motion seeking, among other things, (i) authorization to sell all or substantially all of its assets free and clear of all liens, claims and encumbrances, (ii) approval of certain auction and bid procedures in connection with

the sale of substantially all of the Debtor's assets, and (iii) authorization to enter into a stalking horse asset purchase agreement (the "Initial APA") with the Purchaser (the "February Sale Motion") (Doc. No. 296).

9.      On February 23, 2011, the Court entered an order approving, among other things, the proposed procedures for bidding at an auction for the sale of the Debtor's assets and scheduling March 15, 2011 as the date of the hearing on the sale of the Debtor's assets.  The sale approval hearing was subsequently adjourned to March 16, 2011 which, at the time, was the deadline under the DIP Credit Agreement for obtaining an order approving the sale of the Debtor's assets.

10.     Following the filing of the February Sale Motion, and in accordance with the terms of the Initial APA, the Purchaser decided that it would terminate the Initial APA based on its diligence.  No qualified bids were received in accordance with the bid procedures and, accordingly, the auction was cancelled by the Debtor.  The Debtor and the Lenders negotiated an amendment to the DIP Credit Agreement, which was approved by an order of this Court, establishing a new deadline of April 6, 2011 for the Debtor to obtain entry of an order approving the sale of substantially all of its assets.

11.     Even after the Purchaser terminated the Initial APA, the Debtor and the Purchaser continued to negotiate the terms of a potential sale and the Debtor continued to explore other opportunities to sell its assets to other interested parties.  Following extensive negotiations, the Debtor and the Purchaser were able to reach an agreement as to the terms and conditions of such sale, as set forth in the Asset Purchase Agreement, a copy of which is attached hereto as Exhibit B.  All negotiations with the Purchaser were conducted at arm's-length and in good faith.

12.     The Debtor, in its sound business judgment, believes that the Asset Purchase Agreement constitutes the best offer for the Debtor's assets and will maximize value for the Debtor's estate.  The Asset Purchase Agreement is on substantially similar terms as the Initial APA filed with the February Sale Motion, and attached hereto as Exhibit C is a blackline showing the differences between the two agreements.

13.     A summary of certain principal terms of the Asset Purchase Agreement is as follows:[2]

| Purchase Price | The total consideration to be paid by the Purchaser in consideration of the sale, transfer and assignment of the Purchased Assets is $3,500,000 in cash (the "Purchase Price") plus the assumption by the Purchaser of the Assumed Liabilities, including certain secured liabilities in the aggregate amount of $1,688,000 relating to SJ30 aircraft serial no. 012.  The Purchase Price shall be paid at Closing to the Debtor by wire transfer of immediately available funds to an account designated in writing by the Debtor to the Purchaser. |
|---|---|
| Closing Date | The completion of the transactions contemplated by the Asset Purchase Agreement (the "Closing") shall take place within one business day after the date of entry of an order approving the sale of the Purchased Assets to the Purchaser, provided that all of the conditions precedent to Closing set forth in Article V of the Asset Purchase Agreement (other than conditions to be satisfied at the Closing) have been satisfied or, if permissible, waived by the Debtor and/or the Purchaser (as applicable) (the day on which the Closing takes place being the "Closing Date"). |
| Purchased Assets | The assets being purchased from the Debtor include, among other things, the Debtor's right, title, and interest as of the |

---

[2]    This summary contains a description of only certain principal terms of the Asset Purchase Agreement.  The Asset Purchase Agreement itself should be consulted for a full description of the terms thereof.  To the extent that there are any inconsistencies between the terms set forth herein and in the actual terms set forth in the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.  Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Asset Purchase Agreement.

| | Closing Date in and to all properties, assets, goodwill and business of every kind and description and wherever located, whether tangible or intangible, real, personal or mixed, directly or indirectly owned by the Debtor or to which the Debtor is directly or indirectly entitled, and in any case, belonging to or used or intended to be used in the Business (other than the Excluded Assets) (the "<u>Purchased Assets</u>"), including in certain equipment and personal property leases and executory contracts, furniture, fixtures, equipment, machinery, other tangible personal property, intangible personal property, certain aircraft and aircraft engines, vehicles, accounts receivable, certain claims and causes of action, licenses, permits, and books and records. |
|---|---|
| Excluded Assets | Excluded assets include, among other things, cash and cash equivalents, real property interests and real property leases, certain customer orders, avoidance actions and all other claims or actions the Debtor may have against any of its officers, directors, shareholders or creditors, the Debtor's rights in connection with a certain arbitration proceeding between the Debtor and certain current and former shareholders, privileged communications or information about employees, and executory contracts and unexpired leases that are not assumed and assigned to the Purchaser. The assets of the Debtor in which Liebherr International Deutschland GmbH has a security interest under and pursuant to the Liebherr Purchase Agreement (as defined in the Asset Purchase Agreement) are also excluded from the sale. |
| Assumed Liabilities | The Purchaser shall, effective as of the Closing Date, assume those liabilities arising from executory contracts and unexpired leases assigned to the Purchaser, including certain secured liabilities in the aggregate amount of $1,688,000 relating to SJ30 aircraft serial no. 012, or from the ownership of the Purchased Assets, in each case, first accruing from and after the Closing Date. |
| Excluded Liabilities | The Purchaser shall not assume or be deemed to have assumed any liabilities of the Debtor other than the Assumed Liabilities. |
| Assumption and Assignment of Contracts | At the Closing, the Debtor shall assign to the Purchaser each of the executory contracts and unexpired leases (the "<u>Assigned Contracts</u>") listed in the Assigned Contracts Schedules attached to the Asset Purchase Agreement. |

| | |
|---|---|
| Representations, Warranties, and Covenants | The Asset Purchase Agreement contains usual and customary representations, warranties, and covenants for similar bankruptcy section 363 sale transactions, including representations and warranties by the Purchaser that it has sufficient funds to consummate the transactions contemplated by the Asset Purchase Agreement on the terms set forth in the Asset Purchase Agreement and that on the Closing Date, it will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts. |
| Removal of Purchased Assets from Removal Locations | The Purchaser shall require a period of up to one hundred twenty (120) days following the Closing Date (such period referred to as the "Removal Period") to assemble Purchased Assets located at the leased real property described on Schedule 4.08 to the Asset Purchase Agreement (the "Removal Locations") and to remove such Purchased Assets from the Removal Locations.  As a condition to the Purchaser's obligation to close, in addition to the conditions set forth in Article V of the Asset Purchase Agreement, the Debtor shall deliver to the Purchaser, at or prior to the Closing, written consents from each landlord of the Removal Locations, which consents shall be in form and substance reasonably satisfactory to the Purchaser, granting the Purchaser and its employees, agents, contractors and representatives the right to enter upon, use and occupy such Removal Location solely for the purpose of assembling and removing Purchased Assets from such Removal Location, without any liability to such landlord therefor, other than for damages caused by the Purchaser or any of its employees, agents, contractors and representatives resulting from such entry and removal.  Each such consent shall further confirm that the Purchaser shall have no liability to such landlord for any rent, charges or other obligations under the real property lease or other rental agreement governing such Removal Location.  Notwithstanding anything in the Asset Purchase Agreement to the contrary, Purchaser shall be responsible for the payment of any and all costs associated with the removal by Purchaser or any of its employees, agents, contractors and representatives of the Purchased Assets from the Removal Locations, including, but not limited to, costs associated with the repair of physical damage to the Removal Locations caused by Purchaser's removal of Purchased Assets.  Purchaser shall indemnify, defend, protect, and save and hold the Debtor harmless from and against any and all claims or demands asserted by any Person in |

| | connection with damage caused by Purchaser during the removal of the Purchased Assets. In consideration for such access to the Removal Locations, and on the condition that such access is not interrupted or impaired in any way on account of the Debtor's actions or inaction, the Purchaser shall pay to the Debtor, weekly in advance during the Removal Period, the per diem amount set forth on Schedule 4.08 to the Asset Purchase Agreement with respect to each Removal Location commencing on the Closing Date and terminating upon the date (each, a "Removal Termination Date") that is the earlier of (i) seven (7) days after the date that the Purchaser delivers notice to the Debtor confirming that the Purchaser has completed its removal of Purchased Assets from such Removal Location and is no longer using or occupying such Removal Location, and (ii) the expiration of the Removal Period. The per diem amount set forth on Schedule 4.08 to the Asset Purchase Agreement includes all rent and any and all other charges, expenses and obligations payable under the Removal Location Leases, and, without limitation, taxes, utility charges, insurance and common area maintenance charges. The Purchaser shall not be responsible for any obligations on account of the Removal Location Leases during the Removal Period other than the per diem amount set forth on Schedule 4.08 to the Asset Purchase Agreement. |
|---|---|
| As Is, Where Is | Purchaser is accepting the Purchased Assets at the Closing "as is, where is, and with all faults," and, except as otherwise expressly provided in the Asset Purchase Agreement, the Debtor is making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets. |

## JURISDICTION

14.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. sections 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. section 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. sections 1408 and 1409. The statutory predicates for the relief requested in this Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9006, and Local Rule 6004-1.

**RELIEF REQUESTED**

15.     By this Motion, the Debtor requests entry of an order, substantially in the form attached hereto as Exhibit A (the "Sale Order"):

     (i)    authorizing and approving the sale of substantially all of the Debtor's assets free and clear of all liens, claims, encumbrances and other interests;

     (ii)    authorizing the Debtor to enter into the Asset Purchase Agreement regarding the sale of substantially all of the Debtor's assets free and clear of all liens, claims, encumbrances and other interests;

     (iii)    authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases in connection with the sale of the Purchased Assets; and

     (iv)    granting certain related relief.

**BASIS FOR RELIEF REQUESTED**

**I.     A Sale of the Purchased Assets Under Section 363 of the
Bankruptcy Code is Warranted and Should be Approved**

16.     Ample justification exists for approval of the proposed sale of the Purchased Assets to the Purchaser.  Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In addition, section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

17.     The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the debtor.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines, Inc., Case No. 01-00056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

18.     Courts typically consider the following factors in determining whether to approve a sale under section 363 of the Bankruptcy Code:  (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith.  See In re Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., Case No. 97-1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

19.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See, e.g., In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).  In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand."); In re Integrated Res., Inc., 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

20.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), Case No. 89-C-593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

21. The Debtor submits that the proposed sale of the Purchased Assets is within its sound business judgment. The Debtor, with the assistance of its advisors, has considered all available alternatives and determined that the sale of the Purchased Assets pursuant to the Asset Purchase Agreement will maximize value and is in the best interests of the Debtor's estate, its creditors, and all other parties in interest. The Debtor, in its sound business judgment, believes that greater value will be realized for the estate and creditors through the sale pursuant to the Asset Purchase Agreement than would be realized through a piecemeal liquidation of its assets. If an Event of Default occurs under the DIP Credit Agreement and the Lenders are permitted to exercise the consulting and marketing services set forth in the DIP Credit Agreement, the Lenders will be entitled to substantial fees from the liquidation of the Purchased Assets. Specifically, the Lenders will be entitled to a commission equal to 10% of the gross sale proceeds from the sale of the Purchased Assets, plus an additional premium of 13.5% for onsite

bidders and 16% for online bidders for any of the Purchased Assets that are auctioned or sold by the Lenders.

22.     The Debtor and its advisors have thoroughly marketed the Purchased Assets for sale and negotiated extensively with several interested parties.  The offer submitted by the Purchaser is the best offer received for the Debtor's assets and will maximize value for the estate.  The sale is a valid exercise of the Debtor's business judgment and is in the best interest of the estate, creditors, and all parties in interest.  Accordingly, the Debtor respectfully requests that the sale of the Purchased Assets pursuant to the Asset Purchase Agreement be approved.

**II.     The Sale of the Purchased Assets Should Be Free and
Clear of Liens, Claims, and Encumbrances**

23.     The Debtor submits that the sale of the Purchased Assets should be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances attaching to the proceeds of such sale.

24.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

25.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

26.     Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of liens and interests. See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988)); In re Dundee Equity Corp., Case No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

27.     The Debtor submits that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Purchased Assets. In particular, section 363(f)(2) will be met in connection with the transactions proposed because each of the parties holding liens, claims or encumbrances on the Purchased Assets will consent, or absent any objection to this motion, will be deemed to have consented, to the sale. Further, any such lien, claim or encumbrance will be adequately protected by attachment to the net proceeds of the sale or as otherwise specifically set forth in the Sale Order, subject to any claims and defenses the Debtor may possess with respect thereto. See In re Trans World Airlines, Inc.,

322 F.3d 283, 290–92 (3d Cir. 2003) (holding that section 363(f) permits sales free and clear of interests and liens on property, with such claims and liens relegated to the proceeds of the sale); Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp., 884 F.2d 80, 83 (3d Cir. 1989) ("Where liens are attached as of the date of the stay, the trustee has the power to sell property free and clear of the liens by taking the liens out of the proceeds of the sale."); In re Aneco Elec. Const., Inc., 377 B.R. 338, 343 (Bankr. M.D. Fla. 2006) ("The commonly accepted method for adequate [sic] protecting a secured creditor when a sale is authorized under § 363(f) is to order the liens to attach to the proceeds of the sale.") (quoting In re Collins, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995)).

28.     Accordingly, the Debtor requests that the Purchased Assets be sold and transferred free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

### III.     The Purchaser Should Be Afforded All Protections Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser

29.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

30.     The Debtor submits, and will present evidence at the hearing on this Motion (the "Sale Hearing"), if necessary, that the Asset Purchase Agreement was the product of

arm's-length, good-faith negotiations between the Debtor and the Purchaser. Accordingly, the Debtor requests that the Court make a finding at the Sale Hearing and in the Sale Order that the Purchaser has purchased the Purchased Assets in good faith and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

## IV.    Removal of the Purchased Assets from the Leased Premises

31.     Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Following the sale of the Purchased Assets, the Purchaser will require access to leased real property locations in order to remove any Purchased Assets therefrom.

32.     Accordingly, the Debtor and the landlords under the West Virginia Lease (as defined in the Asset Purchase Agreement) and leases with respect to the real property located in San Antonio, Texas (the "San Antonio Leases") should be authorized and directed, notwithstanding anything to the contrary that may be contained in such leases, to allow the Purchaser to enter upon and use all leased real property, including all buildings and other structures, facilities or improvements located on the real property, that is the subject of the West Virginia and San Antonio Leases for the purpose of allowing the Purchaser to assemble and remove any Purchased Assets from such locations, without any liability to the landlord therefore, other than damages caused by the Purchaser or any of its employees, agents, contractors and representatives resulting from such entry and removal, all as more fully set forth in the Asset Purchase Agreement.

33.     The Debtor respectfully requests that the Court grant such relief as is necessary to ensure that the Purchaser is allowed access to all locations where the Purchased Assets are located in order to remove such Purchased Assets purchased from the Debtor.

## V.    Assumption and Assignment of Executory
        ## Contracts and Unexpired Leases Should Be Approved

### A.    Assumption and Assignment Based on Debtor's Business Judgment

34.    As stated above, to facilitate and effect the sale of its assets, the Debtor also seeks

authority to assume and assign the Assigned Contracts to the Purchaser.

35.    Section 365(a) and (b) of the Bankruptcy Code authorizes debtors in possession to

assume executory contracts or unexpired leases subject to the Court's approval, and requires

such debtors in possession to satisfy certain requirements at the time of assumption.    Under

section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or

reject any executory contract or unexpired lease of the debtor."    11 U.S.C. § 365(a).

Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an

unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume such
> contract or lease unless, at the time of assumption of such contract
> or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee
> will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the
> trustee will promptly compensate, a party other than the
> debtor to such contract or lease, for any actual pecuniary loss
> to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance
> under such contract or lease.

11 U.S.C. § 365(b)(1).

36.    The standard that is applied by the Third Circuit in determining whether an

executory contract or unexpired lease should be assumed is the debtor's "business judgment"

that the assumption is in its economic best interests.  See Sharon Steel Corp. v. National Fuel

Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); In re III Enterprises, Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

37.     It is well established that the court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its "business judgment." See In re Decora Industries, Inc., Case No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard."); see also Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).

38.     To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate."). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." In re Network Access Solutions, Corp., 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.),

293 B.R. 124, 126 (D. Del. 2003); <u>Lubrizol Enters. v. Richmond Metal Finishers</u>, 756 F.2d 1043, 1047 (4th Cir. 1985).

39.     In the present case, the Debtor's assumption and assignment of the Assigned Contracts to the Purchaser meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.   The assumption and assignment of the Assigned Contracts is necessary for the Purchaser to conduct business going forward.   Further, upon consummation of the proposed sale of the Purchased Assets, the Debtor will no longer continue to operate its business and will therefore have no use for the Assigned Contracts.

40.     Consequently, the Debtor requests that the Court authorize the Debtor to assume and assign the Assigned Contracts to the Purchaser.

**B.     Adequate Assurance of Future Performance**

41.     A debtor in possession may assign an executory contract or unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  11 U.S.C. § 365(f)(2).

42.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  <u>EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)</u>, 139 B.R. 585, 592 (S.D.N.Y. 1992); <u>In re Rachels Indus., Inc.</u>, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); <u>see</u> <u>also</u> <u>In re Prime Motor Inns Inc.</u>, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); <u>Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)</u>, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]though no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

43.     Adequate assurance of future performance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

44.     To the extent necessary to satisfy the Court, the Debtor will demonstrate at the Sale Hearing that the Purchaser (i) has assets sufficient to provide adequate assurance of future performance and (ii) is willing and able to perform under the Assigned Contracts from and after the Closing Date.  The Sale Hearing will therefore provide the Court and other interested parties the opportunity, to the extent necessary, to evaluate the ability of the Purchaser to provide adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.  Accordingly, the Debtor should be authorized to assume and assign the Assigned Contracts.

45.     Attached hereto as Exhibit D is a notice (the "Cure Notice") which is being served on the non-Debtor counterparties to such Assigned Contracts.  The Cure Notice includes (i) a description of the Assigned Contract to be assumed, (ii) the name of the counterparty to such Assigned Contract, (iii) the amount, if any, determined by the Debtor to be necessary to be paid to cure any existing default under such Assigned Contract in accordance with sections 365(b) and (f)(2) of the Bankruptcy Code (the "Cure Amount"), (iv) the proposed effective date of the assignment, (v) the identity of the Purchaser, and (vi) the deadline by which any counterparty to such Assigned Contract must object.  The Debtor reserves the right to supplement and modify

the Cure Notice at any time, provided that to the extent that the Debtor adds a Assigned Contract to the Cure Notice or modifies the Cure Amount, the affected party shall receive a separate notice and an opportunity to object to such addition or modification.

46.     Any objection to the assumption and assignment of any Assigned Contract identified on the Cure Notice, including, without limitation, any objection to the Cure Amount set forth on the Cure Notice or to the ability of the Purchaser to provide adequate assurance of future performance under such Assigned Contract, may be raised at any time prior to or at the Sale Hearing.

### C.     Anti-Assignment Provisions Should be Deemed Unenforceable

47.     To facilitate the assumption, assignment and sale of the Assigned Contracts, the Debtor also requests that the Court enter an order providing that any anti-assignment provisions that may be contained in, or otherwise purporting to affect, the Assigned Contracts to be assumed and assigned shall not restrict, limit or prohibit the assumption, assignment and sale of such Assigned Contracts, and that any such provisions are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

48.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease.  See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127 F. 3d 904, 910–11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."), cert. denied, 522 U.S. 1148 (1998).  Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  See, e.g., In

re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (finding that section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

49.    Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.  See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").  Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

50.    Accordingly, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts to the Purchaser and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## VI.    No Consumer Privacy Ombudsman is Necessary

51.    No consumer privacy ombudsman need be appointed under section 363(b)(1) of the Bankruptcy Code because the sale will not involve the transfer of any personally identifiable information in a manner that is not consistent with any privacy policy.  The Debtor maintains a

certain privacy policy governing the use of personally identifiable information collected or submitted through the Debtor's website. In connection with the sale of the Purchased Assets, the Debtor will not be transferring any of information collected through the website to the Purchaser of the Purchased Assets. Instead, the Debtor will send correspondence to those persons that submitted the such information and, in such correspondence, will provide those persons with appropriate contact information for the Purchaser and advise them that they should contact such Purchaser if they wish to continue receiving information regarding the Debtor's products. Therefore, appointment of a consumer privacy ombudsman is not required.

## VII.   Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

52.   Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

53.   The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 at 6004-18 (L. King., 15th rev. ed. 2008). The treatise further provides

that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

54.     As described above, time is clearly of the essence.  The DIP Credit Agreement requires the entry of an order approving a sale of the Purchased Assets by no later than April 6, 2011, and the Debtor lacks the working capital or access to further financing to rehabilitate its operations.  Accordingly, the Debtor requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## RESERVATION OF RIGHTS

55.     The Debtor expressly reserves the right to amend, modify, and/or supplement the relief requested in this Motion in all respects prior to or at the applicable hearing and reserves the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

## NOTICE

56.     No trustee, examiner or statutory creditors' committee has been appointed in this chapter 11 case.  Notice of this motion is being provided to (i) the U.S. Trustee, (ii) counsel to the Creditors' Committee, (iii) prepetition secured creditors, (iv) the Lenders and Agent, (v) counsel to the Lenders and Agent, (vi) counsel to the Purchaser, (vii) all counterparties to the Assigned Contracts, (viii) the Internal Revenue Service, (ix) all landlords, owners, and/or operators of premises at which any of the Purchased Assets are located; and (x) all parties having filed requests for notice in this chapter 11 case.  Due to the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## NO PRIOR REQUEST

57.     Except as set forth in the Debtor's prior sale motions (D.I.s 38, 190, and 296), no prior request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed hereto as Exhibit A, granting the relief requested herein and granting such other and further relief as this Court deems just and proper.

Dated: April 5, 2010
       Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Daniel B. Butz
Robert J. Dehney (No. 3578)
Daniel B. Butz (No. 4227)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 18th Flr.
P.O. Box 1347
Wilmington, DE 19899
Telephone: 302.658.9200
Facsimile: 302.425.4673

*Counsel for Debtor and*
*Debtor in Possession*

-and-

Timothy W. Walsh
Daniel G. Egan
DLA PIPER LLP (US)
1251 Avenue of the Americas, 25th Flr.
New York, New York 10020
Telephone: 212.335.4500
Facsimile: 212.335.4501

*Special Counsel for Debtor and*
*Debtor in Possession*