IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| EMIVEST AEROSPACE CORPORATION, | Case No. 10-13391 (MWF) |
| Debtor.[1] |  |

**DECLARATION OF JAMES D. DECKER IN
SUPPORT OF EMERGENCY MOTION OF THE DEBTOR
FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (II) AUTHORIZING THE
DEBTOR TO ENTER INTO ASSET PURCHASE AGREEMENT BETWEEN
PURCHASER AND DEBTOR, (III) AUTHORIZING AND APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF</u>**

I, James D. Decker, declare as follows:

1. I am a Managing Director in the investment banking practice at Morgan Joseph TriArtisan LLC (f/k/a Morgan Joseph LLC) ("<u>Morgan Joseph</u>") and head of Morgan Joseph's Financial Restructuring Group. I submit this declaration in support of Emivest Aerospace Corporation's (the "<u>Debtor</u>") motion (the "<u>Sale Motion</u>") seeking entry of an order (i) authorizing and approving the sale of substantially all of the Debtor's assets free and clear of all liens, claims, encumbrances and other interests, (ii) authorizing the Debtor to enter into an Asset Purchase Agreement (the "<u>Asset Purchase Agreement</u>") by and between the Debtor and

---

[1] The last four digits of the Debtor's federal tax identification number are 8827. The Debtor's mailing address and corporate headquarters is 1770 Skyplace Blvd., San Antonio, TX 78216.

MT, LLC (the "Purchaser"), (iii) authorizing and approving the assumption and assignment of executory contracts and unexpired leases, and (iv) granting certain related relief.[2]

2. Except as otherwise indicated, all facts set forth in my declaration are based upon my: personal knowledge, discussions with other Morgan Joseph professionals, review of the relevant documents, or opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If called upon to testify, I would testify competently regarding the facts described in my declaration.

3. As set forth in more detail below, since its retention in July 2010, Morgan Joseph has helped the Debtor extensively its Debtor's assets for sale. The Debtor, with the assistance of Morgan Joseph, has reached out to over 100 other potential purchasers. Potential purchasers that expressed an interest in acquiring the Debtor's assets were provided due diligence materials regarding the Debtor's business operations and its assets and were given the opportunity to conduct their own due diligence.

4. Following extensive negotiations, the Debtor and the Purchaser have reached an agreement that provides for the sale of substantially all of the Debtor's assets for, among other things, a cash purchase price of $3,500,000 (the "Purchase Price"), and the assumption by the Purchaser of certain assumed liabilities. The Asset Purchase Agreement constitutes the highest and best offer received for the Debtor's assets and allows the Debtor to avoid the piecemeal liquidation of its estate. Entry into the Asset Purchase Agreement is in the best interests of the Debtor's estate, its creditors and all parties in interest.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

## BACKGROUND AND QUALIFICATIONS

5. My education includes a bachelor's degree in economics and geology from Vanderbilt University and a masters degree in business administration, with a concentration in finance, from The Wharton School of Business at the University of Pennsylvania. I am a licensed FINRA General Securities Registered Representative (Series 7, 24, 63) and a Certified Insolvency and Restructuring Advisor (CIRA). I am a member of the Turnaround Management Association (TMA) and the American Bankruptcy Institute (ABI), where I have served as co-Chair of the Investment Banking Committee and co-Chair of the Southeastern Bankruptcy Workshop. Additionally, I am a Fellow in The American College of Bankruptcy and a member of the Board of Directors of the Association of Insolvency and Restructuring Advisors (AIRA).

6. I have over twenty (20) years of investment banking and financial restructuring experience, and have completed a variety of transactions including restructurings, reorganizations, exclusive sale assignments, acquisitions, divestitures, debt and equity financing, management buyouts, leveraged buyouts, recapitalizations, valuations and fairness opinions.

7. During my career, I have completed in excess of 150 transactions across a variety of industries and situations. Some of my notable client transactions include: Tropicana Entertainment, LLC; Black Gaming, LLC; Dixie Pellets, LLC; James River Coal Company; Murray Energy Corporation; GEO Specialty Chemicals, Inc.; Pen Holdings, Inc.; Friede Goldman Halter, Inc.; and Vista Eyecare, Inc.

8. Morgan Joseph is a nationally recognized, full service investment banking firm whose primary focus is on providing financial advisory and capital raising services in the U.S., Asia and Europe. Morgan Joseph's Financial Restructuring Group has extensive restructuring and transactional experience in many industries.

9. Prior to joining Morgan Joseph, I was a Managing Director with Alvarez & Marsal and served as co-head of the firm's Corporate Finance Group. Prior to that, I was a Managing Director with Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), where I served as co-head of the firm's Atlanta office and was responsible for new client development, engagement management and with Houlihan Lokey's personnel development for its Restructuring and Corporate Finance practices. Previously, I founded and served as president of Inverness Partners Incorporated ("Inverness"), a boutique mergers and acquisitions firm that was acquired by Houlihan Lokey in July of 1999. Before Inverness, I was a Director with the Mergers and Acquisitions department of SunTrust Capital Markets, Inc. I began my career as an investment banker in the Corporate Finance department of Bear, Stearns & Co., Inc.

## BACKGROUND

10. The Debtor is a U.S. based aircraft manufacturing company that produces business jets, including the SJ30, the world's fastest, highest flying and longest range, light business jet. The Debtor retails aircraft directly to individuals through a combination of its own sales force and its three distributors, located in the US, UK and Germany. Over the course of its operations, the Debtor has built up an extensive customer order book and currently has a five-year order backlog. However, since commencing commercial production in late 2005, the Debtor has suffered from a lack of sufficient working capital resources to fund materials necessary in the production process. Further, the global economic downturn, which severely hit the business aviation industry, reduced the demand for business jets and resulted in increased liquidity constraints which impacted the Debtor's ability to service its outstanding debt obligations.

11. In July 2010, the Debtor retained Morgan Joseph as its investment banker and financial advisor. Prior to filing this chapter 11 case, the Debtor, with the assistance of Morgan Joseph, pursued a range of options to address its liquidity concerns, including new financing, refinancing and the sale of certain or all of the Debtor's assets or its business. The Debtor ultimately determined that a chapter 11 filing was necessary and that the value of its estate would be best maximized and preserved through a sale of its assets pursuant to section 363 of the Bankruptcy Code.

12. The Debtor, with the assistance of Morgan Joseph, extensively negotiated with a number of institutions regarding postpetition financing, and determined that the proposal advanced by Counsel RB Capital, LLC ("Counsel RB") and EAI Capital, LLC ("EAI") was the best available under the circumstances and would maintain the going concern value of the Debtor's business pending a sale of the company. Accordingly, the Debtor, Counsel RB, as agent (the "Agent"), and Counsel RB and EAI, as lenders (together, the "Lenders"), entered into that certain Debtor-in-Possession Credit and Security Agreement (as amended, the "DIP Credit Agreement"), which provided the Debtor with postpetition financing of up to $4 million.

13. Pursuant to the terms of the DIP Credit Agreement, the Debtor is required to achieve certain milestones in accordance with a sale transaction schedule as set forth therein. These milestones include (i) obtaining entry of an order approving a sale of all or substantially all of the Debtor's assets on or before April 6, 2011, and (ii) consummating a sale of all or substantially all of the Debtor's assets on or before April 7, 2011. In addition, the maturity date under the DIP Credit Agreement is April 7, 2011. Failure to comply with this sale transaction schedule constitutes an Event of Default under the DIP Credit Agreement.

## POSTPETITION MARKETING EFFORTS

14. As described in further detail below, Morgan Joseph has actively and extensively marketed the Debtor's assets for sale. Morgan Joseph's marketing efforts have included (i) reaching out to well over one hundred strategic and financial investors regarding the potential purchase of the Debtor's assets, (ii) coordinating with numerous interested parties on a daily basis in response to inquiries concerning the marketing and sale processes, (iii) preparing and managing a virtual data room population with comprehensive information concerning the Debtor's business, assets, and liabilities, (iv) coordinating with the Debtor, the Lenders, the Creditors' Committee, and their respective advisors regarding all relevant matters attendant to the status of the marketing and sale processes, and (v) coordinating due diligence and site visits by interested parties and their respective advisors.

15. Morgan Joseph prepared a comprehensive confidential information memorandum (the "Confidential Information Memorandum") to solicit potential purchasers. Of the 146 potential strategic and financial investors contacted, 136 parties were provided with the Confidential Information Memorandum and 94 entered into further dialog with Morgan Joseph.

16. Over nineteen (19) potential purchasers received access to the virtual data room to facilitate due diligence. Morgan Joseph also created a management presentation and conducted onsite due diligence at the Debtor's facilities in San Antonio, Texas and Martinsburg, West Virginia for various parties.

17. Term sheets were received from eight (8) distinct parties, each of which were evaluated by Morgan Joseph and the Debtor. The Debtor and its advisors engaged in extensive negotiations with one of these parties and its advisors, which resulted in numerous iterations of both terms sheets and asset purchase agreements.

18. On January 14, 2011, the Debtor filed a motion to sell substantially all of its assets to this potential purchaser. Following the filing of this motion, the Debtor and this potential purchaser continued to negotiate the terms of a sale; however, the parties were unable to reach an agreement. Accordingly, this sale motion was withdrawn by the Debtor.

19. During this time, the Debtor continued to explore other opportunities to sell the Debtor's assets to other interested parties. One such interested party, the Purchaser, emerged and submitted an attractive offer for the Debtor's assets. The Debtor and the Purchaser continued to negotiate and ultimately agreed on a stalking horse asset purchase agreement to be filed with the Court.

20. On February 16, 2011, the Debtor filed an emergency motion seeking, among other things, (i) authorization to sell all or substantially all of its assets free and clear of all liens, claims and encumbrances, (ii) approval of certain auction and bid procedures in connection with the sale of substantially all of the Debtor's assets, and (iii) authorization to enter into a stalking horse asset purchase agreement (the "Initial APA") with the Purchaser (the "February Sale Motion"). On February 23, 2011, the Court entered an order approving, among other things, the proposed procedures for bidding at an auction for the sale of the Debtor's assets.

21. Following the filing of the February Sale Motion, and in accordance with the terms of the Initial APA, the Purchaser decided that it would terminate the Initial APA based on its diligence. No qualified bids were received in accordance with the bid procedures and, accordingly, the auction was cancelled by the Debtor. The Debtor and the Lenders negotiated an amendment to the DIP Credit Agreement, which was approved by an order of this Court, establishing a new deadline of April 6, 2011 for the Debtor to obtain entry of an order approving the sale of substantially all of its assets.

22. Even after the Purchaser terminated the Initial APA, the Debtor and the Purchaser continued to negotiate the terms of a potential sale and the Debtor continued to explore other opportunities to sell its assets to other interested parties. Following extensive negotiations, the Debtor and the Purchaser were able to reach an agreement as to the terms and conditions of such sale, as set forth in the Asset Purchase Agreement

23. The Asset Purchase Agreement provides for a purchase price of $3,500,000, together with the assumption by the Purchaser of certain liabilities of the Debtor. The Asset Purchase Agreement is the highest and best offer received for the Purchased Assets (as defined in the Asset Purchase Agreement). It provides for $3,500,000 of consideration from a buyer with the financial wherewithal to complete the proposed transaction and consummate the sale within the time frame required under the DIP Credit Agreement.

## **THE PROPOSED SALE OF THE ASSETS SHOULD BE APPROVED**

24. I believe that the Debtor has thoroughly and fairly marketed the Debtor's assets and conducted the related sale process in good faith. All interested persons and entities have been afforded a full, fair and reasonable opportunity to conduct due diligence and investigations and submit offers for the purchase the Debtor's assets.

25. The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith and from arm's-length bargaining positions. Neither the Debtor nor the Purchaser have engaged in any conduct that would cause or permit the avoidance of the sale or the Asset Purchase Agreement or the imposition of costs or damages under section 363(m) of the Bankruptcy Code.

26. Further, I believe that there are good, sufficient and sound business reasons and compelling circumstances to enter into the Asset Purchase Agreement, sell the Purchased Assets,

and assume and assign the Assigned Contracts (as defined in the Asset Purchase Agreement), and such actions are appropriate and reasonable exercises of the Debtor's business judgment and in the best interest of the Debtor's estate, its creditors, and other parties in interest. Such business reasons include, but are not limited to, the facts that (i) there are substantial risks of deterioration of the value of the Debtor's assets if the sale is not consummated quickly, (ii) the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets, (iii) the consideration provided by the Purchaser for the Purchased Assets pursuant to the Asset Purchase Agreement is fair and reasonable, (iv) no other person or entity or group of persons or entities has offered to purchase the Purchased Assets for greater economic value to the Debtor's estate than the Purchaser, (v) the sale pursuant to the terms of the Asset Purchase Agreement will present the best opportunity to realize the value of the Debtor's assets on a going concern basis and avoid decline and devaluation of the Debtor's business, and (vi) unless the sale is concluded expeditiously as provided for in the Sale Motion and pursuant to the Asset Purchase Agreement, recoveries to creditors would likely be diminished.

27. To maximize the value of the Debtor's assets and preserve the viability of the business to which the assets relate, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Sale Motion and the Asset Purchase Agreement. Time is of the essence in consummating the sale.

28. The Asset Purchase Agreement with the Purchaser provides greater value to the Debtor than the Debtor could receive if it was required to liquidate its assets piecemeal. If the Debtor does not obtain entry of an order approving the Asset Purchase Agreement and authorizing the Debtor to sell its assets pursuant thereto, the Lenders will permitted to exercise the consulting and marketing services set forth in the DIP Credit Agreement, and the Lenders

will be entitled to substantial fees from the liquidation of the Purchased Assets. Specifically, the Lenders will be entitled to a commission equal to 10% of any gross sale proceeds from the sale of the Purchased Assets, plus an additional premium of 13.5% for onsite bidders and 16% for online bidders for any of the Purchased Assets that are auctioned or sold by the Lenders.

29. Given all of the circumstances of this case and the adequacy and fair value of the Purchase Price under the Asset Purchase Agreement, I believe that the sale of the Purchased Assets to the Purchaser is reasonable and approval of the sale and the consummation of the transactions contemplated by the Asset Purchase Agreement is in the best interests of the Debtor's estate, its creditors, and other parties in interest.

Executed this 5th day of April, 2011

                                                 James D. Decker
                                                 Managing Director